**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 07-046 (GK)** |
| | : | |
| **v.** | : | |
| | : | |
| **DEBORAH JEANE PALFREY** | : | |
| *aka* "Jeane Palfrey," | : | |
| *aka* "Julia," | : | |
| *aka* "Pamela Martin," | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**GOVERNMENT'S REPLY TO DEFENDANT'S MEMORANDUM IN
OPPOSITION TO THE MARCH 22, 2007 PROTECTIVE ORDER AND THE
SUPPLEMENTAL PROTECTIVE ORDER ISSUED ON MAY 10, 2007**

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully files this Reply to Defendant's Opposition to the March 22, 2007

Protective Order and the Supplemental Protective Order Issued on May 10, 2007. The United

States respectfully submits that a third hearing is unnecessary. If, however, the Court is inclined

to revisit Defendant's (and her agent's) misconduct, the Government requests that the Court

Order the lawyer who has appeared on Defendant's behalf in the related civil forfeiture case,

Montgomery Blair Sibley, to attend the next hearing, prepared to testify about his involvement in

the matters of public record set forth as background, below.

**BACKGROUND**

1.    Legal proceedings involving Defendant Deborah Jeane Palfrey began in 2006,

when law enforcement officers executed a search warrant at Defendant's home, from where, she

says, she ran her "Adult Fantasy Sex" service for 13 years. See What's Next for 'The D.C.

Madam'?", Web-Exclusive *Newsweek* Interview by Eve Conant, May 15, 2007, available at

<http://www.msnbc.msn.com/id/18664289/site/newsweek/>.  Contemporaneous with their

search of Defendant's home, law enforcement officials executed seizure warrants, and instituted

civil forfeiture proceedings, against property that Defendant had acquired or maintained with

criminal proceeds (and about which the Government was then aware).

2.    During the pendency of the civil forfeiture proceedings, and while Ms. Palfrey

was aware that the Government was investigating her for having engaged in criminal activities,

Ms. Palfrey sent an email to the Government's attorney in the forfeiture proceeding.  Ms. Palfrey

indicated, in her email:

> . . . I simply cannot emphasize to you the terrible and quite
> unnecessary ramifications this case (civil and/or criminal) will set
> off, if permitted to advance for both sides.  The press will have a
> field day at each of our expense.  Despite my aforementioned
> disclaimer not to comment upon my case, let me say this.  The
> attached item rings more true than false when juxtaposed to my
> situation.  . . . I am ferocious fighter when need be.  Knowing my
> intense makeup as I do, far more than even my attorneys
> comprehend at this juncture and my belief in the solidness of my
> case, I can state with unequivocal certainty this situation will be a
> very long and unpleasant one; this despite, the sickening and
> humiliating additional lambasting I expect to receive in the media.
> Please reflect soberly upon my various thoughts, here.  This is all I
> ask. –Sincerely, Jeane Palfrey"  (Emphasis in original).

See 07-cr-46 Docket Entry 13.  Ms. Palfrey posted a copy of the entire e-mail she sent to

Government counsel on a website maintained on her behalf:  <www.deborahjeanepalfrey.com>.

3.    The Government understood Defendant's intent, in sending her e-mail to a

prosecutor, to be to threaten "terrible and quite unnecessary ramifications" for the Government's

witnesses should the Government persist in its effort to enforce criminal laws.  (This

understanding was illuminated by the Government's awareness of Defendant's history in a prior

case with almost identical facts.  The Government was aware that during the course of a

prosecution of Defendant for having acted as the madam for a prostitution-based out-call escort

service in San Diego, California, in the early 1990's, allegations had been made that Defendant

had threatened one or more former employees.)

     4.      On February 21, 2007, in the civil forfeiture case, Mr. Sibley filed a "Motion to

Enjoin Criminal Proceedings Against [Claimant]" because, he said, [t]his case raises questions of

vindication of sexual rights."  See 06-cv-1710, Docket Entry 38, at 3.

