**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **V.** | ) | **CRIMINAL NO. 07-46 (GK)** |
| | ) | |
| **DEBORAH JEANE PALFREY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEBORAH JEANE PALFREY'S REPLY TO THE GOVERNMENT'S OMNIBUS
RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTIONS TO DISMISS ALL
OR PART OF THE INDICTMENT, AND FOR A BILL OF PARTICULARS
(DOCUMENTS 61, 63-68)**

Pursuant to Rules 7(c) and 12(b)(6) of the Federal Rules of Criminal Procedure, Defendant Deborah Jeane Palfrey, by and through counsel, respectfully submits this reply to the government's opposition to Ms. Palfrey's motions to dismiss the Indictment and for a bill of particulars. This Indictment seeks to charge Ms. Palfrey alone of the numerous escorts and customers allegedly involved with federal felony offenses carrying a potential aggregate sentence of some 55 years of imprisonment while the others involved apparently face no more than public embarrassment. This case, a misdemeanor on stilts, is deeply flawed in its inception and execution and must be dismissed.

In this pleading, Ms. Palfrey addresses specific issues the government has raised in opposition, while incorporating and reasserting certain arguments previously set forth in her motions and supporting memoranda filed June 15, 2007. The selective nature of this reply is not intended to waive or abandon any argument asserted in Ms. Palfrey's previous motions.

## ARGUMENT

This Court should grant Ms. Palfrey's motions to dismiss the Indictment. As a general and oft-repeated position, the government attempts to undermine the United States Supreme Court's decisions in Russell v. United States, 369 U.S. 749 (1962), and Hamling v. United States 418 U.S. 87 (1974), addressing the standards for a sufficient indictment. See Opp. at 20 n.10, 32. The government invokes Judge John D. Bates's opinion in United States v. Quinn, 401 F. Supp. 2d 80 (D.C. Cir. 2005), to support its deeply-embedded and incorrect argument that the appropriate standard for ensuring the sufficiency of an indictment is merely tracking the statutory language for a criminal offense. See Opp. at 20 n.10, 32. The government's interpretation of Quinn takes Judge Bates's analysis out of context and finesses the continuing vitality of the Russell and Hamling decisions.

In Quinn, Judge Bates addressed a motion to dismiss certain counts of the indictment for failure to state an offense. The indictment in that case alleged that the defendants violated the International Emergency Economic Powers Act (IEEPA) prohibiting exportation of certain goods to Iran. 401 F. Supp. 2d at 83. The statute used the term "willfully" as the requisite *mens rea* standard to be met by the government, and the defendants argued that the indictment's use of this term was ambiguous and insufficient to apprise them of the standard they should be prepared to meet. Id. at 101. That was the only issue before Judge Bates on this ground.

In analyzing whether the failure to define "willfully" rendered the indictment insufficient, Judge Bates relied on more than the indictment's tracking of the language of the IEEPA statute; he also looked to the statute itself to see if its language comported with the specificity and fair notice standards required by the Supreme Court in Russell. Id. at 101. Judge Bates ultimately found that "in the field of regulatory statutes governing business activities, where the acts limited

are in a narrow category, greater leeway is allowed."  Id. at 100 (citing Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972)).

Thus, the government's suggestion that Quinn requires *only* that an indictment track the language of the statute is not correct.  Tracking the language of the statute is but one step toward drafting a sufficient indictment.  It must also be true that the statutory language itself does not include generic terms, and that it is not uncertain or ambiguous about the elements of the offense. Id. at 101 (citing Russell, 369 U.S. at 764; Hamling, 418 U.S. at 117).  Moreover, Rule 7, following Russell, mandates that an indictment provide a "plain, concise, and definite statement of the essential facts constituting the offenses charged. . . ."  Fed. R. Crim. P. 7(c)(1).  These requirements, which Quinn did not and cannot overrule, are well-founded.[1]  Unlike the highly specific and narrow statute charged in Quinn, the acts proscribed by the RICO, Travel Act, and Money Laundering statutes are far more expansive.  Thus, by merely reprinting bald statutory language, and otherwise failing to provide particulars in the charges against Ms. Palfrey, the Indictment in this case is constitutionally deficient and must be dismissed.

---

[1] See United States v. Conlon, 628 F.2d 150, 155 (D.C. Cir. 1980) ("The more generally applicable rule is that the indictment may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged."); United States v. Nance, 533 F.2d 699, 701 (D.C. Cir. 1976) ("Following the generic wording of a statute is not necessarily sufficient."); Hamling v. United States, 418 U.S. 87, 116 (1974) ("Undoubtedly the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged."); Russell v. United States, 369 U.S. 749, 764 (1962) ("It is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars.").

I.   **MS. PALFREY'S MOTION TO DISMISS COUNT ONE, RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS, AND ITS ATTENDANT FORFEITURE ALLEGATION SHOULD BE GRANTED.**

The government's response to Ms. Palfrey's motion to dismiss Count One of the Indictment, Racketeer Influenced and Corrupt Organization ("RICO"), and its attendant forfeiture allegation fails to address, in some instances entirely, Ms. Palfrey's arguments.  As the government acknowledges, Fed. R. Crim. P. 7(c)(1) states that an "indictment . . . must be a plain, concise, and definite written statement of the *essential facts constituting the offense charged*." Opp. at 19 (emphasis added).  Moreover, as previously discussed, supra, Russell requires that an indictment's citation of statutory language "'be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.'"[2]  United States v. Nance, 533 F.2d 699, 701 (D.C. Cir. 1976) (quoting Russell, 369 U.S. at 764-66).  See MTD (RICO) at 5.[3] Nevertheless, the government persists in asserting that because "'it is generally sufficient that an indictment set forth the offense in the words of the statute itself,'" it must be so here.  Opp. at  20 n.10 (quoting Quinn, 401 F. Supp. 2d at 101-02).

