# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CRIMINAL NO. 07-046 (GK) |
| | ) | |
| DEBORAH JEANE PALFREY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT DEBORAH JEANE PALFREY'S MOTION
## TO SUPPRESS EVIDENCE OBTAINED FROM HER HOME

Deborah Jeane Palfrey, through counsel, respectfully submits this Motion to suppress the evidence seized by the government pursuant to the October 3, 2006 search warrant obtained for her home in Vallejo, California, and for her personal vehicle. The Application and Affidavit for Search Warrant relies impermissibly upon stale facts and ultimately fails to establish probable cause, in violation of the Fourth Amendment. Additionally, the search warrant fails to describe particularly the items to be seized and is, therefore, unconstitutionally overbroad. Consequently, the evidence obtained by the government pursuant to this search warrant should be suppressed.

For the reasons addressed in the accompanying Memorandum, Ms. Palfrey respectfully requests that the Court suppress the evidence obtained by the government pursuant to the October 3, 2006, search warrant. Ms. Palfrey respectfully requests an evidentiary hearing on this motion.

Respectfully submitted,

_____/s/_____
Preston Burton, Esq., D.C. Bar No. 426378
Bree N. Murphy, Esq., D.C. Bar No. 497418
Orrick, Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street, N.W.
Washington, D.C. 20007
*Counsel for Deborah Jeane Palfrey*

Dated: July 26, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **V.** | ) | **CRIMINAL NO. 07-046 (GK)** |
| | ) | |
| **DEBORAH JEANE PALFREY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT DEBORAH JEANE PALFREY'S MEMORANDUM**
**OF POINTS AND AUTHORITIES IN SUPPORT OF HER MOTION**
**TO SUPPRESS EVIDENCE OBTAINED FROM HER HOME**

Deborah Jeane Palfrey, through counsel, respectfully submits this Memorandum in

support of her Motion to suppress the evidence seized by the government pursuant to the October

3, 2006 search warrant, attached hereto as **Exhibit A**, obtained for her home in Vallejo,

California, and for her personal vehicle.  The Application and Affidavit for Search Warrant

("Affidavit," attached hereto as part of Exhibit A)  rely impermissibly upon stale facts and

ultimately fail to establish probable cause, in violation of the Fourth Amendment.  Additionally,

the search warrant fails to describe particularly the items to be seized and is, therefore,

unconstitutionally overbroad.  Consequently, the evidence obtained by the government pursuant

to this search warrant should be suppressed.

## INTRODUCTION

On October 4, 2006, United States Postal Inspector Maria Couvillon entered and searched

Ms. Palfrey's home at 803 Capitol Street in Vallejo, California, pursuant to a search warrant

issued one day prior by a United States Magistrate Judge for the United States District Court for

the Eastern District of California.[1]  Inspector Couvillon's Affidavit provides factual assertions to

validate the government's right to search Ms. Palfrey's residence.  The facts on which the

Affidavit relies include paraphrased information from five unidentified confidential informants

during interviews conducted beginning in December 2005.  The statements attributed to these

five unidentified confidential informants concern conduct occurring at the *latest* in the Spring of

2003, and at the *earliest* in April 2001—**between two-and-a-half and four-and-a-half years**

**prior to their interviews, and between three to five years prior to the execution of the**

**search warrant**.

        In the sixteen-page Affidavit, the sole allegation of a recent fact consists of one sentence,

buried just before the conclusion, which states, "As of August, 2006, Pelfrey [sic] continued to

receive express mailings from various women in the Washington, D.C. metropolitan area."

Affidavit at ¶ 32.  This statement fails to assert that any of the referenced "women" in that

sentence had ever been interviewed, fails to identify them as escorts engaged in illegal

prostitution activities, or that the mailings related to the alleged criminal conduct discussed by

the five unidentified informants.  The statement also addresses the express mailings allegedly

sent not to Ms. Palfrey's home, the place for which the warrant was obtained, but instead to a

post office box in Benicia, California.  See Affidavit at ¶ 14.  Moreover, the Affidavit fails to

inform the Magistrate of certain additional facts Ms. Palfrey believes were known to the affiant

and which were inconsistent with establishing probable cause, namely facts diminishing the

credibility and reliability of an informant and acknowledging that Ms. Palfrey was not directly

involved in running the business of Pamela Martin and Associates during several months of the

time frame described by the confidential informants, or, as the government recently and only

---

[1] Ms. Palfrey's vehicle was also searched pursuant to a warrant but counsel is not aware of any evidence having
been seized from that vehicle.  That being said, should evidence be identified as having come from the car, the same
issues regarding the search are presented.

reluctantly acknowledged in response to this Court's questions, that these informants were deemed co-conspirators who were, apparently, being absolved of any criminal responsibility for their own actions.  Based primarily upon the stale information provided by these unidentified confidential informants, the Affidavit concludes, without any meaningful reference to recent surveillance or information, that "there is probable cause to believe that Deborah Jean [sic] Palfrey has been and continues to operate Pamela Martin Associates, an illegal outcall prostitution business."  Id.

Attachment B to the Affidavit describes the items believed by Inspector Couvillon to be located within Ms. Palfrey's residence.  The Attachment lists five general categories including, summarily, (a) financial records, (b) identifying information relating to employees and/or clients, (c) information demonstrating Ms. Palfrey's possession, dominion, and control of the residence, (d) computer and/or electronic equipment and any written or printed material relating to Pamela Martin and Associates; and (e) "photographs of co-conspirators and any other photographs or depictions of evidentiary value."  Affidavit at Attachment B, 17-18.  Armed with this warrant granting permission  to seize items conforming to these overbroad categories, Inspector Couvillon searched Ms. Palfrey's home and seized on behalf of the government the items listed on the five-page Search Warrant Inventory attached hereto as **Exhibit B**.

## <u>ARGUMENT</u>

## I.  THE SEARCH WARRANT FAILS TO ESTABLISH PROBABLE CAUSE.

Freedom from intrusion into the home "is the archetype of the privacy protection secured by the Fourth Amendment."  <u>Dorman v. United States</u>, 435 F.2d 385, 389 (D.C. Cir. 1970).  The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Supreme Court has

held that the test for determining if an informant-based affidavit establishes probable cause is

"whether, given all the circumstances set forth in the affidavit before him, including the 'veracity'

and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that

contraband or evidence of a crime will be found in a particular place." United States v. Edelin,

128 F. Supp. 2d 23, 46 (D.D.C. 2001) (quoting Illinois v. Gates, 462 U.S. 213, 230 (1983)).

The information provided in the Affidavit is stale and cannot support a finding of probable cause

justifying the issuance of a warrant to search Ms. Palfrey's home.

