**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 07-046 (GK)** |
| | : | |
| **v.** | : | |
| | : | |
| **DEBORAH JEANE PALFREY,** | : | |
| ***also known as* "Jeane Palfrey,"** | : | |
| ***also known as* "Julia,"** | : | |
| ***also known as* "Pamela Martin,"** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION**
**TO SUPPRESS EVIDENCE OBTAINED FROM HER HOME (DOCUMENT 85)**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, herewith files this opposition to defendant Deborah Jeane Palfrey's motion, with accompanying memorandum in support, to suppress evidence obtained from her home (hereinafter "Def.'s. Mot." and "Def.'s Mem."). Defendant asserts that all evidence recovered during the October 4, 2006 search of her home should be suppressed because, according to her, the application for the search warrant and affidavit in support thereof relied upon stale facts, failed to establish probable cause, failed to state with particularity the items to be seized, and was overly broad. Def.'s Mot. at 1; Def.'s Mem. at 1. As discussed in detail below, defendant's assertions are without merit. Accordingly, her motion should be denied.

## I. BACKGROUND

In June 2004, the United States Postal Inspection Service and the Internal Revenue Service Criminal Investigation Division began a joint investigation into Pamela Martin and Associates. The defendant owned and operated Pamela Martin and Associates. On October 3, 2006, United States Magistrate Judge Kimberly J. Mueller, of the Eastern District of California, approved a warrant to

search the defendant's residence at 803 Capitol Street, Vallejo, California, and a 2003 Ford Thunderbird convertible automobile with California license plate RUM009.[1]  The search warrant was based on the October 3, 2006 affidavit of Postal Inspector Maria E. Couvillon, in which she set forth facts indicating that Deborah Jeane Palfrey had managed a prostitution operation out of her home and laundered the proceeds of the illegal business during the course of its operation.  On October 4, 2006, Postal Inspectors and IRS Agents executed the search warrant.  Agents seized, *inter alia*, checks, deposit slips, appointment books, ledgers, tax returns, bank statements, and files that the defendant maintained on her employees and her employees' activities.

On March 1, 2007, a federal grand jury for this District returned a multi-count indictment charging defendant with five felonies.  Count One of the indictment charges defendant with participation in a Racketeer Influenced Corrupt Organization in violation of 18 U.S.C. § 1962(c), and lists fourteen racketeering acts involving violations of 18 U.S.C. §§ 1953(a)(3) (interstate travel in aid of racketeering enterprises) and 2 (aiding and abetting).  Counts Two through Four charge defendant with three substantive counts of violation of the interstate travel statute, 18 U.S.C. §§ 1952(a)(3) and 2 (aiding and abetting).  Count Five charges defendant with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  The indictment also includes two criminal forfeiture allegations, invoking 18 U.S.C. §§ 1963 and 982(a)(1).  The first forfeiture allegation is associated with Count One; the second allegation is associated with Count Five.

---

[1]  The search warrant, affidavit in support thereof, search warrant return, and search warrant inventory are attached hereto as Exhibit A.

## II. ARGUMENT

Defendant alleges that the application for a search warrant and affidavit in support thereof relied upon stale facts, failed to establish probable cause, failed to state with particularity the items to be seized, and was overly broad. Defendant further argues that the appropriate remedy for any one of these alleged failings is first to hold an evidentiary hearing, and then to suppress all evidence obtained pursuant to the search warrant.

Rule 41(c) of the of the Federal Rules of Criminal Procedure states that a search warrant may issue upon an affidavit subscribed and sworn before a federal magistrate judge and reflecting probable cause to find, among other things, evidence of a crime, contraband, fruits of a crime, or property used in committing a crime. Fed. R. Crim. P. 41(c)(1)-(3). The affidavit in this case established ample probable cause sufficient to support the warrant.

As a preliminary matter, the defendant is not entitled to an evidentiary hearing on her motion. It is well established that "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his [or her] judgment that the form of the warrant is technically sufficient." United States v. Leon, 468 U.S. 897, 921 (1984). Defendant's motion completely ignores controlling case law in this Circuit that clearly establishes that where the warrant describes with particularity the place to be searched and the items to be seized, unless there is evidence of misconduct on the part of the officer applying for or executing the search warrant, courts in this District will apply the Leon good faith exception. United States v. Singh, 973 F. Supp. 7, 13 (D.D.C. 1997); United States v. Pelham, 749 F. Supp. 304, 309 n.6 (D.D.C. 1990).

Accordingly, suppression of evidence obtained pursuant to a search warrant later determined to be deficient is unwarranted if officers acted with "objective good faith" in obtaining and executing

the warrant. Leon, 468 U.S. at 920-21. This "good faith" exception is inapplicable only "if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." Id. at 926. See also United States v. Salamanca, 990 F.2d 629, 634 (D.C. Cir. 1993) ("even if [warrant] affidavit did not sufficiently establish a finding of probable cause, the executing officers justifiably relied in good faith on the magistrate's determination that probable cause existed"); United States v. Maxwell, 920 F.2d 1028, 1034 (D.C. Cir. 1990) (same); United States v. Thornton, 746 F.2d 39, 51 (D.C. Cir. 1984) (same). Here, defendant does not even allege, let alone substantially show, that Agent Couvillon offered any false statements, or was reckless or dishonest in the preparation of the affidavit. Instead, defendant provides only a conclusory allegation regarding the credibility of an alleged potential confidential informant, an unsupported allegation that the confidential informants were absolved of any criminal responsibility, and an allegation that the defendant was not "directly involved" in running the business during several months of the relevant time period. Even if true, none of these claims negates probable cause, nor do they rise to a level of dishonesty or recklessness.[2]

---

[2] Even assuming, *arguendo*, that defendant alleged the affidavit included false statements, the test to be applied in determining whether the defendant is entitled to an evidentiary hearing on the issue of the alleged falsity of the statements in the affidavit, or whether statements proven to be untrue invalidate the warrant, is the same. There is a "presumption of validity" attached to such affidavits. Franks v. Delaware, 438 U.S. 154, 155-157 (1978). Moreover, a defendant must both make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and show that "the allegedly false statement is necessary to the finding of probable cause." Id. at 155-56; United States v. Richardson, 861 F.2d 291, 293 (D.C. Cir. 1998). See also United States v. Davis, 617 F.2d 677, 694 (1979) (a defendant must make a substantial showing that the affiant deliberately falsified information in the warrant or "in fact entertained serious doubts as to the truth" of the information).

A.     Legal standard for analyzing an attack on a search warrant

In United States v. Edelin, 128 F. Supp. 2d 23, 46 (D.D.C. 2001), the Court set forth the

standard for analyzing an attack on a search warrant.

