# Call girl in 'D.C. Madam' scandal in bed with feds?

**BY JAMES GORDON MEEK**
DAILY NEWS WASHINGTON BUREAU

ARLINGTON, Va. — The mail is piling up against the apartment door in the shabby Wellington apartments near the Pentagon.

It is the last known address of Paula Neble, an alleged high-priced call girl at the center of the "D.C. Madam" scandal.

Neble has gone underground after being fingered as a government informant in the racketeering case against Deborah Jeane Palfrey and her alleged call-girl service.



Sources told the Daily News that Neble, 36, is a cooperating government witness.

But former associates say the Houston hottie's credibility will crumble on the witness stand if the government calls her to testify against Palfrey, who sent Washington into a panic when she handed over current phone records to ABC News.

Neble has claimed to have a doctorate, several sources said, but may have only a medical degree. Neble never earned any degree, her mother confirmed.

Told that Neble is named as a high-class prostitute in the case rocking the capital, her mother, Cathleen, gasped: "A what? That doesn't sound like her."

But acquaintances aren't shocked by the allegations.

Known for stockpiling cheap romance novels she read while devouring cookie dough, Neble has long mixed fact and fantasy.

"She was a very odd and mysterious girl, a pathological liar with serious emotional problems," said one former roommate.

In the 1990s, she told co-workers at a stationery store that she was engaged to an English prince, but he died in an accident. She was also a Ford model in New York until a stalker with a staple gun shot her in the face, she claimed.

She once rented a room in Arlington with a letter from England's esteemed Oxford University stating that she was a Ph.D. lab worker. But a school spokesman said she never worked there.

Neble's lawyer declined comment.

mjacobino@nydailynews.com

*Next page intro/separate column:*

...say?"

"One shooting is too many, particularly when it affects a young person," said Police Commissioner Raymond Kelly.

The battle erupted when rival groups of Dominicans and African-Americans started arguing in a party packed with teenagers in a basement apartment.

"Boom, boom, boom," said Paralisse dela Cruz, 16.

Kirsys tried to get into a building courtyard, but a man refused to let her in. "But they're shooting," the terrified middle schooler pleaded, Paradise said.

Amid the chaos and gunfire, Kirsys ran to a neighboring building and was trying to buzz her way inside when she was hit by a stray bullet.

"I'm okay, I'm okay," Kirsys murmured.

"She was just standing there," said Cristina Rosario, 12. "She tried to open the door and she got shot."

Within seconds, a driver pulled up and offered to take the wounded girl and a friend, who gave...

...consumed with rage, the gunman started shooting as Kirsys, who had fled the party, and dozens of other bystanders ran for cover.

"She was shooting crazy," said...

someone had stolen the $200 cell phone.



Enraged over a cell phone during one of what neighbors say are notorious parties at the spot. Above, cops work crime scene where bullets flew. Photos by Michael Schwartz

...his name only as Jeremy, to the hospital.

Even as she faded in and out of consciousness, the plucky victim tried to reassure her friend as they raced to St. Barnabas Hospital in less than five minutes.

Neighbors said the dingy apartment where the fight started is notorious for illicit parties and underage drinking.

An aspiring police officer was shot and killed after an argument at the same place on Dec. 10, 2005.

"They're always throwing parties and there is always a fight,"

...sources said.

"She's really bad shape," said a source close to the case.

"She has a really tough battle in front of her."

Kirsys earned A's at nearby Middle School 45 and loves to play Double Dutch jump rope. Slim and beautiful, she has long black hair and lit up rooms with her wide smile.

"She's always happy and smiling," said Dayris.

With **Bill Egbert and Tamer El-Ghobashy**

said Frankie Martinez, 52.

Dayris Jimenez, the wounded girl's best friend, said she passed up the chance to go to the party because she knew there could be trouble there.

Kirsys was moved to New York-Presbyterian Hospital Columbia, where she underwent surgery and was in critical but stable condition last night. A 40-caliber bullet nicked her bowel, police

Exhibits CR 07-046-GK

FILED

SEP 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



Home Page > News > Local > Local Stories

# E-Mails Expose Inner Workings of Palfrey's Escort Service

August 16, 2007 - 5 35am
Neal Augenstein, WTOP Radio

WASHINGTON - "Why did you do this to me? I never did anything to you "

That accusatory two-sentence e-mail from alleged D C madam Deborah Jeane Palfrey to an escort she considered her "little sister" and one of her most trusted confidantes came moments after Palfrey realized her assets had been frozen by the U S Department of the Treasury

"My first thought because of the timing was that (Jennifer) was working with the government," writes Palfrey, in a series of e-mails to WTOP.

"Jennifer" was the name escort customers knew for a legal secretary at Akin Gump Strauss Hauer & Feld, a prominent D C law firm The woman was fired in May 2007, shortly after revealing to the firm that she had moonlighted for Palfrey's Pamela Martin & Associates between 2002 and 2006

Palfrey faces federal racketeering and money laundering charges in U S District Court in Washington for allegedly running a prostitution ring Palfrey maintains her company provided legal escort services in the nation's capital, catering to adult fantasies from 1993 until 2006.

WTOP is not identifying "Jennifer" by her given name, as she has not been charged with any crimes Her lawyer confirms his client has been contacted by the prosecution, and at trial would testify against Palfrey

"If my client is called as a witness, she intends to testify," says Athan Tsimpedes, attorney for "Jennifer."

Channing Phillips, spokesman for U S Attorney Jeffrey Taylor, refused comment on "Jennifer," citing pretrial secrecy rules

Ever since Palfrey was indicted in March, she's wondered, theorized and hypothesized how she came to the attention of the U S government, since Pamela Martin operated without arrest for 13 years in a city which is home to dozens of escort services Palfrey has alleged she is the target of selective prosecution

On Oct 4, 2006, when Palfrey learned her assets had been frozen and her home searched by federal agents as part of a joint Internal Revenue Service-U S Postal Inspection Service investigation, she initially believed "Jennifer" provided the government with the impetus to bring a criminal case against her

Palfrey quickly changed her mind

"I immediately backed off," Palfrey writes "I have continued to maintain she -- like the other escorts -- probably is a victim "

The indictment against Palfrey states 14 of her escorts described to the grand jury how they sent money by mail to Palfrey's Benicia, Calif home. Prosecutors say the money facilitated the operation of an unlawful activity -- a major component of the federal Racketeer Influenced and Corrupt Organizations Act, or RICO charge If she were convicted on the organized crime charge, Palfrey could lose most of her assets permanently.

Palfrey's second thought was apparently the correct one Tsimpedes says the first time his client had any contact with the federal government was after Palfrey's home had been searched and her assets seized. One of the items recovered from Palfrey's home was a file containing contact numbers for her employees. Tsimpedes believes that's how the government learned the identity of "Jennifer "

"My client had no involvement with the government as far as them looking at her for anything She received a subpoena," in relation to Palfrey's case

Palfrey's fondness for "Jennifer" was, in large part, due to their long business association WTOP has learned the escort's phone number appears 1,052 times in Palfrey's records between April 3, 2002 and May 21, 2006

"She was in her late 20s, a five foot and no inches tall, pretty, busty blonde," writes Palfrey

A recent traffic citation lists the former Akin Gump employee as 5 feet tall and 110 pounds

In her day job, WTOP has learned "Jennifer" was a legal secretary for John M Dowd, the head of Akin Gump's criminal litigation group Sheila Turner, director of communications for the firm, would not specify for whom the woman worked or provide any details on her employment

"This is an internal personnel matter, and as such we will not provide comment "

"She was very smart," writes Palfrey, "I was very fond of her, if for no other reason than she had her head on straight "

Tsimpedes, the attorney for "Jennifer" says while at times she did provide outcall escort services, "she was not involved in prostitution She did nothing wrong " Tsimpedes and Palfrey agree that for the past few years, much of his client's work had involved working the phones for Palfrey, setting appointments for customers Both say "Jennifer" had stopped working for Palfrey by mid-2006

On Oct 2, 2006, two days before Palfrey's home was searched and her assets frozen, "Jennifer" broached the subject of reuniting In e-mails from her Akin Gump account obtained by WTOP, she typed, "Just wanted to drop you a line to see if there is another contact number for me to call in case I wanted to pick up a few nights or has everything been shut down?"

Palfrey, in Europe at the time, informed "Jennifer" that she'd closed her business in August

"I simply could not take it anymore," Palfrey wrote at the time, declaring frustration with temperamental escorts, who "acted as if they hardly could stomach the business, the job, and most especially me when on call "

Yet, Palfrey was willing to consider passing-along her business to Jennifer.

"It is plain 'foolish' to take a perfectly viable revenue stream (of any kind) and just throw it away, without solid justification," Palfrey wrote

Palfrey detailed the steps "Jennifer" would need to take to revive the business. One of those steps involved pulling-back the curtain on

what was apparently a secret between Palfrey and her most trusted employee -- the other escorts' real names. "Haley's # is 202-xxx-xxxx and her real name is Paula   Angela's # is 202-xxx-xxxx and her real name is Donna and McKenzie's # is 202-xxx-xxxx and her real name is Lynette."

As previously reported by WTOP, "Paula" is Paula Neble, a former escort Palfrey is suing for breach of contract.