     5.      At the same time that Mr. Sibley moved, in the civil case, to stay a criminal

investigation, Mr. Sibley filed, electronically and in the public docket, a "Notice" to depose Dick

Morris in the civil case.  Mr. Sibley filed this notice despite numerous prohibitions against filing

discovery materials, and notwithstanding the lack of any legal basis to compel a non-party's

deposition through such a "notice."  See 06-cv-1710, Docket Entry 39.  Several troubling

inferences can fairly be drawn from Mr. Sibley's decision to name Mr. Morris in an improperly

filed discovery document.  First, Mr. Sibley was likely hoping to wrap himself around the

immunity often afforded to statements made in judicial proceedings.  Second, Mr. Sibley

intended to send a message to those who may have used or worked in the agency, and thereby

participated in "adult fantasy sex", that unless they remained hidden, they should expect the same

fate.  Finally, Mr. Sibley may have wanted to Government to know that, this time, he and

Defendant were intending to see their threat through to fruition.

     6.      The validity of the Government's understanding of Defendant's and Mr. Sibley's

conduct as follow-through on a threat to "out" potential witnesses in this case in order to

intimidate and embarrass them on the basis of their apparent sexual activity, and thereby to

hamstring the Government in its effort to prosecute Defendant, was confirmed in subsequent conversations between Mr. Sibley and the Government's attorneys.

7.      During a meeting held on Saturday, February 24, 2007, Mr. Sibley told prosecutors that if they did not halt the investigation into Ms. Palfrey's criminal activities, and did not also dismiss the civil forfeiture case, Ms. Palfrey would publicly disclose the identities of the users of her escort service.  Mr. Sibley explained to the Government's attorneys that he had a list of all of the telephone calls made between Ms. Palfrey, and her employees and customers, from 1993 to 2006.  Mr. Sibley indicated that Ms. Palfrey would give the phone records to the Government if it dismissed the civil forfeiture case and refrained from instituting any criminal charges against her.  But, Mr. Sibley explained, absent the Government's full retreat, he and his client would take actions that would embarrass individuals caught up in Ms. Palfrey's affairs.

8.      After the Government's attorneys made it clear to Mr. Sibley that they were not amenable to his and his client's attempted extortion, Mr. Sibley wrote a letter addressed to the Attorney General of the United States.  In the letter, dated February 26, 2007, Mr. Sibley asked for a Special Prosecutor to be appointed to investigate his client's "legal sexual activities."  In the letter, Mr. Sibley reiterated that Defendant's "adult fantasy escort business . . . had over Ten Thousand (10,000) customers [and] those customers necessarily included present and former employees of the Department.  Moreover . . . the telephone records of every single call that came into and went out of the business have been preserved."  Mr. Sibley also explained, in his letter, that "[a] simply [sic] reverse-telephone number look-up – we are using 'ussearch.com" – permits the identification of the owner of a telephone number."  See Exhibit 1 at 1.

9.      On March 1, 2007, within days of  Mr. Sibley's threat to disclose the identities of

the users of the escort service if the criminal investigation did not cease, a federal grand jury for

this District returned a multi-count Indictment charging Defendant Palfrey with a number of

felony offenses, including violations of 18 U.S.C. § 1962(c) (Racketeer Influenced and Corrupt

Organizations (RICO)); 18 U.S.C. § 1952(a)(3) (Travel in Interstate Commerce in Aid of

Racketeering Enterprises); and 18 U.S.C. § 1952(h) (Conspiracy to Commit Money Laundering).

The Indictment also included two criminal forfeiture allegations, invoking 18 U.S.C. §§

982(a)(1) & 1963.  This criminal case was calendared as Criminal Number 07-0046, assigned to

the Honorable Gladys Kessler, and set for an arraignment on March 9, 2007.

     10.     The day after the Defendant was indicted, numerous press reports quoted her and

her lawyer as saying that she intended to sell 46 pounds of phone records to the highest bidder

because she needed to secure funds to retain a criminal defense attorney.

     11.     After the Indictment was returned, Government counsel sent Mr. Sibley a copy of

Ms. Palfrey's Indictment, and a letter dated March 5, 2007.  In the Government's letter to Mr.