Representative of the Indictment's failure to provide the required level of particularity, "Racketeering Act Number Two" states:

---

[2] Indeed, the government quibbles with the use of the word "facts" in Ms. Palfrey's motion to dismiss, asserting that Ms. Palfrey confuses what must be alleged in an indictment with sufficiency of evidence at trial.  See Opp. at 28 n.12.  But it is the government that is confused.  The Federal Rules of Criminal Procedure and the Supreme Court, as recognized by numerous decisions in this Circuit, expressly require an indictment to include sufficient facts and circumstances to inform the accused of the charges against her.  Without such facts, the Indictment is no more applicable to Ms. Palfrey than to any other individual, and it is impossible to tell on what facts the Grand Jury founded its charges.

[3] For the sake of succinctness and continuity, this Reply will refer to Ms. Palfrey's various motions to dismiss as "MTD" followed by a parenthetical description of the particular motion to which the statement refers.

> Between in or about June 1999 and in or about December 2004, in the District of Columbia and elsewhere, defendant Palfrey, aided and abetted by another person known to the Grand Jury ("Individual #2") but not named herein, did use and cause to be used the United States mail and a facility in interstate commerce from the District of Columbia to the state of California, with intent to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, a business enterprise involving prostitution offenses in violation of the State laws described in paragraph nine, and thereafter did perform and attempt to perform an act to promote, manage, establish, and carry on and to facilitate the promotion, management, establishment, and carrying on of said unlawful activity in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

Indict. at ¶ 12. The government's assertion that "each racketeering act relates to a different individual who aided and abetted defendant in the violation set forth therein, that is, ITAR, and gives the respective approximate time and place," Opp. at 20-21, fails wholly to address how these generic statutory citations, sparsely peppered with references to unnamed individuals, unnamed interstate facilities, regions of elsewhere, and time periods spanning some five years, provide Ms. Palfrey with the constitutionally mandated notice of the charges against her or a plain, concise and definite statement of the essential facts required by Rule 7(c)(1). Moreover, as discussed infra, the government resists providing a bill of particulars to identify exactly which of the 132 escorts is referenced in any of these distinct allegations.

The government also fails to address several of Ms. Palfrey's other challenges to the RICO charge. The government's entire response, for example, to the assertion that it has not alleged an enterprise distinct from the person of Ms. Palfrey, see MTD (RICO) at 7, appears to rest on the semantic contention that because the Indictment names both "Pamela Martin" and "Pamela Martin and Associates," it has satisfied the distinctness requirement. Opp. at 27. This conclusion either ignores or misapprehends the argument; namely, that the Indictment fails to correctly charge this offense because it alleges a person and enterprise that are *substantively* the

same entity.  See MTD (RICO) at 7.  Similarly, addressing the "common purpose" prong of the

three-pronged constituency of a RICO "enterprise" set out in United States v. Perholtz, 842 F.2d

343 (D.C. Cir. 1988), the government answers Ms. Palfrey's objections with cursory conclusions

but no actual rebuttal.  Restating the case law cited in Ms. Palfrey's motion to dismiss, and

referencing the precise paragraph of the Indictment Ms. Palfrey argued insufficiently alleges a

common purpose,[4] the government states, "the cases defendant cites support the conclusion that

the indictment appropriately alleges a common purpose."[5]  Opp. at 26.  Ms. Palfrey reasserts that

the Indictment's allegation that "the purpose of the enterprise was to enrich the members of the

enterprise," is unconstitutionally vague and insufficient in light of United States v. Richardson,

167 F.3d 621 (D.C. Cir. 1999) and United States v. Cooper, 91 F. Supp. 2d 60 (D.D.C. 2000).

See MTD (RICO) at 10-11.  In short, while the government accurately parrots the applicable law,

it offers little or no support for its conclusion that the Indictment complies with that law.[6]  See,

e.g., Opp. at 22, 27.

    Moreover, the cases the government cites in support of its pleading of a RICO enterprise

are not persuasive.  United States v. Korando, 29 F.3d 1114 (7th Cir. 1994), cited for the

proposition that a "loose band of associates" may constitute an enterprise, Opp. at 24-25,

---

[4] See Indict. at ¶ 8 ("The purpose of the enterprise included . . . enriching the members and associates of the enterprise through the operation of a prostitution business.").

[5] In the very last sentence of its "enterprise" argument, the government states that "the purpose of the enterprise was to obtain funds through acts of prostitution and laundering of the profits."  Opp. at 27.  While this is an improved statement of purpose, it does not actually appear in paragraph 8(a) of the Indictment as claimed by the government, and it still fails to address the distinction between the purpose of the *enterprise* and the "common purpose *among the participants*" required by Richardson.  167 F.3d at 625 (emphasis added).  See MTD (RICO) at 11.  Moreover, this extra-Indictment supplementation highlights the significance of the issues before the Court—the government is bound by the terms of the Indictment; it may not supplement or alter those terms.  To permit such a free hand would render completely meaningless whatever little meaning remains for the Fifth Amendment's constitutional requirement that such offenses be presented to the grand jury, not by Information.