**A. The information provided in the Affidavit is stale and cannot support a finding of probable cause.**

As part of the Fourth Amendment's protections against unreasonable searches and

seizures, the Supreme Court has held "that the facts supporting a warrant must be 'so closely

related to the time of the issue of the warrant as to justify a finding of probable cause at that

time.'" United States v. Webb, 255 F.3d 890, 904 (D.C. Cir. 2001) (quoting Sgro v. United

States, 287 U.S. 206, 210 (1932)). In Webb, the D.C. Circuit found "troubling" the issuance of a

search warrant more than 100 days after the last direct evidence of criminal activity, and

questioned "whether there was probable cause to believe that such records would still be [in

defendant's home] four months after the last known transaction." Webb, 255 F.3d at 904. The

information on which the affidavit in Webb relied consisted of drug transactions conducted

between the defendant and an informant, recorded on audiotape, two of which occurred inside

the informant's home 119 and 123 days prior to the application, and the last of which occurred in

a government vehicle some 109 days prior. Webb, 255 F.3d at 892. The court ultimately

declined to reach the staleness issue, finding under United States v. Leon, 468 U.S. 897, 926

(1984), that given the facts presented it would not have been unreasonable for a "well trained

police officer" to have "believed that there existed probable cause to search." Webb, 255 F.3d at 905 (quoting Leon, 468 U.S. at 926). In contrast, the Affidavit here relies on information from confidential informants that, at the time the Application was presented, was three to five years old. Here, none of the informants provided any information as to what occurred in Ms. Palfrey's home, nor had they even allegedly been there. Additionally, the informants claimed to have mailed money orders to a post office box, not Ms. Palfrey's home. Such reliance is more than "troubling;" indeed, it cannot support a finding of probable cause.

In Schoeneman v. United States, 317 F.2d 173 (D.C. Cir. 1963), the D.C. Circuit reversed the defendant's bribery and conspiracy convictions on the basis that probable cause was insufficiently established in the search warrant issued, and a motion to suppress should therefore have been granted. The court found the timing of the search warrant application—107 days following the date on which a government informant stated that he had seen the alleged classified documents in the defendant's home—especially relevant, though it noted that "time alone, of course, is not controlling." Id. at 177. The Schoeneman court found the critical question to be whether the affidavits, at the time presented in support of the search warrant, demonstrated probable cause to believe that the items sought were still on the premises:

> To support a search warrant the proof supplied 'must speak as of the time of the issue of (the) warrant. The commissioner has no authority to rely on affidavits which have sole relation to a different time and have not been brought down to date or supplemented so that they can be deemed to disclose grounds existing when the . . . warrant is issued.'

Id. (quoting Sgro, 287 U.S. at 211 n.9). The court found that the affidavits did not sufficiently demonstrate probable cause, as it was "merely alleged that certain [items] were seen in [defendant's] house," there was no allegation that such items had not been moved in the intervening time period, and further, the evidence indicating that the items were in the

5

defendant's home was uncorroborated hearsay.  Schoeneman, 317 F.2d at 177-78.  While

Schoenman is obviously an old case, its basic analysis of the staleness issues remains valid

today.  See, e.g., United States v. Johnson, 437 F.3d 69, 72 (D.C. Cir. 2006) (citing Schoeneman

with approval for the proposition that "everything else being equal, of course, dated information

is less likely to show probable cause than fresh evidence.").[3]

In the Affidavit here, probable cause is based primarily on the statements of five

unidentified confidential informants who, the government fails to reveal in the Application, were

surely motivated to provide as much information about Ms. Palfrey as possible since they were

apparently being excused from any wrongdoing themselves.  Confidential Informant #1 is

alleged to have worked for Pamela Martin & Associates ("PM&A") between April and

September 2001, and again between December 2001 and February 2002.  Affidavit at ¶ 21.

Confidential Informant #2 is alleged to have worked for PM&A between February and May

2003.  Affidavit at ¶ 25.  Confidential Informant #3 is alleged to have begun working for PM&A

in October or November 2001 and is unsure as to how long she worked, but there is no

suggestion that her tenure was contemporaneous with the time of the search.  Affidavit at ¶ 26.

Confidential Informant #4 is alleged to have started working for PM&A in the Spring of 2003

and worked for approximately two months.  Affidavit at ¶ 27.  Confidential Informant #5 is

---

[3] Other reported cases in this Circuit that have upheld search warrants attacked on staleness grounds involved significantly shorter time frames than the three to five year interval separating the alleged criminal conduct and application for a search warrant in this case.  See, e.g., United States v. Johnson, 437 F.3d 69, 72 (D.C. Cir. 2006) (four-and-a-half weeks); United States v. Anderson, 924 F. Supp. 286, 291-92 (D.D.C. 1996) (28 days); Allen v. United States, 960 F.2d 1055, 1057 (D.C. Cir. 1992) (less than 72 hours); United States v. Pelham, 749 F. Supp. 304, 308-09 (D.D.C. 1990) (six months); United States v. Laws, 808 F.2d 92, 104-05 (D.C. Cir. 1986) (less than 10 hours); United States v. Bruner, 657 F.2d 1278, 1298-99 (D.C. Cir. 1981) (six months).

alleged to have worked for PM&A "for a few months in 2003." Affidavit at ¶ 30. Each of these

confidential informants is alleged to have informed the affiant that she sent money orders via

express mail to Ms. Palfrey care of a post office box in Benicia, California. None of the

informants, nor the affiant, asserts any factual claim of knowledge as to what was actually

maintained in Ms. Palfrey's home, whether they had even been in her home, or whether Ms.

Palfrey operated her business from her home or received any of the proceeds in her home. In all,

the information provided by these unidentified confidential informants relates to activities

conducted at best two years prior to the application for a search warrant, and in some cases, more

than four years prior. The sum total of the information relating to activity contemporaneous with

the application for a search warrant is the affiant's broad statement that, "[a]s of August, 2006,

Pelfrey [sic] continued to receive express mailings from various women in the Washington, D.C.

metropolitan area," which addresses neither the volume nor the nature of the alleged continued

mailings nor whether the alleged illegal activity involved Ms. Palfrey's home as opposed to her

post office box. Affidavit at ¶ 32.

     Despite the affiant's attempt to link the stale information provided by the confidential

informants to contemporaneous activity, the Affidavit fails to establish probable cause that the

items sought by the search warrant were likely located in Ms. Palfrey's home at the time of the

Application. None of the confidential informants provide any information whatsoever regarding

items that might be held in Ms. Palfrey's home. In fact, none of these women ever claim to have

even stepped foot inside Ms. Palfrey's home. Instead, the affiant, Inspector Couvillon, relies

solely on assumptions and generalities, based on relatively little experience investigating such

federal offenses:

       [T]hat outcall agencies invariably use various writings, video tapes, computer
       records and other things . . . [that] [i]n most illegal outcall operation businesses,

the agency uses or keeps lists of customers, customer cards, and writings
depicting the names [of prostitutes working for the agency] . . . [that] [t]he
agencies also keep or use financial records . . . [and] that it is common for persons
engaged in illegal prostitution activity using outcall fronts, to preserve the records
and other items used to conduct the business for extended periods of time, such as
months or even years, even though such items are incriminating.

Affidavit at ¶ 8.  Similar to the concerns stated in Webb and Schoeneman, the Affidavit here

raises serious questions as to whether there existed probable cause to believe that the items

sought were located within Ms. Palfrey's home.  As addressed more fully below, the stale

information provided by the confidential informants fails to substantiate Inspector Couvillon's

claims regarding the usual practices of "outcall services," and the Affidavit as a whole fails to

establish probable cause.

**B.  The Affidavit omits relevant facts which cut clearly against a finding of probable cause.**

The Affidavit, as discussed above, fails to establish probable cause in violation of the

Fourth Amendment.  In addition, however, the Affidavit omits relevant information—

information to which Ms. Palfrey believes the affiant, Inspector Couvillon, would have been

privy and which would demonstrate that she, as a "prudent, reasonably cautious [ ] officer,"

could not have believed there was probable cause to search Ms. Palfrey's home.  United States v.