> The affidavits in this case meet the test established in Illinois v. Gates, 462 U.S. 213
> . . . (1983).  The Supreme Court has held that the test for determining if an informant-
> based affidavit establishes probable cause is
>
>> "whether, given all the circumstances set forth in the affidavit before
>> him, including the 'veracity' and 'basis of knowledge' of persons
>> supplying hearsay information, there is a fair probability that
>> contraband or evidence of a crime will be found in a particular place."
>> Id. at 230 . . . .
>
> That test has been met in this case.  The Circuit Court of Appeals for the District of
> Columbia has determined that courts should look to a variety of factors, such as
> whether the informants have proven "credible in other instances," United States v.
> Laws, 808 F.2d 92, 100 (D.C. Cir. 1986), and whether there is corroboration of the
> facts by the police.  Illinois v. Gates, 462 U.S. at 241-42 . . . ; United States v.
> Vaughn, 830 F.2d 1185, 1187 (D.C. Cir. 1987).  Other courts have held that the trial
> court must examine the facts included in the supporting affidavits in a practical,
> commonsense fashion, and that the court should accord "considerable deference" to
> a magistrate's determination of probable cause.  United States v. Feliz, 182 F.3d 82,
> 85 (1st Cir.1999).

In this case, the information provided by each confidential informant, (as set forth in the

affidavit), was corroborated by information provided by the other confidential informants, in the

similarity of the information from all five confidential informants, and by other facts known to the

investigators.  See Affidavit ¶ 20 ("The reliability of the informants' knowledge of the operation of

PM&A was verified by USPS money order databases.  Original and/or postal money order images

of the money orders purchased by the informants were retrieved.  In addition, the Express Mail labels

used by them to send the money orders were also verified and retrieved.")  Moreover, examining the

facts included in the affidavit in a practical, common sense fashion, it was reasonable for the

magistrate judge to conclude that evidence of criminal activity would be found in defendant's residence.

B.  <u>Information in the affidavit was not stale and supported the finding of probable cause</u>

Defendant contends that the information in the affidavit in support of the search warrant was so stale as to preclude probable cause.  Def.'s Mem. at 4-8.  Given the ongoing nature of the defendant's criminal activity leading up to the time of the warrant, this argument is meritless.  The leading case on the issue of "staleness" is <u>Andresen v. Maryland</u>, 427 U.S. 463 (1976).  In <u>Andresen</u>, a search warrant was issued for the seizure, *inter alia* of various office records, some three months after defendant's fraudulent activity.  The records sought were prepared in the ordinary course of defendant's law and real estate business.  On appeal, defendant argued that the evidence in support of the search warrant was stale.  As a result, defendant argued the search was not supported by probable cause.  In rejecting defendant's argument, the Supreme Court held that it was "eminently reasonable" to expect that defendant's business records would be maintained for an extended period of time in the offices searched.  <u>Id.</u> at 478 n.9.  As observed by the Maryland Court of Appeals and affirmed by the Supreme Court in <u>Andresen</u>:

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed.

<u>Andresen v. State</u>, 331 A.2d 78, 106 (Md. App. 1975), <u>aff'd</u> <u>sub</u> <u>nom</u>, <u>Andresen v. Maryland</u>, 427

U.S. 463 (1976). Hence, probable cause is not determined merely by "counting the number of days between the time of the facts relied upon and the search warrant's issuance." United States v. Rahn, 511 F.2d 290, 292 (10th Cir. 1975).

This Circuit's decision in Edlin also supports the government's position. In seeking to attack the search warrant in Edlin, the defendants also argued that the evidence relied upon was unduly stale. The Court analyzed the appropriate standard and held that:

> In determining whether the information used to support the affidavits was stale in the eyes of the law, it is necessary to look at other cases with similar charges and see what other courts have determined to be "stale" in an ongoing conspiracy to distribute drugs. Other courts have determined that when the evidence sought is of a type that would be maintained after the criminal activity ceased, then older information can still be considered reliable when used to obtain a search warrant. See United States v. Rowell, 903 F.2d 899, 903 (2nd Cir. 1990) (finding eighteen month old information reliable because evidence related to a drug distribution business); United States v. LaMorte, 744 F.Supp. 573, 575 (S.D.N.Y. 1990) (holding three and one-half years not too distant where evidence sought was of a massive criminal enterprise and was of a type that would be maintained long after criminal activity ceased); United States v. Glass Menagerie, Inc., 721 F.Supp. 54, 58-59 (S.D.N.Y. 1989) (determining that two and one-half year old information was reliable when evidence sought was of a narcotics paraphernalia manufacturing business). Furthermore, the affidavit submitted to support the warrant for the search of the Recreation Center included updated information corroborating the less recent evidence of narcotics trafficking. See United States v. Butler, 102 F.3d 1191, 1198 (11th Cir.1997) (finding information two years old not stale when additional information updated and substantiated older information).

128 F. Supp. 2d at 46-47. See also In re Search Warrant Dated July 4, 1977, 667 F.2d 117, 136 (D.C. Cir. 1981) (three-month-old information not stale in light of ongoing character of conspiracy, organized nature of defendant's recordkeeping, and practice of keeping files), cert. denied, 456 U.S. 926 (1982); Pelham, 749 F. Supp. at 308-09 (six-month-old information not stale where items sought were clothing and documents as opposed to per se inculpatory items).

In this case, the defendant was being investigated for running an illegal business from her

home.  The evidence sought included records of the business, and the location to be searched was the location from which the business was operated.[3]  Thus, as was true in <u>Rowell</u>, <u>LaMorte</u>, and <u>Glass Menagerie</u> - all of which were cited with approval by this Circuit in <u>Edlin</u> - the government's search for business records at the business' hub of operations within months of the business' operation, cannot, as a matter of law, be deemed stale.

Moreover, as the affidavit makes clear, law enforcement agents were also investigating the defendant for money laundering.  Because of the nature of money laundering offenses, evidence of money laundering is rarely considered stale.  <u>See</u> <u>United States v. Yusuf</u>, 461 F.3d 374, 391 (3d Cir. 2006) (mere passage of time does not render information stale where the facts suggest that the activity is continuous in nature and the items to be seized - such as business records - were created for the purpose of being preserved and are therefore still likely to be found); <u>United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)</u>, 307 F.3d 137, 148 (3d Cir. 2002) (holding that eleven-month gap between criminal activity and execution of the warrant did not render the affidavit stale because the relationship between the defendant and the criminal enterprise was "of considerable duration" and the warrant authorized a search for business records, which are typically retained for an extended period of time); <u>United States v. Farmer</u>, 370

---

[3] Defendant's claim that the affidavit does not establish that the defendant "operated her business from her home" is without merit.  <u>See</u> <u>e.g.</u>, Affidavit ¶ 13 ("The ads direct both potential clients and escorts to call three telephone numbers . . . .  Your affiant obtained and reviewed phone records for the above listed phone numbers.  The investigation revealed that these telephone numbers are remote call forwarded to (707) 648-1500 and (707) 648-1000.  Telephone records indicate that [these numbers] are landline numbers listed to Deborah Jean [sic] Palfrey with a service address of 803 Capitol Street, Vallejo, California and a mailing address of P.O. Box 1211, Benicia, California 94510."); Affidavit ¶ 14 ("[T]he box holder for post office box 1211 is Deborah Jean [sic] Palfrey.  The application lists her home address as 803 Capitol Street, Vallejo, California 94590.").