In her criminal and civil cases, Palfrey has said her escorts were independent subcontractors, who signed contracts pledging they would not engage in illegal activities. WTOP has reported Neble, whose customers included Sen. David Vitter, R-La., told a grand jury she considered her work for Palfrey to be prostitution.

Palfrey says a few months before her life began tumbling down she helped "Jennifer" buy a small horse farm in Maryland, "by vouching as her other or second employer with a lender."

Tsimpedes says the former secretary is trying to pick up the pieces of a broken legal career. WTOP has learned she is working in the debt collection business.

"She was wrongfully fired. Akin Gump did her an injustice. She was imprisoned by her firing. It doesn't take much to figure out who she was," Tsimpedes says.

In an Internet search of previous news articles, it appears the law firm has never publicly identified "Jennifer."

Palfrey realizes the irony that one of her most-trusted confidantes in their shared secret world may someday take the witness stand against her.

"I have always stated the girls ("Jennifer" included) were bullied by the government in the grand jury proceeding and absolutely had no prior predilection to hurt or harm me," Palfrey writes.

Despite her intention to "fight to the death" in her criminal case, "When this is all over," Palfrey writes, "I look forward to reconnecting with each and every one of the women, if they so desire. I hope to have some very long and long overdue lunches and dinners in my future."

(Copyright 2007 by WTOP. All Rights Reserved.)

< Back.

VICTIM'S SISTER RIPS PLANNED O.J. BOOK | By CINDY ADAMS...    http://www.nypost.com/seven/08222007/gossip/cindy/victims_sister_rip...


NYC
Weather
64° CLOUDY



Wednesday, August 22, 2007
Last Update 04 15 PM EDT

**CARS**
**JOBS**
**REAL ESTATE**
**DATING**

[____] Recent [GO] powered by YAHOO! SEARCH


Moving?
(No lifting required.)
learn more ▸
The new at&t


WaMu
WaMu Free
Checking™
$5.00
Savings.
Apply online in
just 7 minutes.
LEARN MORE
FDIC Insured

# VICTIM'S SISTER RIPS PLANNED O.J. BOOK


**Cindy Adams**



**DENISE BROWN** Worried about Nicole's children.

August 22, 2007 — THE "shocked" and "horrified" **Denise Brown** has sent friends a note concerning the Goldman family decision to publish O.J.'s "If I Did It" book Calling this literary replication of her sister Nicole Brown Simpson's killing a "Manual on Murder," she's "asking everyone in our country and the world to step forward and speak loud and clear" against its publication She writes

"Hold **Fred Goldman** to his own words, 'Make certain this material never sees the light of day That someone is willing to publish this garbage is morally despicable I would hope no one would buy this book that the message from people in this country is sent to his publisher we as a nation won't put up with it it's reprehensible ' "

🖶 PRINT
✉ EMAIL TO A FRIEND
DIGG IT
REDDIT
PERMALINK

Says Denise "I plead with the public to help protect the two innocent victims of all this I can't bear that **Sydney** and **Justin**, Nicole's children, will have to be subjected to this step-by-step manual on how their mother and her friend Ron Goldman were murdered Please help us stop everyone involved with this horrendous business deal "

Goldman obviously reversed his initial disgust, and publisher Beaufort is going ahead with this icky sticky junky How To Stab Someone To Death nice little read

DEBORAH Jeane Palfrey, the accused Washington, D C madam, purported to have a mouth as big as her client list, is opening it Slightly Not large enough to actually mention which of her janes she paired with which of the capital's johns but sufficiently wide to fire her existing Washington legal team One of her lawyers is Preston Burton, a gent steeped in the frailties of the flesh along the Potomac A few sex scandals ago, Mr Burton rep'd Monica Lewinsky, of whom you and Hillary may have heard Anyway, Miss Palfrey, not all that thrilled with whatever's whateovering, now intends to fight for new laws that will legalize prostitution from sea to shining sea As a result of this hot cause, I'm told she will inform her attorneys or solicitors or mouthpieces or however they're called that it might be best if they don't represent her further Supposedly she may tell them that this week Me, I'm telling them now

A BROOKE Astor addendum The pews didn't overflow for her funeral To quote one friend "It wasn't disrespect She wouldn't know if we appeared or not But the farewell was choreographed by her son We have no use for him We would not grant him and his wife this honor " In fact, after speaking, David Rockefeller stiffed the Marshalls Rather than join their front row, he took an empty seat in the bleachers Continues the friend "Every one of us will come out for Brooke's memorial in the fall Her favorite charities, the New York Public Library and Metropolitan Museum

**AFFIDAVIT**

Blanche Palfrey, pursuant to the authority of 28 U.S.C. §1746 and under penalty of perjury states:

1.    In or about October 2006, I spoke with Montgomery Blair Sibley about the seizure of my daughter Deborah Jeane Palfrey's assets. At that time he offered to represent me in case any investigation of me was undertaken by the government. I accepted that offer and he became my attorney. I was instructed by him not to speak with anyone about this matter but refer all questions to him. We have spoken several times since last fall.

2.    On June 4, 2007, at approximately 8:30 p.m., two people knocked on my residence door and identified themselves as Maria Couvillion of the U.S. Postal Service and Troy Burrus of the Internal Revenue Service and asked if they could speak with me. I have a weak heart and given the late hour, I agreed, as I didn't want to get into an argument.

3.    They came into my house and questioned me for 30-45 minutes. During that questioning, I told them that they should speak to Mr. Sibley. In response, both agents indicated that they already had spoken with Mr. Sibley and that I should speak with them.

4.    Thereafter, they asked me questions and I answered, regarding my daughter's escort services and my finances. They did not tape record the interview to my knowledge, but were making written notes.

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Date: _6-8-07_                          _Blanche Palfrey_
                                        Blanche Palfrey

**A FALSE STATEMENT OR CLAIM MAY SUBJECT A PERSON TO PROSECUTION UNDER 18 U.S.C. §1001 AND/OR §1621 AND IS PUNISHABLE BY A FINE AND UP TO FIVE YEARS IMPRISONMENT.**

2

**METRO DC ESCORT SERVICES:**

1.      Exquisite Escorts  240-463-7754
2.      Evening Delight  202-270-8874
3.      Asian Sweety  800-948-0089
4.      Asian Penthouse  877-666-4022
5.      That's Hot!  888-595-5524
6.      That's Hot  800-377-1088
7.      College Girls  888-595-5524
8.      College Girls  800-377-1088
9.      Tops Referral Service  202-332-8049
10.     About An Hour  800-377-1088
11.     About An Hour  888-595-5524
12.     Private Angels  301-608-2444
13.     Full Service Encounters 703-815-8003
14.     Full Service Encounters 800-479-3814
15.     Asian Paradise  866-493-5727 Call
16.     Seductive Temptations  301-333-1972
17.     Bunny Ranch 202-965-6000
18.     Sin City Escorts  202-216-0013
19.     Charming Cherries 240-381-1989
20.     Brandy's Fetishes Unlimited 703-798-2109
21.     Sinister Entertainment 202-289-8777
22.     Evil Empire  202-789-2600
23.     Klimaxxx  202-265-5252
24.     Vivid Girls  202-408-5545
25.     Black Fantasy Escorts  202-965-3283
26.     Black Fantasy Escorts  703-553-0500
27.     Amanda's 202-889-2100
28.     Amanda's Escort Service Llc 202-582-1666
29.     Amanda's Escort Service Llc 703-807-0704
30.     Amazing Escorts & Entertainers 202-289-8777
31.     Amazing Escorts & Entertainers 202-789-2600
32.     Angels 202-678-6800
33.     Angels 202-889-2100
34.     Appealing Act 202-466-4636
35.     Appealing Act 703-521-7159
36.     Appealing Acts 202-439-4737
37.     Asian Honey 202-628-0001
38.     Asian Penthouse 877-666-4022
39.     Asian Sweety 800-948-0089
40.     Bunny Ranch 202-265-5252
41.     Bunny Ranch 202-625-6111
42.     Bunny Ranch The 202-965-6000

43. Choices Inc 202-293-2770
44. City Girls 202-678-6800
45. Command Performance 202-399-5515
46. Cp Services 202-399-5515
47. CP Services 202-399-5515
48. Cs Network 202-628-0001
49. DC's Finest Escorts & Entertainment 202-429-0044
50. Delightfully Yours 301-277-4195
51. Ecstasy 202-628-0001
52. Erotica Escorts & Entertainment 202-299-1010
53. Experience Ecstassy 202-628-0001
54. Extravagant International 202-466-4636
55. Extravagant International Inc 703-521-7159
56. Gentle Touch 202-293-2770
57. Girl Friday Escorts 202-889-2100
58. Kayla's 202-678-6800
59. L & M Enterprises 202-289-8777
60. Mademoiselle 202-628-0001
61. Miller Nancy Ava Mistress Med 202-452-5522
62. Mistress Nancy Ava Miller 703-912-1718
63. Paradise Playmates 202-465-1469
64. Pleasures 202-678-6800
65. Premier Enterprises 202-289-8777
66. Premier Enterprises 202-299-1010
67. Premier Enterprises 202-965-6000
68. Prestige 202-889-2100
69. Pretty Woman 202-889-2100
70. Private Angels 202-678-6800
71. Sin City 202-216-0013
72. Sin City 202-299-1010
73. Sin City 202-965-6000
74. Sin City 301-767-1600
75. Sin City Girls & Escorts 703-516-4477
76. Sinister Entertainment 202-289-8777
77. Tops 202-332-8049
78. Tops Referral Service 202-332-8049
79. Ultimate 202-678-6800
80. Vivid Girls & Escorts 703-465-4410
81. Xxx Entertainment 202-328-0808
82. XXX Entertainment 202-328-0808
83. XXX Entertainment 202-625-1444

# U.S. SENATOR PATRICK LEAHY

**CONTACT: Office of Senator Leahy, 202-224-4242**          **VERMONT**

## Comment Of Senator Patrick Leahy (D-Vt.),
## Chairman, Senate Judiciary Committee,
## On Reports Of The Resignation
## Of Attorney General Alberto Gonzales
## August 27, 2007

"Under this Attorney General and this President, the Department of Justice suffered a severe crisis of leadership that allowed our justice system to be corrupted by political influence. It is a shame, and it is the Justice Department, the American people and the dedicated professionals of our law enforcement community who have suffered most from it.