Sibley, we reminded Mr. Sibley that the Indictment provided additional notice to him that the

Government was seeking forfeiture of <u>all property interests Ms. Palfrey acquired through her</u>

<u>operation of the unlawful enterprise articulated in the Indictment, and all assets traceable thereto</u>.

This broad forfeiture would, obviously, include proceeds traceable to any sale of Defendant's

customer (or client) list.  In other words, we explained, there was no legal basis for Mr. Sibley (or

any other attorney) to accept as fees funds generated from the post-indictment sale of

Defendant's business's assets.  While some might believe Mr. Sibley's and his client's

insinuation – that the procuring of legal fees was the true purpose behind his threat to sell

Defendant's "customer list" – Mr. Sibley and his client had threatened to take action that they

know would embarrass witnesses weeks before they crafted the story that this case was too complex for the seasoned criminal counsel, A.J. Kramer,  who already represented Defendant (and plainly disagreed with her civil attorney's tactics).

12.     When the Court set the time for defendant's arraignment, the Government requested the Court also to schedule a status hearing in the related Civil Forfeiture case for that same day.  Prior to making its request, the Government sought and obtained consent from claimant's counsel for the requested status hearing.  The Government wanted Mr. Sibley to appear before the Court so that the Court could address the motion for a stay of the civil forfeiture case.  As the Court recognized during the March 9, 2007 arraignment, Mr. Sibley still opposed the stay.  But, Mr. Kramer, who was Defendant's criminal defense attorney at that time, did not voice disagreement with the Court's assessment that permitting civil discovery against Defendant would likely compromise his ability to defend her in her criminal defense and, on that same issue, Mr. Sibley had refused to commit to a position.  Meanwhile, neither attorney appeared to rebut the Government's assessment that disposition of the criminal charges, and the criminal forfeiture allegations, would likely proceed much quicker than the civil forfeiture case and might moot the entire civil forfeiture case.  The Court granted the Government's motion for a stay.  See 06-cv-1710, Minute Entry dated March 9, 2007.

13.     Government counsel raised another concern on March 9, 2007.  In response to Mr. Sibley's effort to embarrass Mr. Morris and to signal to others Defendant's apparent intentions, the Government asked the Court to remind claimant's counsel that the local rules prohibit discovery filings.  The Court did not disagree with the Government's suggestion that the lawyer representing Defendant (as a claimant) in the civil forfeiture proceeding appeared to be using

civil discovery submissions to cast dispersions, publicly, on individuals who may (or may not) have used the escort service.  Mr. Sibley represented to the Court that he knew his electronic filing of the Morris Deposition Notice was in error.  Mr. Sibley's excuse was that he had tapped the wrong keyboard key.

14.     On March 9, 2007, the very day that this Court stayed the civil forfeiture case, Mr. Sibley filed another civil lawsuit, purportedly against some of his client's former employees.  See Palfrey v. Neble, et al., Civil Action No. 1:07-cv-0461 (GK).  In the lawsuit, which Mr. Sibley apparently authored, Defendant publicly identified Ms. Neble as a former employee and maintained that Ms. Neble had, unbeknownst to Defendant, "engaged in illegal sexual activities with customers of the escort service."  See Complaint at 1.  Defendant claimed entitlement to damages against Ms. Neble and, presumably, against other yet to be identified former employees who might testify, or have testified, that they engaged in prostitution, because, according to Defendant, she faced criminal charges as a result of these others' violations of employment contracts they allegedly had with Defendant.  (As was the case with the Morris deposition notice, it is not clear that Mr. Sibley ever properly served either person he was "outing."  Instead, a public embarrassment of these individuals appears to have been each document's purpose.  This lawsuit too, appeared on Defendant's website the same day it was filed.)

15.     On March 14, 2007, the Government filed, ex parte, its "Application for Temporary Restraining Orders, and a Protective Order, and Request for a Hearing.  See Docket Entry 13.  In the Government's Application, which the Court unsealed during the first hearing the Court held on the matter, at the Government's request, on March 19, 2007, the Government requested two forms of relief.  First, the Government requested that the Defendant and her agents

(meaning, primarily, the lawyer who appeared to represent Defendant (as a claimant) in the civil forfeiture case) be ordered to stop acting to harass Paula Neble and any others who Defendant (and her agents) had identified as potential witnesses in the Government's prosecution of Defendant. Second, the Government requested that the Defendant (and her agents) be restrained from dissipating assets subject to criminal forfeiture.