[6] The government devotes several paragraphs to arguing that the Indictment properly alleges the "organization" element of a RICO enterprise, the sole prong of the Perholtz test Ms. Palfrey's motion to dismiss did not dispute.  Opp. at 24-25.

involved a sufficiency of the evidence challenge in which the court emphasized the "uphill battle" faced by defendant in light of the standard of review on appeal for such an assignment of error.  <u>Id.</u> at 1118 ("[I]n making this determination, we are to review the evidence in the light most favorable to the government, and draw all reasonable inferences in its favor.").  As the <u>Korando</u> court noted, "the government has (though only barely) cleared this very low hurdle." <u>Id.</u>  This holding hardly supports the contention that the government has adequately alleged an enterprise in the Indictment.

The other cases on which the government relies are similarly unavailing: <u>United States v. Pipkins</u>, 378 F.3d 1281, 1290 (11th Cir. 2004), a case about an extensive Atlanta "pimp network" with an exhaustive code of violent and extortionate conduct practiced by "the chief executives in a juvenile female prostitution enterprise;" <u>United States v. Panno</u>, 1987 WL 11347 (unpublished opinion) (N.D. Ill. 1987), in which the court found the indictment properly charged a RICO *conspiracy* by alleging an enterprise distinct from the conspiracy itself; and <u>United States v. Morrow</u>, 2005 WL 1389256 (D.D.C. 2005) in which the court denied a Rule 29(a) motion for acquittal, viewing the evidence in the light most favorable to the government.  Notably, the indictment in <u>Morrow</u> detailed four specific purposes of the enterprise at issue, alleging facts well beyond parroting the generic statutory language.  <u>See</u> Government's Supplemental Authority to its Omnibus Response: <u>United States v. Morrow</u> Memorandum Opinion at 6. Factually and legally inapposite, none of these citations inform the consideration of this issue. Ms. Palfrey is charged with neither violent juvenile trafficking nor RICO conspiracy, and the lenient standard of review for a Rule 29 motion does not apply to the sufficiency of an indictment.

Finally, Ms. Palfrey incorporates and reasserts her argument that the RICO Forfeiture

Allegation attendant to Count One of the Indictment is insufficient.  See MTD (RICO) at 15-16.

Thus, Count One of the Indictment, and its attendant Forfeiture Allegation, should be dismissed.

## II.    MS. PALFREY'S MOTION TO DISMISS COUNTS TWO THROUGH FOUR, TRAVEL IN INTERSTATE COMMERCE IN AID OF RACKETEERING ENTERPRISES, SHOULD BE GRANTED.

The government fails to provide any support for its assertion that a mere recitation of the

statutory language of 15 U.S.C. § 1952(a)(3) (Travel Act), regarding an overt act, is sufficient for

a Travel Act charge.  Instead, the government incants over and over that the Indictment "clearly

alleges an overt act," or "clearly charges a subsequent overt act."  Opp. at 32.  Ms. Palfrey

respectfully disagrees and reasserts the arguments set forth in her original motion to dismiss, in

addition to the discussion below.

Ms. Palfrey recognizes that, in the various alleged ITAR components of the RICO

charge, and the substantive Travel Act counts in paragraph fourteen of the Indictment, the words

"thereafter did perform and attempt to perform an act," mimic the language of the Travel Act

statute.  Indict. at ¶¶ 12, 14.  The government, in an attempt to bolster its fourteen ITAR

components, argues that they are sufficient because they give an "approximate time and place."

Opp. at 20.  What it fails to include are any facts whatsoever describing the alleged *overt act* in

issue for each Travel Act count or ITAR component of the RICO charge—thus, effectively, no

notice is supplied.

United States v. Wander, 601 F.2d 1251 (3d Cir. 1979), holds explicitly that the absence

of an allegation of an overt act renders an indictment insufficient, but the court's language

reaches further.  The court stated that "[w]here insufficiency of the indictment is alleged, as here,

the question is whether it is merely a technical deficiency *or a deprivation of a significant*

*protection of the indictment process*." <u>Wander</u>, 601 F.2d at 1258 (emphasis added). The court

analyzed the facts of the case using the criteria identified in <u>Russell</u> and determined that the

indictment returned against Wander was insufficient.[7] <u>Id.</u> (citing <u>Russell</u>, 369 U.S. at 763-64).

This Indictment suffers from the same fatal deficiencies.

In the Indictment against Ms. Palfrey, the government lists fourteen ITAR components as

part of the RICO charge, and charges three substantive violations of the Travel Act, but not once

does it describe exactly what overt acts were performed by Ms. Palfrey to satisfy this element.

Under these facts, as in <u>Wander</u>, the insufficiency of the Indictment goes beyond a mere

technicality, and rises to the level of a deprivation of rights. The Indictment effectively fails to

state the overt act element by failing to provide *factual details* about what acts supposedly satisfy

that element. Accordingly, Counts Two through Four of the Indictment alleging a violation of

the Travel Act should be dismissed.

## III.   MS. PALFREY'S MOTION TO DISMISS COUNT FIVE, MONEY LAUNDERING CONSPIRACY, AND ITS ATTENDANT FORFEITURE ALLEGATION SHOULD BE GRANTED.