Davis, 458 F.2d 819, 821 (D.C. Cir. 1972).  In sum, the information contained in the Affidavit

fails to establish probable cause that Ms. Palfrey was running an *illegal* business.  While the

information known to the affiant does demonstrate that Ms. Palfrey was running an escort

service, the Affidavit fails to set forth information demonstrating that running an escort business

is an illegal activity.[4]

---

[4] Additionally, upon information and belief of defense counsel, the Affidavit relies upon information provided by a
likely confidential informant whose credibility is in tatters.  Assuming, since the actual identities of the informants
described in the Affidavit are not yet known, that this particular former escort was one of the informants, the
Affidavit's failure to disclose clear issues about her reliability is troubling.

For example, in Paragraph 20, the Affidavit describes generally the process through which Ms. Palfrey hired and employed escorts for PM&A.  The description fails entirely to mention the important fact, which we believe was known to the government at the time, that these women were hired as <u>independent contractors</u> who were required by Ms. Palfrey to sign written contracts forbidding them from engaging in illegal activity.  Additionally, in Paragraph 7, the Affidavit states that <u>most</u> operators of outcall agencies are aware that their employees are engaging in sexual acts for money, and that the <u>majority</u> of these outcall agencies are actually illegal prostitution businesses.  Nowhere in the Affidavit do the facts mustered to demonstrate probable cause state unequivocally that Ms. Palfrey knew that the independent contractors of PM&A were engaging in illegal sexual activities.[5]

Most of the Affidavit addresses Ms. Palfrey's management of an escort business and how appointments and payments were made; but it does not specifically allege that Ms. Palfrey knew illegal sexual conduct was taking place.  Indeed, while the Affidavit is crafted in a way that *suggests* Ms. Palfrey was operating an illegal business, a careful parsing of the facts reveals otherwise.  None of the confidential informants provide any information demonstrating that they specifically told Ms. Palfrey they were providing illegal sexual services to clients.  The closest the Affidavit comes to asserting this knowledge is Confidential Informant #1's claim to have had a conversation with Ms. Palfrey in which she, sometime in the course of her employ in mid-2001 or early 2002, informed Ms. Palfrey that she would not sleep with a certain client and another conversation in which Ms. Palfrey informed her to use protection.  Even those statements fail to actually allege illegal sexual conduct or that any relationship with a client was specifically an exchange of money for sexual activities that are illegal, as opposed to sexual activity that is legal

---

[5] While the warrant cites the money laundering, Mann Act, and Travel Act statutes, in essence, the factual allegations are all directed at the purported Travel Act offense.

or sexual activity outside what the client had contracted for through PM&A. Affidavit at ¶ 23.
In fact, a careful reading of the Affidavit demonstrates that the escorts made their own decisions
in regard to having sexual relations, in clear violation of their contracts with PM&A, and
documents several instances where the escort declined to engage in sexual intercourse but
nevertheless was paid and transmitted the management fee to Ms. Palfrey. See, e.g., Affidavit at
¶¶ 22, 27, 30.

        For example, Confidential Informant #2's self-proclaimed "baptism by fire" involved
sexual conduct that stopped short of intercourse. Affidavit at ¶ 25. Her statement that Ms.
Palfrey's comment that the escort service was not about accompanying a client at a social
function made her aware that sex was involved does not actually state that Ms. Palfrey informed
her that the job involved illegal forms of sexual activity, though that is the implication the affiant
seeks in support of the Application. See Affidavit at ¶ 25. Confidential Informant #5 allegedly
fails to inform Ms. Palfrey when she did not have sex but makes no mention of whether she
informed her when she did have sex. See Affidavit at ¶ 30. Thus, the Affidavit artfully, but
misleadingly, describes the business of an escort service but fails to actually set out an alleged
crime by Ms. Palfrey or that she had actual knowledge that the escorts were engaging in illegal
activity.

        In sum, the Affidavit omits facts negating probable cause, but fails nonetheless to
sufficiently demonstrate probable cause that Ms. Palfrey was knowingly engaged in an illegal
prostitution business as opposed to managing an escort service which provided legal sexual
fantasies or other legal services. Accordingly, the information and evidence obtained from the
execution of the October 3, 2006, search warrant should be suppressed.

## II.  THE SEARCH WARRANT IS UNCONSTITUTIONALLY OVERBROAD.

The search warrant and accompanying Affidavit lack sufficient particularity and are unconstitutionally overbroad as defined in this Circuit.  For purposes of satisfying the particularity requirement, the D.C. Circuit permits the interpretation of a search warrant with reference to the affidavit supporting it, provided that, as here, the affidavit accompanies the warrant and the warrant incorporates the affidavit by reference.  See, e.g., United States v. Maxwell, 920 F.2d 1028, 1031 (D.C. Cir. 1990) (finding that while the warrant itself was overbroad, the accompanying affidavit acted to sufficiently limit the scope of the warrant) (citing, *inter alia*, United States v. Vaughn, 830 F.2d 1185, 1186 (D.C. Cir. 1987)).  However here, unlike in Maxwell, both the warrant itself and the accompanying Affidavit are fatally overbroad.

As interpreted by the United States Supreme Court, the Fourth Amendment prohibits the "general, exploratory rummaging [of] a person's belongings" by requiring "a 'particular description' of the things to be seized." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  This reading of the Fourth Amendment limits searches "to the specific areas and things for which there is probable cause to search," for the purpose of ensuring "that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Maryland v. Garrison, 480 U.S. 79, 84 (1987).  As discussed above, the Affidavit here failed to demonstrate probable cause by virtue of its reliance upon stale facts, lack of any assertion of actual knowledge of the contents of Ms. Palfrey's home, and reliance on generalities that could be applied to virtually anyone's home.  Indeed, the category of sought records establishing Ms. Palfrey's "control" of the Vallejo home cannot be a legitimate basis for a search warrant when such records could easily be obtained from local

government real estate records or could have been verified had the government simply engaged in some form of surveillance. Assuming, however, for the sake of argument that the Affidavit did establish probable cause, the search warrant and accompanying Affidavit nevertheless failed to describe with particularity the items to be seized, and the resulting search can be fairly characterized as merely exploratory and therefore unconstitutional.

Attachment B to the Affidavit describes the items Inspector Couvillon believed were located within Ms. Palfrey's residence. Attachment B lists five general categories including, summarily, (a) financial records, (b) identifying information relating to employees and/or clients, (c) information demonstrating Ms. Palfrey's possession, dominion, and control of the residence, (d) computer and/or electronic equipment and any written or printed material relating to Pamela Martin and Associates; and (e) "photographs of co-conspirators and any other photographs or depictions of evidentiary value." Affidavit at Attachment B, 17-18. The information provided by the unidentified confidential informants fails to sufficiently demonstrate probable cause that these items existed within the confines of Ms. Palfrey's home, and the Affidavit relies solely on the affiant's various assumptions that "outcall services" tend to keep these types of materials for long periods of time. These defects render the enumerated categories of items to be seized patently overbroad and effectively constitutes permission for Inspector Couvillon to rummage through Ms. Palfrey's home in search of any document or item which might conceivably support her theory of the case. This is precisely the type of search that the Fourth Amendment categorically prohibits. The fruits of that unconstitutional search—some seven boxes, itemized on the five-page search warrant inventory—should be suppressed.

## **CONCLUSION**

For the foregoing reasons, Ms. Palfrey respectfully requests that the Court suppress the

evidence obtained by the government pursuant to the October 3, 2006, search warrant.  Ms.

Palfrey respectfully requests an evidentiary hearing on this motion.