F.3d 435, 439 (4th Cir. 2004) (concluding that probable cause existed to search for evidence of money laundering even though events supporting search warrant had occurred nine months earlier); United States v. Abboud, 438 F.3d 554, 573 (6th Cir. 2006) (three-year-old evidence in warrant application alleging bank fraud and money laundering was not stale; "business records are a type of evidence that defy claims of staleness").

In the case before this Court, defendant's business was of the type where it was reasonable for the Magistrate Judge to conclude defendant would maintain records for a substantial period of time. See e.g. Affidavit ¶ 8 ("You affiant knows that it is common for persons engaged in illegal prostitution activity using outcall fronts, to preserve the records and other items used to conduct the business for extended periods of time, such as months or even years, even though such items are incriminating.") Moreover, there was recent corroborating information which updated the informant information. See Affidavit ¶ 32 ("As of August 2006, Palfrey continued to receive express mailings from various women in the Washington, D.C. metropolitan area.")

    C.       The affidavit included relevant information of illegal activity

Defendant contends that "[w]hile the information contained in the affidavit known to the affiant does demonstrate that Ms. Palfrey was running an escort service, the affidavit fails to set forth information demonstrating that running an escort business is an illegal activity." Def.'s Mem. at 8-10. Such a reading of the affidavit is disingenuous at best. Presumably, defendant is trying to argue that the affidavit fails to suggest criminal activity and it therefore cannot serve as a basis for probable cause - ignoring the fact that a Judge found it to be sufficient. The affidavit sets forth ample probable cause to establish that the defendant was knowingly running an illegal prostitution ring. See e.g. Affidavit ¶ 20 ("[E]ach woman is sent to a 'screening' appointment, at which the women

perform a free act of prostitution to ensure they are not law enforcement officers."); Affidavit ¶ 23

("CI1 further stated that she met with a client who seemed mentally slow, and she told Julia that she

would not sleep with him again.  On another occasion, CI1 told Julia that she could not work because

she was menstruating.  CI1 also stated that at some point she had a conversation with Julia about

'protection' in which Julia told her to use condoms.")

      D.    <u>The affidavit stated with sufficient particularity the items to be seized and was not overly broad</u>

      Defendant asserts that the search warrant and accompanying affidavit lacked sufficient

particularity and were unconstitutionally overly broad.  Def.'s Mem. at 11-12.  These arguments also

lack a legal or factual basis.  While it is well settled that items to be seized pursuant to a search

warrant must be described with particularity to prevent the seizure of one thing under a warrant

describing another, the degree of specificity required in a warrant is flexible, depending upon the type

of items to be seized and the crime involved.  Thus, a description is valid if it is as specific as the

circumstances and the nature of the activity under investigation permit.[4]  As the Third Circuit noted

in <u>United States v. American Investors of Pittsburgh</u>, "[t]he fact that the warrant authorized a search

for a large amount of documents and records does not necessarily render the search invalid so long

as there exists a sufficient nexus between the evidence to be seized and the alleged offenses."  879

F.2d 1087, 1105-06 (3d Cir. 1989).  Furthermore, in the instant case the breadth of the warrant was

supported by affiant Inspector Couvillon's affidavit, which reasonably suggested that the defendant's

business was simply a cover for her prostitution ring and involved records in support of that business

---

    [4] <u>Leon</u>'s "good faith" exception also applies to this claim of the defendant.  <u>United States v. Maxwell</u>, 920 F.2d 1028, 1034 (D.C. Cir. 1990) (evidence not suppressed, even where warrant was fatally overbroad, because "the agents in this case reasonable relied on the warrant in good faith").

that it was reasonable to conclude defendant would preserve.  See United States v. Davis, 226 F.3d 346, 352 (5th Cir. 2000) (warrant authorizing search of broad category of documents and fifteen specific categories "adequately particular" for investigation of business fraud); United States v. Humphrey, 104 F.3d 65, 68-69 (5th Cir. 1997) (all-records search of home and business valid because affidavit supported conclusion that entire business was merely a scheme to defraud and defendant's personal and business lives overlapped).

### III.  CONCLUSION

The affidavit submitted in this case was a carefully crafted detailed statement of probable cause. There is no suggestion of bad faith on the part of the agent who obtained the search warrant. The affidavit was presented to the constitutionally mandated neutral and detached Magistrate Judge who passed on its adequacy and issued the warrant. The affidavit revealed a totality of circumstances linking the defendant and her home to money laundering and racketeering offenses.  The same agent who submitted the affidavit oversaw the execution of the warrant and the warrant was properly

effectuated.  As such, and for the other reasons set forth above, the government respectfully requests that the Court deny the defendant's motion.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar No. 498610

/ s /

_____

Daniel P. Butler
D.C.  Bar No. 417178
Catherine K. Connelly
Mass.  Bar No. 649430
William R. Cowden
D.C. Bar No. 426301
Assistant United States Attorneys
555 4th Street, N.W.
(202) 353-9431, 616-3384, 307-0258
Washington, D.C.  20530
Daniel.Butler@usdoj.gov
Catherine.Connelly2@usdoj.gov
William.Cowden@usdoj.gov

# Exhibit A

AO 106 (Rev. 5/85) Affidavit for Search Warrant

# United States District Court

ORIGINAL
FILED

EASTERN DISTRICT OF CALIFORNIA

OCT − 4 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of

(Name, address or brief description of person or property to be search)

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

803 Capitol Street
Vallejo, CA, 94590,
2003 Ford Thunderbird Convertible
California License plate RUM009

CASE NUMBER:

**2:06 − SW − 0274 KJM**

I, Maria E. Couvillon being duly sworn depose and say:

I am a(n) Postal Inspector with the U.S. Postal Inspection Service and have reason to believe that ( ) on the person of or (X) on the property or premises known as (name, description and/or location)

SEE ATTACHMENT A

in the Eastern District of California there is now concealed a certain person or property, namely
(describe the person or property to be seized)

SEE ATTACHMENT B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of Criminal Procedure)

Any and all items found inside the premises or the vehicle to be searched that may contain evidence, fruits and instrumentalites.