"The obligations of the Justice Department and its leaders are to the Constitution, the rule of law and the American people, not to the political considerations of this or any White House. The Attorney General's resignation reinforces what Congress and the American people already know -- that no Justice Department should be allowed to become a political arm of the White House, whether occupied by a Republican or a Democrat.

"The troubling evidence revealed about this massive breach is a lesson to those in the future who hold these high offices, so that law enforcement is never subverted in this way again. I hope the Attorney General's decision will be a step toward getting to the truth about the level of political influence this White House wields over the Department of Justice and toward reconstituting its leadership so that the American people can renew their faith in its role as our leading law enforcement agency."

# # # # #

Home    Biography    Vermont    Issues    Press    Office    Services    Search

HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS

*TimesSelect* Free 14-Day Trial | Welcome, yardbirdbk · Member Center · Log Out

## The New York Times

# Washington

US  All NYT    Search



WORLD   U.S.   N.Y / REGION   BUSINESS   TECHNOLOGY   SCIENCE   HEALTH   SPORTS   OPINION   ARTS   STYLE   TRAVEL   **JOBS**   **REAL ESTATE**   **AUTOS**

POLITICS   **WASHINGTON**   EDUCATION

## Former Prosecutor Says Departure Was Pressured

By ERIC LICHTBLAU
Published: March 6, 2007

WASHINGTON, March 5 — The former federal prosecutor in Maryland said Monday that he was forced out in early 2005 because of political pressure stemming from public corruption investigations involving associates of the state's governor, a Republican.

"There was direct pressure not to pursue these investigations," said the former prosecutor, Thomas M. DiBiagio. "The practical impact was to intimidate my office and shut down the investigations."

Mr. DiBiagio, a controversial figure who clashed with a number of Maryland politicians, had never publicly discussed the reasons behind his departure. But he agreed to an interview with The New York Times because he said he was concerned about what he saw as similarities with the recent firings of eight United States attorneys.

As in those cases, there are conflicting accounts of the circumstances that led to Mr. DiBiagio's ouster. The Justice Department disputes his version

His office had been looking into whether associates of Gov. Robert L. Ehrlich Jr. had improperly funneled money from gambling interests to promote legalized slot machines in Maryland. Mr. DiBiagio said that several prominent Maryland Republicans had pressed him to back away from the inquiries and that one conversation had so troubled him that he reported it to an F.B.I. official as a threat.

But he said that the Justice Department had offered little support and that that made it "impossible for me to stay."

Several current and former officials in the Baltimore office said Mr. DiBiagio voiced concerns in 2004 that the corruption inquiries were jeopardizing his career, a view that they shared.

The Justice Department rejected Mr. DiBiagio's explanation. An official in the department, David Margolis, said he told Mr. DiBiagio in 2004 that he had to leave because "we had lost confidence in him."

Mr. Margolis said the prosecutor's harsh management style had caused resentments in the office that ran "wide and deep" and called "an absolute fairy tale" the idea that Mr. DiBiagio's departure was tied to the gambling case or any other investigation.

Mr. Ehrlich, who was defeated for re-election in November, denied any involvement in Mr. DiBiagio's departure and said there was nothing to the gambling investigations.

Like Mr. DiBiagio, several of the newly departing prosecutors were overseeing sensitive political corruption investigations when they left office.

The controversy over the dismissals continued to grow on Monday, as the head of the Justice Department office that oversees prosecutors stepped down, a watchdog group filed an ethics complaint, and House and Senate committees prepared for testimony on Tuesday from some of the ousted prosecutors

E-MAIL
PRINT
REPRINTS
SAVE
SHARE

GET DLL TOOLS SPONSORED BY
NAMESAKE

Thomas M. DiBiagio, former United States attorney for Maryland, in 2002

**Related**

Messenger in Prosecutors' Firings Quits (March 6, 2007)

**More Articles in Washington »**



# welcome to the human network.

See how the human network inspires learning by connecting people.
Read story →

cisco

**MOST POPULAR**

E-MAILED   BLOGGED   SEARCHED

1. Darwin's God
2. English, Irish, Scots: They're All One, Genes Suggest

Former Prosecutor Says Departure Was Pressured – New York Times                                03/06/2007 11 39 AM

Because Mr. Ehrlich was the sole statewide Republican in Maryland at the time of Mr. DiBiagio's appointment in 2001, he had a critical role in recommending him to the White House for the position.

Mr. DiBiagio, a former assistant prosecutor, was a political unknown, but he and the governor had become friends as young lawyers in Maryland. The bond disintegrated soon after the prosecutor took office.

Mr. Ehrlich and his advisers acknowledged on Monday that they were unhappy with Mr. DiBiagio's handling of an earlier corruption investigation that led to the indictment in 2003 of Mr. Ehrlich's state police superintendent, Edward R. Norris, over his misuse of police money.

The gambling investigation caused less concern in the governor's office because officials there considered it without merit, Mr. Ehrlich said. But because of lingering suspicions in Maryland political circles that Mr. Ehrlich's people had a hand in Mr. DiBiagio's departure in early 2005, a longtime aide to the governor, Jervis Finney, called Mr. DiBiagio a few months ago to deny any involvement, Mr. Finney said.

Mr. Finney said in an interview Monday that he wanted to "clean things up" and to let Mr. DiBiagio know that "neither Gov Bob Ehrlich or his representatives had asked the Department of Justice to push him out."

Mr. DiBiagio said he did not accept the explanation.

"I believe it was that investigation that played an integral role in what was done to me," Mr. DiBiagio, now at a law firm here, said about the gambling inquiry. "I clearly got the message that I had alienated my political sponsor and I would not have any political support to stay another term. Clearly, they wanted me to leave."

Mr. DiBiagio pointed to tense conversations in 2003 and 2004 with advisers to the governor who, he said, intimated that the corruption investigations could derail his career. He would not name them publicly.

The former prosecutor said he was particularly troubled by one visit in June 2004 in which, he said, a lawyer allied with the governor said the gambling inquiries were disrupting legislative consideration of the slots question and should be shut down.

Mr. DiBiagio said the lawyer inquired about his political future, asked whether he was interested in being a judge and suggested that his life could be closely scrutinized.

Mr. DiBiagio said he described the conversation in a memorandum for his records and reported it to an official of the Federal Bureau of Investigation in Baltimore as a possible threat

Soon after the meeting, Mr DiBiagio told a Justice Department official in Washington about his office's gambling investigation and said, "Powerful politicians and businessmen are very upset that we are looking into this matter," according to an e-mail message that The Times reviewed.

In the gambling investigation, prosecutors secured a grand jury subpoena for the records of Mr. Ehrlich's communications director, Paul E. Schurick.

Investigators were said to be interested in tracing substantial payments made by a gambling company to a political marketing business in Maryland with ties to Maryland Republicans, people involved in the issue said.

Mr. Ehrlich said Monday that he had no knowledge of any improper transactions to support the slots initiative, and he said the investigation was unfounded.

"I've been for slots for 20 years," he said. "It wasn't any shock that I was for slots. There wasn't anything to this "

The investigation appears to have ended after Mr. DiBiagio left office in January 2005.

In Maryland law enforcement circles, Mr DiBiagio had as many detractors as supporters. The Justice Department publicly rebuked him in mid-2004 over a leaked memorandum that spoke of his desire to bring three "front page" corruption cases before November, a memorandum widely interpreted in Baltimore as an effort to pursue Democrats.

3.  Without Health Benefits, a Good Life Turns Fragile
4.  A United Kingdom? Maybe
5.  Insufferable Clinginess, or Healthy Dependence?
6.  Oil Innovations Pump New Life Into Old Wells
7.  Mortgage Crisis Spirals, and Casualties Mount
8   Choice Tables | London: Where Indian Cuisine Reaches for the Stars
9.  Editorial: The Must Do List
10   'Time Change a Mini-Y2K' in Tech Terms

Go to Complete List »



**Business**
nytimes.com/business

Can Tom Cruise save United Artists?

Also in Business:
 → Bono as editor
 → What Starbucks can learn from the movie palace
 → What is or Warren Buffet's wish list?