16.    The Restraint against witness intimidation and harassment, at that time directed toward Ms. Neble, was made pursuant to 18 U.S.C. §§ 1512 and 1514. As the Government explained in its Application, section 1514(b)(1) requires a court to issue a protective order prohibiting harassment of a victim or witness in a Federal criminal case if the court, after a hearing, finds by a preponderance of the evidence that harassment of an identified victim or witness in a Federal criminal case exists or that such order is necessary to prevent and restrain an offense under section 1512 [of Title 18.]" See 07-cr-046, Docket Entry 13.

17.    The request for a post-indictment restraint against dissipation of forfeitable property was made under the authority of 18 U.S.C. §§ 1963(d)(1) and 982(b)(1) and 21 U.S.C. § 853(e)(1)(A). As the Government explained in its Application for an order restraining all of the criminally forfeitable property, where an indictment has been returned, a pre-restraint hearing is not required before a court may issue an Order restraining assets subject to criminal forfeiture. United States v. Musson, 802 F.2d 384, 386-87 (10th Cir. 1986). In post-indictment cases, a grand jury's return of the indictment against a defendant establishes probable cause that the charged offenses were committed. United States v. Jones, 160 F.3d 641, 648 (10th Cir. 1998); In re Billman, 915 F.2d at 919. As noted in the legislative history of the Comprehensive Crime Control Act of 1984,

> For the purposes of issuing a [forfeiture] restraining order, the
> probable cause established in the indictment or information is to be
> determinative of any issue regarding the merits of the government's
> case on which the forfeiture is to be based.

S. Rep. No. 225, 98th Cong., 2d Sess. 203 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3386.

See also 21 U.S.C. § 853(e)(1), incorporated by 18 U.S.C. § 982(b)(1).

18.    On March 16, 2007, the Court issued an Order granting the Government's *ex parte* Application for a Temporary Restraining Order, Protective Order and Request for Hearing." See 07-cr-046, Docket Entry 12.

19.    The Government's application identified numerous activities that Mr. Sibley and the Defendant had engaged in for no apparent legal reason, and also highlighted several events in Mr. Sibley's past tending to establish that such witness harassment was his *modus operandi*.  See 07-cr-046, Docket Entry 13.  (The Government will not revisit each example of Mr. Sibley's apparent witness intimidation and harassment here, but refers the Court to the Application it filed in March 2007.  But, between the statements made by Defendant and Mr. Sibley and reported in the media, including reports from the Internet, radio, television, and print media outlets, and court filings that Defendant and Mr. Sibley have lodged against potential witnesses, there is no shortage of support for the Government's, and the Court's, concerns about witness intimidation and harassment.)

20.    On March 19, 2007, the Court held a hearing on the Government's Application for a Protective Order directed to defendant and her agents, and seeking to prohibit them from engaging in further witness intimidation and harassment.  The Government's Application papers, already on file, were unsealed and a copy was shared with Mr. Kramer.  The Application papers

cited to matters of public record and to published statements from Defendant and Mr. Sibley that demonstrated the basis for the Government's request.  In addition to its written submission, Government counsel also explained, at a bench conference with Mr. Kramer, its perception of Mr. Sibley's threat on February 24, 2007, to "out" and embarrass witnesses to the activities of the escort service if the Government did not go away.  At Mr. Kramer's request, the Court continued the hearing on the Government's request for a protective order until March 22, 2007.

21.     On March 22, 2007, with no objection from Mr. Kramer, the Court granted the Government's request for a Protective Order "after determining that there were 'reasonable grounds to believe that harassment of an identified witness exists or that such an order is necessary to prevent such harassment.'"  See March 22, 2007 Order at 1; May 10, 2007 Order at 1.