The government addresses Ms. Palfrey's argument with regard to the ambiguity of Count

Five by simply restating the required elements for money laundering conspiracy and then

asserting that "the twenty-page indictment in this case gives the defendant, consistent with Fed.

R. Crim. P. 7(c), 'a plain, concise and definite written statement of the essential facts constituting

the offense charged.'" Opp. at 37. Ms. Palfrey reasserts her argument that the Indictment is

deficient in failing to provide the *essential facts* underlying the money laundering charge in

addition to the required statutory elements. <u>See</u> MTD (Money Laundering) at 4-5. Ms. Palfrey's

"complaint about the need to prepare for trial," Opp. at 38, is properly addressed at this stage of

---

[7] Indeed, not even the existence of averred overt acts that were part of a conspiracy count earlier in the <u>Wander</u> indictment, but not incorporated into the Travel Act counts, could save the Travel Act charges. 601 F.2d at 1259. In the current Indictment, specific acts are never delineated.

the pleadings, where "the test for sufficiency is whether it is fair to require the accused to defend himself on the basis of the charge as stated in the indictment." United States v. Conlon, 628 F.2d 150, 155 (D.C. Cir. 1980).

Furthermore, the government responds to Ms. Palfrey's specific argument about the ambiguity of the word "proceeds" in the Indictment by again invoking United States v. Quinn for its mythic holding that if an indictment simply tracks statutory language, any claim of insufficiency evaporates. Opp. at 39. As previously stated, the government's suggestion that Quinn only requires an indictment to track the language of a statute is incorrect, and the Indictment's failure to further clarify the ambiguous term "proceeds" in §1956(a)(1)(A)(i) renders it insufficient under the requirements of Fed. R. Crim. P. 7(c).

The government responds to Ms. Palfrey's remaining arguments—regarding the Indictment's failure to plead a predicate offense and its failure to allege a "substantial connection" between money laundering and the interests to be forfeited—by referring to previous sections of its Opposition. Opp. at 39. Thus, Ms. Palfrey reasserts those arguments previously set forth in her motion to dismiss the money laundering count, MTD (Money Laundering) at 10-12, and respectfully requests that Count Five of the Indictment and its attendant forfeiture allegation be dismissed.

## IV.   MS. PALFREY'S MOTION TO DISMISS THE INDICTMENT DUE TO SELECTIVE PROSECUTION SHOULD BE GRANTED.

Sufficient evidence exists which, if not establishing a selective prosecution claim to the extent necessary to warrant dismissal, provides at least a colorable basis for improper motive that would merit discovery on the issue. See United States v. Armstrong, 517 U.S. 456 (1996); Attorney General of the United States v. Irish People, Inc., 684 F.2d 928, 932 (D.C. Cir. 1982). Ms. Palfrey reiterates the suspect timing of the Indictment, notwithstanding the government's

explanation.  This concern is amplified by the government's steadfast resistance to the release of Ms. Palfrey's phone records.  Finally, Ms. Palfrey points to the government's apparent decision to charge only Ms. Palfrey in this conspiracy, despite the involvement of at least 132 other individuals, at least one of whom managed Pamela Martin & Associates ("PM&A") during the relevant period.

In its Opposition, the government frames the timing of the Indictment after Ms. Palfrey's request for special counsel as the inevitable result of an ongoing investigation and grand jury inquiry.  See Opp. at 11-12.  This benign explanation does not eliminate the suspicion inherent in this sequence; discovery on the issue will confirm or refute these suspicions.

The inference of improper motive is bolstered by the government's repeated attempts to keep Ms. Palfrey's phone records out of the public domain.[8]  The events since the public release of "the list" reinforce such suspicions of the government's motivation in restraining Ms. Palfrey's disclosure.  Public scrutiny of the phone records has revealed that phone numbers of government officials were among Ms. Palfrey's records, including both a Deputy Secretary of State and a sitting United States Senator.  See Shailagh Murray, Senator's Number on 'Madam' Phone List, Washington Post, July 10, 2007, at A03.  Pressure from within the Department of Justice, the executive branch, or other areas of the federal government may have led directly to the government's decision to charge Ms. Palfrey.  While the defense concedes that evidence of the identities of those whose phone numbers are contained in Ms. Palfrey's records only circumstantially implies an improper motive, discovery on this issue will either confirm these suspicions or alleviate fears of improper prosecutorial motive.

---

[8] This Court has questioned the government's resistance to the public disclosure of Ms. Palfrey's telephone records in its order lifting the restraining orders preventing Ms. Palfrey from selling the records or distributing copies for free. United States v. Palfrey, Criminal No. 07-46, Memorandum Order at 7 n.6 (July 5, 2007).