Respectfully submitted,


        /s/
Preston Burton, Esq., D.C. Bar No. 426378
Bree N. Murphy, Esq., D.C. Bar No. 497418
Orrick, Herrington & Sutcliffe LLP
Washington Harbour
3050 K Street, N.W.
Washington, D.C.  20007

Dated: July 26, 2007                    *Counsel for Deborah Jeane Palfrey*

# EXHIBIT A

AO 106 (Rev. 5/85) Affidavit for Search Warrant

# United States District Court

## ORIGINAL FILED

OCT - 4 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

### EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of

(Name, address or brief description of person or property to be search)

803 Capitol Street
Vallejo, CA, 94590,
2003 Ford Thunderbird Convertible
California License plate RUM009

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER:

2:06 - SW - 0274    KJM

I, Maria E. Couvillon being duly sworn depose and say:

I am a(n) Postal Inspector with the U.S. Postal Inspection Service and have reason to believe that ( ) on the person of or (X) on the property or premises known as (name, description and/or location)

SEE ATTACHMENT A

in the Eastern District of California there is now concealed a certain person or property, namely
(describe the person or property to be seized)

SEE ATTACHMENT B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of Criminal Procedure)

Any and all items found inside the premises or the vehicle to be searched that may contain evidence, fruits and instrumentalites.

concerning a violation of Title   United States Code, 18   Section(s) 1956(a)(A)(1)(f), 2242 and 1952. The facts to support a finding of Probable Cause are as follows:

See Attached Affidavit of Maria E. Couvillon

Continued on the attached sheet and made a part hereof.        (X) Yes        ( ) No

_Maria E. Couvillon_
Signature of Affiant
Maria E. Couvillon
Postal Inspector

Sworn to before me, and subscribed in my presence

10/3/06
Date

at  Sacramento, CA
City and State

KIMBERLY J. MUELLER
United States Magistrate Judge
Name and Title of Judicial Officer
AUSA R. STEVEN LAPHAM

_Signature of Judicial Officer_
Signature of Judicial Officer

AO 93 (Rev. 12/03) Search Warrant

ORIGINAL
FILED

# UNITED STATES DISTRICT COURT
OCT - 4 2006

EASTERN _____ District of _____ CALIFORNIA

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ____ DEPUTY CLERK

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

**SEARCH WARRANT**

803 Capitol Street
Vallejo, CA 94590,
2003 Ford Thunderbird Convertible
California License plate RUM009

2:06 - SW - 0274    KJM

Case Number:

TO: **Maria E. Couvillon** _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____ **Maria E. Couvillon** _____ who has reason to believe

that ☐ on the person of, or ☒ on the premises known as (name, description and/or location)

**See Attachment A, attached hereto and make a part hereof,**

in the _____ Eastern _____ District of _____ California _____ there is now
concealed a certain person or property, namely (describe the person or property)

**See Attachment B, attached hereto and made a part hereof,**

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described
is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED TO search on or before _____ 10/13/06

Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the

search ☒ in the daytime -- 6:00 A.M. to 10:00 P.M. ☐ at anytime in the day or night as I find reasonable cause has been
established and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person
or property taken and prepare a written inventory of the person or property seized and promptly return this warrant to

**KIMBERLEY J. MUELLER** _____ as required by law.

U.S. Magistrate Judge (Rule 41(f)(f4))

10/3/06 —3:05 p.m. _____ at _____ **Sacramento, CA**

Date and Time Issued _____ City and State

**KIMBERLEY J. MUELLER**
**U.S. MAGISTRATE JUDGE**

Name and Title of Judge _____ Signature of Judge

AO 93 (Rev. 12/03) Search Warrant

| RETURN | | Case Number: | |
|---|---|---|---|
| DATE WARRANT RECEIVED 10/3/06 | DATE AND TIME WARRANT EXECUTED 10/4/06  8:13 a.m. | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH Dep 803 Capitol Street, Dining Room Table | |

INVENTORY MADE IN THE PRESENCE OF Postal Inspector Maria Couvillon

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

SEE ATTACHED FIVE SEARCH WARRANT INVENTORY SHEETS.

MC

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Maria Couvillon

Subscribed, sworn to, and returned before me this date.

_____
Signature of Judge

10/4/06
Date

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Maria E. Couvillon, being duly sworn, depose and state the following:

1. I have been a Postal Inspector with the United States Postal Inspection Service since February 2004 and I am currently assigned to the Washington Division.  Upon entering the United States Postal Inspection Service, I completed twelve weeks of training.  This training covered various aspects of federal law enforcement.  Prior to serving as a United States Postal Inspector I was a Police Officer with the Arlington County Police Department for six and one half years.  In that capacity, I attended the Northern Virginia Regional Criminal Justice Academy in Ashburn, Virginia for twenty weeks. My law enforcement training and experience include the preparation, presentation, and service of criminal complaints, arrest and search warrants.

2. This affidavit is made in support of an application for a warrant to search the premises located at 803 Capitol Street, Vallejo, California, 94590, in the county of Solano, which is more particularly described in Attachment A.  The purpose of this application is to seize evidence of violations of Title 18 United States Code, Section 1956 (a)(1)(A)(i), Laundering of Monetary Instruments, and Title 18 United States Code, Section 1952, Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises.

3. The information contained in this affidavit is based on my personal knowledge and observations made by me during the course of this investigation, on information conveyed to me by other individuals and law enforcement officials, and on my

1

examination and review of records, documents and physical evidence obtained during the course of the investigation.

4. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe establish a violation of Title 18 United States Code, Section 1956 (a)(1)(A)(I), Laundering of Monetary Instruments, and Title 18 United States Code, Section 1952, Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises , and Title 18 United States Code, Section 2422 inducing interstate travel to engage in prostitution and that evidence of these crimes is presently at the location to be searched. Section 1952 makes it a crime for anyone to use the mail or any interstate facility with the intent to distribute the proceeds of any buisness enterprise involving prostitution, or otherwise promote, manage, establish, carry on, or faciliate any such enterprise. Section 1956 (a)(1)(A)(i) makes it a crime for anyone to conduct a financial transaction knowing that the property involved in that financial transaction represents the proceeds  of some form of criminal activity and with the intent to promote the carrying on of specified unlawful activity.

5. Your affiant knows that criminals who violate laws against Title 18 United States Code, Section 1956 (a)(1)(A)(i) and 1952, operate front businesses which may appear to be legitimate, but which in fact are vehicles used to conduct prostitution businesses while avoiding detection or apprehension by law enforcement officers.  A majority of these fronts are outcall type businesses, usually referring to or purporting to involve models or modeling, escorts, or massage services.  These services advertise in news publications, local magazines, the internet and in the Yellow Pages, usually listing

2

one or more phone numbers for the business. Experience has shown that customers, almost all of whom are male, can call the listed number and request a woman, usually in the form of a request for a model, escort, date, or for a massage. The customer in many cases will be allowed to describe the type of female and the physical characteristics he desires. The person answering the phone for the outcall agency will explain the cost, usually obtain the customer's name and address or location and the method of payment, i.e. cash, check or charge card, and will contact or dispatch a female to go to the caller's location.

6. In most of those operations the woman dispatched to the call will go to the location given by the caller, introduce herself and discuss the financial aspects of the meeting, usually in terms of a flat fee for the outcall agency and in some cases an additional tip for herself. In most of these arrangements, the woman will solicit or engage in sexual acts with the customer in return for the agency fee and/or the tip.

7. Generally, a major portion of the agency fee is paid to the owner or operator of the outcall agency by the female who goes to the particular call. The female generally keeps the rest of the agency fee and the tip, if any. Most of the owners or operators of these outcall agencies are aware that the females dispatched to the customers are engaging in sexual acts in return for money paid by the customer. The majority of these outcall agencies are illegal prostitution businesses.