1956(h) )+⁴⁽ᶜ⁾

concerning a violation of Title    United States Code, 18   Section(s) 1956(a)(A)(1)(f), 2242 and 1952. The facts to support a finding of Probable Cause are as follows:

See Attached Affidavit of Maria E. Couvillon

Continued on the attached sheet and made a part hereof.        (X) Yes        ( ) No

_____
Signature of Affiant
Maria E. Couvillon
Postal Inspector

Sworn to before me, and subscribed in my presence

Date  10/3/06                at   Sacramento, CA
                                    City and State

KIMBERLY J. MUELLER
United States Magistrate Judge
Name and Title of Judicial Officer        Signature of Judicial Officer
AUSA R. STEVEN LAPHAM

AO 93 (Rev. 12/03)  Search Warrant

**ORIGINAL**
**FILED**

# UNITED STATES DISTRICT COURT

OCT - 4 2006

EASTERN                    District of                    CALIFORNIA

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY CLERK

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

**SEARCH WARRANT**

**803 Capitol Street**
**Vallejo, CA 94590,**
**2003 Ford Thunderbird Convertible**
**California License plate RUM009**

**2:06 - SW - 0274      KJM**

Case Number:

TO:  __Maria E. Couvillon_____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____**Maria E. Couvillon**_____ who has reason to believe

that    ☐ on the person of, or    ☒ on the premises known as (name, description and/or location)

**See Attachment A, attached hereto and make a part hereof,**

in the _____Eastern_____ District of _____California_____ there is now
concealed a certain person or property, namely  (describe the person or property)

**See Attachment B, attached hereto and made a part hereof,**

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____10/13/06_____

Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search    ☒ in the daytime -- 6:00 A.M. to 10:00 P.M.    ☐ at anytime in the day or night as I find reasonable cause has been established and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken and prepare a written inventory of the person or property seized and promptly return this warrant to

_____**KIMBERLEY J. MUELLER**_____ as required by law.

U.S. Magistrate Judge (Rule 41(f)(f4))

10/3/06  —3:05 p.m.          at     **Sacramento, CA**
Date and Time Issued                              City and State

**KIMBERLEY J. MUELLER**
**U.S. MAGISTRATE JUDGE**
Name and Title of Judge                           Signature of Judge

AO 93 (Rev. 12/03) Search Warrant

| **RETURN** | | Case Number: | |
|---|---|---|---|
| DATE WARRANT RECEIVED 10/3/06 | DATE AND TIME WARRANT EXECUTED 10/4/06   8:13 a.m. | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH 803 Capitol Street, | |
| INVENTORY MADE IN THE PRESENCE OF Postal Inspector Maria Couvillon | | | Dining Room Table |

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

SEE ATTACHED FIVE SEARCH WARRANT INVENTORY SHEETS.

---

**CERTIFICATION**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_Maria Couvillon_

Subscribed, sworn to, and returned before me this date.

_____
Signature of Judge

10/4/06
Date

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Maria E. Couvillon, being duly sworn, depose and state the following:

1. I have been a Postal Inspector with the United States Postal Inspection Service since February 2004 and I am currently assigned to the Washington Division. Upon entering the United States Postal Inspection Service, I completed twelve weeks of training. This training covered various aspects of federal law enforcement. Prior to serving as a United States Postal Inspector I was a Police Officer with the Arlington County Police Department for six and one half years. In that capacity, I attended the Northern Virginia Regional Criminal Justice Academy in Ashburn, Virginia for twenty weeks. My law enforcement training and experience include the preparation, presentation, and service of criminal complaints, arrest and search warrants.

2. This affidavit is made in support of an application for a warrant to search the premises located at 803 Capitol Street, Vallejo, California, 94590, in the county of Solano, which is more particularly described in Attachment A. The purpose of this application is to seize evidence of violations of Title 18 United States Code, Section 1956 (a)(1)(A)(i), Laundering of Monetary Instruments, and Title 18 United States Code, Section 1952, Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises.

3. The information contained in this affidavit is based on my personal knowledge and observations made by me during the course of this investigation, on information conveyed to me by other individuals and law enforcement officials, and on my

1

examination and review of records, documents and physical evidence obtained during the course of the investigation.

4. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe establish a violation of Title 18 United States Code, Section 1956 (a)(1)(A)(I), Laundering of Monetary Instruments, and Title 18 United States Code, Section 1952, Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises , and Title 18 United States Code, Section 2422 inducing interstate travel to engage in prostitution and that evidence of these crimes is presently at the location to be searched. Section 1952 makes it a crime for anyone to use the mail or any interstate facility with the intent to distribute the proceeds of any buisness enterprise involving prostitution, or otherwise promote, manage, establish, carry on, or faciliate any such enterprise. Section 1956 (a)(1)(A)(i) makes it a crime for anyone to conduct a financial transaction knowing that the property involved in that financial transaction represents the proceeds of some form of criminal activity and with the intent to promote the carrying on of specified unlawful activity.

5. Your affiant knows that criminals who violate laws against Title 18 United States Code, Section 1956 (a)(1)(A)(i) and 1952, operate front businesses which may appear to be legitimate, but which in fact are vehicles used to conduct prostitution businesses while avoiding detection or apprehension by law enforcement officers. A majority of these fronts are outcall type businesses, usually referring to or purporting to involve models or modeling, escorts, or massage services. These services advertise in news publications, local magazines, the internet and in the Yellow Pages, usually listing

2

one or more phone numbers for the business. Experience has shown that customers, almost all of whom are male, can call the listed number and request a woman, usually in the form of a request for a model, escort, date, or for a massage. The customer in many cases will be allowed to describe the type of female and the physical characteristics he desires. The person answering the phone for the outcall agency will explain the cost, usually obtain the customer's name and address or location and the method of payment, i.e. cash, check or charge card, and will contact or dispatch a female to go to the caller's location.

6. In most of those operations the woman dispatched to the call will go to the location given by the caller, introduce herself and discuss the financial aspects of the meeting, usually in terms of a flat fee for the outcall agency and in some cases an additional tip for herself. In most of these arrangements, the woman will solicit or engage in sexual acts with the customer in return for the agency fee and/or the tip.

7. Generally, a major portion of the agency fee is paid to the owner or operator of the outcall agency by the female who goes to the particular call. The female generally keeps the rest of the agency fee and the tip, if any. Most of the owners or operators of these outcall agencies are aware that the females dispatched to the customers are engaging in sexual acts in return for money paid by the customer. The majority of these outcall agencies are illegal prostitution businesses.

8. Your affiant knows that outcall agencies invariably use various writings, video tapes, computer records and other things, such as those described fully in Attachment A. In most illegal outcall operation businesses, the agency uses or keeps lists of customers, customer cards, and writings depicting the names or first names or nicknames of the

3

prostitutes working with the agencies, along with their physical descriptions and/or measurements and notations of the sexual acts in which they will or will not participate with a customer. The agencies also generally keep lists of police officers or undercover names used by police officers active in Vice enforcement, and lists of locations where the agency's prostitutes have been arrested while on outcalls, often called "hot lists". The agencies also keep or use financial records of the prostitution business or records of activity, such as ledger sheets, writings depicting calls by customers and prostitutes dispatched thereto, the amounts charged and received for the outcall, checks made out by customers, credit card slips completed by customers and bank slips for future customers, and credit card imprinting devices. Because the outcalls are conducted via telephone, the businesses use the telephone themselves, telephone answering equipment and tapes thereto, tape recorder and tapes, automatic or speed dialers, and in many cases, will subscribe to beepers or pagers for the individual prostitutes so that the agency can contact them at any time. Many outcall businesses have call forwarding capabilities on their telephone lines so that incoming calls can be re-routed to remote telephones, cellular phones or other paging devices, making it possible for the business to receive client calls at any location. Most outcall prostitution businesses maintain maps of the cities and counties in which they operate in order to locate calls for the prostitutes. Your affiant knows that it is common for persons engaged in illegal prostitution activity using outcall fronts, to preserve the records and other items used to conduct the business for extended periods of time, such as months or even years, even though such items are incriminating. Such records are valuable as a ready reference source to the operator of an illegal outcall prostitution business, enabling that person to screen incoming telephone calls as a means

4

of determining whether a prospective customer is in fact an established customer of the business or is, instead, a police officer attempting to pose as a customer of the business. Having such value, these records are typically kept in the immediate area where the business' telephones are being answered, usually at night, and are secreted in a hiding place when the business is not actually operational, usually during the daytime hours. It is quite common for outcall prostitution businesses to have, at any given time, records dating back several months and even years. Persons who own or operate these outcall prostitution services are highly likely to possess current and past records and other items such as those fully described in Attachment A, at the places where the given operator is now, or was recently, or to which incoming calls are forwarded.