The New York Times STORE


New York Times Crossword Puzzle Society
Buy Now

In response, the department said all public corruption cases in Maryland would have to obtain approval by superiors in Washington. Soon, the department initiated an unscheduled performance review of Mr. DiBiagio  Mr. Margolis said the review had shown deep resentment over the prosecutor's aggressive management.

Several officials in the Baltimore prosecutor's office said that although Mr. DiBiagio had been an unpopular manager, the timing of the events leading to his departure appeared to be linked, at least partly, to the corruption investigations.

"We had several investigations that were very sensitive publicly, and what did him in was the probes into prominent Republicans," said a former official involved in the inquiries who insisted on anonymity.

The state's attorney in Baltimore, Patricia C. Jessamy, who worked often with Mr. DiBiagio, said she believed that he had alienated too many important people to succeed.

"He was a good prosecutor," she said. "But he did not play politics well, and that was his downfall."

More Articles in Washington »

Explore TimesSelect with a no-risk 14-day free trial.

Ads by Google                                                                                          what's  his?

**Official US Citizenship**
Complete your US Citizenship online Learn if you qualify for free!
www.USCitizenship.info

**Free Government Grants**
Free Government Grants for 2007 Billions Available. Never Repay!
Government Free-Grant-Kit.com

**Government Grants Program**
Information on no-pay back money  Get free grant money to assist you!
FederalFundingSources.com

**Tips**
To find reference information about the words used in this article, double-click on any word, phrase or name. A new window will open with a dictionary definition or encyclopedia entry.

**Past Coverage**
A New Mystery to Prosecutors  That Lost Jobs (March 4, 2007)
House Panel Subpoenas 4 Prosecutors of 8 Ousted (March 2, 2007)
Ex-Prosecutor Says Politics Was Motive for Dismissal (March 1, 2007)
Dismissed U S  Attorneys Received Strong Evaluations (February 25, 2007)

**Related Searches**
United States Politics and Government
Justice Department
Gonzales, Robert B Jr
Maryland

INSIDE NYTIMES.COM                                                                                 ◀  ▶

SCIENCE »              TELEVISION »          TimesSelect          ART & DESIGN »        TimesSelect          WORLD »



Screens Blog:
For Shame

Online video has been
a boon to the sport
of public shaming,
writes Virginia
Heffernan.



Why Write
Weird Music?

Michael Gordon
offers some answers
on The Score, a blog
by four composers.



Bad vehicle and the Promise
of Surprise

Across the Universe: An
Astronomy Blog

Celebrating the Overlooked:
Henry Wessel

Breathing Easier in Bangkok

Home   World   U.S.   N Y / Region   Business   Technology   Science   Health   Sports   Opinion   Arts   Style   Travel   Jobs   Real Estate   Automobiles   Back to Top

Copyright 2007 The New York  ms Company   Privacy Policy   Search   Corrections   RSS   First Look   Help   Contact Us   Work for Us   Site Map



September 8, 2007

Media
## ABC to Explore 'D.C. Madam' Case
by David Folkenflik

*Morning Edition,* May 4, 2007 · Faced with an expensive legal battle, alleged Washington, D.C., madam Deborah Jeane Palfrey has turned to the media for help identifying her former clients. One administration official has already resigned based on a reporter's phone call about Palfrey. A story Friday night on the ABC News show *20/20* promises to reveal other patrons of her escort service.

Palfrey faces federal charges of money laundering and racketeering related to her business, which she says was a legal escort service. The government says the operation was a prostitution ring and has frozen her assets.

"I believe there is something very, very rotten at the core of my circumstance," Palfrey told reporters on the steps of a federal courthouse in Washington this week. "And without money to hire my own investigators, I must rely on your acumen and talent in the press and the media to uncover the truth."

All Palfrey has left of her records to offer reporters are her phone bills. She's asking the press to use them to figure out who her clients were — so she can call them to the witness stand and have them testify that no one paid her firm for sex.

Reporters from more than two-dozen news outlets started calling months ago to try to get her story, and those records. But it was ABC News correspondent Brian Ross who got first crack at them.

"They said, 'Well, we're going to sell the phone records.' We said, 'Well, thank you very much, we're gone — we can't pay for them — we can't do anything like that,'" Ross said. "And then they came back to us and said ... 'We'd like to give them to you. Would you be interested?'"

Ross and his producers got copies of four years worth of phone records from the escort service, though Ross says they made it clear they weren't acting as Palfrey's investigators.

Her civil lawyer is Montgomery Blair Sibley. He says he turned to ABC's Ross because the reporter would handle them responsibly, and because he'd track down those clients. The strategy has already paid off, in the lawyer's eyes.

"I think the — I don't want to say the genius of the strategy — but the proof is in the pudding," Sibley said. "We've identified at least one witness who will get on the stand, apparently, and now say, 'I was having a massage. I was not having illegal sexual relations, nor was I promised any."

The person who was identified is former senior State Department official Randall Tobias. He resigned from his job directing United States aid abroad late last month when Ross called to ask why his number had appeared on Palfrey's phone lists.

"When the former Deputy Secretary of State Tobias told me there was no sex, that's sort of what she has in mind as a witness who could help her," Ross said. "But I have talked to other men who told me, 'If she calls me, she's making the biggest mistake of her life, because there was sex.'"

Ross says some other prominent government leaders and Washington figures will be named in Friday

night's broadcast.

Former NBC News President Lawrence Grossman used to be Ross' boss at that network. Grossman says he has great faith in the reporter, but suggests ABC should hold back on naming anyone unless it can show how public policy was affected.

Ross says private citizens and minor government figures aren't fair game. But he says those clients of the escort service with powerful jobs — or who have taken strong public stands on morality — are newsworthy.

"There will be those who are cynical about Washington who will say, 'of course,' [this is going on]," Ross said. "And others will be surprised that leaders of government and people in important positions are customers of an operation that the federal government says was a big prostitution operation."

Ross says his reporting may well aid palfrey's defense, but she won't learn anything more from him than his viewers do.

**Related NPR Stories**

- April 30, 2007
  Bush Official Resigns in Prostitution Scandal
- April 28, 2007
  Aid Official Leaves Bush Administration
- April 30, 2007
  'DC Madam' Calls for Clients to Aid Her Defense

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 SEP 10  AM 9: 47

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NANCY M.
MAYER-WHITTINGTON
CLERK

UNITED STATES OF AMERICA,

PLAINTIFF,

VS.

DEBORAH JEANE PALFREY,

DEFENDANT.

_____/

CRIMINAL CASE NUMBER: 07-046-GK

DEFENDANT'S FIRST OMNIBUS MOTION

FILED

SEP 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Defendant Deborah Jeane Palfrey, appearing *pro se* as her court-appointed counsel refuses

to bring these matters to the Court's attention and objecting to the delay imposed without her consent

upon this matter by the Court's order of September 7, 2007, moves the Court to determine the

following matters promptly and as required by 18 U.S.C. §3161, *et seq.*:

1.  Motion to Expedite Consideration of Montgomery Blair Sibley's
    LCrR 44.5(a) Notice of Appearance

2.  Motion for Extension of Time to File New Motions;

3.  Motion to Dissolve the "Stipulated" May 22nd [D.E. #49] Discovery
    Order;

4.  Motion to Bar Assistant United States Attorneys Daniel Pearce
    Butler, Catherine K. Connelly, William Rakestraw Cowden from
    further involvement in this matter;

5.  Motion to Dismiss the Indictment for Outrageous Government
    Conduct;

6.  Motion to Completely Dissolve the March 16th [D.E. #12] and March
    22nd [D.E.# 17] Restraining Orders;

7.  Motion to Declare 18 U.S.C. §3006a Unconstitutional;

8.  Motion to Dismiss the Indictment as Violating the Tenth

1

Leave to file granted — J. Kessler — 9/19/07.

Amendment;

9.    Petition to Disclose Grand Jury Proceedings Pursuant to Rule 6(e);

10.   Motion to Meaningfully Disclose Un-Redacted Witness Statement

11.   Motion for Pre-Trial Investigation Report;

12.   Suppression Hearing Motions

13.   Motion to Set Pre-trial Evidentiary Hearing and Issue Subpoenas

1.    **MOTION TO EXPEDITE CONSIDERATION OF MONTGOMERY BLAIR SIBLEY'S LCRR 44.5(A) NOTICE OF APPEARANCE**

This Court has delayed by some nineteen days the simple matter of allowing Mr. Sibley – a member is good standing of this Court who is authorized to represent defendants in criminal matters – to file his notice of appearance on my behalf.  I request that this Court expedite the briefing scheduling on this matter and determine by September 14th whether it will accept Mr. Sibley's notice of appearance.

2.    **MOTION FOR EXTENSION OF TIME TO FILE NEW MOTIONS**

Defendant requests an additional three weeks to file motions in this matter to permit (i) review of the discovery material heretofore withheld from review by Mr. Sibley by the "Stipulated" May 22nd, [D.E. #49] Discovery Order and (ii) to present motions which prior counsel refused to file.  Otherwise, pursuant to Rule 12(e), Defendant may have been deemed to have waived a Rule 12(b)(3) defense, objection, or request not raised by the past-deadline the court set under Rule 12(c).