22.     On March 22, the Court also revised the post-indictment asset restraint order (again without objection), in order that, consistent with the request the Government made in its March 15, 2007 Application, the Temporary (i.e., extending to the end of the criminal case) Asset Restraint Order not only tracked the forfeiture language in the Indictment, but also specifically included the business records identified by Mr. Sibley and his client as the sole business asset still in her possession.  See 07-cr-046, Docket Entry 18.

23.     Although the Government, and presumably the Court, though the intent of the March 22, 2007 Orders was clear, Mr. Sibley said he was still confused.  On March 27, 2007, he filed a document he termed a "Motion to Clarify and for Limited Appearance."  See Docket 19. In his Motion to Clarify, Mr. Sibley explained that he may have custody of some of the property subject to the Post-Indictment Restraining Order, including "(i) the original telephone records of

the escort service, (ii) copies of newsletters of the escort service and (iii) copies of advertising images used by the escort service." <u>See</u> Motion to Clarify at 1, n1.   Mr. Sibley also indicated that he was not sure what the Court meant when it entered an Order precluding him and his client from "selling, transferring, assigning, pledging, distributing, encumbering, wasting, secreting, depreciating, damaging, or in any way diminishing the value of" the property at issue in the Order. <u>Id.</u>

24.    By Order dated April 11, 2007, the Court denied Mr. Sibley's effort to obtain, through a Motion to Clarify, permission to expand his distribution of forfeitable property in his possession, including telephone records. <u>See</u> Docket Entry 27.

25.    Stuck with the March 22, 2007 Order prohibiting his release of the phone records, Mr. Sibley returned to a favorite old strategy:  he renewed his effort to slander others by identifying them, gratuitously in court filings, as having associated with Defendant's so-called fantasy sex operation.  Mr. Sibley's next such outing effort was disguised as a "Motion for Reconsideration of Appointment of Counsel."  In this motion, which Mr. Sibley filed on April 11, 2007, Mr. Sibley wrote a pleading, styled as *pro se*, in which he and Defendant gratuitously wrote that "this is not an ordinary case [because] one of the regular customers of this service was Harlan K. Ullman [and] Mr. Ullman is only one of dozens of such officials who will be identified during the course of my defense." <u>See</u> 07-cr-046, Docket Entry 28 at 1-2.  Mr. Sibley filed this "outing" electronically, on the public docket, without redacting any personally identifiable information.  The unredacted document also was put on Defendant's website – where, as of this filing, it remains.

26.    The Court held a previously scheduled status hearing on Tuesday, April 12, 2007.

Neither Mr. Sibley, nor Defendant, attended.  In addition to a discussion of the apparent conflict

between Mr. Kramer and his client, and the need for defendant to be present for the conflict

matter to be properly addressed, the Court asked the Government whether it viewed the

document Mr. Sibley had filed on Monday, outing another potential witness, as a violation of the

Court's Protective Order.  Government counsel suggested that Mr. Sibley might contend he was

confused.

       27.     But then, on Sunday May 6, 2007, Mr. Sibley wrote another letter addressed to the

Attorney General of the United States.  In the May 6, 2007 letter, Mr. Sibley acknowledged that

Defendant had previously distributed "approximately 20% of the telephone records of the escort

service . . to Brian Ross of *ABC News*."  Then, despite the Court's Restraining Order, and its

denial of his Motion for Clarification, Mr. Sibley threatened that, unless the Attorney General

agreed by May 11, 2007 to relieve the AUSAs currently prosecuting this case, appoint a Special

Counsel, and engage in settlement negotiations, Defendant would distribute copies of telephone

records to organizations and individuals with "'standards and practices' . . . decidedly different

[from the] professional standards . . . of *ABC News*."  With this letter attached as our evidence of

the Defendant's intent to violate the Court's existing Order, we asked the Court to make its prior

Order perfectly clear to Mr. Sibley and to the client he said he had been advising.  See Exhibit 2.

On May 10, 2007, the Court did just that.  See 07-cr-046, Docket Entry 41.