Finally, the colorable basis of impropriety is supported by the selectivity exercised in the government's decision to prosecute Ms. Palfrey only.  Not only does the Indictment reveal the involvement of at least 132 other individuals, including alleged prostitutes and "testers," but the public release of Ms. Palfrey's phone records has extended the cloud of suspicion in this case to the "Johns," two of which have been identified as high profile members of the federal government.  Apparently, not one of these alleged prostitutes, testers, or "Johns" faces conspiracy or any other charges, for that matter.  Furthermore, the government has acknowledged the involvement of at least one other individual in the management of PM&A during the relevant time period who is not subject to prosecution.  See Opp. at 27 ("[T]here was the period from April 29, 2002 until November 12, 2002 [] when another woman with the supervision of defendant, ran [PM&A].").  If it is Ms. Palfrey's conduct in the leadership role of PM&A which has led to her being the target of this Indictment, the government's failure to charge this other individual, who occupied substantially the same leadership role, suggests that its stated motive may simply be pretext for an improper one.[9]

Ms. Palfrey has been singled out for prosecution from among numerous other local proprietors of massage parlors and escort services and from numerous others involved in the alleged conspiracy.  See MTD (Selective Prosecution) at 2.  The evidence available to the defense supports an inference that this selectivity is based on improper factors, including Ms. Palfrey's stated intention to release her phone records to the public and her petition for the appointment of Special Counsel.  If such evidence is insufficient to warrant dismissal of the

---

[9] In correspondence with the government, Ms. Palfrey, through counsel, requested information on this point as part of discovery required by Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).  Specifically, defense counsel notified the government that it considered subject to discovery any non-prosecution decisions, immunizations, or other disposition arrangements regarding the independent contractors utilized by PM&A who the government alleges engaged in prostitution services.  To date, the government has provided no such information.  The government has indicated that the Giglio discovery will be turned over "in time for defendant's to make use of it," and the Jencks material will be provided one week before trial.  Counsel for Ms. Palfrey disagrees strongly with this timetable and position.

Indictment at this time, it at least provides a colorable basis meriting discovery on the government's apparent selection of Ms. Palfrey alone to face charges for this alleged conspiracy. In a case where the alleged conspiracy is of such a grand scale, yet only one individual appears to be prosecuted and the available evidence suggests an improper motivation of the government, equal protection demands the government produce evidence supporting the propriety of its decision-making.  Accordingly, Ms. Palfrey respectfully requests that this Court grant her motion to dismiss the Indictment based on selective prosecution, or, alternatively, grant appropriate discovery on the issue to further investigate the government's selection process in this case.

**V.    MS. PALFREY'S MOTION TO DISMISS THE INDICTMENT FOR UNCONSTITUTIONAL APPLICATION OF THE LOCAL PROSTITUTION STATUTES SHOULD BE GRANTED.**

The local prostitution laws on which the government founds its case are unconstitutional as applied to the instant matter, which involves allegations that the consenting adult escorts and their customers negotiated an exchange of sexual activity for financial compensation in private settings.  This position is supported by the United States Supreme Court's recent articulation of privacy rights in Lawrence v. Texas, 539 U.S. 558 (2003), where it rendered unconstitutional criminal laws proscribing certain sexual activities.  Ms. Palfrey respectfully reasserts the position set forth in her original motion on this issue.

## A.    Privacy Considerations

The activity in this case, unlike many of the cases cited by the government, does not involve incest, Mann Act violations, or human slave trafficking.[10]  This case involves activities occurring between consenting adults meeting in private locales where alleged discussions took place which involved an exchange of money from customers for sexual activity.  While the existence of the escort service was certainly publicly advertised information,[11] the alleged illegal services and acts were not; all of that activity occurred in private settings—thus the alleged solicitations did not occur on the street or in the public domain.

When prostitution laws are applied to private situations, significant constitutional questions arise.  In 1974, now-Justice Ruth Bader Ginsburg co-authored a report addressing the treatment of women in the U.S. Code.  See Ruth Bader Ginsburg & Brenda F. Fasteau, Report of the Columbia Law School Equal Rights Advocacy Project, The Legal Status of Women under Federal Law, (1974) ("Ginsburg & Fasteau").  In that Report, Justice Ginsburg and Ms. Fasteau noted, in their analysis of the Travel Act  and the Mann Act, that "[t]hese prostitution proscriptions are subject to several constitutional and policy objections.  Prostitution, as a consensual act between adults, is arguably within the zone of privacy protected by recent

---

[10] See, e.g., Muth v. Frank, 412 F.3d 808 (7th Cir. 2005) (declining to apply Lawrence retroactively in a habeas challenge to a Wisconsin anti-incest statute); United States v. Thompson, 458 F. Supp. 2d 730 (N.D. Ind. 2006) (Mann Act case); United States v. Jandres, (D. Md. 2007) (press release attached to government pleading indicates that the defendant pleaded guilty to conspiring to harbor and transport illegal aliens into Maryland to serve as prostitutes).  The remaining cases cited by the government almost all deal with solicitation involving undercover police officers—a situation not presented by this case. See, e.g., Louisiana v. Thomas, 891 So.2d 1233 (La. 2005) (Lawrence challenge in context of solicitation of undercover officer for oral sex (a felony in Louisiana) instead of vaginal intercourse (a misdemeanor)); Hawaii v. Romano, 155 P.3d 1102 (Hawaii 2007) (Lawrence challenge to arrest for agreeing to give a handjob to undercover officer for $20; dissent argued that Lawrence prohibited such prosecution where the negotiation did not occur in public); North Carolina v. Pope, 608 S.E.2d 114 (N.C. Ct. App. 2005) (undercover officer solicited "crime against nature," namely oral sex).   The language of several of the statutes addressed in these decisions are precisely the sort of laws overturned by the Court in Lawrence.