8. Your affiant knows that outcall agencies invariably use various writings, video tapes, computer records and other things, such as those described fully in Attachment A. In most illegal outcall operation businesses, the agency uses or keeps lists of customers, customer cards, and writings depicting the names or first names or nicknames of the

prostitutes working with the agencies, along with their physical descriptions and/or measurements and notations of the sexual acts in which they will or will not participate with a customer. The agencies also generally keep lists of police officers or undercover names used by police officers active in Vice enforcement, and lists of locations where the agency's prostitutes have been arrested while on outcalls, often called "hot lists". The agencies also keep or use financial records of the prostitution business or records of activity, such as ledger sheets, writings depicting calls by customers and prostitutes dispatched thereto, the amounts charged and received for the outcall, checks made out by customers, credit card slips completed by customers and bank slips for future customers, and credit card imprinting devices. Because the outcalls are conducted via telephone, the businesses use the telephone themselves, telephone answering equipment and tapes thereto, tape recorder and tapes, automatic or speed dialers, and in many cases, will subscribe to beepers or pagers for the individual prostitutes so that the agency can contact them at any time. Many outcall businesses have call forwarding capabilities on their telephone lines so that incoming calls can be re-routed to remote telephones, cellular phones or other paging devices, making it possible for the business to receive client calls at any location. Most outcall prostitution businesses maintain maps of the cities and counties in which they operate in order to locate calls for the prostitutes. Your affiant knows that it is common for persons engaged in illegal prostitution activity using outcall fronts, to preserve the records and other items used to conduct the business for extended periods of time, such as months or even years, even though such items are incriminating. Such records are valuable as a ready reference source to the operator of an illegal outcall prostitution business, enabling that person to screen incoming telephone calls as a means

4

of determining whether a prospective customer is in fact an established customer of the business or is, instead, a police officer attempting to pose as a customer of the business. Having such value, these records are typically kept in the immediate area where the business' telephones are being answered, usually at night, and are secreted in a hiding place when the business is not actually operational, usually during the daytime hours. It is quite common for outcall prostitution businesses to have, at any given time, records dating back several months and even years. Persons who own or operate these outcall prostitution services are highly likely to possess current and past records and other items such as those fully described in Attachment A, at the places where the given operator is now, or was recently, or to which incoming calls are forwarded.

9. In addition to using telephones to receive calls from customers and potential customers, the outcall prostitution business will often require the prostitute to check in via telephone with the agency when she arrives at a customer's location and again when she is ready to leave. Such agencies also communicate over the telephone with other agencies to learn of "hot" locations or recent Vice arrests.

10. With respect to the location where the illegal prostitution business is conducted, or where evidence of the business is kept, it is your affiant's experience that persons who use or occupy a premise will invariably keep items there which show their possession of the premises, such as keys, canceled mail envelopes, rental and lease agreements of the premises, rent receipts, bills for telephone and utility service, either in the name of the occupier or addressed to the premises, bank statements and photographs, notices from governmental agencies and employment application forms, and legal and

personal effects and correspondence likely to be kept or stored by an occupant or possessor of the premises.

11. Your affiant knows that suspects who are involved in outcall prostitution often keep records of prostitution transactions, names and addresses of customers and prostitutes, and related personal notes in their vehicles. Your affiant also knows that suspects engaging in this activity lead a highly mobile lifestyle and often use their vehicles as their "offices". Keeping the prostitution records in their vehicles enables them to conduct business during periods of absence from the premises where the evidence of the business is kept.

Background

12. Starting in June 2004, the United States Postal Inspection Service and the Internal Revenue Service, Criminal Investigation Division began a joint investigation into the operation of a purported outcall escort business known as "Pamela Martin and Associates" (PM&A), which operated in the Washington, DC metropolitan area. Deborah Jean Palfrey owns and operates PM&A from her home located at 803 Capitol Street, Vallejo, California. Your affiant has reviewed evidence demonstrating Palfrey's involvement in the prostitution business since the early 1990's. In 1991, she was arrested and convicted of running a prostitution business in San Diego, California. She served eighteen months in prison for that conviction. Upon being released from prison and while on probation for that offense, she started the current prostitution business under the name Pamela Martin and Associates in the Washington, DC metropolitan area in 1993.

13. The investigation has revealed that Deborah Jean Palfrey, aka "Julia," advertises PM&A in the Washington City Paper, the Yellow Pages under "Escorts" and

6

on the internet using the web address www.pamelamartin.com. The ads direct both

potential clients and escorts to call three telephone numbers: (202) 737-4200, (301) 231-

5800 and (410) 244-1818. Your affiant obtained and reviewed phone records for the

above listed phone numbers. The investigation revealed that these telephone numbers are

remote call forwarded to (707) 648-1500 and (707) 648-1000. Telephone records

indicate that (707) 648-1500 and (707) 648-1000 are landline numbers listed to Deborah

Jean Palfrey with a service address of 803 Capitol Street, Vallejo, California and a

mailing address of P.O. Box 1211, Benicia, California 94510.

14. United States Postal Service (USPS) records were obtained and reviewed for

Post Office Box 1211, Benicia, California. USPS Form 1093, Application for Post

Office Box or Caller Service, indicates the box holder for post office box 1211 is

Deborah Jean Palfrey. The application lists her home address as 803 Capitol Street,

Vallejo, California 94590. The form indicates that California driver's license number

C5206966 was documented as a form of identification for Palfrey at the time the box was

rented. The form further indicates the applicant did not intend to use the box for

soliciting or doing business with the public.

15. A review of Department of Motor Vehicle records revealed that California

driver's license number C5206966 is issued to Deborah Jean Palfrey, P.O. Box 1211,

Benicia, California 94510.

16. Your affiant obtained and reviewed domain records for

www.pamelamartin.com. The records revealed that the domain name is registered to

Pamela Martin and Associates, P.O. Box 1211, Benicia, California 94510. The

administrative contact is listed as Jeane Palfrey, P.O. Box 1211, Benicia, California

94510 and lists (707) 648-1000 as the phone number and (707) 648-1500 as the facsimile number.

17. Your affiant obtained and reviewed two Uniform Residential Loan Applications for 803 Capitol Street, Vallejo, California dated March 19, 1999 and November 2, 2001. Both documents indicate Deborah J. Palfrey is the sole owner of this property. Her employment is listed as owner of Pamela Martin and Associates, P.O. Box 1211, Benicia, California 94510. The type of business is described as "personal services" and the business and home phone numbers listed on both documents is (707) 648-1000.

18. Your affiant also obtained and reviewed the Uniform Residential Loan Application for 1441 Vaquero Glen, Escondido, California 92026, which is dated January 9, 2002. The document indicates Deborah J. Palfrey is the sole owner of this property. Her employment is listed as owner of Pamela Martin and Associates, P.O. Box 1211, Benicia, California 94510. The type of business is described as "personal services" and the business and home phone number is listed as (707) 648-1000.

19. Your affiant also obtained and reviewed the Charles Schwab SEP-IRA Participant Account Application for Deborah Jean Palfrey, which is dated February 24, 2003. The record reflects a home address of 803 Capitol Street, Vallejo, California 94510 and a mailing address of P.O. Box 1211, Benicia, California. Both the home and business phone number listed on the application is (707) 648-1000.