9. In addition to using telephones to receive calls from customers and potential customers, the outcall prostitution business will often require the prostitute to check in via telephone with the agency when she arrives at a customer's location and again when she is ready to leave. Such agencies also communicate over the telephone with other agencies to learn of "hot" locations or recent Vice arrests.

10. With respect to the location where the illegal prostitution business is conducted, or where evidence of the business is kept, it is your affiant's experience that persons who use or occupy a premise will invariably keep items there which show their possession of the premises, such as keys, canceled mail envelopes, rental and lease agreements of the premises, rent receipts, bills for telephone and utility service, either in the name of the occupier or addressed to the premises, bank statements and photographs, notices from governmental agencies and employment application forms, and legal and

personal effects and correspondence likely to be kept or stored by an occupant or possessor of the premises.

11. Your affiant knows that suspects who are involved in outcall prostitution often keep records of prostitution transactions, names and addresses of customers and prostitutes, and related personal notes in their vehicles. Your affiant also knows that suspects engaging in this activity lead a highly mobile lifestyle and often use their vehicles as their "offices". Keeping the prostitution records in their vehicles enables them to conduct business during periods of absence from the premises where the evidence of the business is kept.

Background

12. Starting in June 2004, the United States Postal Inspection Service and the Internal Revenue Service, Criminal Investigation Division began a joint investigation into the operation of a purported outcall escort business known as "Pamela Martin and Associates" (PM&A), which operated in the Washington, DC metropolitan area. Deborah Jean Palfrey owns and operates PM&A from her home located at 803 Capitol Street, Vallejo, California. Your affiant has reviewed evidence demonstrating Palfrey's involvement in the prostitution business since the early 1990's. In 1991, she was arrested and convicted of running a prostitution business in San Diego, California. She served eighteen months in prison for that conviction. Upon being released from prison and while on probation for that offense, she started the current prostitution business under the name Pamela Martin and Associates in the Washington, DC metropolitan area in 1993.

13. The investigation has revealed that Deborah Jean Palfrey, aka "Julia," advertises PM&A in the Washington City Paper, the Yellow Pages under "Escorts" and

6

on the internet using the web address www.pamelamartin.com. The ads direct both

potential clients and escorts to call three telephone numbers: (202) 737-4200, (301) 231-

5800 and (410) 244-1818. Your affiant obtained and reviewed phone records for the

above listed phone numbers. The investigation revealed that these telephone numbers are

remote call forwarded to (707) 648-1500 and (707) 648-1000. Telephone records

indicate that (707) 648-1500 and (707) 648-1000 are landline numbers listed to Deborah

Jean Palfrey with a service address of 803 Capitol Street, Vallejo, California and a

mailing address of P.O. Box 1211, Benicia, California 94510.

14. United States Postal Service (USPS) records were obtained and reviewed for

Post Office Box 1211, Benicia, California. USPS Form 1093, Application for Post

Office Box or Caller Service, indicates the box holder for post office box 1211 is

Deborah Jean Palfrey. The application lists her home address as 803 Capitol Street,

Vallejo, California 94590. The form indicates that California driver's license number

C5206966 was documented as a form of identification for Palfrey at the time the box was

rented. The form further indicates the applicant did not intend to use the box for

soliciting or doing business with the public.

15. A review of Department of Motor Vehicle records revealed that California

driver's license number C5206966 is issued to Deborah Jean Palfrey, P.O. Box 1211,

Benicia, California 94510.

16. Your affiant obtained and reviewed domain records for

www.pamelamartin.com. The records revealed that the domain name is registered to

Pamela Martin and Associates, P.O. Box 1211, Benicia, California 94510. The

administrative contact is listed as Jeane Palfrey, P.O. Box 1211, Benicia, California

7

94510 and lists (707) 648-1000 as the phone number and (707) 648-1500 as the facsimile number.

17. Your affiant obtained and reviewed two Uniform Residential Loan Applications for 803 Capitol Street, Vallejo, California dated March 19, 1999 and November 2, 2001. Both documents indicate Deborah J. Palfrey is the sole owner of this property. Her employment is listed as owner of Pamela Martin and Associates, P.O. Box 1211, Benicia, California 94510. The type of business is described as "personal services" and the business and home phone numbers listed on both documents is (707) 648-1000.

18. Your affiant also obtained and reviewed the Uniform Residential Loan Application for 1441 Vaquero Glen, Escondido, California 92026, which is dated January 9, 2002. The document indicates Deborah J. Palfrey is the sole owner of this property. Her employment is listed as owner of Pamela Martin and Associates, P.O. Box 1211, Benicia, California 94510. The type of business is described as "personal services" and the business and home phone number is listed as (707) 648-1000.

19. Your affiant also obtained and reviewed the Charles Schwab SEP-IRA Participant Account Application for Deborah Jean Palfrey, which is dated February 24, 2003. The record reflects a home address of 803 Capitol Street, Vallejo, California 94510 and a mailing address of P.O. Box 1211, Benicia, California. Both the home and business phone number listed on the application is (707) 648-1000.

Informants

20. Beginning in December, 2005, interviews were conducted with several informants regarding PM&A. These informants had first hand knowledge of its operations and their respective roles. The informants revealed that Deborah Jean Palfrey



*The reliability of the informants knowledge of the operation of PM&A was verified by the USPS money order databases. Original and/or postal money order images of the money orders purchased by the informants were retrieved. In addition the Express Mail labels used by them to send the money orders were also retrieved and reviewed.*

(aka "Julia") was the leader of the prostitution business. The informants described the business process as follows: Prostitutes are hired by Palfrey through classified, yellow page and internet ads. Palfrey interviews all of the women over the phone and requires them to mail a picture to her at a post office box in Benicia, California. Once hired, each woman is sent to a "screening" appointment, at which the women perform a free act of prostitution to ensure they are not law enforcement officers. The prostitutes set their own work schedules based on their availability, but are encouraged by Palfrey to work at least three nights per week. The prostitutes work at various locations, either residences or hotels in the Washington, DC metropolitan area. Palfrey tells them where, when and who they will be seeing. Clients pay a set fee at the start of the meeting, which has changed over the years (approximately $295 currently) for the purpose of engaging in sexual acts with a prostitute. Per Palfrey's instructions, the prostitutes keep approximately fifty percent of the money and forward the remainder to her. The prostitutes are directed by Palfrey to convert the cash payments received to postal or other money orders and send them to Palfrey via Express Mail to the post office box in Benicia, California. They are also directed by Palfrey to purchase multiple money orders in increments less than $1,000.