3.    **MOTION TO DISSOLVE THE "STIPULATED" MAY 22ND, [D.E. #49] DISCOVERY ORDER**

Defendant moves to dissolve *in toto* the "Stipulated" May 22nd, [D.E. #49] Discovery Order for as it stands, it prevents Defendant from rendering preparing and effective defense. *Inter alia*, that

2

order provides that documents produced by the government may only be used by my criminal defense attorneys "and their agents and employees exclusively in connection with the defense of this prosecution." This phrase is ambiguous and raises the specter that the Court may view certain acts by the Defendant and/or my defense team as violative of that order when no such intention to violate the order was present.

Moreover, given the paucity of resources available to the Defendant since the seizing of all her assets in October 2006, Defendant has been compelled to seek assistance through media contacts who – possessing similar interests – have devoted their resources to un-cover significant favorable facts for the Defendant. *Cf.*: "*Call Girl in 'DC Madam' Scandal in Bed with feds?*", Daily News, May 7, 2007. To prevent – as the present order does – Defendant from similar use of the information seized from her by the government significantly undermines the practical application of the Sixth Amendment's guarantees to confront and call witnesses. Moreover, the bulk of this information contains data seized from Defendant rendering a protective order over its contents perverse.

Accordingly, Defendant requests that this Court enter its order vacating *in toto* the May 22nd, [D.E. #49] Discovery Order.

**4.    MOTION TO BAR ASSISTANT UNITED STATES ATTORNEYS DANIEL PEARCE BUTLER, CATHERINE K. CONNELLY, WILLIAM RAKESTRAW COWDEN FROM FURTHER INVOLVEMENT IN THE MATTERS**

Defendant moves for an order barring the Assistant United States Attorneys assigned to prosecute this matter – Daniel Pearce Butler, Catherine K. Connelly, William Rakestraw Cowden – given their outrageous conduct in (i) disclosing privileged settlement communications for a malicious and improper purpose and (ii) allegedly implicitly violating the April 12, 2007, "gag" order of this Court and explicitly violating LCrR 57.7.

**a.** **DISCLOSURE OF SETTLEMENT NEGOTIATIONS**

On February 24, 2007, at the instance of Assistant United States Attorneys Daniel Pearce Butler, Catherine K. Connelly and William Rakestraw Cowden ("AUSAs"), Defendant's then-criminal counsel, A.J. Kramer, and her undersigned then-civil Counsel, met with the AUSAs to discuss a possible global resolution of the Criminal and Forfeiture Cases. No settlement was reached.

Ten (10) days later, on March 5. 2007, AUSA Cowden sent a letter to Defendant's then-civil counsel which (i) acknowledged that the February 24, 2007, meeting was a settlement conference and (ii) sought to self-servingly memorialize the substance of the discussions held at the meeting. A sealed copy of that letter along with a motion to seal is filed herewith in the Appendix marked "Supplement – Under Seal".

On March 16, 2007, the government filed a motion for an *ex parte* temporary restraining order seeking (i) to restrain further proceedings in the *Palfrey v. Neble et al.*, breach of contract case, (ii) a hearing as required by 18 U.S.C. §1514(b)(1) and (iii) to preserve the evidence of the customers and escorts in Defendant's sole possession. The motion contains several paragraphs which were sealed and related to the February 24, 2007, global settlement conference.

As a result on March 16, 2007, the Court entered its *ex parte* order granting that relief sought in the motion for Temporary Restraining Order [D.E. #12]. Additionally on March 22, 2007, the Court entered its Post-indictment Restraining Order. [D.E.# 17].

First, the utilization of the discussions had at the settlement conference was highly improper and deserves stern rebuke from this Court followed by the sanction of removing those three AUSAs from further involvement in the case.

4

Federal Rules of Evidence, Rule 408 "Compromise and Offers to Compromise", states as follows:

> Evidence of (1) furnishing or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

"Federal Rule of Evidence 408 is broader than the common law exclusionary rule in many jurisdictions and excludes from evidence all statements made in the course of settlement negotiations. *McCormick on Evidence*, 3rd Ed. (1984), p. 812. . . .To determine whether the statements are covered by the rule, the inquiry is whether the 'statements or conduct were intended to be part of the negotiations for compromise'. *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106 (5th Cir.1981)." *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652 (4th Cir. 1988).

Moreover, Federal Rules of Criminal Procedure, Rule 11(f)[1] points to Federal Rules of Evidence, Rule 410, which states: "evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions: . . .any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later

---

[1]

(f) Admissibility or Inadmissibility of a Plea, Plea Discussions, and Related Statements. The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410.

5

withdrawn."

Here, patently all of the statements made at the February 24, 2007, settlement conference are covered by Rules 408 and 410 and thus the use by the AUSAs of those statements in the sealed portion of the motion for temporary injunction was blatantly improper. The "chilling" effect of this behavior by the Department of Justice attorneys must draw immediate attention from this Court.

As noted in *Goodyear Tire & Rubber Co.* at 980 :

> There exists a strong public interest in favor of secrecy of matters discussed by parties during settlement negotiations. This is true whether settlement negotiations are done under the auspices of the court or informally between the parties. . . . Parties are unlikely to propose the types of compromises that most effectively lead to settlement unless they are confident that their proposed solutions cannot be used on cross examination, under the ruse of "impeachment evidence," by some future third party. Parties must be able to abandon their adversarial tendencies to some degree. They must be able to make hypothetical concessions, offer creative quid pro quos, and generally make statements that would otherwise belie their litigation efforts. Without a privilege, parties would more often forego negotiations for the relative formality of trial. . . . Moreover, confidential settlement communications are a tradition in this country.

Stated simply, what defense attorney is now willing to go into a settlement negotiation with the United States Attorney's office knowing that at the conclusion, the AUSA will (i) create a self-serving record of the meeting ten (10) days later and (ii) then improperly attempt to utilize that record in subsequent, *ex parte*, litigation?

**b.    LCrR 57.7**

LCrR 57.7(2)  states "It is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with

which the lawyer or the law firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice."

Here, on August 22, 2007, prior to the Court's ordering "Defendant's Pro Se Motion for Replacement of her Counsel, Preston Burton and Permitting Hybrid Representation" to be filed publically, New York Post columnist Cindy Adams printed a story indicating that Jeane had announced that she was set to "fire her Washington DC Legal team."

As the government had been e-mailed a copy of that motion on August 21, 2007, and this Court did not receive the motion until later on in the day of August 22, 2007, according to the FedEx records, it is appears that the government "leaked" this information.

Patently, this is not the first time the government has sought to use the power of "leaking" from "undisclosed sources" information in this case to avoid ethical obligations public disclosure would curtail. Notably, a website known as "TheSmokingGun.com" – a notorious on-line tabloid – published on October 9, 2006, an article entitled "New D.C. Sex Scandal Looming?" Attached to that article was (i) a copy of the seizure warrant affidavit in this matter notably **without** a signature as a copy obtained from the Clerk's office would certain have had and (ii) Defendant's prior arrest booking photograph. *A priori*, between the issuance of the seizure warrant on September 29, 2006, and the appearance of the article on October 9, 2006, someone in the government gave a copy of both the unfiled seizure warrant and the booking photograph to the TheSmokingGun.com in an attempt to prejudice Defendant. This behavior not only violates LCrR 57.7(2) but also the ABA Standards for Criminal Justice, Standard 3-1.4 Public Statements[2].

---

[2]

A prosecutor should not make or authorize the making of an extra judicial statement that a reasonable person would expect to be disseminated by means of public communication if the

Here, the requisite "prejudice" is it allows the first public notice of Defendant's decision to switch counsel to be made by a gossip columnist for a major New York newspaper, rather than simultaneously released to all media outlets so that all media outlets could report as their view deemed appropriate. This is an attempt to relegate this matter to the "gossip" columns by the government seeking to prejudice the public to this matter by "spinning" it as trivial.

Accordingly, these AUSAs must be removed from further contact with this case. Alternatively, Defendant requests a hearing to delve into the allegations regarding the government's improper use of media to influence this matter with the Court assisting Defendant by issuing subpoenas and arranging for travel for testimony of (i) Cindy Adams and (ii) Bill Bastone, the editor of the TheSmokingGun.com.

## 5.    MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT

### a.    FACTS

Defendant has a seventy-five (75) year old widowed mother, Blanche Palfrey, who is in frail health and in the early stages of forgetfulness living in Florida.

In or about October 2006, Blanche spoke with Mr. Sibley about the seizure of her daughter Deborah Jeane Palfrey's assets. At that time Mr. Sibley offered to represent her in case any investigation of Blanche was undertaken by the government. Blanche accepted that offer and Mr. Sibley became her attorney. Blanche was instructed by Mr . Sibley not to speak with anyone about this matter but refer all questions to him. Blanche has consulted with Mr. Sibley repeatedly during the intervening months. (Blanche Palfrey Affidavit, ¶1, attached hereto).

---

prosecutor knows or reasonably should know that it will have a substantial likelihood of prejudicing a criminal proceeding.