## ARGUMENT

       Defendant's nine-page Opposition consists largely of an attack on the Government, and

inferentially the Court, for being concerned with, what Defendant terms, the "emotional distress"

of "apparently fragile potential witnesses[.]"  Defendant writes that the "persons who voluntarily

provided, purchased or sought the services of the business . . . should have . . . contemplated" what they were doing "prior to involving themselves with Pamela Martin & Associates." Opposition at 5.  Consistent with statements made by Mr. Sibley and the Defendant, Defendant's recent Memorandum in Opposition maintains that Defendant's public effort to "out" her customers "is not illegal not unethical and, indeed, has resulted in the beneficial identification of at least one witness who denies having engaged in any illegal activities."  Opposition at 5-6.  But, as was true in United States v. Lewis, 411 F.3d 838 (7th Cir. 2995), conduct that Defendant initiated, on her own or in concert with Mr. Sibley, to "out" employees and customers of a her "Adult Fantasy Sex" operation, whether through vexatious litigation or other means, and thereafter to blame the Government for the embarrassment witnesses in this case (given its nature) have suffered, is nothing but "a veiled attempt to discourage [a witness's] participation in the government's criminal case."  Lewis, 411 F.3d at 843.  Defendant's assertion that she has merely been looking for defense witnesses is belied by more than just by Mr. Sibley's assertion (in his first letter to the Attorney General) that he could successfully use a simple web-based product to research phone numbers.  Recently, a former customer was identified by the media after Defendant provided some of her phone records to the media.  That customer indicated, publicly, that he did not pay Defendant's employees for sex – only for massages.  Defendant faulted him for not coming forward earlier, and then she called him a liar.  According to Defendant, "we never offered massage services."  See "What's Next for 'The D.C. Madam'?", Newsweek Web-Exclusive Interview, supra.

     Defendant's new criminal counsel lodges a protest to both the existing Protective Order and the Government's proposal for issuance of a Privacy Act Protective Order.  As to the latter,

buried in footnote 2, Defendant's criminal counsel wrote that his client has decided to "decline[]

to agree" to a Privacy Act Protective Order because it "unduly restricts her ability to use her own

records for not only this matter but any other appropriate use she may identify. But, on the same

day this Opposition is being filed, it appears that Defendant's complaint that she should be

permitted to use the discovery she obtains from the Government for "any other appropriate use

she may identify" has been rendered moot, at least for a time, by Defendant's agreement finally,

through her new criminal counsel, to a Privacy Act Protective Order similar to the one the

Government initially proposed on March 5, 2007.

     Thus, the Government understands that what remains to be addressed in Defendant's

latest Opposition is an apparently legitimate complaint that the existing "protective orders, as

written, improperly restrain [criminal defense] counsel from confronting potential witnesses or

their counsel with key documents."  Defendant's Opposition at 7.  Unfortunately, such a broad

restraint against Defendant and her agents, at least when she appeared to be acting, invariably, in

concert with Mr. Sibley and no qualified criminal attorney, plainly was warranted.  But, the

Government has never intended to have the Court preclude Defendant's criminal counsel from

confronting potential witnesses or their counsel with key documents.  Consistent with the

recently issued Privacy Act Protective Order, the Government has no objection to the Court

making it clear to the Defendant's criminal counsel that criminal counsel may be provided with

and may provide to those employed by criminal counsel as experts and investigators, copies of

phone records.[1]

---

[1] As the Court and both Defendant's prior and current criminal defense attorneys know, L.Cr.R.
57.7(b), "Conduct of Attorneys in Criminal Cases", provides that lawyers "associated with the
prosecution or defense shall not release or authorize the release of any extrajudicial statement

WHEREFORE, the United States respectfully requests that this Court modify the Post-Indictment Asset Restraint Order to make it clear that the Order is not intended to prohibit Defendant's criminal counsel from providing copies of the business's phone records to individuals necessary for the defense, which may include (consistent with the language in the Stipulated Privacy Act Protective Order):

> (1) the Defendant; and (2) her criminal counsel of record; and (3) agents, meaning persons in the employ of Defendant's criminal counsel of record and under criminal counsel's direct supervision. Agents shall include only law firm employees working with criminal counsel of record, expert witnesses retained on behalf of the Defendant, and investigators (who may be employed by criminal counsel or retained by criminal counsel but compensated by the Court). In addition, phone records may be disclosed by the Defendant and her criminal counsel of record to potential witnesses and/or such witnesses' attorneys.