[11] The government's reference to the public nature of the advertisements as somehow relevant conflicts with its dismissive comments about its failure to prosecute any of the other numerous escort services openly operating in this area.  Compare Opp. at 8-9 with Opp. at 16.

constitutional decisions." Id. at 72 (citing Griswold v. Connecticut, 381 U.S. 479 (1965);

Eisenstadt v. Baird, 405 U.S. 438 (1972); Roe v. Wade, 410 U.S. 113 (1973)).  The Report notes

further that, as in this case, the application of such laws is also discriminatory because the male

customers are rarely prosecuted for patronizing a prostitute.  Id. at 72-73.  This case bears out

that concern, as we now know that a sitting United States Senator and a former senior State

Department official, among hundreds of other customers, have apparently not been prosecuted

for participating in what the government asserts was a criminal conspiracy.[12]

### B.      Vagueness and the First Amendment

These issues also raise serious vagueness and First Amendment questions.  At its core, an

objective concern arises with regards to how one makes a principled distinction between this

escort service and ostensibly legal "dating" or "matchmaking" websites.  The act of paying one

of these services to set a customer up on a date which ends in a sexual encounter is essentially

indistinguishable from the allegations against Ms. Palfrey.  The local statutes which predicate the

federal charges against Ms. Palfrey appear to reach the activities of these "matchmaking"

websites.  See  D.C. Code Ann. § 22-2707 (LexisNexis 2007) ("It is unlawful for any person . . .

to receive any money or other valuable thing for or *on account of arranging for* or causing any

individual to engage in prostitution *or a sexual act or contact*.") (emphasis added); Md. Code

Ann., Criminal Law § 11-306 (LexisNexis 2007) ("A person may not knowingly engage in

prostitution or assignation."  "Prostitution" is defined in § 11-301 of the Md. Criminal Law Code

as "the performance of a sexual act, sexual contact, or vaginal intercourse for hire."); Va. Code

Ann. § 18.2-356 (2007) ("Any person who shall receive any money or other valuable thing for or

on account of procuring for or placing in a house of prostitution or elsewhere any person for the

---

[12] The government's refusal thus far to provide information about any implicit or explicit understanding with these people concerning whether they will be prosecuted also raises questions about its fulfillment of its disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963).

purpose of causing such person to engage in unlawful sexual intercourse . . . shall be guilty."). The law in this area is sufficiently vague such that there is no way for persons who engage in that type of interaction, none of whom are prosecuted, to be effectively distinguished from persons who have more explicit arrangements but who are prosecuted.[13]

Likewise, pornographic films are protected under the First Amendment despite the actors being paid to engage in sexual activity in a private setting while being filmed or photographed for later public distribution—neither the actors nor the producers who pay for this activity and who receive funds from the production and distribution of the films or photographs are prosecuted for prostitution offenses where the participants are consenting adults engaged in conventional sexual activity or even activity that constitutes sodomy. The enforcement of these laws in a context where the alleged solicitation and negotiation all occurred in a private setting raises squarely both First Amendment and privacy concerns.[14]

---

[13] In Papachristou v. City of Jacksonville, 405 U.S. 156 (1972) for example, a unanimous Supreme Court struck down a vagrancy ordinance that punished, *inter alios*, "lewd, wanton, and lascivious persons." Id. at 156 n.1. The ordinance was found to be facially invalid because it did not give fair notice of what conduct was forbidden and because it encouraged arbitrary and erratic arrests by law enforcement. Id. at 162. The Court noted that the ordinance "makes criminal activities which by modern standards are normally innocent." Id. at 163. See also Hicks v. District of Columbia, 383 U.S. 252 (1966); Edelman v. California, 344 U.S. 357 (1953); Winters v. New York, 333 U.S. 507 (1948) (striking down vagrancy statutes as void for vagueness). The local prostitution laws in issue, particularly the District of Columbia's law, are similarly vulnerable. Also, if some, but not all, of these laws are stricken, the Court must parse the remaining allegations to determine which can remain given the overlapping and general references to the local statutes in the Indictment.

[14] Pornography is protected under the Court's precedent in Miller v. California, 413 U.S. 15, 24-25 (1972), which holds that if work, taken as a whole, has "serious literary, artistic, political, or scientific value," the First Amendment likely protects its distribution. It is not clear why, although two people may wish to have sex with each other in private, the law can intervene to say that they cannot, just because one of them seeks money. But if both members of the couple are in it for the money, and there is a person with a camera taping them, then the sex is likely insulated by the Constitution from legal regulation. Indeed, one could reasonably characterize pornography as the payment of prostitutes to have sex in front of a camera. See Sherry F. Colb, The Legal Line Between Porn and Prostitution, FINDLAW, Aug. 12, 2005, available at http://www.cnn.com/2005/LAW/08/12/ colb.pornography/index.html.

### C.    Equal Protection Concerns

The enforcement of these laws against Ms. Palfrey and not the male customers also raises equal protection concerns.  There is scant evidence that the government actually prosecutes any male customers or even the participant "testers" in such cases.  The enforcement regime evidences a pattern of gender discrimination in the application of these laws.  That the laws are written in non-discriminatory language is no defense when the application and enforcement are clearly discriminatory—indeed, the case law in this area is ancient, as most of these scenarios have fortunately been eradicated in this country.  See, e.g., Yick Wo v. Hopkins, 118 U.S. 356 (1886) (laundry permit laws were facially non-discriminatory but permit approval was withheld to those of Chinese ancestry and granted to non-Chinese persons); see also Rosenbleet & Pariente, The Prostitution of the Criminal Law, 11 Am. Crim. L. Rev. 373, 406-411 (Fall 1972) ("Rosenbleet & Pariente") (discussing cases).  As the defense receives more information confirming the government's apparent decision in this regard, we reserve the opportunity to revisit and expand this argument.