Informants

20. Beginning in December, 2005, interviews were conducted with several informants regarding PM&A. These informants had first hand knowledge of its operations and their respective roles. The informants revealed that Deborah Jean Palfrey

The reliability of the informants knowledge of the operation of
PM&A was verified by the USPS money order databases. Original
and/or postal money order images of the money orders purchased
by the informants were retained. In addition the Express Mail labels used by the

(aka "Julia") was the leader of the prostitution business. The informants described the business process as follows: Prostitutes are hired by Palfrey through classified, yellow page and internet ads. Palfrey interviews all of the women over the phone and requires them to mail a picture to her at a post office box in Benicia, California. Once hired, each woman is sent to a "screening" appointment, at which the women perform a free act of prostitution to ensure they are not law enforcement officers. The prostitutes set their own work schedules based on their availability, but are encouraged by Palfrey to work at least three nights per week. The prostitutes work at various locations, either residences or hotels in the Washington, DC metropolitan area. Palfrey tells them where, when and who they will be seeing. Clients pay a set fee at the start of the meeting, which has changed over the years (approximately $295 currently) for the purpose of engaging in sexual acts with a prostitute. Per Palfrey's instructions, the prostitutes keep approximately fifty percent of the money and forward the remainder to her. The prostitutes are directed by Palfrey to convert the cash payments received to postal or other money orders and send them to Palfrey via Express Mail to the post office box in Benicia, California. They are also directed by Palfrey to purchase multiple money orders in increments less than $1,000.

Confidential Informant #1

21. During the course of the investigation your affiant learned that CI1 worked for PM&A from April 2001 until September 2001, and then again from December 2001 until February 2002. At that time she was living in Great Falls, Maryland. CI1 saw PM&A's website, and then looked the company up in the yellow pages. CI1 does not recall if she called a local number or a long distance number to make initial contact. At Julia's

9

request, CI1 mailed a photo of herself to Julia at the post office box in California. After receiving the photograph, Julia called CI1 back and set up her first appointment. CI1's trial appointment was with Paul Huang, in Rockville, Maryland. CI1 told Julia that she wanted to be paid for the trial appointment, and Julia agreed. CI1 stated that Julia told her to charge $275.00 per hour, and CI1 kept 60% of the money and sent 40% to Julia. CI1 also stated that for "out of town" clients she was instructed to check their airline tickets or passports to ensure that they were who they said they were.

22. Following her initial appointment, CI1 worked as a prostitute for PM&A in Baltimore, MD, Sterling, VA, Annapolis, MD and Washington, D.C. She stated that she met with clients in private homes, and also at the J.W. Marriott Hotel in Washington, D.C., the Willard Hotel in Washington, D.C., and a number of Marriott Hotels and Hilton Hotels. CI1 never went to dinner, a movie, or a party with a client during the course of her employment with PM&A. She had sex with the majority of clients, but she stated that she refused to have sex with a few clients who appeared unwell, either physically or mentally.

23. CI1 further stated that she met with a client who seemed mentally slow, and she told Julia that she would not sleep with him again. On another occasion, CI1 told Julia that she could not work because she was menstruating. CI1 also stated that at some point she had a conversation with Julia about "protection" in which Julia told her to use condoms.

24. CI1 usually used a post office in Falls Church, Virginia to purchase and mail the money orders. She made out the postal money orders to "Ms. Palfrey" and express mailed them to P.O. Box 1211, Benicia, California.

10

Confidential Informant #2

25. During the course of the investigation your affiant learned that CI2 started working for PM&A in February 2003, and worked there for approximately three months. CI2 was living in Manassas, Virginia at the time. She found the agency in the "Adult Employment" section of the Washington City Paper. CI2 called a phone number with a 301 area code (301 is the area code for Maryland) and spoke to a woman who called herself "Julia". At Julia's request, CI2 mailed a photo of herself to Julia in California. After receiving the photograph, Julia called CI2 back and set up her first appointment. During one of their initial conversations, Julia told CI2 that "some women think this is just about going out to dinner with a guy, or going out socially with him." CI2 stated that this statement is what made her realize there would be sex involved. According to CI2, Julia described her first appointment as a "baptism by fire," and said this appointment was to ensure that CI2 was not a reporter. CI2's first appointment was in Woodbridge, VA, in an apartment or condominium with a white balding male who was employed in accounting. They engaged in sexual contact, but not intercourse. Following her initial appointment, CI2 was hired as a prostitute by PM&A. CI2 charged $275.00 per sexual encounter and kept $130.00. She was never paid by check. She stated that Julia told her to split the money orders so as to avoid sending anything over $800.00. (However, CI2 did send an $870.00 money order on one occasion.) CI2 made the postal money orders out to "Ms. Palfrey" and express mailed them to P.O. Box 1211, Benicia, California. CI2 never went to dinner or a movie with a client, and engaged in some form of sexual activity with each client scheduled by Julia. According to CI2, Julia told her that if she was seeing a new client, she was to allow the client to make the first move. She also told

11

CI2 that a particular client in Washington, D.C. "sounded like he had a little bit to drink, but was definitely not a cop." Julia sent a stack of PM&A "newsletters" via U.S. Mail to CI2 in Manassas, Virginia. CI2 kept these newsletters, which span from 1993 to 2003, and provided them to investigators. These news letters provide instructions to the prostitutes regarding their work hours, how long encounters with clients should last, fee structure, security measures against clients, how to recognize and avoid law enforcement, how to send payments, and other matters relating to the prostitution enterprise.

<u>Confidential Informant #3</u>

26. During the course of the investigation your affiant learned that CI3 started working for PM&A in October or November of 2001. CI3 was living in Washington, D.C. at the time. She claimed she needed money to pay off graduate school debts and moving expenses. She responded to an ad in the Washington City Paper. CI3 called the number listed in the ad and spoke to a woman who identified herself as Julia and Ms. Palfrey. Pursuant to Julia's request, CI3 sent a photograph to California. CI3's test run was in Arlington, Virginia. She understood the purpose of that appointment was to ensure that she could "comply with [Julia's] expectations and that [she] understood the nature of the work." CI3 had sex with the client but was not paid for this appointment. CI3 was thereafter hired by PM&A as a prostitute. At Julia's direction, CI3 charged $250.00 per appointment, and sent half of that money to Julia to a post box office in Benicia, California. CI3 was never paid by check. She stated that Julia instructed her to purchase and send money orders, and that she never sent cash to Julia. CI3 sent Julia money orders approximately once a week and made them out to "Ms. Palfrey". She did not remember if she was told to send them on particular days or in particular amounts.

She thought she sent money orders to Julia on approximately ten occasions. While she

worked for PM&A she received approximately ten to fifteen PM&A newsletters at her

home in Washington, D.C.

Confidential Informant #4

27. During the course of the investigation your affiant learned that CI4 started

working for PM&A in the spring of 2003. CI4 was living in Washington, DC at that

time. She found the agency in the yellow pages and called a phone number with a "301"

area code. Her initial conversation was with "Julia." At Julia's request, CI4 emailed a

photo of herself to Julia to a post box office in California. Julia sent a stack of PM&A

newsletters to CI4's Washington, D.C. address, but CI4 did not keep any of them. CI4's

test appointment was in Woodbridge, VA, with "Robert." CI4 had sex with Robert but

was not paid for that appointment, nor did she receive any money from Robert to send to

Julia. CI4 worked as a prostitute for PM&A for approximately two months, and believes

she charged $325 per appointment. She made out the postal money orders to "J. Palfrey"

and "Jeane Palfrey" and mailed them to P.O. Box 1211, Benicia, CA.