Confidential Informant #1

21. During the course of the investigation your affiant learned that CI1 worked for PM&A from April 2001 until September 2001, and then again from December 2001 until February 2002. At that time she was living in Great Falls, Maryland. CI1 saw PM&A's website, and then looked the company up in the yellow pages. CI1 does not recall if she called a local number or a long distance number to make initial contact. At Julia's

9

request, CI1 mailed a photo of herself to Julia at the post office box in California. After receiving the photograph, Julia called CI1 back and set up her first appointment. CI1's trial appointment was with Paul Huang, in Rockville, Maryland. CI1 told Julia that she wanted to be paid for the trial appointment, and Julia agreed. CI1 stated that Julia told her to charge $275.00 per hour, and CI1 kept 60% of the money and sent 40% to Julia. CI1 also stated that for "out of town" clients she was instructed to check their airline tickets or passports to ensure that they were who they said they were.

22. Following her initial appointment, CI1 worked as a prostitute for PM&A in Baltimore, MD, Sterling, VA, Annapolis, MD and Washington, D.C. She stated that she met with clients in private homes, and also at the J.W. Marriott Hotel in Washington, D.C., the Willard Hotel in Washington, D.C., and a number of Marriott Hotels and Hilton Hotels. CI1 never went to dinner, a movie, or a party with a client during the course of her employment with PM&A. She had sex with the majority of clients, but she stated that she refused to have sex with a few clients who appeared unwell, either physically or mentally.

23. CI1 further stated that she met with a client who seemed mentally slow, and she told Julia that she would not sleep with him again. On another occasion, CI1 told Julia that she could not work because she was menstruating. CI1 also stated that at some point she had a conversation with Julia about "protection" in which Julia told her to use condoms.

24. CI1 usually used a post office in Falls Church, Virginia to purchase and mail the money orders. She made out the postal money orders to "Ms. Palfrey" and express mailed them to P.O. Box 1211, Benicia, California.

10

Confidential Informant #2

25. During the course of the investigation your affiant learned that CI2 started

working for PM&A in February 2003, and worked there for approximately three months.

CI2 was living in Manassas, Virginia at the time. She found the agency in the "Adult

Employment" section of the Washington City Paper. CI2 called a phone number with a

301 area code (301 is the area code for Maryland) and spoke to a woman who called

herself "Julia". At Julia's request, CI2 mailed a photo of herself to Julia in California.

After receiving the photograph, Julia called CI2 back and set up her first appointment.

During one of their initial conversations, Julia told CI2 that "some women think this is

just about going out to dinner with a guy, or going out socially with him." CI2 stated that

this statement is what made her realize there would be sex involved. According to CI2,

Julia described her first appointment as a "baptism by fire," and said this appointment

was to ensure that CI2 was not a reporter. CI2's first appointment was in Woodbridge,

VA, in an apartment or condominium with a white balding male who was employed in

accounting. They engaged in sexual contact, but not intercourse. Following her initial

appointment, CI2 was hired as a prostitute by PM&A. CI2 charged $275.00 per sexual

encounter and kept $130.00. She was never paid by check. She stated that Julia told her

to split the money orders so as to avoid sending anything over $800.00. (However, CI2

did send an $870.00 money order on one occasion.) CI2 made the postal money orders

out to "Ms. Palfrey" and express mailed them to P.O. Box 1211, Benicia, California. CI2

never went to dinner or a movie with a client, and engaged in some form of sexual

activity with each client scheduled by Julia. According to CI2, Julia told her that if she

was seeing a new client, she was to allow the client to make the first move. She also told

11

CI2 that a particular client in Washington, D.C. "sounded like he had a little bit to drink, but was definitely not a cop." Julia sent a stack of PM&A "newsletters" via U.S. Mail to CI2 in Manassas, Virginia. CI2 kept these newsletters, which span from 1993 to 2003, and provided them to investigators. These news letters provide instructions to the prostitutes regarding their work hours, how long encounters with clients should last, fee structure, security measures against clients, how to recognize and avoid law enforcement, how to send payments, and other matters relating to the prostitution enterprise.

Confidential Informant #3

26. During the course of the investigation your affiant learned that CI3 started working for PM&A in October or November of 2001. CI3 was living in Washington, D.C. at the time. She claimed she needed money to pay off graduate school debts and moving expenses. She responded to an ad in the Washington City Paper. CI3 called the number listed in the ad and spoke to a woman who identified herself as Julia and Ms. Palfrey. Pursuant to Julia's request, CI3 sent a photograph to California. CI3's test run was in Arlington, Virginia. She understood the purpose of that appointment was to ensure that she could "comply with [Julia's] expectations and that [she] understood the nature of the work." CI3 had sex with the client but was not paid for this appointment. CI3 was thereafter hired by PM&A as a prostitute. At Julia's direction, CI3 charged $250.00 per appointment, and sent half of that money to Julia to a post box office in Benicia, California. CI3 was never paid by check. She stated that Julia instructed her to purchase and send money orders, and that she never sent cash to Julia. CI3 sent Julia money orders approximately once a week and made them out to "Ms. Palfrey". She did not remember if she was told to send them on particular days or in particular amounts.

12

She thought she sent money orders to Julia on approximately ten occasions. While she worked for PM&A she received approximately ten to fifteen PM&A newsletters at her home in Washington, D.C.

Confidential Informant #4

27. During the course of the investigation your affiant learned that CI4 started working for PM&A in the spring of 2003. CI4 was living in Washington, DC at that time. She found the agency in the yellow pages and called a phone number with a "301" area code. Her initial conversation was with "Julia." At Julia's request, CI4 emailed a photo of herself to Julia to a post box office in California. Julia sent a stack of PM&A newsletters to CI4's Washington, D.C. address, but CI4 did not keep any of them. CI4's test appointment was in Woodbridge, VA, with "Robert." CI4 had sex with Robert but was not paid for that appointment, nor did she receive any money from Robert to send to Julia. CI4 worked as a prostitute for PM&A for approximately two months, and believes she charged $325 per appointment. She made out the postal money orders to "J. Palfrey" and "Jeane Palfrey" and mailed them to P.O. Box 1211, Benicia, CA.

28. CI4 stated that Julia told her to check the identification of some of the clients because Julia was concerned that someone she had not dealt with before might be from law enforcement. Julia also told CI4 not to send money orders over a certain amount.

29. CI4 had sex with "nearly all" the clients she met. She stated that the times she didn't have sex with the clients, it was usually because the client had physical problems. She did go to dinner or a bar with about a half dozen of the clients. CI4 identified some of her clients by name.