On June 4, 2007, at approximately 8:30 p.m., two people knocked on Blanche's residence door in her senior community and identified themselves as Maria Couvillion of the U.S. Postal Service and Troy Burrus of the Internal Revenue Service and asked if they could speak with her. Having a weak heart (barely 40% heart function without further surgical options) and given the late hour, Blanche agreed, as she didn't want the stress of a confrontation to get into an argument. (Blanche Palfrey Affidavit, ¶2)

The two agents came into Blanche's house and questioned her for 30-45 minutes. During that questioning, Blanche told them that they should speak to the undersigned counsel, Mr. Sibley. In response, **both agents indicated that they already had spoken with Mr. Sibley and that she should speak with them**. (Blanche Palfrey Affidavit, ¶3)

Thereafter, they asked Blanche questions and intimidated by the agents' presence, she answered, regarding her daughter's escort services and Blanche's finances. They did not tape record the interview to Blanche's knowledge, but were making written notes. (Blanche Palfrey Affidavit, ¶4).

Two additional facts are significant. First, Defendant was with her mother for the three days preceding this visit by Federal Agents to Blanche Palfrey and had left only minutes before the Federal Agents appeared at her door raising the specter that the Agents waited until Defendant had left in order to confront Defendant's mother when she was alone.

Second, this Court must take judicial notice that it was scheduled to hold a hearing on the temporary restraining orders thirteen hours later on **June 5, 2007, the following day**. As the government has stated that they have been investigating Defendant since **June 2004** (First Amended

Complaint for Forfeiture in Rem, D.E. #10, ¶9[3]), it was no coincidence that they chose **June 4ᵗʰ** to

pay a late-night visit to Defendant's elderly, ill and confused mother.

### b.    LAW APPLICABLE

The Supreme Court long ago recognized that impartiality in criminal cases requires that

"[b]etween [the accused] and the state the scales are to be evenly held." *Hayes v. Missouri*, 120 U.S.

68, 70 (1887). Such a policy dates back to the Bill of Rights, which was "designed to level the

playing field between the defendant and the state," Susan Bandes, *Empathy, Narrative, and Victim*

*Impact Statements*, 63 U. Chi. L.Rev. 361, 402 (1996), and indeed the policy has animated landmark

constitutional decisions, see, e.g., *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (stating that "[s]ociety

wins not only when the guilty are convicted but when criminals trials are fair"); *Miranda*, 384 U.S.

at 460,(stating that privilege against self-incrimination is required, inter alia, "[t]o maintain a fair

state-individual balance")(citation and internal quotations omitted). Simply put, ours is an adversarial

legal system, and implicit in this system, which pits the government against the Defendant in a court

of law, is the notion of fair play.

The doctrine of outrageous government conduct stems from a statement in *United States v.*

*Russell*, 411 U.S. 423 (1973), a case involving the entrapment defense. The Supreme Court found

that the defendant in *Russell* was predisposed to commit the crime at issue, and therefore was not

entrapped. However, the Court noted that it might "some day be presented with a situation in which

the conduct of law enforcement agents is so outrageous that due process principles would absolutely

---

[3]        ¶9 "In about **June 2004**, investigators with the Internal Revenue Service and the
United States Postal Service began a joint investigation of a business enterprise involving illegal
prostitution (hereafter "prostitution business"), that Deborah J. Palfrey operated in Washington,
D.C., Maryland, Virginia, and California."

bar the government from invoking judicial processes to obtain a conviction." *Id*. at 431-32, 93 S.Ct. 1643.

In *United States v. Morrison*, 449 U.S. 361 (1981), the Supreme Court leaves open the possibility of a dismissal for a Sixth Amendment violation in the event that facts show "demonstrable prejudice, or substantial threat thereof." Here, the substantial threat of demonstrable prejudice exists by the threat upon the Defendant and her mothers' ability to confer with counsel and to assist in the preparation of their defenses.

Moreover, Congress has recognized the need for legislative protection of these basic rights against government encroachment in two particular statutes. First, 18 U.S.C. §241 states: "If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State . . .in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States . . . They shall be fined under this title or imprisoned not more than ten years, or both . . ."

Likewise, under 18 U.S.C. §1001 "Statements or Entries Generally (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully - (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation . . .shall be fined under this title, imprisoned not more than 5 years."

**c.    REQUEST FOR EVIDENTIARY HEARING**

While Defendant does not suggest that any member of the prosecution team had any hand in nor was aware of the late-night visit by the Federal Agents to Defendant's mother, or that the

prosecutors were privy to plans for such a visit, such a contention is not immediately dismissible as fantastic.

The visit was conducted by Government representatives who have been working closely with prosecutors in this matter since last October.

The Visit was made in preparation of the both this civil and the related criminal case, and as such is a blatant invasion of both Defendant and her mother's Fifth Amendment right to due process of law and their Sixth Amendment right to effective assistance of counsel. Assuming either that incriminating statements were made by Blanche Palfrey, or, more likely, that there was no prosecutorial basis for the Visit and was simply an intimidation tactic, a strong basis for a motion to dismiss for governmental misconduct exists and requires a hearing concerning this claim.

At the hearing Defendant will establish that there was no coincidence between the date of the visit and the hearing before this Court the next day.  Moreover, examination of the evidence will raise the specter to this Court that the federal agents knowingly misrepresented to Blanche Palfrey that they had consulted with Mr. Sibley and that she was free to speak with them – a blatant lie.

Finally, at the hearing, Defendant will produce evidence that there is a pattern and practice of the United States Government to go after the parents of defendant and/or claimants who will not accept the government's offer to settle but instead vigorously litigate specious charges that implicate governmental incompetence, malfeasance and/or misfeasance.

### d.    CONCLUSION

Based upon the forgoing, "fair play" is not being done in this matter.  Accordingly, Defendant asks this Court for the relief  – and to dismiss the indictment for prosecutorial misconduct, or, alternatively – to preserve the record for subsequent review if necessary – to order an evidentiary

hearing to determine if the imposition of a stern rebuke and this repressive sanction is warranted.

6. **MOTION TO COMPLETELY DISSOLVE THE MARCH 16 [D.E. #12] AND MARCH 22 [D.E.# 17] TEMPORARY RESTRAINING ORDERS**

On March 16th, this Court entered its order pursuant to 18 U.S.C. §1512 and §1514 restraining the pursuit of the suit against Paula Neble and prohibiting Defendant or her agents from engaging "in similar acts against government witnesses, agents or investigators". This overboard order does not comply with the evidentiary requirements of 18 U.S.C. §1514 and the government could not meet their burden at a hearing that is <u>mandatory</u> under that section. That statute states in pertinent part: "**If on two days notice to the attorney for the Government** or on such shorter notice as the court may prescribe, the adverse party appears and moves to dissolve or modify the temporary restraining order, the court **shall proceed to hear and determine such motion as expeditiously as the ends of justice require**."

Moreover, if the temporary restraining orders are to be made permanent, then a protective order must be entered <u>after</u> an evidentiary hearing:

> §1514(b)(1)   A United States district court, upon motion of the attorney for the Government, shall issue a protective order prohibiting harassment of a victim or witness in a Federal criminal case if the court, **after a hearing, finds by a preponderance of the evidence that harassment of an identified victim or witness in a Federal criminal case exists or that such order is necessary** to prevent and restrain an offense under section 1512 of this title, other than an offense consisting of misleading conduct, or under section 1513 of this title.

Accordingly, Defendant requests that this Court set a hearing to expeditiously determine the motion to dissolve the temporary restraining orders and protective orders.

7. **MOTION TO DECLARE 18 U.S.C. §3006A UNCONSTITUTIONAL**

13

Defendant asks this Court to declare the scheme contained in 18 U.S.C. §3006A "Adequate Representation of Defendants" as violating both Fifth and Sixth Amendment guarantees. Consequently, the limitations contained in §3006A on payment of fees thereby being lifted, Defendant can seek and receive adequate and prompt compensation to fairly exercise her rights under the Sixth Amendment.

Under §3006A, the financial limitations are so severe as to render the statute *de facto* violative of due process. Clearly, the "fair and just administration of criminal justice, [is] a goal of which the judiciary is the special guardian." *Campbell v. United States*, 365 U.S. 85, 92 (1961).

This Court must recognized that capping (i) attorney fees at $7,000[4] and (ii) fees for services other than counsel at $1,600[5] is simply inane. At a market rate of $300/hour for attorneys, $7,000 only pays for 23 hours of an attorney's time – hardly enough time to prepare and conduct an pre-trial hearing – let alone prepare for a trial. Moreover, expert witnesses regularly require $10,000 deposits for the time and expertise they bring to their testimony. Last, investigative services which regularly cost $100 per hour, would could only be used for 16 hours in a particular case.

Under §3006A, counsel for a defendant is require to wait until after the trial for the determination of the amount he and his support staff would be paid turning the attorney into a banker for the government by being forced to loan his or her money and time and ultimately wait for

---

[4]
§3006A(d)(2) "For representation of a defendant before the United States magistrate judge or the district court, or both, the compensation to be paid to an attorney or to a bar association or legal aid agency or community defender organization shall not exceed $7,000 for each attorney in a case in which one or more felonies are charged . . ."

[5]
§3006A(e)(3) "Compensation to be paid to a person for services rendered by him to a person under this subsection, or to be paid to an organization for services rendered by an employee thereof, shall not exceed $1,600, exclusive of reimbursement for expenses reasonably incurred . . .

payment in an uncertain amount. Thirteenth Amendment issues may be present in such scheme that (i) compels an attorney to take on representation but (ii) delays and minimizes payments to such a degree as to render the attorney in that position a virtual "slave" to the system.