RESPECTFULLY SUBMITTED,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

/s/

By:     _____
DANIEL P. BUTLER
DC Bar # 417718
CATHERINE K. CONNELLY
MA Bar # 649430
WILLIAM R. COWDEN
DC Bar #426301
ASSISTANT UNITED STATES ATTORNEYS
555 Fourth Street, N.W.

---

which a reasonable person would expect to be disseminated by means of public communication, relating to that matter and concerning:. . . (iv) The identity, testimony, or credibility of prospective witnesses … [and] (vi) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case." The attorneys of record in this criminal case have never here demonstrated an inability or unwillingness to comply with the existing applicable rules; thus, there should be no need for further Court intervention.

Washington, DC 20530
(202) 514-7700

# MONTGOMERY BLAIR SIBLEY, CHARTERED

### 50 WEST MONTGOMERY AVENUE
### SUITE B-4
### ROCKVILLE, MARYLAND 20850

| | |
|---|---|
| MONTGOMERY BLAIR SIBLEY | ADMITTED TO PRACTICE: |
| 301-251-5200 | FLORIDA |
| 202-478-0371 (E-FAX) | NEW YORK |
| SIBLEY@CIVILFORFEITURE.COM | DISTRICT OF COLUMBIA |

February 26, 2007

Via FedEx #8581-1680-3504
Alberto Gonzalez, Attorney General
Office of the Attorney General
425 New York Avenue, N.W.
Department of Justice
Washington, D.C. 20530-0001

Re:    *Request for Appointment of Special Counsel*

Greetings:

I represent Jeanne Palfrey who (i) is under criminal investigation by your office and (ii) has had all her assets seized in a civil forfeiture matter pending in the District of Columbia before Judge Kessler, Case No.:1:06-CV-01710-GK.

I write to request pursuant to 28 C.F.R. §600.1 the appointment of a Special Counsel for the above matters. As detailed below, it would be a conflict of interest for the Department to prosecute these matters. Additionally, other extraordinary circumstances and the public interest require such an appointment. Alternatively, under 28 C.F.R. §600.2, I request that you direct that appropriate steps be taken to mitigate any conflicts of interest, such as recusal of particular officials or creating a "Chinese wall" around this prosecution.

Ms. Palfrey has been operating an adult fantasy escort business in the Metropolitan District of Columbia area for the last thirteen years. During that time period she had over Ten Thousand (10,000) customers from every walk of life. Based upon her knowledge and belief, those customers necessarily included present and former employees of the Department. Moreover, her supposition can – and will – be confirm as the telephone records of every single call that came into and went out of the business have been preserved.

A simply reverse-telephone number look-up – we are using "ussearch.com" – permits the identification of the owner of a telephone number. While I cannot name a particular Department employee to you at this time as the identification undertaking has just begun, given the broad spectrum of customers it is a mathematical certainty that in time such Department employees will

Alberto Gonzalez, Attorney General
Office of the Attorney General
February 26, 2007
Page 2

be identified as customers of the service and subpoenaed in either the civil matter, the criminal matter, or both.

Accordingly, as prosecution by the Department of Ms. Palfrey when members of the Department were customers of the service would be a clear conflict of interest, a Special Counsel appointment is appropriate. This is doubly so as the nature of the services offered were for legal sexual activities which included sexual role-play in a wide variety of forms. Crucial to Ms. Palfrey's defense if this matter proceeds is the calling to the stand the customers – some of whom doubtlessly will be Department employees – to testify as to the type of legal sexual activities they engaged in with the staff of Ms. Palfrey's service.

I look forward to your prompt attention to this matter.