It is also telling that the government retreats to diversionary paternalistic and puritanical arguments in support of these unconstitutional laws.  The authority they cite, authored by two non-lawyers with doctorates in psychology, positing that the distinction between high class call girls and street prostitutes is not verified by research is not only a weak assertion, but is irrelevant and unresponsive to the issue of whether such laws are constitutional, particularly since the passage cited by the government addresses considerations of whether there is a similar incidence of post-traumatic stress disorder or other personal health issues between street prostitutes and those who work in brothels.  That being said, Justice Ginsburg's article counters this assertion, noting that "[r]eliable studies indicate that prostitution is not a major facet in the

spread of venereal disease." Ginsburg & Fasteau at 74 (citation omitted). Promiscuity and unprotected sexual activity create health risks whether the participants are prostitutes or not. Accord Rosenbleet & Pariente at 417 (studies indicate that spread of venereal disease is not a consequence of prostitution). One could just as well reason that experienced professional prostitutes take more precautions in this regard because of their knowledge of the increased risks, and that an educated prostitute is intelligent enough to take even greater precautions—particularly since this activity is the prostitute's livelihood. Of course, the reasons motivating the passage of such laws are largely irrelevant to the question of their constitutionality—this Court does not act as a shadow legislature as the government seems to invite. The argument that "cash only" businesses skirt the tax laws is equally disingenuous since there is no allegation nor evidence that Ms. Palfrey failed to address her tax obligations; indeed, as will be demonstrated at trial, she had Form 1099's issued to the escorts.

Ultimately, because of these constitutional infirmities, Justice Ginsburg and Ms. Fasteau recommended that Section 1952(b) of the Travel Act be repealed. Ginsburg & Fasteau at 74. In light of Lawrence, we believe that recommendation, made some 30 years ago, rings with greater force today. The laws in issue, like Sunday blue laws, are badges of a dated moral view that dominated state legislatures for decades but which are being challenged and abolished to acknowledge that the Constitution does not permit the state to invade certain areas of adult activity because of religious or moral paternalism. The activity in this case does not bear facts that compel or permit government regulation and this Indictment, which rests on the sanctity of these laws, must be dismissed.

## VI.    MS. PALFREY'S MOTION FOR A BILL OF PARTICULARS SHOULD BE GRANTED.

The government misconstrues Ms. Palfrey's argument in support of her request for a bill of particulars. Ms. Palfrey supplemented her request with cases supporting three frequently addressed types of particulars: the names of unidentified co-conspirators, the acts in which those unidentified co-conspirators are alleged to have engaged, and the alleged nexus between property subject to criminal forfeiture and the relevant allegations of criminal conduct. Defendant's decision not to discuss the other requests for particulars in the memorandum was nothing more than a recognition of this Court's discretion and the absence of precedent specifically on-point to guide this Court's ruling, not, as the government suggests, an abdication. In her several motions pending before the Court, Ms. Palfrey has repeatedly argued the Indictment's insufficiencies and unconstitutional bases. Even if this Court finds the Indictment sufficient to meet constitutional muster, Ms. Palfrey submits that particulars are necessary for her to fully comprehend the nature of the accusations against her so that she may adequately prepare her defense.

In responding substantively only to the first specific request in Ms. Palfrey's motion, the government completely ignores the separate authority[15] supporting Ms. Palfrey's request for particulars identifying which of the many unindicted co-conspirators engaged in which alleged act. Opp. at 41. As the government points out, "each racketeering act relates to a different individual who aided and abetted defendant in the violation set forth," yet the government provides no indication as to which fourteen of the alleged 132 escorts, much less their customers, were involved in these acts, what acts were committed, or which local law was violated. See

---

[15] Ms. Palfrey offered two cases from the District of Columbia which support her request for particulars detailing the specific co-conspirators engaged in specific acts. BoP at 4. See, e.g., United States v. Hsia, 24 F. Supp. 2d 14 (D.D.C. 1998); United States v. Trie, 21 F. Supp. 2d 7 (D.D.C. 1998). The government substantively addresses neither case in its opposition, stating in a footnote with no further discussion that these cases are factually different and failing wholly to distinguish the analyses therein.

Opp. At 20-21.  Without particulars, Ms. Palfrey is forced to prepare her defense by looking for fourteen needles in a haystack.  The government's response also concludes, without more, that particulars stating the nexus between property and criminal conduct need not be provided and the case cited by Ms. Palfrey supporting this argument should not be taken by this court as persuasive.  See id. at 45.