28. CI4 stated that Julia told her to check the identification of some of the clients

because Julia was concerned that someone she had not dealt with before might be from

law enforcement. Julia also told CI4 not to send money orders over a certain amount.

29. CI4 had sex with "nearly all" the clients she met. She stated that the times she

didn't have sex with the clients, it was usually because the client had physical problems.

She did go to dinner or a bar with about a half dozen of the clients. CI4 identified some

of her clients by name.

Confidential Informant #5

30. During the course of the investigation your affiant learned that CI5 worked for PM&A for a few months in 2003. During that time CI5 was living in Odenton, Maryland. She found the agency in the yellow pages and called a phone number with a 202 area code (202 is the area code for Washington, D.C.). Her initial conversation was with "Julia." At Julia's request, CI5 mailed a photo of herself, and a copy of her photo identification, to Julia at a post office box in California. CI5's test appointment was in Virginia, but she claimed not to recall the exact location, or the name of the person with whom she met. CI5 engaged in sexual relations with the test client, after which Julia told her that the client was "happy" with everything and that CI5 could start working for PM&A. CI5 stated that Julia instructed her to charge $275.00 for each one and a half hour appointment. CI5 also stated that Julia told her to purchase the money orders she sent to California from a different post office each time. CI5 ignored this instruction, and purchased and mailed most of her proceeds from a post office in Beltsville, Maryland. She made out the postal money orders to "Ms. Palfrey" and mailed them to P.O. Box 1211, Benicia, California. Most of CI5's appointments were in Maryland, although she did work in Washington, D.C. and Virginia a few times. CI5 could not recall the names of any hotels or addresses she went to. CI5 never went to a social event with a client, and she also stated that on a few occasions she refused to have sex with a client. She claimed that she never told Julia when she refused to have sex with a client. CI5 stated she received PM&A newsletters from Palfrey via the U.S. Mail, but she did not keep them.

14

Express Mail

31. Your affiant knows that shippers of illicit funds have learned to convert some or all of their proceeds into negotiable instruments such as money orders. The use of money orders allows illicit fund shippers to distance themselves from the proceeds of unlawful activity by converting those proceeds into negotiable instruments, which are less likely to draw the scrutiny of law enforcement. Your affiant also knows that the use of Express Mail is favored by illicit fund shippers because of the reliability, speed, low cost and the delivery tracking capability of this service. Mailers of illicit funds also select a signature waiver to ensure that the item goes through to its intended recipient and that the mailing is not returned to sender.

32. USPS Express Mail records were obtained and reviewed from February 2000 to the present. Those records reflect that more than 1,550 express mailings were addressed and delivered to P.O. Box 1211, Benicia, California. The vast majority of the express mailings were mailed with a signature waiver. Deborah Jean Palfrey is presently the box holder for post office box 1211. As of August, 2006, Pelfrey continued to receive express mailings from various women in the Washington, D.C. metropolitan area.

Conclusion

33. Based on the facts set forth herein, there is probable cause to believe that Deborah Jean Palfrey has been and continues to operate Pamela Martin and Associates, an illegal outcall prostitution business. Palfrey hired various female subjects, residing in Virginia, Maryland and the District of Columbia, to travel to Virginia, Maryland and the District of Columbia for the purposes of engaging in illegal sex acts, instructed these

women to convert the proceeds to postal money orders and mail them to her via express mail in violation of Title 18 U.S.C. § 1956 (a)(1)(A)(I) and 1952.

34. Your affiant believes that there is probable cause that the property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment A of this Affidavit, are located in the residence at 803 Capitol Street, Vallejo, California, 94590 and her vehicle, more fully described in Attachment B. Deborah Jean Palfrey has violated Title 18 U.S.C. § 1956 (a)(1)(A)(i), § 2422 and § 1952.


Inspector Maria Couvillon
U.S. Postal Inspection Service



Sworn to and subscribed before me this ___3rd___ day of October, 2006.


United States Magistrate Judge

16

ATTACHMENT B

LIST OF ITEMS TO BE SEIZED AND SEARCHED

Any and all items found inside the premises to be searched that may contain evidence, fruits and instrumentalities of violations Title 18 United States Code, Section 1956 (a)(1)(A)(i) and 1952, including closed or locked containers and the following items:

a. financial records, however maintained, including but not limited to income statements, cash receipts journals, bank statements, deposit slips, canceled and uncanceled checks, check stubs, check registers, money orders, accounts receivable journals, U.S. Currency, cash disbursement journals, tax returns and tax return information, general journals, financial statements and record of assets;

b. rolodex and other files, customer cards, and lists, employee lists, city and county directories, maps, address and/or telephone notebooks and papers, including any computerized or electronic records, reflecting names, addresses and telephone numbers, telephone equipment including programmable automatic dialing devices, answering and recording equipment, video and audio tapes, credit card vouchers and credit card imprinting devices, employee instruction lists, employment application forms, and other business records which show the operation of the female outcall business known as Pamela Martin & Associates;

c. handwriting exemplars, papers, documents and effects which tend to show possession, dominion and control of the described residence premises, including

17

but not limited to keys, canceled mail envelopes, rental and lease agreements and

receipts, property tax bills and ownership documents, vehicle registration slips,

bills for telephone and utility service, notices from government agencies;

d.   computer equipment, peripherals and electronic storage media, including

information stored on a computer hard drive, diskettes, tapes and other media

capable of storing information in a form readable by computer data printer and all

software necessary to retrieve electronic data, including but not limited to

operating systems, database, spreadsheet, word processing and graphics

programs, and all written notes or printed material describing the operation of the

computer, and confidential password lists to enter secured files, including any

computerized or electronic records, relating to Pamela Martin and Associates;

e.   photographs of co-conspirators and any other photographs or depictions of

evidentiary value, passport, cellphones, caller ID call logs;

f.   to open safes, lock boxes or receptacles where evidence listed above in sections a

through e could be hidden.

18

## ATTACHMENT A

## THE VEHICLE TO BE SEARCHED

The vehicle identified by California license plate RUM009, described as a 2003 Ford Thunderbird convertible, registered to Deborah Jean Palfrey at P.O. Box 1211, Benicia, California 94510. Included in the areas to be searched are the trunk, glove boxes, and all closed containers, bags, folders, wallets, briefcases, suitcases, envelopes, and document depositories within and attached to said vehicle.

## PREMISES TO BE SEARCHED

803 Capitol Street, Vallejo, CA is described as a two story Victorian house constructed of beige vinyl siding and white trim with a brown stained front door, enclosed by a black wrought iron fence. The numbers 803, appear on the front column of the house and are gold in color. A black city landmark plaque is attached to the front of the house adjacent to the front door. Attached to the house is a garage with a white door and red brick driveway. The requested search is to include all the rooms, closets, filing cabinets, desks, trash receptacles, storage areas, crawl spaces, luggage such as brief cases and suitcases, folders, basements, attics, safes, safety deposit boxes, cabinets, bags, bureaus, drawers, handbags, personal effects such as wallets and appurtenant structures such as sheds, trash areas, guest houses, garage, attached and unattached outbuildings, and yards and storage areas within the property boundaries, and items found therein that may contain evidence, including items such as computers and other digital or electronic media, as well as closed or locked containers.