13

Confidential Informant #5

30. During the course of the investigation your affiant learned that CI5 worked for

PM&A for a few months in 2003. During that time CI5 was living in Odenton,

Maryland. She found the agency in the yellow pages and called a phone number with a

202 area code (202 is the area code for Washington, D.C.). Her initial conversation was

with "Julia." At Julia's request, CI5 mailed a photo of herself, and a copy of her photo

identification, to Julia at a post office box in California. CI5's test appointment was in

Virginia, but she claimed not to recall the exact location, or the name of the person with

whom she met. CI5 engaged in sexual relations with the test client, after which Julia told

her that the client was "happy" with everything and that CI5 could start working for

PM&A. CI5 stated that Julia instructed her to charge $275.00 for each one and a half

hour appointment. CI5 also stated that Julia told her to purchase the money orders she

sent to California from a different post office each time. CI5 ignored this instruction, and

purchased and mailed most of her proceeds from a post office in Beltsville, Maryland.

She made out the postal money orders to "Ms. Palfrey" and mailed them to P.O. Box

1211, Benicia, California. Most of CI5's appointments were in Maryland, although she

did work in Washington, D.C. and Virginia a few times. CI5 could not recall the names

of any hotels or addresses she went to. CI5 never went to a social event with a client, and

she also stated that on a few occasions she refused to have sex with a client. She claimed

that she never told Julia when she refused to have sex with a client. CI5 stated she

received PM&A newsletters from Palfrey via the U.S. Mail, but she did not keep them.

14

Express Mail

31. Your affiant knows that shippers of illicit funds have learned to convert some or all of their proceeds into negotiable instruments such as money orders. The use of money orders allows illicit fund shippers to distance themselves from the proceeds of unlawful activity by converting those proceeds into negotiable instruments, which are less likely to draw the scrutiny of law enforcement. Your affiant also knows that the use of Express Mail is favored by illicit fund shippers because of the reliability, speed, low cost and the delivery tracking capability of this service. Mailers of illicit funds also select a signature waiver to ensure that the item goes through to its intended recipient and that the mailing is not returned to sender.

32. USPS Express Mail records were obtained and reviewed from February 2000 to the present. Those records reflect that more than 1,550 express mailings were addressed and delivered to P.O. Box 1211, Benicia, California. The vast majority of the express mailings were mailed with a signature waiver. Deborah Jean Palfrey is presently the box holder for post office box 1211. As of August, 2006, Pelfrey continued to receive express mailings from various women in the Washington, D.C. metropolitan area.

Conclusion

33. Based on the facts set forth herein, there is probable cause to believe that Deborah Jean Palfrey has been and continues to operate Pamela Martin and Associates, an illegal outcall prostitution business. Palfrey hired various female subjects, residing in Virginia, Maryland and the District of Columbia, to travel to Virginia, Maryland and the District of Columbia for the purposes of engaging in illegal sex acts, instructed these

women to convert the proceeds to postal money orders and mail them to her via express mail in violation of Title 18 U.S.C. § 1956 (a)(1)(A)(I) and 1952.

34. Your affiant believes that there is probable cause that the property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment A of this Affidavit, are located in the residence at 803 Capitol Street, Vallejo, California, 94590 and her vehicle, more fully described in Attachment B. Deborah Jean Palfrey has violated Title 18 U.S.C. § 1956 (a)(1)(A)(i), § 2422 and § 1952.

Inspector Maria Couvillon
U.S. Postal Inspection Service

Sworn to and subscribed before me this _____3rd_____ day of October, 2006.

United States Magistrate Judge

16

## ATTACHMENT B

### LIST OF ITEMS TO BE SEIZED AND SEARCHED

Any and all items found inside the premises to be searched that may contain evidence, fruits and instrumentalities of violations Title 18 United States Code, Section 1956 (a)(1)(A)(1) and 1952, including closed or locked containers and the following items:

    a.  financial records, however maintained, including but not limited to income statements, cash receipts journals, bank statements, deposit slips, canceled and uncanceled checks, check stubs, check registers, money orders, accounts receivable journals, U.S. Currency, cash disbursement journals, tax returns and tax return information, general journals, financial statements and record of assets;

    b.  rolodex and other files, customer cards, and lists, employee lists, city and county directories, maps, address and/or telephone notebooks and papers, including any computerized or electronic records, reflecting names, addresses and telephone numbers, telephone equipment including programmable automatic dialing devices, answering and recording equipment, video and audio tapes, credit card vouchers and credit card imprinting devices, employee instruction lists, employment application forms, and other business records which show the operation of the female outcall business known as Pamela Martin & Associates;

    c.  handwriting exemplars, papers, documents and effects which tend to show possession, dominion and control of the described residence premises, including

17

but not limited to keys, canceled mail envelopes, rental and lease agreements and

receipts, property tax bills and ownership documents, vehicle registration slips,

bills for telephone and utility service, notices from government agencies;

d.  computer equipment, peripherals and electronic storage media, including

information stored on a computer hard drive, diskettes, tapes and other media

capable of storing information in a form readable by computer data printer and all

software necessary to retrieve electronic data, including but not limited to

operating systems, database, spreadsheet, word processing and graphics

programs, and all written notes or printed material describing the operation of the

computer, and confidential password lists to enter secured files, including any

computerized or electronic records, relating to Pamela Martin and Associates;

e.  photographs of co-conspirators and any other photographs or depictions of

evidentiary value, passport, cellphones, caller ID call logs;

f.  to open safes, lock boxes or receptacles where evidence listed above in sections a

through e could be hidden.

18

## ATTACHMENT A

### THE VEHICLE TO BE SEARCHED

The vehicle identified by California license plate RUM009, described as a 2003 Ford Thunderbird convertible, registered to Deborah Jean Palfrey at P.O. Box 1211, Benicia, California 94510. Included in the areas to be searched are the trunk, glove boxes, and all closed containers, bags, folders, wallets, briefcases, suitcases, envelopes, and document depositories within and attached to said vehicle.

### PREMISES TO BE SEARCHED

803 Capitol Street, Vallejo, CA is described as a two story Victorian house constructed of beige vinyl siding and white trim with a brown stained front door, enclosed by a black wrought iron fence. The numbers 803, appear on the front column of the house and are gold in color. A black city landmark plaque is attached to the front of the house adjacent to the front door. Attached to the house is a garage with a white door and red brick driveway. The requested search is to include all the rooms, closets, filing cabinets, desks, trash receptacles, storage areas, crawl spaces, luggage such as brief cases and suitcases, folders, basements, attics, safes, safety deposit boxes, cabinets, bags, bureaus, drawers, handbags, personal effects such as wallets and appurtenant structures such as sheds, trash areas, guest houses, garage, attached and unattached outbuildings, and yards and storage areas within the property boundaries, and items found therein that may contain evidence, including items such as computers and other digital or electronic media, as well as closed or locked containers.