Clearly, no private attorney – **nor the government's attorneys** – labors under this sort of restriction. "Each claim shall be supported by a sworn written statement specifying the **time expended, services rendered, and expenses incurred** while the case was pending . . ."§3006A(d)(5). Note, all in the past tense.

Hence, while §3006A fine design to provide "representation for any person financially unable to obtain adequate representation" is admirable, in practice it is a jape as practically denying to an indigent defendant the very right the Criminal Justice Act seeks to safeguard.

Accordingly, Defendant asks this Court declare that §3006A violates in practice the Fifth Amendment right to due process and the Sixth Amendment right to counsel. Additionally, upon such ruling, accept Defendant's *ex parte* application for payment of representation and providing services other than counsel authorizing payment of those fees on a monthly basis.

**8.    DEFENDANT'S MOTION TO DISMISS THE INDICTMENT UNDER THE TENTH AMENDMENT**

The Tenth Amendment states: "The powers **not delegated** to the United States by the Constitution, nor prohibited by it to the States, **are reserved to the States respectively**, or to the people." At issue here is the "police power" to "punish" only sparingly and specifically delegated by the Constitution to the federal government. "That the United States lacks the police power, and that this was reserved to the states by the Tenth Amendment, is true." *Hamilton v. Kentucky Distilleries & Warehouse Company*, 251 U.S. 146 (1919).

Here, it is Defendant's argument that lacking delegated "police power", the government is without authority to "punish" Defendant as it proposes to do in the indictment. As this Court noted:

> Although not charged in the indictment, the offense of procuring prostitution underlies the RICO, Travel Act, and Conspiracy to Commit Money Laundering in this case. The Travel Act counts in turn allege that Defendant intended to promote or facilitate the violation of the prostitution laws of the District of Columbia, Maryland and Virginia.

[D.E. #89, p. 8]. Thus, simply stated, the federal government is seeking to punish Defendant for "procuring prostitution" and "promoting" and/or "facilitating" the violation of *state* prostitution laws. As the federal government was never delegated the authority to punish for crimes of this nature – i.e., prostitution – this indictment must be dismissed.

Defendant's argument is amply supported by a review of the Constitution and the cases interpreting the limits of the federal government's police power.

### 1.    CONSTITUTIONAL "PUNISH" PROVISIONS

The federal government is given the express power to "punish" only three times in the United States Constitution. First and Second, at Article I, §8, "The Congress shall have power . . .To define and **punish** piracies and felonies committed on the high seas, and offenses against the law of nations" and "To provide for the **punishment** of counterfeiting the securities and current coin of the United States". Likewise, at Article III, §3, "The Congress shall have power to declare the **punishment** of treason . . .".

Directly on point is *Keller v. United States,* 213 U.S. 138 (1909) where the Court found unconstitutional a Congressional attempt to control prostitution: "While the keeping of a house of ill fame is offensive to the moral sense, yet that fact must not close the eye to the question whether

the power to punish therefor is delegated to Congress or is reserved to the state. Jurisdiction over such an offense comes within the accepted definition of the police power. Speaking generally, that power is reserved to the states, for there is in the Constitution no grant thereof to Congress."

Thus, lacking an express grant of authority to "punish" commercial sex crimes, the federal government possesses <u>no</u> power to punish Defendant – or anyone – for prostitution related offenses. "The Federal Government **does not have plenary power** to define and punish criminal acts." *Minor v. United States*, 396 U.S. 87, 99 (1969)(Douglas, dissenting). As such, the federal government may <u>not</u> punish Defendant upon allegations of facilitating prostitution as what ever prostitution may be, it is not a (i) high seas felony, (ii) counterfeiting or (iii) treason; the only areas the federal government has been delegated express police power to punish.

### 2. CONSTITUTIONAL "REGULATE" PROVISIONS

The federal government has been delegated the power to (i) "regulate" commerce, and (ii) "lay and collect Taxes" and upon these powers corollary criminal statues of have been sustained as constitutional by <u>bare</u> majorities in the United States Supreme Court.

Thus, in *Nigro v. United States* ,276 U.S. 332 (1928), the Court stated:

> In interpreting the Act, we must assume that it is a taxing measure, for otherwise it would be no law at all. If it is a mere act for the purpose of regulating and restraining the purchase of the opiate and other drugs, it is beyond the power of Congress, and must be regarded as invalid, just as the Child Labor Act of Congress was held to be, in *Bailey, Collector v. Drexel Furniture Co.*, 259 U.S. 20. . . In interpreting the Act, we must assume that it is a taxing measure, for otherwise it would be no law at all. **If it is a mere act for the purpose of regulating and restraining the purchase of the opiate and other drugs, it is beyond the power of Congress, and must be regarded as invalid**, just as the Child Labor Act of Congress was held to be, in *Bailey, Collector v. Drexel Furniture Co.*, 259 U.S. 20. (Emphasis added).

17

Here, the government does not contend that it has regulated "prostitution" or enacted a scheme to tax "prostitution" which Defendant has violated. Instead, seeking to become a super-police power in clear contravention of the Amendment, the federal government has created RICO, the Travel Act and Money Laundering statutes in to attempt to "regulate and restrain" the commercial sex business and, accordingly, "it is beyond the power of Congress, and must be regarded as invalid."

"It is the high duty and function of this court in cases regularly brought to its bar to decline to recognize or enforce seeming laws of Congress, dealing with subjects **not entrusted to Congress, but left or committed by the supreme law of the land to the control of the States.** We cannot avoid the duty even though it require us to refuse to give effect to legislation designed to promote the highest good. The good sought in unconstitutional legislation is an insidious feature because it leads citizens and legislators of good purpose to promote it without thought of the serious breach it will make in the ark of our covenant or the harm which will come from breaking down recognized standards. In the maintenance of local self-government, on the one hand, and the national power, on the other, our country has been able to endure and prosper for near a century and a half." *Bailey, Collector v. Drexel Furniture Co.*, 259 U.S. 20, 37 (1922).

Here, far reaching though the consequences of recognizing the *impotence* of the federal government to exercise police power in an area expressly reserved to the states, i.e., commercial sex, this Court must "decline to recognize or enforce seeming laws of Congress, dealing with subjects not entrusted to Congress." Here, those laws are RICO, the Travel Act, and Conspiracy to Commit Money Laundering laws as applied in this case.

**9.    PETITION TO DISCLOSE GRAND JURY PROCEEDINGS PURSUANT TO RULE 6(E)**

Defendant requests that the Grand Jury Minutes be disclosed pursuant to *Brady v. Maryland* and Rule 6(e).

As witnessed by the attached article from WTOP news, one of the former escorts of the service is (i) a witness for the government and therefore presumably testified at the Grand Jury and (ii) according to her attorney is going to testify for the government that " while at times she did provide outcall escort services, 'she was not involved in prostitution. She did nothing wrong.'" WTOP News, August 16, 2007 - 5:35am.

Clearly, the government has knowledge of a witness who will substantiate Defendant's claim of operating a legitimate escort service. Thus, it must come forward with that information under *Brady*. Notably, this the government has <u>not</u> done though specifically requested to do so.

Moreover, under Rule 6(e)(3)(E)(i&ii), "The court may authorize disclosure-at a time, in a manner, and subject to any other conditions that it directs-of a grand-jury matter: (i) preliminarily to or in connection with a judicial proceeding; (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."

Here, Defendant demands disclosure of the testimony, law read, explanations given and the vote of the grand jury in this matter to allow consideration of a motion to dismiss the indictment due to lack of proof at the grand jury and/or upon the reading or explanation of the charged statutes to the Grand Jury.

**10.    MOTION TO MEANINGFULLY DISCLOSE UN-REDACTED WITNESS STATEMENT**

As Rule 26.2 " Producing a Witness's Statement" requires disclosure of witness statements at a motion to suppress hearing upon motion to produce by the defendant – hereby made – and likewise the Court is authorized to "recess the proceedings to allow time for a party to examine the

statement and prepare for its use".

On September 7, 2007, the government – in typical fashion – provided the Rule 26.2 material to Defendant's counsel.  Providing that material immediately before the start of the scheduled hearing prevented adequate review of that material.  Accordingly, Defendant requests that the government be ordered to provide Rule 26.2 material seventy-two (72) hours before any suppression hearing in this matter.

Moreover, the Rule 26.2 material was so heavily redacted that it rendered it meaningless. Accordingly, Defendant moves for an order directing the government to provide un-redacted Rule 26.2 material.

11.    **PRE-TRIAL PRE-SENTENCE INVESTIGATION REPORT GIVEN LACK OF PROSTITUTION OFFENSE IN FEDERAL STATUTES**

The Federal Sentencing Guidelines applied to this case create an anomaly which prevents clear understanding of the mandatory potential months of incarceration Defendant would face if convicted.  Clearly, it is a fundamental tenet of due process that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).  A criminal statute is therefore invalid if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *United States v. Harriss*, 347 U.S. 612, 617 (1954). So too, vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute. See *United States v. Evans*, 333 U.S. 483 (1948); *United States v. Brown*, 333 U.S. 18 (1948); cf. Giaccio v. Pennsylvania, 382 U.S. 399 (1966).