Yours,

# CENTER FOR FORFEITURE LAW

1629 K Street, Suite 300
Washington, D.C. 20006

| | |
|---|---|
| **MONTGOMERY BLAIR SIBLEY** | **ADMITTED TO PRACTICE:** |
| 202-508-3699 | FLORIDA |
| 202-478-0371 (E-FAX) | NEW YORK |
| SIBLEY@CIVILFORFEITURE.COM | DISTRICT OF COLUMBIA |

May 6, 2007

Via FedEx #8617-4631-8049
and email c/o AUSAs Daniel Pearce Butler, Catherine K. Connelly, William
Rakestraw Cowden

Alberto Gonzalez, Attorney General
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Re:    *Second Request for Appointment of Special Counsel*

Greetings:

I represent Deborah Jeanne Palfrey, a/k/a the "D.C. Madam" who (i) has been indicted by your office in a matter assigned Criminal Case Number: 07-046-GK and (ii) has had all her assets seized in a civil forfeiture matter in Case No.:1:06-CV-01710-GK.

On March 1, 2007, FedEx delivered (Tracking #8581-1680-3504) to your office my request pursuant to 28 C.F.R. §600.1 for the appointment of a Special Counsel for the above matters. In that letter I indicated that "given the broad spectrum of customers [of the escort service] it is a mathematical certainty that in time [Justice] Department employees will be identified as customers of the service and subpoenaed in either the civil matter, the criminal matter, or both." To date, I have yet to receive a response to that letter.

In the interim, approximately 20% of the telephone records of the escort service were turned over to Brian Ross of *ABC News*. As you are doubtlessly aware, last Friday, Brian Ross, in the publically available transcript of his *20/20* report, is quoted as stating: "The phone records trace back to thousands of men, *including a career Justice Department prosecutor*."

Moreover, consider the math: If 20% of the telephone records produced one *"career Justice Department prosecutor"*, then 100% of the telephone records will very likely produce at least another four (4) *"career Justice Department prosecutor*s." Moreover, this discounts the possibility that if one *Akin/Gump* law firm employee was an escort for the service, it is as likely that your "law firm" has similarly situated employees who also worked as escorts for the service. Do not assume

Alberto Gonzalez, Attorney General
Office of the Attorney General
May 6, 2007
Page 2

that the records sezied from my client identified all of the women who worked for the service at one time or another.

Finally, please note that Brian Ross also reported that: "[t]here are NASA officials; at least five military officers, including the commander of an Air Force intelligence squadron" and "[t]he phone numbers also track back to Georgetown mansions and prominent CEOs, officials at the World Bank and the International Monetary Fund and **lobbyists both Republican and Democratic**."

Given that the person who ordered an escort was not necessarily the person who received the services provided by the escort, the highlighted phrase ought to make you ponder the misogynist wisdom of prosecuting my client for a victimless crime when significant **men** of power are walking on crimes of much greater significance to the Republic.  Moreover, given that pre-9/11, an appreciable part of the clientele of the service were Arabs, national security interests may also be at issue: *Profumo/Ivanov »Tobias/*?

As of present, (i) *ABC News* received copies of 75% of the 2002-2006 telephone records of the escort service and (ii) confirming the recent *Boston Globe* report – a group of veteran investigative journalists associated with the *Washington Independent Writers Association* are researching the 1997-1999 telephone records of the escort service.

This limited distribution  will change in seven (7) days and when it does: (i)  the reporting will be much more extensive as all of the years of the escort service telephone records will be released and (ii) the "standards and practices" committees of the recipient organizations, journalists and internet bloggers who will receive these records have decidedly different professional standards than that of *ABC News*.

Thus, I must <u>insist</u> that you take the following steps:

1.    To restore public confidence in your office, demand that Brian Ross identify to you that *"career Justice Department prosecutor"* and then you publically detail, what, if any, role that individual played in the investigation and prosecution of my client; and

2.    Under 28 C.F.R. §600.1, undertake the <u>immediate</u> interview and appointment of a Special Counsel for the above matters.

My client is prepared to withhold further distribution of copies of the telephone records pending *confidential* settlement negotiations with yourself or your designee – other than the presently

Alberto Gonzalez, Attorney General
Office of the Attorney General
May 6, 2007
Page 3

assigned AUSAs who are demonstratively not trustworthy in this regard – <u>if</u> these steps are taken <u>and</u> communicated to me by May 11, 2007.

In my mind, failure to do so will simply confirm to the world that your office wields its considerable power without thought or concern of the damaging consequences upon the public and the real public interests at issue.

Yours,