The government's response to the first request boils down to the unsupported conclusion that the Indictment, combined with the "voluminous discovery" provided in this case, is sufficient.  Opp. at 41.  The government begins with a broad overview of bills of particulars, citing cases from the D.C. Circuit generally, but fails to apply these characteristics to the facts of this case.  See id. at 40-41.  The only actual *argument* in the Government's Opposition regarding particulars cites primarily to cases outside this Circuit and presents a failed attempt to distinguish a case cited in Ms. Palfrey's request for particulars.  See id. at 41-43.   The government then concludes that particulars are not required based on the declaration that this case is "not complex."[16]

Contrary to the government's contention, there are no "strict limitations" placed on the scope of a "bill of particulars."  See United States v. Mejia, 448 F.3d 436, 445 (D.C. Cir. 2006) ("The determination of whether a bill of particulars is necessary 'rests within the sound discretion of the trial court' and will not be disturbed absent an abuse of that discretion.") (citations omitted).  The ordering of particulars is within the district judge's discretion, dependent on the facts and circumstances of the case and the generality of the indictment.  Id.  In a complex case with voluminous discovery and a vague indictment, it is well within the trial court's powers to

---

[16] A brief overview reveals immediately the complexity of the instant case; there are at least 132 alleged co-conspirators, fourteen charged racketeering acts, an alleged conspiracy lasting thirteen years, and at least four relevant jurisdictions.  Id. at 44.

require the government to more sufficiently apprise the defendant of the nature of the charges she faces.  See id.

In support of its argument, the government cites a recent case from this district, United States v. Bourdet, 477 F. Supp. 2d 164 (D.D.C. 2007).  The government, by way of a parenthetical, notes that a bill of particulars was not granted in Bourdet and that the "indictment sufficiently set forth the time period of conspiracy, at least three countries where defendants acted in furtherance of the conspiracy, [the] object of the conspiracy, the statutes violated by the conspiracy, and the *mens rea* required by those statutes."  Opp. at 40.  The government does not mention that Bourdet involved only five conspirators, each of which was charged in the indictment.  477 F. Supp. 2d at 169.  In contrast, the current case involves at least 132 co-conspirators, only one charged.  Indict. at ¶ 10.  The indictment in Bourdet alleged a drug conspiracy over a four month period.  477 F. Supp. 2d at 184.  The charges against Ms. Palfrey allege a conspiracy spanning 156 months.  Indict. at ¶ 10.

Without precedent from cases of analogous complexity,[17] the government forces a distinction from only one case, United States v. Ramirez, out of the four cases cited by Ms. Palfrey to support her request for the names of co-conspirators and the acts in which each allegedly engaged.  Opp. at 43.  Like this case, Ramirez involved an indictment with few details. 54 F. Supp. 2d 25, 30 (D.D.C. 1999).  The government's attempt to distinguish Ramirez rests solely on the fact that defendants in Ramirez were charged only with criminal conduct occurring

---

[17] The government provided the Court with an unpublished district court opinion in the supplement to its response filed on July 9, 2007.  This case, United States v. Morrow, No. 04-355 (March 16, 2005), in relevant part, provides only the same general overview of a bill of particulars which the government has already set forth.  In denying the request for particulars, the court noted the "exceptional discovery" granted to defendants in the form of photographic discovery and boxes of police reports.  Discovery is valued in quality, not quantity.  In the instant case, the government may have provided "voluminous" discovery, but the information it has withheld makes it anything but exceptional.  In contrast to the armed robbery conspiracy of Morrow, the instant case involves complex charges of RICO and ITAR violations as well as allegations of money laundering, all occurring over a thirteen year period and the discovery does not identify which persons are those referenced in the Indictment.

during the final six days of a ten month conspiracy. Opp. at 43. Ms. Palfrey, the government compares, "was involved in the conspiracy throughout the entire time of the conspiracy"—a thirteen year period. Indict. at ¶ 10. Yet, the criminal conduct charged in the Indictment of Ms. Palfrey spans little more than half of that period. Indict. at ¶ 12. Just as defendants in Ramirez needed additional information from the government to adequately prepare their defense, so too does Ms. Palfrey need particulars to whittle down the complex Indictment and the voluminous discovery to understand exactly what the government is charging and with which of the unindicted co-conspirators she engaged in this activity.

Requests for particulars have been granted in cases where the government has provided voluminous discovery, just like the "thousands of pages of documents" seized from the home of Ms. Palfrey which defense must sift through to prepare for trial. See United States v. Santiago, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001) (citing United States v. Nachamie, 91 F. Supp. 2d 565, 572-73 (S.D.N.Y. 2000)). Allowing the government to satisfy its obligations for particulars or specificity in the Indictment merely by dumping such voluminous discovery on defendants assumes that the defense knows precisely the scope of the conduct in which the defendant is alleged to have engaged—an assumption which, when combined with an indictment alleging only "acts" undertaken with "individual[s] . . . not named herein," is contrary to the presumption of innocence. See Trie, 21 F. Supp. 2d at 21.

In circumstances such as those present in the current case—numerous unidentified co-conspirators yet only one charged defendant, an extended duration of conspiracy, voluminous discovery including thousands of pages of documents, and an indictment which proudly provides precious little information beyond the words of the statute—particulars are necessary for the defendant to appreciate the nature of the charges she faces and adequately defend for trial.

Accordingly, Ms. Palfrey respectfully requests that the Court grant her motion for a bill of particulars.

## **CONCLUSION**

For the foregoing reasons, defendant Deborah Jeane Palfrey respectfully requests that this Court grant her motions to dismiss the indictment and, in the alternative, for a bill of particulars. Ms. Palfrey respectfully requests a hearing on these motions.

Respectfully submitted,


_____/s/_____
Preston Burton, DC Bar No. 426378
Bree Nicolai Murphy, DC Bar No. 497418
ORRICK, HERRINGTON & SUTCLIFFE, LLP
Washington Harbour
3050 K Street, N.W.
Washington, DC  20007
202-339-8400

Counsel for Deborah Jeane Palfrey.