# EXHIBIT B

# THE UNITED STATES POSTAL INSPECTION SERVICE
## SEARCH WARRANT INVENTORY

Position/Box.: _____

Subject Name: DEBORAH JEAN PALFREY

Date: 10/04/06

Subject Address: 803 CAPITOL STREET VALLEJO, CALIFORNIA

Floor/Room No. Rm. 1-B

Inspector(s): MARIA COUVILLON

Case No. 1140-1389459 MLI (1)

| Safe: | Cabinet: | Credenza: | Desk: ✓ | Drawer: ✓ |
|---|---|---|---|---|
| Shelf: | Table: | Wall: | Other: | |

### DESCRIPTION OF ITEMS

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | #A01293460 - Indicia, ID Cards, mail, Business Cards |
| 1 | #A01293461 - Checkbooks + deposit slips (3) |
| 1 | #A01293458 - Indicia |
| 1 | #A01293459 - Deposit records WFB |
| 1 | #A01293457 - Checkbooks (2) |

DISTRIBUTION OF COPIES: White - U.S. Magistrate (Return with Warrant)
Yellow - Inspector (Attach to PS Form 714)
Pink - Subject Searched
Green - Evidence Control Officer (Attach to PS Form 714)

Page 1 of 5 page

# THE UNITED STATES POSTAL INSPECTION SERVICE

## SEARCH WARRANT INVENTORY

Position/Box.: _____1_____

Subject Name: DEBORAH JEAN PALFREY    Date: 10/04/06

Subject Address: 803 CAPITOL STREET    Floor/Room No. Rm 1-D

VALLEJO, CALIFORNIA    Case No. 1940-1389459 MILI (1)

Inspector(s): MARIA COUVILLON

| Safe: | Cabinet: | Credenza: | Desk: | Drawer: |
| Shelf: | Table: | Wall: | Other: Closet |

| QUANTITY | DESCRIPTION OF ITEMS |
| --- | --- |
| 1 | # A01293470 - Toshiba Satellite Pro S/N Y73428577 (with ac power adaptor + manual on continuation label) |
| 1 | # A01293493 - One white box containing manual credit card machine and Verifone CC machine w/ paperwork |
| 1 | # A01293492 - One box labeled Discover containing credit processing information |

# THE UNITED STATES POSTAL INSPECTION SERVICE
# SEARCH WARRANT INVENTORY

Position/Box: _____/_____

Subject Name: DEBORAH JEAN PALFREY    Date: 10/04/06

Subject Address: 803 Capitol Street    Floor/Room No. Rm 1-G
Vallejo, California

Inspector(s): Mand Division    Case No. 1140-1389459 MLI(-)

| Safe: | Cabinet: | Credenza: | Desk: | Drawer: |
|---|---|---|---|---|
| Shelf: | Table: | Wall: | Other: ✓ Kitchen-Countertop | |

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | # A01293469 - Phone contact book including appointment schedule. |
| 1 | # A01293472 - Identification info (drivers license, passport copies for women in MD, Fraser 1099 CD Rom in Express mailer) |
| 1 | # A01293475 - Fax coil listings Park Lake Towers (FL) annual meeting paperwork, Charles Schwab accts. letters, invoice for Web banner, purchase order for Colectica |
| 1 | # A01293474 - Past due amount paperwork with reference to money orders Woman ID and contact information Park Lake Towers annual notice |
| 1 | # A01293471 - Bank checks, Check stubs 2004-2005 |
| 1 | # A01293408 - Appointment book including identification information for women |
| 1 | # A01293467 - 2005 appointment book including notes of sales of stock, real estate contacts + notes |

DISTRIBUTION OF COPIES: White-U.S. Magistrate (Return with Warrant)
Yellow-Inspector (Attach to PS Form 714)
Pink-Subject Searched
Green-Evidence Control Officer (Attach to PS Form 714)

Page 3 of 5 pages

# THE UNITED STATES POSTAL INSPECTION SERVICE
## SEARCH WARRANT INVENTORY

Position/Box: _____1___

Subject Name: DEBORAH JEAN PALFREY          Date: 10/4/06

Subject Address: 803 CAPITOL STREET          Floor/Room No. Rm 1-H

VALLEJO CH

Inspector(s): Maria Couvillon          Case No. 1140-1389459 m 1(1)

Safe: _____ Cabinet: ✓ Credenza: _____ Desk: ✓ Drawer: _____

Shelf: ✓ Table: _____ Wall: _____ Other: OFFICE

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | # A01293473 - Toshiba Satellite 2415-5205 |
| | SN 23121241P Loc adaptor and product info on continuation |
| 1 | # A01293480 - DC Northern VA MD NY mapbooks + |
| 1 | # A01293486 - CD-web design, letters, disbursement journal-|
| 1 | # A01293482 - CD Roms |
| 1 | # A01293485 - Wells Fargo Bank Smts 20 Aug 04 - |
| | 31 Aug 06 Charles Schwab Stmts 2003 - Aug 2006 |
| 1 | # A01293479 - Four expandable folders blue green red |
| | black containing profiles |
| 1 | # A01293478 - Appointment books Binder of notes |
| | on men for escort service. |
| 1 | # A01293476 - Binders of womans profiles |
| 1 | # A01293484 - Phone records, bank/mortgage records - |
| | Wells Fargo City Paper Ad - FHA |
| 1 | # A01293483 - Employee contractor agreements, Newslette |
| | |
| | |
| | |
| | |

DISTRIBUTION OF COPIES: White- U.S. Magistrate (Return with Warrant)
Yellow- Inspector (Attach to PS Form 714)
Pink- Subject Searched
Green- Evidence Control Officer (Attach to PS Form 714)

Page 4 of 5 pages

# THE UNITED STATES POSTAL INSPECTION SERVICE

## SEARCH WARRANT INVENTORY

Position/Box: _____ /

Subject Name: DEBORAH JEAN PALFREY    Date: 10/4/06

Subject Address: 813 Capitol Street    Floor/Room No. Rm 13-1
VALLEJO, CA

Inspector(s): Mano Cauuilion    Case No. 1/40-1389459 (MLI(1)

Safe: ✓    Cabinet: _____    Credenza: _____    Desk: _____    Drawer: _____

Shelf: _____    Table: _____    Wall: _____    Other: ✓ Basement

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | # A01293496 - 4 file folders relating to IDs for Escort Service, 1 file ref. sale of Pamela Martin Business. |
| 1 | # A01293494 - 7 file folders with newspaper Ad material for Escort Services. |
| 1 | # A01293495 - file box marked Internal Revenue + Bank Statements |
| 1 | # A01293487 - US Liberty $50 gold coins (81) US Liberty $1 silver coins (330) Canadian $50 Gold coins (61) South African Gold Krugerrands (413) |

DISTRIBUTION OF COPIES:  White-U.S. Magistrate (Return with Warrant)
Yellow-Inspector (Attach to PS Form 714)
Pink-Subject Searched
Green-Evidence Control Officer (Attach to PS Form 714)

Page 5 of 5 pages

PS Form 8164, October 1993

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **V.** | ) | **CRIMINAL NO. 07-046 (GK)** |
| | ) | |
| **DEBORAH JEANE PALFREY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Upon consideration of defendant Deborah Jeane Palfrey's Motion to Suppress Evidence Obtained from her Home and the accompanying Memorandum, any opposition thereto, and the evidence presented at the hearing on this matter, it is this _____ day of _____, 2007, hereby

ORDERED that the evidence obtained by the government pursuant to the October 3, 2006, search warrant was obtained in violation of Ms. Palfrey's constitutional rights and therefore, must be suppressed.

_____
The Honorable Gladys Kessler
U.S. District Court for the District of Columbia

Copies to counsel of record