19

# The United States Postal Inspection Service

## SEARCH WARRANT INVENTORY

Position/Box.: _____ / _____

Subject Name: DEBORAH JEAN PALFREY
Date: 10/04/06

Subject Address: 803 CAPITOL STREET
Floor/Room No. Rm. 1-B
VALLEJO, CALIFORNIA

Inspector(s): MARIA COUILLON
Case No. 1140-1389459 MLI (1)

Safe: _____  Cabinet: _____  Credenza: _____  Desk: ✓  Drawer: ✓

Shelf: _____  Table: _____  Wall: _____  Other: _____

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| ✓ 1 | # A01293460 - Indicia, ID Cards, mail, business cards |
| ✓ 1 | # A01293461 - Checkbooks + deposit slips (3) |
| 1 | # A01293458 - Indicia |
| ✓ 1 | # A01293459 - Deposit records WFB |
| ✓ 1 | # A01293457 - Checkbooks (2) |

DISTRIBUTION OF COPIES:   White- *U.S. Magistrate (Return with Warrant)*
Yellow- *Inspector (Attach to PS Form 714)*
Pink- *Subject Searched*
Green- *Evidence Control Officer (Attach to PS Form 714)*

Page 1 of 5 pages

PS Form 8164, October 1993

# THE UNITED STATES POSTAL INSPECTION SERVICE

## SEARCH WARRANT INVENTORY

Position/Box.: _____ / _____

Subject Name: DEBORAH JEAN PALFREY    Date: 10/04/06

Subject Address: 803 CAPITOL STREET    Floor/Room No. Rm 1-D
VALLEJO, CALIFORNIA

Inspector(s): MARIA COUVILLON    Case No. 1140·1389459 MLI (1)

| Safe: | Cabinet: | Credenza: | Desk: | Drawer: |
| Shelf: | Table: | Wall: | Other: Closet |

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | # A01293470 - Toshiba Satellite Pro S/N Y7342857 (with ac power adaptor + manual on continuation label) |
| 1 | # A01293493 - One white box containing manual credit card machine and verifone cc machine w/ paperwork |
| 1 | # A01293492 - One box labeled Discover containing credit processing information |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

DISTRIBUTION OF COPIES:  White-*U.S. Magistrate (Return with Warrant)*
Yellow-*Inspector (Attach to PS Form 714)*
Pink-*Subject Searched*
Green-*Evidence Control Officer (Attach to PS Form 714)*

PS Form 8164, October 1993

# THE UNITED STATES POSTAL INSPECTION SERVICE

## SEARCH WARRANT INVENTORY

Position/Box.: _____ / _____

Subject Name: DEBORAH JEAN PALFREY   Date: 10/04/06

Subject Address: 803 Capitol Street   Floor/Room No. Rm. 1-G
Vallejo, CAlifornia

Inspector(s): Maria Couvillon   Case No. 1140-1389459 MLI(1)

| Safe: | Cabinet: | Credenza: | Desk: | Drawer: |
|---|---|---|---|---|
| Shelf: | Table: | Wall: | Other: ✓ Kitchen - Countertop | |

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | #A01293469 - Phone contact book including appointment schedule. |
| 1 | #A01293472 - Identification info (driver's license, passport copies for women in MD, Fraser 1099, CD Rom in Express mailer) |
| 1 | #A01293475 - Fax call listings, Park Lake Towers (FL) annual meeting paperwork, Charles Schwab accts. letters, invoice for Web banner, purchase order for Eclectica |
| 1 | #A01293474 - Past due amount paperwork with reference to money orders, Woman ID and contact information, Park Lake Towers annual notice |
| 1 | #A01293471 - Bank checks, check stubs 2004-2005 |
| 1 | #A01293468 - Appointment book including identification information for women |
| 1 | #A01293467 - 2005 appointment book including notes of sales of stock, real estate contacts + notes |

DISTRIBUTION OF COPIES:   White-*U.S. Magistrate (Return with Warrant)*
Yellow-*Inspector (Attach to PS Form 714)*
Pink-*Subject Searched*
Green-*Evidence Control Officer (Attach to PS Form 714)*

Page 3 of 5 pages

PS Form 8164, October 1993

# THE UNITED STATES POSTAL INSPECTION SERVICE

## SEARCH WARRANT INVENTORY

Position/Box.: _____/_____

Subject Name: DEBORAH JEAN PALFREY          Date: 10/4/06

Subject Address: 803 CAPITOL STREET          Floor/Room No. Rm. 1-H
VALLEJO, CA

Inspector(s): Maria Couvillon          Case No. 1140-1389459 mLI(1)

Safe: _____  Cabinet: ✓  Credenza: _____  Desk: ✓  Drawer: _____

Shelf: ✓  Table: _____  Wall: _____  Other: OFFICE

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | # A01293473 - Toshiba Satellite 2415-S205 |
|   | S/N 23121219P (ac adaptor and product info on continuation) |
| 1 | # A01293480 - DC, Northern VA, MD, NJ mapbooks |
| 1 | # A01293486 - CD - Web Design, letters, disbursement journal -19 |
| 1 | # A01293482 - CD - Roms |
| 1 | # A01293485 - Wells Fargo Bank Stmts 20 Aug 04 - |
|   | 31 Aug 06  Charles Schwab Stmts 2003 - Aug 2006 |
| 1 | # A01293479 - Four expandable folders, blue, green, red, |
|   | black containing profiles |
| 1 | # A01293478 - Appointment books, Binder of notes |
|   | on men for escort service. |
| 1 | # A01293476 - Binders of woman's profiles |
| 1 | # A01293484 - Phone records, bank/mortgage records - |
|   | Wells Fargo, City Paper Ad - PMA |
| 1 | # A01293483 - Employee contractor agreements, Newsletters |
|   |   |
|   |   |
|   |   |
|   |   |

DISTRIBUTION OF COPIES:   White-U.S. Magistrate (Return with Warrant)
Yellow-Inspector (Attach to PS Form 714)
Pink-Subject Searched
Green-Evidence Control Officer (Attach to PS Form 714)

Page 4 of 5 pages

PS Form 8164, October 1993

# THE UNITED STATES POSTAL INSPECTION SERVICE

## SEARCH WARRANT INVENTORY

Position/Box.: _____ / _____

Subject Name: DEBORAH JEAN PALFREY   Date: 10/4/06

Subject Address: 803 Capitol Street   Floor/Room No. Rm. B-1
Vallejo, CA

Inspector(s): Maria Couvillion   Case No. 1140-1389459 (MLIL)

Safe: ✓   Cabinet: _____   Credenza: _____   Desk: _____   Drawer: _____

Shelf: _____   Table: _____   Wall: _____   Other: ✓ Basement

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | # A01293496 - 4 file folders relating to Ads for Escort Service, 1 file ref. sale of Pamela Martin Business. |
| 1 | # A01293494 - 7 file folders with newspaper Ad material for Escort Services. |
| 1 | # A01293495 - file box marked Internal Revenue + Bank Statements |
| 1 | # A01293487 - US Liberty $50 gold coins (81) US Liberty $1 Silver Coins (320) Canadian $50 Gold coins (61) South African Gold Krugerrands (413) |

DISTRIBUTION OF COPIES:   White-*U.S. Magistrate (Return with Warrant)*
Yellow-*Inspector (Attach to PS Form 714)*
Pink-*Subject Searched*
Green-*Evidence Control Officer (Attach to PS Form 714)*

Page 5 of 5 pages

PS Form 8164, October 1993