Here, for example under the RICO count, the term of imprisonment is determined by Federal

20

Sentencing Guideline "§2E1.1. Unlawful Conduct Relating to Racketeer Influenced and Corrupt Organizations" which advises on the Base Offense Level as "(Apply the greater): (1) 19; or (2) the offense level applicable to the underlying racketeering activity." Then, proceeding to the "Comments/Application Notes", the instruction is given: "2. If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used."

Here, of course, there is <u>no</u> "analogous federal offense" to the state charges of promoting and facilitating prostitution. Indeed, the "prostitution" is <u>not</u> a federal offense. Accordingly, no "offense level" can be calculated.

Accordingly, Defendant requests that this Court direct the Probation Department to advise as to how they would resolve this anomaly in a Pre-Sentence Report if directed for each of the Counts of the Indictment.

**12.    SUPPRESSION HEARING MOTIONS**

Prior to the Suppression Hearing in this matter, Defendant requests the following relief:

**a.    DISCLOSURE OF CONFIDENTIAL INFORMANTS IDENTITIES**

First, Defendant seeks disclosure of the five confidential informants referenced in the search warrant affidavit. Given the total lack of verification by the government of <u>any</u> of the information provided by the confidential informants, the credibility of those confidential informants is a legitimate avenue of inquiry in a suppression hearing to test the reasonableness of the government relying upon them. When the government obtains a search warrant based on information provided by a confidential informant, defendants often lack the information required to meet the exacting standards of *Franks*. *See, e.g., United States v. Southard*, 700 F.2d 1, 10-11 (1st Cir.1983). In such cases, district courts may conduct *in camera* examinations of the affiant and, if necessary, of the

21

informant, in order to determine whether disclosure of the confidential informant's identity would enable the defendant to obtain a *Franks* hearing. *Id.*

**b.    PRODUCTION OF THE PERSONNEL FILES OF ALL LAW ENFORCEMENT WITNESSES**

Defendant moves the Court to order the prosecution to produce the state and federal personnel files of all law enforcement witnesses whom it, or the Defendant,[6] intends to call at the suppression hearing "for evidence of perjurious conduct or other like dishonesty, *in camera*, to determine if those portions of the officers' personnel files ought to be made available to defense counsel for impeachment purposes." *United States v. Cadet*, 727 F.2d 1453 (9th Cir.1984).

**c.    *Brady* Request**

Under *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See *United States v. Buchanan*, 891 F.2d 1436, 1443 (10th Cir.1989) ("[B]ecause impeachment is integral to a defendant's constitutional right to cross-examination, there exists no pat distinction between impeachment and exculpatory evidence under Brady.") Timing is critical to proper *Brady* disclosure, *United States v. Peters*, 732 F.2d 1004, 1008-09 (1st Cir.1984), and objections may be made under *Brady* to the state's failure to disclose material evidence prior to a suppression hearing. *See,* e.g., *United States v. Lanford*, 838 F.2d 1351, 1355 (5th Cir.1988); *United States v. Xheka*, 704 F.2d 974,

---

[6]

The Defendant has previously requested that (i) Joe Clark - USPS Inspector, Troy A. Burrus - Special Agent, United States Internal Revenue Service, Criminal Investigation and Meredith Newman - USPS Inspector Supervisor be subpoenaed for the hearing.

982 (7th Cir.) *cert. denied*, 464 U.S. 993.

As detailed above, the government has likely violated *Brady* already in this case. Accordingly, Defendant requests that the Court engage the government in a colloquy regarding their efforts to comply with *Brady* pre-suppression hearing. In particular, Defendant requests that the government be interrogated as to the existence of any evidence related to (i) the veracity of the confidential informants and (ii) what information was known to government agents but not provided to Agent Couvillion prior to her execution of the search warrant affidavit in a deliberate attempt to quarantine Agent Couvillion from knowledge that would have required her to advise United States Magistrate Judge Kimberly J. Mueller of facts that would have defeated the search warrant application.

**13.    MOTION TO ISSUE SET PRE-TRIAL EVIDENTIARY HEARING AND ISSUE SUBPOENAS**

Defendant, pursuant to the Due Process Clause of the Fifth Amendment, the Compulsory Process Clause of the Sixth Amendment, and Federal Rules of Criminal Procedure Rule 17(b), hereby applies for an order issuing subpoenas *ad testificandum* and *duces tecum* for the persons and documents detailed *infra*, and ordering that costs incurred by the process and the fees of the witnesses so subpoenaed shall be paid in the same manner in which similar costs and fees are paid for a witness subpoenaed on behalf of the government

**a.    SELECTIVE PROSECUTION**

In the Defendant's motion to dismiss the indictment, the issue of selective prosecution was raised by the Defendant. This Court ruled that the motion was due to be denied finding that "She has not offered a single piece of evidence to support that claim or demonstrate that other escort services of spa owners who have committed similar acts have not been indicted." [D.E. #89, p. 5].

23

Accordingly, Defendant requests (i) that this Court set an evidentiary hearing date as soon as practicable to permit defendant to offer evidence to support her claim of selective prosecution and (ii) issue subpoenas to Verizon and the District of Columbia Business Tax Office for the Eighty-Three (83) Washington D.C. area escort service owners identified in attached "Metro DC Escort Services" list to permit the identification of those escort service owners, and (iii) subsequent to the identification of those escort service owners, issue subpoenas to each such owners compelling their attendance – with client and escort records – to permit Defendant to present evidence sufficient to meet the standard of *United States v. Armstrong*, 517 U.S. 456 (1996) that the prosecution of her is a prohibited selective prosecution.

**b.     POLITICAL PROSECUTION**

Defendant has reason to believe their was an improper, political and/or discriminatory purpose in the prosecution of her.     A prosecutor's discretion is "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979).  Clearly, "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14 (1926).  However, given the following, Defendant believes this case warrants such an intrusion into the basis of this case's prosecution.

As grounds in support, Defendant asks the Court to take judicial notice that:

1.     A distinguished United States Senator and Chairman of the Senate Judiciary Committee has stated that "Under this Attorney General and this President, the Department of Justice suffered a severe crisis of leadership that **allowed our justice system to be corrupted by political influence.**" August 27, 2007, Comment Of Senator Patrick Leahy (D-Vt.), attached.

24

2.   A former federal prosecutor – whose jurisdiction included part of the operational area of the Defendant's Escort Service and the territory of Agent Burrus of the IRS who investigated this matter – has publically alleged political influence in his firing to stop his investigation of a republican governor. *See Former Prosecutor Says Departure Was Pressured*, New York Times, march 7, 2007, attached.

3.   ABC News, which had received a portion of the escort service telephone records, announced shortly before their broadcast on May 5, that "prominent government leaders and Washington figures will be named in Friday night's broadcast." See NPR article attached. Yet that broadcast in fact <u>failed</u> to name a single Washington figure raising the very real specter that political pressure was placed on ABC News to "bury" those names.

4.   While as demonstrated by the Washington DC escort service list attached, there are over 80 escort services operating in the area, not one has been federally prosecuted. Moreover, the timing of the search of Defendant's home – coming a few short weeks before critical national elections which would toss the Republican Party out of office – raises the very real specter that the prosecution of Defendant was motivated by (i) a hope of finding evidence to discredit Democratic candidates or, as subsequently confirmed, (ii) prevent damaging evidence regarding Republican candidates from being revealed – particularly in Maryland – prior to close elections.

5.   Last, this Court should take notice that though Defendant was being investigated as far back as 2004 – and all of the evidence in the search warrant was available in December 2005 – it was not until immediately prior the elections in the fall of 2006 that Defendant's house was searched.

The jurisprudence of the United States has yet to articulate the standard to be applied in a claim of political prosecution. However, given the unique circumstances of this case, the recent resignation of the Attorney General and the well-known evidence of political corruption within the Department of Justice, this Court must demand proof from the government that the prosecution of the Defendant was instituted and is being maintained free from improper political motivations which would trespass upon equal protection concerns and thereby require dismissal of this action.

Accordingly, Defendant request a hearing on this issue at which she would ask the Court to issue subpoenas to compel the testimony of (i)  Senator Patrick Leahy, (ii) former United States Attorney Thomas M. DiBiagio, (iii) Brian Ross of ABC News, (iv) Cindy Adams of the New York Post, (v) Bill Bastone of the SmokingGun and (v) the United States Attorney Office Record Custodian for copies of all commendations related to the genesis and maintenance of the prosecution of this matter.

## CONCLUSION

Accordingly, Defendant respectfully requests that this Court enter its order granting Defendant aforesaid motions.

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the served pursuant to LcvR 5.4(d) upon William R. Cowden, Assistant United States Attorney, Criminal Division, Asset Forfeiture Unit, 555 4th St., N.W., Room 4818, Washington, D.C. 20530 this September 8, 2007.

Dated: 9/60/07

Deborah Jeane Palfrey

> Montgomery Blair Sibley, upon the ethical constraints imposed upon him, hereby (i) gives notice of assistance to Defendant in the preparation of this pleading and (ii) notes that he does represent Defendant as her attorney in this matter but is presently barred by Court order from filing this pleading on her behalf.

27