**FILED**

SEP **2 6** 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

        PLAINTIFF,

VS.

DEBORAH JEANE PALFREY,

        DEFENDANT.

_____/

CRIMINAL CASE NUMBER: 07-046-GK

**REPLY TO GOVERNMENT'S OPPOSITION TO
MOTION TO SUBSTITUTE COUNSEL FOR
THE DEFENDANT, AND
PETITION FOR DECLARATORY RELIEF**

COME NOW Montgomery Blair Sibley and replies to Government's Opposition to Motion to Substitute Counsel for the Defendant and petitions this Court pursuant to 28 U.S.C. §2201 to issue a declaratory decree that LCvR 83.16 and Rules of the United States Supreme Court, Rule 8, are unconstitutional and/or violate the Rules Enabling Act, and states as follows:

**SUMMARY OF ARGUMENT**

Demonstrating the intellectual vacancy which has become so common from the Department of Justice, the government's "Opposition to Motion to Substitute Counsel for the Defendant" confirms that the government has now moved on to the second phrase of Mahatma Gandhi's famous quote: "First they ignore you, then they ridicule you, then they fight you, then you win." Raising inchoate *ad hominem* arguments, the government raises <u>not</u> one legitimate factual basis for justifying the refusal of this Court to permit the full expression of Defendant's Sixth Amendment right to choose the counsel of her choice. Along the way, the government egregiously violates Federal Rules of Criminal Procedure, Rule 11(f) and Federal Rules of Evidence, Rules 408 and 410.

Accordingly, this Court must finally permit this matter to move beyond Mahatma Gandhi's first and second phrases and permit to Defendant the defense counsel of her choice.

-1-

## I.    THE GOVERNMENT'S FACTUAL SHOWING ARE INCOMPETENT

### A.    DISTRICT OF COLUMBIA PROCEEDINGS

The government starts its *ad hominem* attack on me by meretriciously alleging that "The government checked with [the District Attorney's Office]. According to personnel from that office, Mr. Sibley started with the office apparently right after he obtained his first bar membership (New York) in 1982. See id. at 3. He worked as a prosecutor from February 1982 until December of 1986 ... Furthermore, despite Mr. Sibley's representations that he prosecuted "virtually all crimes handled by the office, including homicides, white collar crimes, drug crimes and sexual abuse crimes," see id. at 4, that office informed us that their records, which show all felony trials for that period, show no homicides or white collar cases tried by Mr. Sibley."

What personnel? Simply stated, if this Court is going to rely upon this vague, un-attributed assertion of my experience in that prosecutor's office in order to make any determination of my qualifications, then a full an accurate record must be prepared, for this vague assertion is not only inaccurate, it is insulting in its sly innuendo of incompetence.

Next, the government alleges that "Mr. Sibley has demonstrated an inability to comply with the local rules, as well as this Court's orders and instructions." If this Court likewise wishes to rely upon this scurrilous allegation, then let an evidentiary hearing be held. Notably, this Court has not had reason to sanction or even caution me regarding the Local Rules.

Moreover, and remarkably, the government then proceeds to once <u>again</u> disclose settlement negotiations in its attempt to further its *ad hominem* attack on me by improperly and inaccurately disclosing the settlement negotiations of February 24, 2007, a meeting of all counsel in the criminal and civil matters. Then, in one can only be described as a blatant violation of Federal Rules of

Criminal Procedure, Rule 11(f) and Federal Rules of Evidence, Rules 408 and 410, selectively disclosed part of a September 10, 2007, settlement letter tendered by the Defendant to the government which expressly stated in the first paragraph: "This letter is tendered for the sole purpose of settlement pursuant to Federal Rules of Criminal Procedure, Rule 11(f) and Federal Rules of Evidence, Rules 408 & 410."

Such behavior is appalling and is addressed contemporaneously in motions for sanctions and to disqualify this Court. Here, it can only be noted that such a reference was not only improper, but is inapposite as well. At worst, the letter simply communicates that Defendant is intending to vigorously pursue whatever remedies the law provides.

Next, the government characterizes as a "threat" the legitimate exercise by Defendant through her counsel of her right under 28 C.F.R. §600.1 to request the appointment of a Special Counsel given that one of the customers of the escort service was an Assistant United States Attorney at the time he was an Assistant United States Attorney. For this zealous and proper invocation of 28 C.F.R. §600.1, the government seeks to bar me as Defendant's counsel? This Court would abdicate the few shreds of impartiality it retains if it were to silence Defendant's counsel for taking the legitimate act of seeking Special Counsel on non-frivolous grounds.[1]

In response to the government's claim that I violated Local Criminal Rule 57.7 by filing "Motion for Reconsideration of Appointment of Counsel." [D.E.#. 28], two points are relevant. First, that rule is expressly limited at 57.7(b)(3) to "extrajudicial statements" which the "Motion for

---

[1]    Subsequently, a DOJ spokesman admitted that Defendant's allegation was true that an Assistant United States Attorney was a client of the Defendant's escort service, but that the Assistant United States Attorney died prior to the commencement of the investigation of Defendant -- an assertion that Defendant expressly challenges.

Reconsideration" was not as it was filed with the Clerk.  Second, and most telling, is that the government has not heretofore been so concerned that it sought an "Orders in Widely Publicized or Sensational Cases" if it felt that witnesses needed protection.

## B.    THE FLORIDA PROCEEDINGS

The government's next set of arguments *invites* this Court to violate *Selling v. Radford*, 243 U.S. 46, 49 (1917), where the Court stated that <u>before</u> the sanction of revoking the license of an attorney to practice before a federal court is granted it "must depend upon the character of the acts of misconduct and wrong relied upon, of the place of their commission, and the nature of the proof relied upon to establish their existence."  In short, the Federal Court cannot simply rubber stamp the decision of a State  – this would place federalism and the independence of federal courts on its ear. Thus the Court may not accept uncritically the as yet <u>unproven</u> allegations in the Florida disciplinary proceedings without a full evidentiary hearing before it.

Furthermore, the Supreme Court later explained in  *Theard v. United States*, 354 U.S. 278, 282 (1957):

> Disbarment being the very serious business that it is, ample opportunity must be afforded to show cause why an accused practitioner should not be disbarred. **If the accusation rests on disbarment by a state court, such determination of course brings title deeds of high respect. But it is not conclusively binding on the federal courts.** The recognition that must be accorded such a state judgment and the extent of the responsibility that remains in the federal judiciary were authoritatively expounded in *Selling v. Radford*, 243 U.S. 46. **The short of it is that disbarment by federal courts does not automatically flow from disbarment by state courts**. (Emphasis added).

Returning to *Selling*, this Court must – <u>before</u> according any weight to a state court disciplinary hearing – accord due process to me:

-4-

> That is to say, we are of opinion that we should recognize the condition created by the judgment of the state court unless, from an intrinsic consideration of the state record, one or all of the following conditions should appear: 1, that the state procedure, from want of notice or opportunity to be heard, was wanting in due process, 2, that there was such an infirmity of proof as to facts found to have established the want of fair private and professional character as to give rise to a clear conviction on our part that we could not, consistently with our duty, accept as final the conclusion on that subject, or 3, that some other grave reason existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the conviction that, under the principles of right and justice, we were constrained so to do.

In *Konigsberg v. State Bar*, 353 U.S. 252, 273 (1957), the Supreme Court went on to state, "We recognize the importance of leaving States free to select their own bars, but it is equally important that the State not exercise this power in an arbitrary or discriminatory manner nor in such way as to impinge on the freedom of political expression or association. A bar composed of lawyers of good character is a worthy objective but it is unnecessary to sacrifice vital freedoms in order to obtain that goal. It is also important both to society and the bar itself that lawyers be unintimidated free to think, speak, and act as members of an Independent Bar."

In *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239 (1957), the Supreme Court stated that, "[a] State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment."

Thus, before this Court considers the four half (4 1/2) year old, non-concluded, disciplinary proceeding against me to bar my pursuit of my livelihood and to Defendant the counsel of her choice, this Court must examine the "intrinsic record" from that proceeding.

To that end, my initial brief in the Florida disciplinary proceeding is attached hereto. Even

-5-

a cursory review of that brief will reveal that the "intrinsic proceedings" were (i) wanting in due

process, and (ii) suffered an "infirmity of proof as to facts". In sum, in the Florida Proceedings:

- Florida treated the attorney disciplinary proceedings as "quasi-judicial administrative proceeding" in violation of United States Constitution, Article VI, clause 2 and *In re Ruffalo*, 390 U.S. 544, 550-551 (1968)("These are adversary proceedings of a quasi-criminal nature.") with the attendant loss to me of procedural and substantive rights;

- I was <u>refused</u> permission to call <u>any</u> witnesses and obtain <u>any</u> documents for my defense in violation of the Fifth and Sixth Amendments;

- The Referee <u>refused</u> to continue for ten days the Final Hearing given my professional conflicts which was an egregious abuse of discretion by the Referee given that the matter was over 1600 days old and I had never asked for a continuance before;

- The Referee adopted *verbatim* the Florida Bar's proposed Report without providing an opportunity to me to comment or including one fact proffered by me;

- All of my affirmative defenses were struck by the Referee denying me any chance to have those defenses considered by the Referee;

- The Referee's repeated *ex parte* communication with the Florida Bar's counsel removed the label of "fair and impartial" from him and thus denied me an impartial tribunal;

- The substantive errors are just as plain. Simply put, I did not fail to pay child support – I was unable as the record clearly establishes and such order (i) was not issued by a competent court and (ii) in all events was overturned on appeal.

- Finally, I did not violate Rule 4-3.1's prohibition against "frivolous" filings as **none** of my filings were "frivolous" and the cited court order to that end fails

to <u>even</u> mention that phrase.

Moreover, "the natural consequences of the judgment to have their effect would conflict with the duty which rests upon" this Court  given the egregious trespass upon my rights by the Florida Court's sanctioning me for accessing federal court as prohibited in *Donovan v. City of Dallas*, 377 U.S. 408, 413 (1964).[2]

In sum, while it may be difficult for this Court to imagine that " state courts were being used to harass and injure individuals . . .because the state courts  . . .were in league with those who were bent upon abrogation of federally protected rights" [3], such is the case in the Florida Disciplinary proceedings against me as the record reveals.

### C.    "HARASSING" LAWSUITS

The government's next specious complaint is that:"In this case and others, Mr. Sibley has filed harassing and vexing lawsuits."

---

[2]    "Petitioners being properly in the federal court had a right granted by Congress to have the court decide the issues they resented, and to appeal to the Court of Appeals from the District Court's dismissal. They have been punished both for prosecuting their federal-court case and for appealing it. They dismissed their appeal because of threats to punish them more if they did not do so. The legal effect of such a coerced dismissal on their appeal is not now before us, but the propriety of a state court's punishment of a federal-court litigant for pursuing his right to federal-court remedies is. **That right was granted by Congress and cannot be taken away by the State. The Texas courts were without power to take away this federal right by contempt proceedings or otherwise.**" (Emphasis added).

[3]    Indeed, Congress has acted to protect this right from encroachment by a state.  In *Mitchum v. Foster*, 407 U.S. 225, 240 (1972), the Court held: "Congress enacted §1983 and its predecessor, § 2 of the Civil Rights Act of 1866, 14 Stat. 27, to provide an independent avenue for protection of federal constitutional rights. The remedy was considered necessary because '**state courts were being used to harass and injure individuals, either because the state courts** were powerless to stop deprivations or **were in league with those who were bent upon abrogation of federally protected rights**." (Emphasis added).

First, this Court has <u>yet</u> to make such a determination after a hearing, and, notably, <u>refused</u> to conduct the hearing as mandated by 18 U.S.C. §1512 and §1514. Hence, to argue that I should be barred from representing a client before a determination on the truth of this un-proven allegation of filing "Harassing and vexing lawsuits" is absurd and an affront to due process.

I expressly <u>challenge</u> the government – and this Court – to conduct the requisite hearing under 18 U.S.C. §1512 and §1514 and then let the determination be made whether that suit violates the constraints imposed in 18 U.S.C. §1512 and §1514. Until such time, this argument is asinine.

As for the allegations regarding the alleged "similar history of filing vexatious litigation" where is the decision of any court that such litigation was "vexatious" or "frivolous"? Patently, there is none and for this Court to premise denying the Defendant her right to choose counsel upon such an allegation is ridiculous. However, if the Court wishes to proceed, each one of those referenced suits will be fully explained both as to their origins and ultimate dispositions which in each instance was legitimate.

Admittedly, "the Eleventh Circuit deemed Mr. Sibley's pleadings in a matter before it to be "a multi-headed leviathan of meritless litigation . . . ." *Sibley v. Lando*, 437 F.3d 1067, 1069 (11th Cir. 2005). The significant word there of course is "meritless". However, subsequent to *Sibley v. Lando*, the Supreme Court in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S.280 (2005) finally noted: "Variously interpreted in the lower courts, the doctrine has sometimes been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases" and *Marshall v. Marshall*, 126 S.Ct. 1735 (2006) in which in his concurrence, Justice Stevens noted, "I would provide the creature [the probate exception to federal jurisdiction] with a decent burial in a grave adjacent to the resting place of the *Rooker-Feldman* doctrine. See *Lance v. Dennis*, 546 U.S. 459 (2006)."

As such, the alleged "meritless litigation" to which the Eleventh Circuit was referring *in toto* challenged the *Rooker-Feldman* doctrine and in retrospect was <u>not</u> "meritless" but – had I been the largest corporation in the world rather than a vilified *pro se* litigant – the Supreme Court would have accepted *certiorari* on my cases to declare that which it finally did declare in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, i.e., that the district and circuit courts had little understanding of the *Rooker-Feldman* doctrine and their repeated dismissal of federal cases on that ground represents the largest wholesale denial of access to federal court in the history of the United States.

Hoping that at least some of the mud the government is throwing will stick, the government seeks to obliquely allege a violation of ethical constraints regarding disrespect for the "administration of justice". A review of my quotes reveal that they are not directed to the "administration of justice" but instead to properly exercising appellate rights and First Amendment rights related to the country status. Far be it from this Court to premise denial of the right to appear in this action upon such grounds involving freedom of expression.

Last, the government seeks to disqualify me upon the <u>only</u> legal ground that is available to deny representation – a conflict of interest. To that end, the government cites D.C. Bar Rule 1.7(a) which creates a non-consentable conflict where a lawyer seeks to represent two clients taking adverse positions in the same "matter." Here, no such "adverse position" is known to me. Moreover, Defendant's mother is not being represented in the same "matter" as the proceedings against Defendant as she is not a party to this proceeding. As both clients have consented to this mutual representation at this time, no such "ethical conundrum" exists and thus the government's argument in this regard is as otiose as the rest of its arguments.

## II.     PETITION FOR DECLARATORY RELIEF

The government's last appeal to this Court to bar me from representing Defendant, and making my living, is that at some point in the future I might be suspended from the practice of law and thus would be barred from representing clients in this Court.

Accordingly, I petition the Court to declare, pursuant to the authority granted by 28 U.S.C. §2201 "the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." In particular, I ask the Court to declare that of LCvR 83.16 and Rules of the United States Supreme Court, Rule 8 both violate the Rules Enabling Act and constitutional guarantees of due process.

Both LCvR 83.16[4] and Rules of the United States Supreme Court, Rule 8[5] require an automatic suspension from practice in those respective courts of an attorney <u>without</u> a hearing upon notification of a state court's suspension order. These rules and the practice both on its face and as applied violate the Rules Enabling Act and due process guarantees and this Court must so declare.

The Rules Enabling Act, found at 28 U.S.C.§2072(b)[6] expressly prohibits a court from making a rule of practice or procedure that would violate a "substantive" right.

---

[4]     (c) Discipline Imposed by Other Courts, (1) Policy of Reciprocal Discipline. An attorney subject to these Rules who has been suspended for more than 30 days or disbarred by another court shall be automatically suspended from practice in this Court. The suspension shall be effective upon service of a Temporary Suspension and Show Cause Order in accordance with these Rules.

[5]     Rule 8. Disbarment and Disciplinary Action. 1. Whenever a member of the Bar of this Court has been disbarred or suspended from practice in any court of record, or has engaged in conduct unbecoming a member of the Bar of this Court, the Court will enter an order suspending that member from practice before this Court and affording the member an opportunity to show cause, within 40 days, why a disbarment order should not be entered

[6]     " Such rules shall not abridge, enlarge or modify any substantive right."

I claim the substantive right to be given notice and an opportunity to be heard before the right to practice law and make my living is taken from me in this Court and the United States Supreme Court on a non-emergency basis. "A lawyer's interest in pursuing his calling is protected by the Due Process Clause of the Fourteenth Amendment." *Leis v. Flynt,* 439 U.S. 438, 445 (1979). *A priori,* that right is protected from federal intervention under the Fifth Amendment. As Justice Black, joined by Justice Douglas, stated in his dissent in *Law Students Civil Rights Research Council v. Wadmond,* 401 U.S. 154, 174 (1971)

> But it must be remembered that the right of a lawyer or Bar applicant to practice his profession is often more valuable to him than his home, however expensive that home may be. Therefore I think that, when a State seeks to deny an applicant admission or to disbar a lawyer, it must proceed according to the most exacting demands of due process of law. . . . When it seeks to deprive a person of the right to practice law, a State must accord him the same rights as when it seeks to deprive him of any other property.

Clearly, before one can be deprived of property, one must be accorded procedural due process. "For more than a century, the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right, they must first be notified' . . . It is equally fundamental that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin* , 407 U.S. 67, 80 (1972).

Here, LCvR 83.16 and Rules of the United States Supreme Court, Rule 8 both set up a procedure where an attorney's right to practice law is "affected" – suspended – <u>before</u> an attorney is allowed to be heard in "a meaningful way and in a meaningful manner." Such rules, *ipso facto,* violate the Rules Enabling Act's prohibition against such procedure. Indeed, as a practical matter, an attorney is suspended <u>indefinitely</u> as these rules provide <u>no</u> frame work for making a

determination as to the speedy resolution rights of such a suspended attorney.

Thus, returning to *Selling v. Radford*, 243 U.S. 46, 49 (1917), the substantive right to a hearing <u>before</u> acting on a state court suspension or disbarment order is established. In *Selling*, the Court conclude by expressly holding:

> Thus defining what is open to our consideration, we think we ought not to foreclose the subject on the answer made to the rule to show cause in the proceeding which is now before us, **but that an opportunity should be afforded the respondent, confining himself to the propositions stated, if he is so advised, to file the record or records of the state court within thirty days from this date with permission by printed brief**, considering the record intrinsically, to point out any ground within the limitations stated **which should prevent us from giving effect to the conclusions established by the action of the Supreme Court of Michigan which is now before us**, as we have seen, as part of the petition we are now considering. (Emphasis added).

Accordingly, <u>before</u> "giving effect to the conclusions established by the action of the Supreme Court of" Florida if an when it ever gets around to making a determination,  an "opportunity should be afforded" to me to present the "record intrinsically, to point out any ground within the limitations stated". Such an "opportunity" will reveal much about the Florida so-called justice system.[7]

To suspend first and then proceed on inquiry trespasses upon the procedural due process rights detailed in *Selling*. As such, both LCvR 83.16 and Rules of the United States Supreme Court, Rule 8 violate due process and the Rules Enabling Act and therefore this Court must declare them void.

---

[7]    Such an opportunity will confirm the continued vitality of President Truman's 1948 observation that: "The main difficulty with the South is that they are living eighty years behind the times and the sooner they came out of it the better it will be for the country and themselves." Correspondence with friend Ernie Roberts on Civil Rights, August 18, 1948.

CONCLUSION

What patently the government – and now apparently this Court – wants is to avoid being forced to litigate this matter opposed by a zealous, innovative, skilled (both at trial and appellate levels), persistent and precise member-in-good standing of this Court.  To deny me the right to pursue my profession and the Defendant the counsel of her choice would be an unreasonable and/or arbitrarily interference with an accused's right to retain counsel of her choice, and as such, a conviction attained under such circumstances could not stand, irrespective of whether the Defendant has been prejudiced.

As noted in *United States v. Wheat*, 813 F.2d 1399, 1402 (9th Cir.1987), *aff'd*, 486 U.S. 153, "The sixth amendment provides that criminal defendants who can afford retained counsel have a qualified right to counsel of their choice. *United States v. Ray*, 731 F.2d 1361, 1365 (9th Cir.1984). The right is qualified by the need to avoid undermining public confidence in the integrity of the legal system. *United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir.1986).  Wrongful denial of this qualified right is reversible error even without a showing of prejudice."

Here, the "confidence in the integrity of the legal system" would be completely undermined if this Court denied to Defendant the choice of her "retained counsel" upon the specious grounds raised herein.

Moreover, to silence me because I don't belong to the castrated federal criminal bar which has evolved to become the very bar that the dissent recognized in *Caplin & Drysdale v. United States*, 491 U.S. 617 (1989)[8], is an appalling evisceration of the Sixth Amendment.  As that same

---

[8]    As the dissent in *Caplin & Drysdale* noted:

When the Government insists upon the right to choose the defendant's

-13-

court recognized: "There is a place in our system of criminal justice for the maverick and the risk

taker and for approaches that might not fit into the structured environment of a public defender's

office, **or that might displease a judge whose preference for nonconfrontational styles of**

**advocacy might influence the judge's appointment decisions.**" *Caplin & Drysdale* at 647.

Here, neither the fact that the government does not like me, nor this Court's "preference for

nonconfrontational styles of advocacy" are legal grounds to deny Defendant her day in court with

the counsel of her choice, Montgomery Blair Sibley.

WHEREFORE, I request leave of this Court to substitute as counsel for the Defendant.

Further, I petition this Court to declare LCvR 83.16 and Rules of the United States Supreme Court,

Rule 8 void as violating both due process and the Rules Enabling Act.

---

counsel for him, that relationship of trust is undermined: counsel is too readily perceived as the Government's agent rather than his own. . . .The Government can be expected to "spend vast sums of money ... to try defendants accused of crime," and of course will devote greater resources to complex cases in which the punitive stakes are high. Precisely for this reason, 'there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses.' But when the Government provides for appointed counsel, there is no guarantee that levels of compensation and staffing will be even average. Where cases are complex, trials long, and stakes high, that problem is exacerbated. . . .Over the long haul, the result of lowered compensation levels will be that talented attorneys will 'decline to enter criminal practice'. . . This exodus of talented attorneys could devastate the criminal defense bar." (Citations omitted).

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the served by U.S. Mail upon Catherine Connelly, Assistant United States Attorney, Criminal Division,, 555 4th St., N.W., Room 4818, Washington, D.C. 20530 this September 23, 2007.

**MONTGOMERY BLAIR SIBLEY**
CENTER FOR FORFEITURE LAW
1629 K Street, Suite 300
Washington, D.C. 20006
202-508-3699
202-478-0371 Fax
mbsibley@civilforfeiture.com
www.civilforfeiture.com

By: _____
Montgomery Blair Sibley
D.C. Bar #464488

IN THE SUPREME COURT OF FLORIDA

THE FLORIDA BAR,

          COMPLAINANT,

VS.

MONTGOMERY BLAIR SIBLEY,

          RESPONDENT.

_____/

CR 07-46 - GK

CASE: SC06-1387

TFB File No. 2005-00,557(2B)
TFB File No. 2003-00,597(2B)

FILED

SEP 2 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**RESPONDENT'S AMENDED INITIAL BRIEF**

**MONTGOMERY BLAIR SIBLEY**
*In Proper Per*
50 West Montgomery Avenue, Suite B-4
Rockville, Maryland 20850
301-251-5200

**TABLE OF CONTENTS**

Table of Citations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Statement Regarding Oral Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Request to Supplement the Record  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case and of the Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.     Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    II.    Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    III.   Course of Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          A.    The Disciplinary Committee Hearings . . . . . . . . . . . . . . . . . . 5

          B.    The Leon County Referee  . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          C.    The Miami-Dade County Referee  . . . . . . . . . . . . . . . . . . . . . 8

Summary of Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    I.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    II.    Procedural Due Process Errors . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          A.    Rule 3-7.7(f) Violates Florida and Federal
               Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

               1.    The Florida Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

               2.    The Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ii

B.   The Delay in Resolution Denied Due Process
     to Respondent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.   The Refusal to Permit Respondent to Call
     Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D.   The Referee's Abuse of Discretion Violated
     Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E.   The Denial of Documentary Discovery . . . . . . . . . . . . . . . . 32

F.   Striking of Affirmative Defenses . . . . . . . . . . . . . . . . . . . . . 34

G.   Verbatim Adoption of Bar's Proposed Order . . . . . . . . . . . 35

H.   Respondent Was Entitled to A Jury Trial . . . . . . . . . . . . . . 36

I.    Fair and Impartial Tribunal . . . . . . . . . . . . . . . . . . . . . . . . . 37

III.  Substantive Due Process Errors – Rule 4-8.4(h) . . . . . . . . . . . . . . . 38

A.   The August 5, 2002 Contempt Order Was Not
     Based Upon Record Evidence . . . . . . . . . . . . . . . . . . . . . . . . 39

     1.   *Sibley v. Sibley*, 833 So.2d 847
          (Fla.App. 3 Dist. 2002) . . . . . . . . . . . . . . . . . . . . . . . 39

     2.   The August 5, 2002 Contempt
          Order Does Not Demonstrate
          Respondent Had the Ability to
          Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

B.   The November 22, 2002 Contempt Order Was
     Not Based Upon Record Evidence . . . . . . . . . . . . . . . . . . . . . 43

IV.  Substantive Due Process Errors – Rule 4-3.1 . . . . . . . . . . . . . . . . . 44

iii

A.    Respondent Filed <u>No</u> Frivolous Matters  . . . . . . . . . . . . . . . . 45

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Certificate of Compliance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Appendix  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Attached

TABLE OF CITATIONS

## CASES

*Advisory Opinion to Atty. Gen. Funding for Criminal Justice,* 639 So.2d 972 (Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) . . . . . . . . . . . . . . . . . . . 36

*BE&K Construction Co. v. NLRB* 536 U.S. 516 (2002) . . . . . . . . . . . . . . . . . . . . . 48

*Bickett v. Bickett*, 579 So. 2d 149 (3rd DCA 1991) . . . . . . . . . . . . . . . . . . . . . . . . 42

*B.J.Y. v. M.A.*, 617 So.2d 1061, 1063 (Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Dickey v. Florida*, 398 U.S. 30, 54 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Donovan v. City of Dallas*, 377 U.S. 408, 413 (1964) . . . . . . . . . . . . . . . . . . . . . 48

*Dumas v. State*, 439 So.2d 246, 253 n. 8 (Fla. 3d DCA 1983) *review denied*, 462 So.2d 1105 (Fla.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Ex Parte Burr*, 22 U.S. 529, 530 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Fleming v. Fleming*, 710 So.2d 601, 603 (Fla.App. 4 Dist. 1998) . . . . . . . . . . . . 29

*Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Greene v. McElroy*, 360 U.S. 474, 496 (1959) . . . . . . . . . . . . . . . . . . . . . . 24, 28, 33

*In re Forfeiture of 1978 Chevrolet Van*, 493 So.2d 433, 435 (Fla.1986) . . . . . . . 37

*In re Ruffalo*, 390 U.S. 544, 550-551 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*Irvin v. Dowd*, 359 U.S. 394, 404 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Julian v. Lee*, 473 So.2d 736, 739 (Fla. 5th DCA 1985) . . . . . . . . . . . . . . . . . . . 21

*Marshall v. Jerrico*, 446 U.S. 238, 242 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*MCI Telecommunications Corp. v. F. C. C.,* 627 F.2d 322 (D.C. Cir. 1980) . . . . 21

*Morgan v. United States*, 298 U.S. 468 (1936) . . . . . . . . . . . . . . . . . . . . . . . 25-27

*Perlow v. Berg-Perlow*, 875 So.2d 383, 390 (Fla. 2004) . . . . . . . . . . . . . . . . . . 35

*Petition for Revision of, or Amendment to, Integration Rule of Florida Bar,* 103 So.2d 873, 875 (Fla. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*Ray v. Mortham*, 42 So.2d 1276, 1290 (Fla. 1999) . . . . . . . . . . . . . . . . . . . . . . . 18

*Schooley v. Judd,* 149 So.2d 587, 590 (Fla.App. 2 Dist. 1963 . . . . . . . . . . . . . . 47

*Sibley v. Sibley,* 833 So.2d 847 (Fla.App. 3 Dist. 2002) . . . . . . . . . . . . . . . . 39-41

*Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 591 (1926) . . . . . . . . . . . . . . . . . . 22

*State v. Dixon*, 283 So.2d 1, 23 (Fla. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*State v. Palm Beach County*, 89 So.2d 607 (Fla. 1956) . . . . . . . . . . . . . . . . . . . 18

*State v. Salzero*, 714 So.2d 445, 448 (Fla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 22

*State v. Stepansky*, 761 So.2d 1027, 1031 (Fla. 2000) . . . . . . . . . . . . . . . . . . . . 18

*Stein v. Professional Center, S.A.*, 666 So.2d 264 (Fla.App. 3 Dist. 1996) . . . . . 27

*Supreme Court of New Hampshire v. Piper,* 470 U.S. 274 (1985) . . . . . . . . . . . 20

*The Florida Bar v. Clement*, 662 So.2d 690,f/n #3 (Fla. 1995) . . . . . . . . . . . . . . 23

*The Florida Bar v. Forrester*, 656 So.2d 1273, 1275 (Fla. 1995) . . . . . . . . . . . . 16

*The Florida Bar v. Fussell*, 179 So.2d 852, 854 (Fla. 1965) . . . . . . . . . . . . . . . . 23

*United States v. Flynt*, 756 F.2d 1352, 1359 (9th Cir.) (Flynt ), *amended*, 764 F.2d 675 (9th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Wardius v. Oregon*,  412 U.S. 470, 474 (1973)  . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Wolff  v.  McDonnell* 418 U.S. 539 (1974)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Ziegler v. Klein*, 590 So.2d 1066, 1067 (Fla. 4th DCA 1991)  . . . . . . . . . . . . . . 29

## STATUTES AND RULES

Florida Rules of Judicial Administration, Rule 2.071(c)  . . . . . . . . . . . . . . . . . . . 13

Florida Rules of Judicial Administration, Rule 2.450  . . . . . . . . . . . . . . . . . . . . . . v

United States Constitution, Article VI, clause 2 . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Preamble, Code of Judicial Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## STATEMENT REGARDING ORAL ARGUMENT

Respondent requests – and believes it is his right under the Sixth Amendment – oral argument on the matters raised herein given their complicated nature and value that electronic media recording and broadcasting of such an oral argument pursuant to Florida Rules of Judicial Administration, Rule 2.450 would have in advancing the jurisprudence of this state and as a just check upon judicial authority.

STATEMENT OF THE CASE AND OF THE FACTS

## I.    INTRODUCTION

On August 5, 2002, after hearings stretching back two years to October 24,

2000, Judge Maxine Cohen Lando of the Florida Circuit Court for the 11th Judicial

Circuit, in and for Miami-Dade County, Florida, entered an order in Case No.: 94-

18177 FC 19 on child support directing Respondent to pay $100,000 in back child

support and thereafter $4,000/month and giving Respondent until January 1, 2003,

to purge that contempt or face incarceration.[1]

Second, in another appeal, Florida Third District Court of Appeal Judges Cope,

Gersten and Green entered an order sanctioning Respondent. It is from this order that

the second count of the instant Complaint arises. Again, that order contains

---

[1]    A copy of that order is attached as Exhibit "A" to the Complaint in this matter.
The order of August 5, 2002, was adopted *verbatim* by Judge Lando from a proposed
order submitted by counsel for Barbara Sibley, the former wife in that action.
Notwithstanding that Respondent had until **January 1, 2003,** to purge the contempt
amount, at a hearing held on **November 22, 2002,** Judge Lando, without notice of
her intent to incarcerate Respondent and refusing to allow Respondent to be fully
heard, ordered Respondent to commenced a sentence of indefinite incarceration in the
Miami-Dade County Department of Corrections which ultimately ran until February
7, 2003, for civil contempt due to failure to pay child support. Notably, Judge Lando
had already issued her writ of bodily attachment the day before the hearing,
apparently having already made up her mind to incarcerate Respondent prior to the
hearing.  A copy of that order is also attached as Exhibit "A" to the Complaint in
this matter.

numerous misstatements of facts in order to arrive at its apparently pre-ordained conclusion.

Thus, the <u>sole</u> facts upon which the instant Complaint rests are one circuit court order and one district court order.

## II.    BACKGROUND

Respondent's divorce action was commenced on August 12, 1994, by his Former Wife when she filed a petition for dissolution of marriage upon which a final judgment of dissolution was granted on September 20, 1994. On July 27, 2000, an "Emergency Motion for Temporary Primary Physical Residence of the Minor Children and To Allow Minor Children To Be Enrolled in Private Schools and Prohibiting the Removal of the Children to Washington D.C." After numerous delays, Judge Lando finally set for conclusion the hearing on the "Emergency Motion" for September 24, 25 and 26, 2001 – <u>over</u> 1½ years later. During that time, Respondent was <u>only</u> allowed to see his children for seven days.[2]

In January, 2002, Respondent's Ex-Wife filed two motions for contempt relating to enforcement of the marital settlement agreement between the parties

---

[2]    On December 15, 2001 – Five Hundred Six (506) days after the filing of the "Emergency Motion", Judge Lando <u>finally</u> entered her Order on Emergency Motion for Temporary Custody of the Minor children. Noteworthy is that the order entered by Judge Lando was <u>identical</u> to the proposed order submitted by Respondent's Ex-Wife's Counsel.

relating to child support.

On June 4, 5, 6, 7, 2002, Judge Lando held and then adjourned until July 1, 2002, the trial on the pending motions related to final child custody, support and modification of Respondent's obligations under the Marital Settlement Agreement.

At the conclusions of the hearings on July 1, 2002, Judge Lando – without making her intentions known on the record – ordered counsel to submit proposed orders and written closing arguments by July 19, 2002.  A copy of the submission by Respondent's Ex-Wife's counsel are attached as Exhibit "A" to the Appendix.

On August 5, 2002, some <u>692</u> days after the commencement of the hearings which formed the basis for Judge Lando's rulings on the motion to transfer custody and contempt, Judge Lando signed Respondent's Ex-Wife's proposed order granting Respondent's Ex-Wife's motion for contempt.  A copy of that order is attached as Exhibits "A" to the Complaint.

**Most conspicuously,  a comparison of Exhibit "A" hereto and with Exhibit "A" of the Complaint reveal that they are <u>identical</u>: as such, it is plain that Judge Lando entered <u>*verbatim*</u>, the proposed order of Respondent's Ex-Wife's Counsel on the contempt motion.**

Judge Lando adopted Respondent's Ex-Wife's counsel's findings *verbatim* and ordered Respondent (i) to pay $100,000 for past due child support and (ii) remain

-3-

current on his child support of $4,000 per month. Next, Judge Lando found that the Respondent "at all times from May 2000 had the present financial ability to pay but willfully or intentionally failed and refused to do so and wilfully violated the Order of this Court." On August 27, 2002, Respondent filed his notice of appeal of the above orders. That appeal was been assigned Case No.: 3D02-2308 by the Third District Court of Appeal.

Notwithstanding that Respondent was given until **January 1, 2003**, to pay the ordered $275,000, Judge Lando incarcerated Respondent for "indirect contempt" on **November 22, 2002**, upon her finding that Respondent "continues to 1) have the ability to pay the past due child support (of $100,000), and 2) that he is willfully refusing to pay his child support obligation." Patently, this action by Judge Lando was to put the "squeeze" on Respondent given the pending Thanksgiving and Christmas holidays and his four year old son's upcoming December birthday.

The following day, November 23, 2003, Respondent filed a notice of appeal with the Florida Third District Court of Appeal of the November 22, 2002, Family Court order which was assigned Case No. 3D02-3171. On December 23, 2003, two judges of the Florida Third District Court of Appeals – Alan R. Schwartz and Mario P. Goderich – entered the majority opinion in *Sibley v. Sibley*, Case No. 3D02-3171, 833 So.2d 847 (Fla. 3d DCA 2002) affirming Respondent's incarceration "for

-4-

indirect contempt," holding remarkably that (i) "the record shows substantial assets, although admittedly not in the purge amount, in his [Respondent's] own name" and (ii) Respondent "may command, simply by asking, the payment of the purge amount through his very wealthy father. . ."[3]

Subsequently, Respondent took another appeal to the Third District Court of Appeal which was assigned Case No.: 3D03-2083. The second count of the instant Complaint arises from a portion of the opinion in that matter. On November 12, 2004, Father made a motion for rehearing challenging the panel to cite even one case brought before it in which Father was deemed to have filed –either by the Court or Respondent – a frivolous, abusive or incomprehensible pleading. Notably, in denying the motion for rehearing, the panel was unable and/or refused to so do.

## III.    COURSE OF PROCEEDINGS BELOW

### A.    THE DISCIPLINARY COMMITTEE HEARINGS

On November 22, 2002, Judge Lando – who apparently couldn't wait to report her premature incarceration of Petitioner to the Florida Bar – wrote a letter to the

---

[3]    In the dissenting opinion the Honorable Judge Cope, pointed out that the holding of the majority that Respondent's "very wealth father" can pay was issued by the majority based on the "'tipsy coachman' doctrine, or 'right for the wrong reason' rule" for which there was **no** factual support in the record.   Notably, though this appeal of Judge Lando's orders resulted in a *de facto* reversal of the conclusion that Respondent willfully failed to pay child support, the Florida Bar omits this appeal from its Complaint.

Florida Bar reporting her "finding" of contempt of Respondent – **five weeks before the January 1, 2003, deadline to purge the terms of her August 5, 2002, order**. As a result, the Florida Bar assigned that complaint TFB File No. 2005-00,557(2B) alleging failure to pay child support.[4]

The Second Count of the Complaint which alleges a violation of Rule 4-3.1 (Meritorious Claims) arose from the Complaint of Respondent's Former Wife's attorney filed with the Florida Bar in early December 2004 arising from the November 4, 2004 opinion in *Sibley v. Sibley*, 885 So.2d 980 (3rd DCA 2004) in which the Court found that Respondent was "a source of vexatious and meritless litigation." That matter was assigned TFB File No. 2003-00,597(2B).[5]

---

[4]     Delaying the matter apparently to allow the process to be the punishment – and with full knowledge that the State of Maryland would <u>not</u> admit Respondent to practice as long as there was a disciplinary proceeding pending in Florida – it was not until (i) November 5, 2005 when the Grievance Committee found probable cause and (ii) July 12, 2006, that the Florida Bar filed the instant complaint – a delay of One Thousand Three Hundred Twenty Eight (**1,328**) days from Judge Lando's contrived complaint to filing of the first count of the instant Complaint on TFB File No. 2005-00,557(2B).

[5]     Again, making the process the punishment, it was not until (i) December 1, 2005 that the Grievance Committee found probable cause and (ii) July 12, 2006, that the Florida Bar filed the instant complaint – a delay of Six Three Hundred Fifteen (**615**) days from the complaint to filing of the second count of the Complaint arising from TFB File No. 2003-00,597(2B).

## B.    THE LEON COUNTY REFEREE

Continuing the pattern of using the nuisances of procedure to inflict punishment through process prior to adjudication, Justice Lewis of this Court in an order dated July 27, 2006, referred the matter to the Circuit Court of Leon County for assignment of a Referee.[6]

On July 15, 2006, Respondent served and filed his Notice of Depositions Duces Tecum and of Production from Non-Parties" seeking the depositions of the judges who had issued the order upon which solely the Florida Bar sought discipline.[7]

On September 15, 2006, Respondent filed his (i) Answers and Affirmative Defenses to the Complaint, (ii) his "First Omnibus Motion" seeking, *inter alia*, a change in venue and (iii) motion to compel production of documents previously requested from the Florida Bar.

On September 20, 2006, notwithstanding the pending motion to change venue, the Referee entered his order denying Respondent's "First Request for Issuance of Subpoenas Duces Tecum" seeking the depositions of the afore-mentioned judges. On September 26, 2006, Respondent promptly filed his "Motion to Re-Consider Order

---

[6]    This "assignment" was done without an *iota* of facts in the Complaint supporting venue in Leon County and was plainly incompetent under Rule 3-7.6(d).

[7]    Judges Gerald B. Cope, Jr., David M. Gersten, Melvia B. Green, Mario P. Goderich, of Third District Court of Appeal, Alan R. Schwartz, Former Judge Third District Court of Appeal and Maxine Cohen Lando, Judge, 11th Judicial Circuit.

Denying Respondent's First Request for Issuance of Subpoena Duces Tecum".

On October 3, 2006, as the Florida Bar couldn't not raise a <u>single</u> argument in opposition to the motion to transfer venue and thus did not object, the Referee granted Respondent's motion to change venue to Miami-Dade County, the only permissible venue under Rule 3-7.6(d). Accordingly, this matter was improperly delayed seventy-five (75) days.

## C.    THE MIAMI-DADE COUNTY REFEREE

Pursuant to Justice Lewis' order of October 4, 2006, this matter was then transferred to Miami-Dade County. The appointment of the Honorable Orlando A. Prescott as the successor-Referee was made on October 11, 2006, by 11th Circuit Chief Judge Farina. According to this Court's order of October 4th, the Referee was <u>ordered</u> to (i) conduct a case management conference within sixty (60) days, to wit, **December 10, 2006**, and (ii) to issue his Report by **April 9, 2007**.[8]

On September 1, 2006, the Florida Bar moved to strike Respondent's Affirmative Defenses. On December 15, 2006, without affording Respondent an opportunity to be heard in opposition, the Referee granted the motion and – commencing a pattern and practice of the Referee – signed the Florida Bar's proposed order **without** prior comment by Respondent on that order.

---

[8]    Putting the initial resolution of this matter at One Thousand Six Hundred (**1,600**) days since the initial complaint by Judge Lando.

Eventually, the Referee set the requisite Case Management Conference to "establish a schedule for the proceedings" for January 23, 2007 – notably Forty Five (45) days <u>after</u> this Court's order requiring such a hearing by December 10, 2006.

At the conclusion of the January 23, 2007, hearing, the Referee requested further briefing on Respondent's First Request for Issuance of Subpoenas Duces Tecum filed on September 16, 2006. Full briefing was accomplished by the parties and non-parties as ordered by February 15, 2007.

Either prior to or after the hearing on January 23rd, the Referee – despite asking the parties to submit an agreed-as-to-form order of his rulings at that hearing – entered the Florida Bar's proposed orders:

- Denying Respondent's Motion to Compel production;
- Denying Respondent's Motion for More Definite Statement; and
- Granting the Florida Bar's Motion for Partial Summary Judgment (though he denied the motion orally during the hearing)

After consultation between the parties, they submitted the agreed-as-to-form order which the Referee entered on January 29, 2007. Notably, accurately reflecting what transpired at the hearing, the Florida Bar's Motion for Partial Summary Judgment was <u>denied</u>.[9]

---

[9]    Hence, despite <u>this</u> Court's order requiring compliance with Rule 3-7.6(c) by **December 10, 2006**, as of **January 29, 2007**, the Referee had – in what should be an

Of perhaps determinative status of this appeal, on **January 31, 2007**, Respondent filed his "Second Request for Issuance of Subpoenas Duces Tecum" seeking the deposition of Joanne E. Sargent, Counsel, Third District Court of Appeals.[10]

On March 27, 2007, the Referee in an *ex parte* communication contacted Mr. Min to request Mr. Min to draft a motion to the Florida Supreme Court to enlarge time to finish the Report due on April 9, 2007.[11]  Though specifically requested by

---

affront to this Court's authority – ignored without (i) giving explanation or (ii) seeking leave to delay his obligations to resolve the initial matters within the requisite Sixty (60) days.

[10]   Her testimony was relevant to the matters at hand to demonstrate the open hostility of the Florida judiciary to Respondent and serve as a basis to impeach the various orders which were the sole accusations against Respondent made by "persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy". *Wolff v. McDonnell* 418 U.S. 539, 595 (1974) (Douglas, dissenting). A copy of the letter from Joanne E. Sargent which demonstrates the hostility and bias of the Third District Court of Appeals in support of that request is attached as Exhibit "B" to the Appendix.  Significantly, ***the Referee never troubled himself to rule upon this the Second Request and to this day it remains outstanding***.

[11]   Notably, on March 8, 2007, shepard of the Referee's obligations that the Florida Bar plainly sees its role, counsel for the Florida Bar wrote the Referee requesting an order to set a final hearing date.  A copy of the March 8, 2007, letter from Barnaby Min is attached as Exhibit "C" to the Appendix. The Referee ignored this letter.  On March 19, 2007, Mr. Min continued his secretarial duties for the Referee reminding him again that the Referee had failed to discharge this Court's order to set a final hearing.  A copy of the March 19, 2007, letter from Barnaby Min is attached as Exhibit "D" to the Appendix. (Note that the date on the cover letter is wrong).

Respondent to detail the nature of that *ex parte* discussion pursuant to *The Florida Bar v. Mason*, 334 So.2d 1,7 (Fla. 1976)[12], the Referee refused to disclose the sum and substance of that *ex parte* communication.[13]

After receipt on March 28th by the Referee of Respondent's "Motion to Dismiss or, Alternatively, Respondent's Fourth Affidavit and Motion to Disqualify", the Referee in a <u>burst</u> of judicial attention without apparent forethought to this matter entered orders (i) clarifying his prior orders which had both **granted** <u>and</u> **denied** the Florida Bar's motion for summary judgment and (ii) denying Respondent First Request for Issuance of Subpoenas Duces Tecum[14].

Additionally, on March 28th, the Referee entered a "Notice of Final Hearing" setting April 16, 2007, at 1:00 p.m. for the putative, out-of-time and void Final

---

[12]   "We are unimpressed with respondent's argument that the punishment is too severe, particularly in view of respondent's willful failure to disclose the *ex parte* communications after being asked to do so by opposing counsel." *Id.* at 7.

[13]   Notably however, when contacted by Respondent making the same demand, Mr. Min stated "I was contacted by Judge Prescott's assistant to submit a proposed Motion for Enlargement of Time." *A priori* this is not an entirely accurate representation by Mr. Min as the substance of the *ex parte* communication obviously had to be quite a bit more than that as Mr. Min's draft *for the Referee* of the motion to enlarge time including the language as to the "good cause" for the delay. Therefore, the *ex parte* communication between the Referee and Mr. Min was necessarily quite a bit more than has been disclosed.

[14]   Though, as noted above, <u>ignoring</u> Respondent Second Request for Issuance of Subpoenas Duces Tecum.

-11-

Hearing. A copy of that "Notice Setting Final Hearing" is attached to the Appendix as Exhibit "E" to the Appendix.[15]

Upon receipt of the "Notice for Final Hearing" on April 5, 2007, Respondent immediately made a motion to continue the trial for two weeks or, alternatively, appear by telephone hearing for the yet-to-be held requisite Case Management Conference. The basis for the continuation request of two weeks was that Respondent was (and still is) involved in a very-high profile case with issues both legal and of national security concerns the discharge of which required his professional attentions to his client in Washington, D.C., during the last two weeks of April.

Accordingly, on April 10, 2007[16], the Referee made a factually unsupported

---

[15] Notably, (i) there was <u>no</u> certificate of service on the "Notice", thereby violating the applicable rules and (ii) the envelope in which the order was sent did not contain any stamp and thus is of uncertain mailing date. Moreover, notwithstanding the Referee had faxed orders to Respondent on various occasions, the Referee decided it was appropriate to let Respondent – who lives in Maryland – know of the hearing date by U.S. mail. Additionally, the "Notice" failed to indicate the number of days for the hearing – not surprising as that issue was never raised or addressed at the January 23[st] status hearing and indeed was incapable of being resolved as Respondent still had discovery requests outstanding. Finally, the Referee never checked with Respondent as to his availability for that hearing on April 16th.

[16] On April 10th, Mr. Min again reminded the Referee that the April 9th deadline had come and gone, and suggested a motion for enlargement of time to file the Report might be politic. A copy of that April 9, 2007, letter is attached as Exhibit "F" to the Appendix.

motion to enlarge, seeking Forty-Five (45) days, to finish the matter – though the Referee did not believe it was necessary for him to explain how he did <u>not</u> have time to finish this matter though given notice on October 11, 2006, that he had to finish this matter by April 9, 2007.[17]   A copy of that motion is attached as Exhibit "G" to the Appendix. Significantly, in that motion the Referee makes conclusory factual statements that Respondent specifically challenges as to their validity.

On April 12, 2007, though having (i) failed to hold the requisite Case Management Conference, (ii) ignored this Court's April 9th deadline to finish the final hearing and (iii) belatedly asked for and received a Forty Five (45) extension from this Court to finish the matter, the Referee *refused* Respondent's "Motion to Continue Final Hearing", for two weeks and refused to permit Respondent to appear by telephone pursuant to Florida Rules of Judicial Administration, Rule 2.071(c) on April 16th. A copy of that order is attached as Exhibit "H" to the Appendix.

On April 16, 2007, without permitting Respondent to appear by telephone, the Referee conducted and concluded this matter at an *ex parte* hearing with Mr. Min thereby trying Respondent *in absentia*.   Respondent, due to the nature of his professional obligations, was unable to attend without abandoning his professional obligations to his client in Washington, D.C.

---

[17]    This Court granted that motion gratuitously converting it to a motion to enlarge time without giving Respondent a chance to reply.

On or about April 20, 2007, Respondent and the Florida Bar submitted proposed Reports. On June 28, 2007 – adopting verbatim except for an increase of the term of suspension recommended by the Florida Bar from two (2) to three (3) years the Florida Bar's proposed Report and <u>failing</u> to include a single fact or conclusion proposed by Respondent – the Referee *putatively* issued his Report, though – continuing a pattern of passive-aggressive behavior towards Respondent – failed to serve it upon Respondent.

Given that the putative Report contained factual representations by the Referee which were demonstrably false and included an *ad hominem* attack on Respondent.[18]

On July 31, 2007, Respondent timely filed his "Petition for Review" despite the acknowledged improper attempts by the Referee and this Court to fore-shorten the time for that filing by (i) not properly serving Respondent and (ii) *ex cathedra* ignoring the requirements of Florida Bar Rule 3-7.7(c)(1).

---

[18]    Respondent sought from this Court a subpoena *duces tecum ad testificatum* directed to the Referee given that Referee <u>misrepresented</u> facts in the Report when he stated "The undersigned attempted to schedule a mutually convenient time for the final hearing and left messages for the Respondent to determine what his schedule was. As of the filing of this report, none of those messages have been returned." (Report, p.2). This blatant prevarication can be established through telephone records and oral examination of the Referee regarding this as to exactly when he "left messages" and Respondent's alleged failure to return them.   As this Court knows, that request for discovery was denied by this Court.

## SUMMARY OF ARGUMENT

The errors in procedure in this matter, singularly and collectively, are of such magnitude that given the age of this matter, the only remedy is dismissal of the Complaint against Respondent. In particular, (i) this matter is a "quasi-criminal" matter and thus to be accorded the substantial procedural rights attendant thereto, (ii) the failure to permit Respondent to call witness and obtain documents violated the Fifth and Sixth Amendments, (iii) the refusal to continue the Final Hearing was an egregious abuse of discretion by the Referee, (iv) the Referee *verbatim* adoption of the Florida Bar's proposed order and his striking of all Respondent's affirmative defenses was plain error and (v) the Referee's behavior removed the label of "fair and impartial" from him and thus denied Respondent such a tribunal.

The substantive errors are just as plain. Simply put, Respondent did <u>not</u> fail to pay child support – he was unable as the record clearly establishes and such order (i) was not issued by a competent court and (ii) in all events was overturned on appeal. Likewise, Respondent did not violate Rule 4-3.1 as none of his filings were "frivolous" and the cited court order to that end fails to even mention that phrase.

Accordingly, this Court must now (i) recognize that Respondent is blameless and has been harmed long enough by the Florida Courts' vindictive and false accusations against Respondent and (ii) thus dismiss this Complaint with prejudice.

### ARGUMENT

## I.    STANDARD OF REVIEW

Pursuant to Florida Bar Rule 3-7.7 (c)(5) *Burden* "Upon review, the burden shall be upon the party seeking review to demonstrate that a report of a referee sought to be reviewed is erroneous, unlawful, or unjustified."

However, "A referee's recommendations as to discipline are subject to broader review by this Court than the referee's findings of fact, but we have said that the referee's recommendations come to this Court with a presumption of correctness. *Florida Bar v. Roberts*, 626 So.2d 658, 659 (Fla.1993). We continue to recognize this standard of review but also recognize that the responsibility for the discipline of lawyers is ultimately the duty of this Court."  *The Florida Bar v. Forrester*, 656 So.2d 1273, 1275 (Fla. 1995).

## II.    PROCEDURAL ERRORS

### A.    RULE 3-7.7(F) VIOLATES FLORIDA AND FEDERAL LAW

The procedural rights attendant upon this disciplinary proceeding are determined by the nature of this proceeding.  This Court has re-defined the nature of these proceedings as "a quasi-judicial administrative proceeding." Rule 3-7.7(f)(1). This Court by so doing has violated both Florida and Federal law thereby denying to Respondent his fundamental procedural rights.

-16-

### 1.    THE FLORIDA LAW

In the seminal case on this question of what procedural rights are to be accorded in a disciplinary proceedings, this Court – when faced with an amendment to the Florida Bar Rules which would permit discipline if an attorney invoked his Fifth Amendment right to refuse to answer questions regarding affiliation with the Communist Party – set and recognized nature of disciplinary hearings and the procedural due process necessarily attendant upon them.[19]:

Notably, when the Rules of the Florida Bar were amended to make the drastic change from the "long established" rule that "the investigation and trial of a lawyer for unprofessional conduct must be a judicial proceeding" to a proceeding that was "a quasi-judicial administrative proceeding", this Court <u>failed</u> to explain or distinguish it's radical shift from the standard in *Petition for Revision of, or Amendment to, Integration Rule of Florida Bar* – presumably because it would be

---

[19]    "Adoption of the rule as proposed would, in our opinion, jeopardize rights secured by Section 12, Declaration of Rights, Constitution of Florida, F.S.A., as well as the guaranties embraced in the Fifth Amendment to the Federal Constitution. The proposed rule in whatever form approved should contemplate the **proper exercise of every safeguard wrapped in these provisions of organic law**; they may not always be obvious on the surface, however, the **importance of adhering to the doctrine long established by this court that the investigation and trial of a lawyer for unprofessional conduct must be a judicial proceeding**, in the manner provided by law or rule of this court, cannot be overemphasized." *Petition for Revision of, or Amendment to, Integration Rule of Florida Bar,* 103 So.2d 873, 875 (Fla. 1956). (Emphasis added).

intellectually inconvenient to do so.[20]  Accordingly, this Court now faced with this

challenge to the lowering of the standard must reconcile these differences or admit

that the change of disciplinary proceeding to "a quasi-judicial administrative

proceeding" was improper.

### 2.   THE FEDERAL LAW

Regardless of what this inferior Court may deem the law to be under Florida

jurisprudence, this Court is prisoner to the Supreme law of this land.[21]  United States

---

[20]   Indeed, in the seven times that *Petition for Revision of, or Amendment to, Integration Rule of Florida Bar* has been cited in Florida Jurisprudence, not once has the *prima facie* conflict between its holding defining the process as "a judicial proceeding" and this Court's *furtive* change to "a quasi-judicial administrative proceeding" been reconciled. Moreover, by this serendipitous change, this Court has invaded the province of the "organic law" of this State – something it is powerless to do and is a bold usurpation of power never delegated to this branch by the People. *Accord: State v. Palm Beach County*, 89 So.2d 607, 612 (Fla. 1956)(". . . that the people in their wisdom wrote the 1930 restriction into the organic law. It is not for us to question their wisdom.); *Advisory Opinion to Atty. Gen. Funding for Criminal Justice,* 639 So.2d 972, 973 (Fla. 1994)("The single-subject requirement is a rule of restraint. It is designed to insulate Florida's organic law from precipitous and cataclysmic change."); *Ray v. Mortham*, 42 So.2d 1276, 1290 (Fla. 1999)("[It is] the will of the people to make a change in their organic law, as expressed through their vote on the initiative ballot, and the importance of giving effect to the change in law which was actually voted on by the people, rather than some judicially crafted change.") Yet here, by "judicially crafted change" coupled with the usurped benefit of ignoring *stare decisis*, this Court has changed the organic law removing the "safeguard[s] wrapped in these provisions of organic law."

[21]   "Nonetheless, if federal law has preempted state law, either expressly or impliedly, the Supremacy Clause requires state law to yield." *State of Florida v. Stepansky*, 761 So.2d 1027, 1031 (Fla. 2000). "Upon the State courts, equally with the courts of the Federal system, rests the obligation to guard, enforce, and protect

Constitution, Article VI, clause 2.[22]

Accordingly, Respondent takes exception to the characterization of Florida attorney disciplinary proceedings as "a quasi-judicial administrative proceeding" under Rule 3-7.7(f)(1).

The characterization of the United States Supreme Court clearly prevails over this inferior Court's characterization. As the superior court has stated: "Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer. *Ex Parte Garland*, 4 Wall. 333, 380, 18 L.Ed. 366; *Spevack v. Klein*, 385 U.S. 511, 515. He is accordingly entitled to procedural due process, which includes fair notice of the charge. *See In re Oliver*, 333 U.S. 257, 273. . . .These are adversary proceedings of a quasi-criminal nature. *Cf. In re Gault*, 387 U.S. 1, 33." *In re Ruffalo*, 390 U.S. 544, 550-551 (1968). Accordingly, notwithstanding any Florida Rule or pronouncement

---

every right granted or secured by the Constitution of the United States, whenever those rights are involved in any suit or proceedings before them. Consequently, it is the duty of State Supreme Courts to follow the guidelines announced by the Supreme Court of the United States in construing Federal Constitutional rights." *State v. Dixon*, 283 So.2d 1, 23 (Fla. 1973)(Boyd, dissent, footnotes omitted). *Accord: Irvin v. Dowd*, 359 U.S. 394, 404 (1959)("the obligation which rests upon 'the state courts, equally with the courts of the Union, . . . to guard, enforce, and protect every right granted or secured by the constitution of the United States").

[22]    "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; **and the judges in every state shall be bound thereby**, anything in the Constitution or laws of any State to the contrary notwithstanding." (Emphasis added).

-19-

by this inferior Court,, the proceedings must not trespass upon those rights guaranteed to Respondent under the U.S. Constitution.[23]

Here, Respondent – an "out-of-state lawyer" – has and continues to raise "unpopular federal claims" in the Florida courts – when only he can for (i) lack of local counsel willing to incur the wrath of a demonstrably vindictive Florida judiciary[24] and (ii) the natural ability to persevere regardless of personal cost imposed by a Florida judicial resolution system which is "fair" in name only.

Accordingly, Respondent is entitled to those procedural rights secured by the federal Constitution notwithstanding this inferior Court's pronouncements to the contrary and upon these rights this Court must publically resolve Respondent's claims

---

[23]    Moreover, the significance of attorneys in our society cannot be ignored either. In an 8-1 decision, the Supreme Court recognized:

> The lawyer's role in the national economy is not the only reason that the opportunity to practice law should be considered a "fundamental right." We believe that the legal profession has a noncommercial role and duty that reinforce the view that the practice of law falls within the ambit of the Privileges and Immunities Clause. Out-of-state lawyers may -- and often do -- represent persons who raise unpopular federal claims. In some cases, representation by nonresident counsel may be the only means available for the vindication of federal rights. The lawyer who champions unpopular causes surely is as important to the "maintenance or well being of the Union," as was the shrimp fisherman in *Toomer* or the pipeline worker in *Hicklin*.

*Supreme Court of New Hampshire v. Piper,* 470 U.S. 274 (1985).

[24]    See Exhibit "B" to the Appendix hereto.

to procedural violations which require dismissal of this matter.

## B.    THE DELAY IN RESOLUTION DENIED DUE PROCESS TO RESPONDENT

While it is doubtlessly true that: "The constitutional right to a speedy trial in

criminal cases has no application to civil proceedings"[25], the United States Supreme

Court had held that: "Disbarment, designed to protect the public, is a punishment or

penalty imposed on the. . . .**These are adversary proceedings of a quasi-criminal**

**nature**." *In re Ruffalo*, 390 U.S. 544, 550-551 (1968). Accordingly, some aspect of

speedy trial rights must attach to such this disciplinary proceeding. Indeed, while the

constitutional right to speedy trial in attorney disciplinary proceedings has never been

expressly addressed, analogous situations abound compelling this Court to recognize

the delay here has frustrated the assertion of Respondent's rights and damaged him

immeasurably.[26]

---

[25]    *Julian v. Lee*, 473 So.2d 736, 739 (Fla. 5th DCA 1985); see also Amend. V I,
U.S. Const.

[26]    "Many of the same considerations that impel judicial protection of **the right
to a "speedy trial" in criminal cases or implementation of civil decrees with all
deliberate speed are <u>not</u> inapposite in agency deliberations**. Those situations
generally involve protection of constitutional rights, but delay in the resolution of
administrative proceedings can also deprive regulated entities, their competitors or
the public of rights and economic opportunities without the due process the
Constitution requires." *MCI Telecommunications Corp. v. F. C. C.,* 627 F.2d 322, 341
(D.C. Cir. 1980)(Footnotes omitted, emphasis added.) *Accord*: *Dickey v. Florida*, 398
U.S. 30, 54 (1970) (Brennan, J., concurring; citation omitted)("Society's interest in
avoiding undue delay in criminal trials stems from a general presumption that

Here, the allegations were brought to the Florida Bar's attention in December 2002. Now, some One Thousand Six Hundred (1600) days or Four and One Half (4 ½) years later, this matter is <u>still</u> pending against Respondent.[27]

Respondent has both a Florida and federal "constitutional right to be brought to trial within a reasonable time." The State of Florida has an obligation imposed on it that "justice shall be administered without sale, denial or delay".[28] Can this Court publically say that a Sixteen Hundred (1600) day delay in adjudication is discharging that burden? Respondent explicitly challenges this Court to so declare at least to the end of letting the public know each Judge's position on the meaning of Article I, § 21 for the edification of the voters in the next election cycle.

---

governmental delay is unfair: "Despite the difficulties of proving, or disproving, actual harm in most cases, it seems that inherent in prosecutorial delay is 'potential substantial prejudice' . . . ."); *Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 591 (1926) ("(p)roperty may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them.").

[27]    As Justice Anstead noted in *State v. Salzero*, 714 So.2d 445, 448 (Fla. 1998): "We deal here with a question that goes to the very nature and purpose of the speedy trial rule and to the basic principles of advocacy in an adversary system of criminal justice. **Petitioner had a constitutional right to be brought to trial within a reasonable time.** The rule of 180 days provides a practical way to effectuate the constitutional right."

[28]    Florida Constitution, Article I, § 21. Access to courts.

Moreover, Respondent has been significantly harmed by the delay.[29] Accordingly, for delay in resolving this matter, this matter must be dismissed.

## C.    THE REFUSAL TO PERMIT RESPONDENT TO CALL WITNESSES

"We have the view, and so hold, that under such circumstances due process requires both notice to the lawyer involved and reasonable opportunity to be heard in person and through witnesses if he desires to explain the circumstances of the offense and otherwise mitigate the disciplinary penalty." *The Florida Bar v. Fussell*, 179 So.2d 852, 854 (Fla. 1965).

Regardless, this Court has held that: "In addition to the authority to hear this evidence provided by the Florida Evidence Code, a referee in a bar-discipline case can consider any evidence he or she deems relevant to resolving a factual question." *The Florida Bar v. Clement*, 662 So.2d 690,f/n #3 (Fla. 1995).

However, Respondent expressly challenges this holding as the superior federal law prohibits this court from allowing disciplinary proceedings which trespass upon

---

[29]    Factual issues have become clouded due the passage of time. Documents are no longer available. On a professional level, the pending bar complaint against Respondent has caused Respondent to repeatedly lose clients who did not want to invest their legal matters with an attorney who may be disbarred. Moreover, the State of Maryland has refused to admit Respondent to practice as long as the Florida Bar proceedings continue. Last, lost to the gowned-ones is the stress that this constant Damocles sword hanging over Respondent's head for over four years this proceeding represents. To further delay is simply to continue to punish Respondent without a hearing implicate the Eighth Amendment's cruel and unusual prohibition.

those rights guaranteed to Respondent under the U.S. Constitution.  Those rights

includes the right under the Sixth Amendment to "be confronted with the witnesses

against him; to have compulsory process for obtaining witnesses in his favor, and to

have the assistance of counsel for his defense."  Thus, notwithstanding any Florida

law to the contrary, under the supremacy clause of the United States Constitution, the

Acts of Reconstruction and the Sixth and Fourteenth Amendments, Respondent has

the right to confront his accusers before suffering any "punishment or penalty

imposed" upon him.[30]

Here, The Florida Bar failed to present charges <u>under</u> oath or permit

---

[30]    The United States Supreme Court held that "(i)n almost every setting where
important decisions turn on questions of fact, due process requires an opportunity to
confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254,
269 (1970).  Likewise, in *Greene v. McElroy*, 360 U.S. 474, 496 (1959), the court
found that cross-examination and confrontation must be permitted whenever
"governmental action seriously injures an individual, and the reasonableness of the
action depends on fact findings" was one of the "immutable' principles of our
jurisprudence."

Most significantly, in *Ex Parte Burr*, 22 U.S. 529, 530 (1824), the Court was
presented with a motion for mandamus to the Circuit Court for the District of
Columbia, to restore Mr. Burr to his place of attorney at the bar of that Court.  In
detailing the level of proof necessary to remove an attorney from the practice of law,
the Court held: "In the case at bar, the proceedings were supposed to be irregular,
because **Mr. Burr was put to answer charges *not* made on oath**.  That the charges,
in a regular complaint against an attorney, ought not to be received and acted on,
**unless made on oath**, is admitted. It is a course of proceeding which is recommended
by considerations, too obvious to require that they should be urged." (Emphasis
added).

Respondent to "be confronted with the witnesses against him", and as such, the charges must be summarily dismissed under *Ex Parte Burr*'s requirement. Moreover, Respondent was <u>denied</u> an opportunity to call witnesses in his defense, *i.e.*, Judge Lando, the six Third District Court of Appeal Judges and their legal counsel, Joanne Sargent.

Thus, it bordered upon the intellectually dishonest for the first Referee to cite *United States v. Morgan*, 313 U.S. 409 (1941) for the proposition that Respondent should be denied depositions of the complaining witnesses as requested when the history of that case clearly establishes that Respondent falls within the exception to the general rule cited in *United States v. Morgan.*[31].

---

[31]    The *Morgan* line of cases arose from the validity of an order of the Secretary of Agriculture fixing maximum rates to be charged by market agencies at the Kansas City Stockyards. *Packers and Stockyards Act 1921*, 7 U.S.C. §§ 181 – 229. In the first case, *Morgan v. United States*, 298 U.S. 468 (1936), the contention that the plaintiffs had not been accorded the hearing which the statute made a prerequisite to a valid order was at issue. The district court had struck from plaintiffs' complaints the allegations that the Secretary had made the order without having heard or read the evidence and without having heard or considered the arguments submitted, and that his sole information with respect to the proceeding was derived from consultation with employees in the Department of Agriculture. *United States v. Morgan*, 304 U.S. 1, 14 (1938). The Supreme Court concluded that first case by stating "that it was error to strike these allegations, that the **defendant should be required to answer them**, and that the question whether plaintiffs had a proper hearing should be determined." *Id.* (Emphasis added).

Hence, finding that the Secretary of Agriculture sat in a similar position to that of a judge required fundamental due process, the Supreme Court went on to <u>order</u> that the Secretary answer question under oath concerning the nature of the actions he took

Here, Respondent is alleging – and is collaborated by the dissent in *Sibley v.*

---

in his judicial capacity so that the plaintiffs' allegations could be properly considered. "The defendants should be required to answer these allegations, and the question whether plaintiffs had a proper hearing should be determined." *Morgan v. United States*, 298 U.S. 468, 482.

Subsequently, "after the remand, the bills were amended and interrogatories were directed to the Secretary which he answered. The court received the evidence which had been introduced at its previous hearing, together with additional testimony bearing upon the nature of the hearing accorded by the Secretary. **This evidence embraced the testimony of the Secretary and of several of his assistants**. The district court rendered an opinion, with findings of fact and conclusions of law, holding that the hearing before the Secretary was adequate and, on the merits, that his order was lawful. On this appeal, plaintiffs again contend (1) that the Secretary's order was made without the hearing required by the statute; and (2) that the order was arbitrary and unsupported by substantial evidence." *United States v. Morgan*, 304 U.S. 1, 14. (Emphasis added).

After reviewing the testimony of the Secretary, the Supreme Court found that there was a <u>failure</u> to accord due process holding:

> The maintenance of proper standards on the part of administrative agencies in the performance of their quasi judicial functions is of the highest importance and in no way cripples or embarrasses the exercise of their appropriate authority. On the contrary, it is in their manifest interest. For, as we said at the outset, if these multiplying agencies deemed to be necessary in our complex society are to serve the purposes for which they are created and endowed with vast powers, **they must accredit themselves by acting in accordance with the cherished judicial tradition embodying the basic concepts of fair play**. **As the hearing was fatally defective, the order of the Secretary was invalid.**

*United States v. Morgan*, 304 U.S. 1, 22. (Emphasis added).

*Sibley,* 833 So.2d 847(Fla.App. 3 Dist. 2002) – that the judicial actors who entered the orders upon which the two counts of the complaint are based were <u>not</u> relying upon the record before them.   Moreover, that the Third District Court of Appeal judges – just as the Secretary in *Morgan* – could not have made their determination that Respondent's cases were "meritless" in the cases which they were not empaneled to decide.

Accordingly, the trilogy of *Morgan* cases clearly establishes the exception to the general rule which prohibits the deposition of judges: where the facts upon which they relied are at issue.[32]

Here, Respondent is not seeking the "meaning" of the subject orders, but

---

[32]   Florida likewise recognizes this exception.   In *Stein v. Professional Center, S.A.*, 666 So.2d 264, 266 (Fla.App. 3 Dist. 1996) the court held:

> We recognize that under the case law there are certain discrete occasions where a trial judge may be subpoenaed to testify as to certain relevant facts in a case, such as (1) a criminal defendant's demeanor during trial when a subsequent issue arises in post-conviction proceedings as to the defendant's mental competence to stand trial; or (2) the terms of an oral settlement agreement made before the judge when that agreement was never memorialized on the record because the proceedings were not transcribed by a court reporter. These cases, relied on by the respondent, have no application to this case because the petitioner is not being subpoenaed to give testimony as to certain relevant facts in the case; instead, the petitioner is being subpoenaed to give testimony as to the meaning of a prior order which she entered in the case, and, under the established case law, such testimony is impermissible.

instead the "relevant facts" relied upon by the judges in each of the cases the Complainant is relying upon to maintain that Respondent behaved in a manner which violated the cited Bar Rules. If, as Respondent maintains with authority, those judges relied upon evidence (i) "which was not introduced as such" and/or (ii) "which should not legally influence the conclusion", then due process has been denied and no finding of an ethical breach can be premises upon such discredited orders.

Additionally, the right to confront and cross examine is particularly relevant when the complaining witnesses – here the judges and their legal counsel – can be demonstrated to be made by "persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy".[33]

---

[33]    This point is made indelible – and thus binding upon this inferior Court – in *Greene v. McElroy*, 360 U.S. 474, 496-497 (1959), where the Court stated:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that, where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. . . . This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases . . . , but also in all types of cases where administrative and regulatory actions were under scrutiny.

Here, this Court would sanction the extreme harm to Respondent by government action of suspension or disbarment by judges demonstrably "motivated by malice, vindictiveness, intolerance, prejudice, or jealousy" without requiring those individuals to swear to their charges or permit Respondent to cross-examine them all the while shielding their judicial acts from **any** sort of scrutiny under the (i) *per curiam* affirmance without written decision policy and (ii) the defense of judicial immunity to any claim against a judge.

Hence, the <u>failure</u> to (i) permit Respondent to take discovery or call as witnesses the subject judges and (ii) acknowledge and rule upon the request to take Joanne Sargent's deposition rises to a level of Sixth Amendment constitutional deprivation requiring dismissal of the charges against Respondent.

## D.    THE REFEREE'S ABUSE OF DISCRETION VIOLATED DUE PROCESS

It was a plain abuse of discretion[34] for the Referee to <u>refuse</u> to continue the

---

[34]    "A motion for continuance is addressed to the sound judicial discretion of the trial court and absent abuse of that discretion the court's decision will not be reversed on appeal." *Ziegler v. Klein*, 590 So.2d 1066, 1067 (Fla. 4th DCA 1991). "Factors to be considered in determining whether the trial court abused its discretion in denying the motion for continuance include whether the denial of the continuance creates an injustice for the movant; whether the cause of the request for continuance was unforeseeable by the movant and not the result of dilatory practices; and whether the opposing party would suffer any prejudice or inconvenience as a result of a continuance." *Fleming v. Fleming*, 710 So.2d 601, 603 (Fla.App. 4 Dist. 1998). *Accord: United States v. Flynt*, 756 F.2d 1352, 1359 (9th Cir.) (Flynt), *amended*, 764 F.2d 675 (9th Cir.1985).

putative "Final Hearing" for two weeks to accommodate Respondent's pre-existing professional obligations. Accordingly, this matter ought to be dismissed for that abuse of discretion and the continued harm that further delay would cause to Respondent by remanding this to a new Referee for further hearings.

Clearly, the Referee ignored this Court's orders on the timely resolution of this matter. Thus, while granting to himself the *ex cathedra* right to do whatever he pleased, Respondent – who sought only a Fourteen (14) day delay in a matter that was Sixteen Hundred (1600) days old – could not be afforded that minimal courtesy.

Here, (i) Respondent had not sought a continuance before, (ii) no "injustice" would be created by delaying the final hearing two weeks, (iii) Respondent's continuance request was "unforeseeable" as the Referee did not give notice to Respondent of the final hearing until ten (10) days before the hearing and failed to indicate the length of the hearing, (iv) Respondent engaged in no dilatory practices but promptly and timely filed each document and (v) no "prejudice or inconvenience" would be suffered by a two-week delay.

Moreover, and most significantly, by refusing to continue the Final hearing two weeks, the Referee forced upon Respondent a "Hobson's Choice" of attending the hearing or breaching his professional obligations to a client who was in constant need of them during a significant point in her criminal and civil proceedings in Washington

-30-

D.C.[35]

Additionally, at the hearing on January 23rd, the Referee failed[36] to discharge

his obligations pursuant to  Rule 3-7.6(c) which states:

> Within 60 days of the order assigning the case to the
> referee, the referee shall conduct a pretrial conference. The
> purpose of the conference is to set a schedule for the
> proceedings, including discovery deadlines and a final
> hearing date. The referee shall enter a written order in the
> proceedings reflecting the schedule determined at the
> conference.

Instead, Respondent is ambushed on April 5th by an order to appear for the

---

[35]    In the District of Columbia, Respondent represents Deborah Jeanne Palfrey, a/k/a the "D.C. Madam" who (i) was indicted in a matter assigned Criminal Case Number: 07-046-GK and (ii) has had all her assets  seized in a civil forfeiture matter in Case No.:1:06-CV-01710-GK.   During the time  frame  of mid-April 2007, Respondent was faced with (i) an injunction against him personally regarding records he held and (ii) preparing the documents for the transition of her criminal appointed attorney to a new attorney and dealing with issues arising under the federal Confidential Information Procedures Act, which cannot be further detailed here. Additionally, significant issues regarding communications with the White House Counsel's office were on-going during this time.  These, and other matters that Respondent is unable to disclose at this time, precluded Respondent from disappearing to Miami for a hearing of indeterminate length during the last two weeks of April without breaching his obligations to his client and the Court which had entered a temporary injunction against him.

[36]    Again, the Referee at the January 23rd hearing **failed** to: (i) Set a schedule for the proceedings; (ii) Set discovery deadlines; (iii) Set a final hearing date; or (iv) Enter a "written order "reflecting the schedule determined at the conference" (notably because no such schedule was determined at the conference).

putative "Final Hearing" absent notice of (i) who the witnesses of the Complainant will be and (ii) who he may call in his defense. Plainly, this Court <u>cannot</u> condone such behavior and conclude that "due process" was accorded Respondent here.

As such, it was an abuse of discretion to require Respondent to drop everything – including his personal child care responsibilities – and rush off to Miami for the Referee's putative[37] final hearing.

Last, it is worthy of note that Respondent sought leave to appear by telephone for the yet-to-be concluded requisite Case Management Conference on April 16th, but the Referee refused that request by ignoring it.

### E.    THE DENIAL OF DOCUMENTARY DISCOVERY

On August 10, 2006, Respondent served upon Complainant a request to produce. On August 14, 2006, Complainant served its response. Respondent promptly file a motion to compel production of the documents requested. On January 23, 2007, the Referee denied Respondent's motion to compel.[38]

---

[37]    "Putative" is the correct adjective here as (i) the Case Management hearing had never been completed and (ii) the Referee had never ruled upon Respondent's Second Request for Issuance of Subpoena Duces Tecum.

[38]    A review of Respondent's Requests 1, 2, 5 and 6, reveal that at the very least, each may " lead to the discovery of admissible evidence". Briefly stated:

*Request #1: All documents related every instance when Complainant has disciplined a member for the Florida Bar for violation of Rule 4-8.4(h) of the Rules Regulating the Florida Bar –* The selective

-32-

As noted in *Greene*, *supra*, ". . .where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence . . ." Here, the denial to Respondent of the sought-after documentary evidence also denied to Respondent fundamental due process.[39]

---

prosecution of Respondent by Complainant is a central affirmative defense in this matter and as such the relevance of the disposition of similarly situated respondents is relevant. *Cf. Bordenkircher v. Hayes*, 434 U.S. 357 (1978).

Request #2: *All documents related every instance when Complainant has disciplined a member for the Florida Bar for violation of Rule 4-3.1 of the Rules Regulating the Florida Bar* – see #1 above.

Request #5: *All documents related to reports detailing the number of complaints processed by Complainant for each of the last three years* – Plainly, Respondent has a right to have "justice shall be administered without sale, denial or delay". The time of processing complaints by the Complainant thus is relevant to a determination of whether Respondent's rights to "justice without delay" have been violated by Complainant.

Request #6: *All documents related to reports detailing the length of time to process complaints by Complainant for each of the last three years* – see #5 above.

[39]    *Accord: Wardius v. Oregon*, 412 U.S. 470, 474 (1973)("Although the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded . . . it does speak to the balance of forces between the accused and his accuser.")

The requests are particularly relevant as (i) there is <u>no</u> reported decision sanctioning an attorney as Respondent is sought to be sanction here for alleged "frivolous" filings and (ii) since the amendment in 1995 to the Florida Bar Rules to include Rule 4-8.4(h), there has been <u>no</u> reported sanctioning of an attorney for violating this Rule. Accordingly, how the Florida Bar has treated other similarly situated attorneys is clearly relevant to Respondent's claims herein.

Accordingly, for the denial of access to relevant documentary evidence, Respondent was denied due process and this matter must be dismissed.

### F.    STRIKING OF AFFIRMATIVE DEFENSES

In Respondent's Answer to the Complaint, Respondent raised Nineteen (19) affirmative defenses, all of which were struck by the Referee in his order of January 29, 2007, without elaboration.

That order was in error for two procedural reasons. First, in part, Rule 1.110(d) states that "In pleading to a preceding pleading a party shall set forth affirmatively ...and any other matter constituting an avoidance or affirmative defense." Likewise, Rule 1.140(b) states "Every defense in law or fact to a claim for relief in a pleading shall be asserted in the responsive pleading, if one is required, but the following defenses may be made by motion at the option of the pleader". Here, rather than file a motion to dismiss, Respondent has properly filed his defenses in law or fact in his

-34-

responsive pleading.

Second, the Florida Bar's legal and factual arguments addressed to the affirmative defenses are premature pending discovery of both parties so that these matters may be properly adjudicated. For example, in response to Respondent's Second Affirmative Defense of duress, the Florida Bar maintains "Respondent was not acting under duress". How can that conclusion be made prior to any factual findings?[40]

Thus, the order granting of the motion to strike affirmative defenses clear error by the Referee.

### G.    VERBATIM ADOPTION OF BAR'S PROPOSED ORDER

A review of the proposed "Report" from the Florida Bar and the "Report" eventually signed and submitted by the Referee reveal that they are *de facto* and *de jure* identical.[41]

---

[40]    Likewise, the Florida Bar maintains in response to the affirmative defense of unclean hands that "The Florida Bar never conveyed any information, through words, admissions, conduct, acts, acquiescence or all combined to Respondent in a willful, culpable or negligent manner . . ." Upon this factual assertion the Florida Bar seeks to strike Respondent's affirmative defense? Patently, that is absurd until after those facts related to unclean hands have been established.

[41]    This Court in *Perlow v. Berg-Perlow*, 875 So.2d 383, 390 (Fla. 2004) noted that: "Based on the foregoing, we conclude that the trial judge erred in this case by entering as the final judgment the proposed final judgment prepared by the wife's attorney without giving the husband an opportunity to comment or object."

The U.S. Supreme court noted in *Anderson v. City of Bessemer*, 470 U.S. 564,

572 (1985):

> We, too, have criticized courts for their verbatim adoption
> of findings of fact prepared by prevailing parties,
> particularly when those findings have taken the form of
> conclusory statements unsupported by citation to the
> record. *See, e.g., United States v. El Paso Natural Gas Co.*,
> 376 U.S. 651, 656-657 (1964); *United States v. Marine
> Bancorporation*, 418 U.S. 602, 615, n. 13 (1974). We are
> also aware of the potential for overreaching and
> exaggeration on the part of attorneys preparing findings of
> fact when they have already been informed that the judge
> has decided in their favor.

As a result, the proceedings before the Referee were violative of the right to an

impartial tribunal and as such this Court must reject the Report of the Referee.

## H.    RESPONDENT WAS ENTITLED TO A JURY TRIAL

In his Answer, Respondent demanded "a trial by jury of each issues raised by

the pleadings and so triable", or, alternatively, an advisory jury.

Clearly, criminal defendants have a fundamental right to jury trial and

infringement of right is fundamental error. *See: Dumas v. State*, 439 So.2d 246, 253

n. 8 (Fla. 3d DCA 1983) *review denied*, 462 So.2d 1105 (Fla.1985). Given that this

is a "quasi-criminal" proceeding, the novel question arises as to whether Respondent

was similarly entitled to a jury trial as he requested.[42]

---

[42]    As this Court stated in *In re Forfeiture of 1978 Chevrolet Van*, 493 So.2d 433,
435 (Fla.1986) the right to a jury trial "is not limited strictly to those specific

As such, in this similar quasi-criminal matter, Respondent was entitled to a jury trial on the claims in the Complaint.

## I.    FAIR AND IMPARTIAL TRIBUNAL

Last, indisputably Respondent is entitled under the Fifth Amendment to the "absolute right" to an impartial and competent tribunal[43]. "The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process." *Marshall v. Jerrico*, 446 U.S. 238, 242 (1980).

---

proceedings in which it existed before the adoption of our constitution, but should be extended to proceedings of like nature as they may arise."    Indeed, in an analogous situation, this Court found the right to jury trial existed.    "She asserts that a proceeding under the 1828 Bastardy Act was clearly **quasi-criminal in nature** and that a paternity proceeding is now strictly an equitable civil action to which the constitutional right of a jury trial does not extend. We disagree." *B.J.Y. v. M.A.*, 617 So.2d 1061, 1063 (Fla. 1993).

[43]    "Our legal system is based on the principle that an **independent, fair and competent** judiciary will interpret and apply the laws that govern us. . . . The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law." Preamble, Code of Judicial Conduct, Adopted September 29, 1994, effective January 1, 1995 (643 So. 2d 1037)(As amended through January 5, 2006 (918 So. 2d 949)(Emphasis added.)

-37-

Here, based upon the behavior of the Referees behavior[44] in this case, the Referees cannot be considered fair and impartial in this matter. Accordingly, for denial of a competent and impartial magistrate, Respondent demands the Report be rejected and that this matter be dismissed.

## III.    SUBSTANTIVE DUE PROCESS ERRORS – RULE 4-8.4(H)

The first count of the Complaint alleges that Respondent violated Rule 4-8.4(h) by failing to pay child support. That Rule states that a lawyer shall not: "willfully refuse, as determined by a court of competent jurisdiction, to timely pay a child support obligation".

Here, for the below reasons, the allegations of the Complaint and upon the law that this Court is bound to notice – as Respondent is expressly requesting pursuant

---

[44]    Among other matters described herein, (i) by entering the Order of August 7, 2006, without affording Respondent a chance to be heard in opposition – which would have included among other issues that it was arguably federal contempt of court for the Referee to proceed at that point in time – the Referee indulged in prohibited judicial behavior – deciding a matter before hearing both sides, (ii) the Referee's apparent attempt to cover-up the failure to abide by the thirty (30) day ruling requirement by the Referee, apparently manipulating the record to avoid an undesirable result for him personally and professionally as it appears the Referee has done so here, (iii) the Referee simply signing any proposed order the Florida Bar presents to him without any real understanding or concern for the issues presented, (iv) in an egregious example of *ex parte* communications, the Referee and the attorney for the Florida Bar have engaged in *ex parte* communications and (v) the Referee has ignored the express order of this Court to timely conduct a Case Management Conference and final hearing to Respondent prejudice by forcing him to make motions to disqualify thus inflaming a judge's sense of un-reviewableness.

-38-

to §90.201(1) – that the orders were <u>not</u> based upon any record evidence and that Respondent, lacking the ability to pay, did <u>not</u> "wilfully refuse" to pay child support obligations.

### A. THE AUGUST 5, 2002 CONTEMPT ORDER WAS NOT BASED UPON RECORD EVIDENCE

This Court cannot ignore that the August 5, 2002 contempt order was <u>not</u> based upon record evidence and, as it was a *verbatim* adoption of a proposed order, it must be rejected as a basis for any action as detailed in Part III.G, "Verbatim Adoption of Bar's Proposed Order", *supra.*

#### 1. *SIBLEY V. SIBLEY,* 833 SO.2D 847 (FLA.APP. 3 DIST. 2002)

Though not an exhibit to the instant Complaint, in response to the Complaint, Respondent has raised the decision in *Sibley v. Sibley,* 833 So.2d 847 (Fla.App. 3 Dist. 2002) as evidence that Respondent did not violate Rule 4-8.4(h) as recognized by the dissent written by Judge Cope in that matter. Similarly, the majority opinion written by Judges Schwartz and Goderich which affirmed Judge Lando's decision is so full of factual errors that Judge Cope was compelled to point them out in his dissent. As a result, Respondent cannot be said to have violated Rule 4-8.4(h) upon the result obtained in *Sibley v. Sibley,* 833 So.2d 847 (Fla.App. 3 Dist. 2002).

Moreover, this Court must take notice of the decision in *Sibley v. Sibley,* 833

So.2d 847, n. 2 (Fla.App. 3 Dist. 2002), which plainly holds that "Notwithstanding that the [Respondent] has adamantly refused to reveal many of his financial records – which in itself raises a strong presumption against him, *City of Miami v. Rantanen*, 645 So. 2d 4 (Fla. 1st DCA 1994) – the record shows substantial assets, although admittedly not in the purge amount, in his own name."[45]

Accordingly, Count I's allegation that "Respondent violated Rules 4-8.4(h) of the Rules Regulating the Florida Bar" cannot be premised upon the trial court's orders attached to the Complaint as those orders were expressly overruled on appeal.

Additionally, Rule 4-8.4(h) states that a lawyer shall not: "willfully refuse, as determined by a court of competent jurisdiction, to timely pay a child support obligation". Here, the court which entered the order was not competent to do so when the order was entered. That order of Judge Lando was incompetent as she was without authority to proceed in Case No.: 94-18177 FC 19 after the filing of by Respondent of his affidavit and motion for disqualification on August 20, 2002, pursuant Florida Statute §38.10 and Judge Lando's failure to rule upon that affidavit pursuant to Florida Rules of Judicial Administration, Rule 2.160. Accordingly,

---

[45]     Indeed, in his dissent, Judge Cope pointed out: "The incarceration order in this case was entered precisely on the theory that the former husband does have $100,000 in assets in his personal possession with which to satisfy the purge amount. The majority opinion concedes that the record does not adequately support the trial court's view of the matter." *Id.* at 850.

Judge Lando was not competent to issue the subject order which is Exhibit "A" to the Complaint.

As such, Respondent did <u>not</u> "willfully" refuse to pay a child support obligation as he did not have the ability to pay such obligation and that determination was not made by a competent court.

### 2. THE AUGUST 5, 2002 CONTEMPT ORDER DOES NOT DEMONSTRATE RESPONDENT HAD THE ABILITY TO PAY

A review of the findings of fact in the Contempt Orders establish that it fails to make the requisite findings of fact and as such depart from the essential requirements of law in this regard.

Florida Family Law Rules of Procedure, Rule 12.615 – "Civil Contempt in Support Matters" requires that such an order must (i) "contain a recital of the facts on which these findings are based" and (ii) contain "separate affirmative finding that the contemnor has the present ability to comply with the purge and the factual basis for that finding". Thus, in order to be competent under this Rule, an incarcerative order must contain facts that the contemptor at all times relevant had the ability to pay the court ordered amounts and at present has the ability to pay the purge amounts.

In the Contempt Order, Judge Lando – through Mother's counsel – made the conclusory finding that Respondent "at all times from May, 2000 had the present

-41-

financial ability to pay", the required "recital of facts" simply does not support such a finding. Indeed, the recited facts inexorably point to just the opposite conclusion.[46] Hence, there was no factual basis upon which Judge Lando relied in order to make that conclusion that Respondent failed to pay child support.

Moreover, in the Contempt Order, Judge Lando fails to make the requisite "separate affirmative finding that the contemnor has the present ability to comply with the purge and the factual basis for that finding." Again, faced with the proof of a negative, Respondent can now only point to the Contempt Order and ask: where is the factual basis for the finding of present ability to pay? Where is the recitation of assets or income that Respondent possesses that could be used to pay the $100,000 in support arrearage and the $4,000/month traveling forward? Simply stated, there

---

[46] As for year 2002, Judge Lando finds that Respondent's gross income is $37,500 annually from his employment as general manager of his Respondent's company which translates to gross income of $3,125/month – far in excess of the $4000/month that Judge Lando finds Respondent has had the present ability to pay since May 2000 just under the Support Order. Indeed, even taking the out of context statement that Respondent's Law Practice has taken in $17,000 so far this year , that amount still if added to the other income of Respondent's would not permit payment of $4,000/month and leave Respondent with funds upon which to live and support his fourth child. *Accord: Bickett v. Bickett*, 579 So. 2d 149 (3rd DCA 1991)(Court must assure that husband has funds remaining on which to live.) As for the years 2000 and 2001, Judge Lando makes no "recital of facts" that Respondent had the ability to pay $4,000/month during those years. Simply stated, the Support Contempt Order is devoid of any such "recital of facts" in that regard and hence Judge Lando's conclusion to that end must be examined for a basis in fact prior to its acceptance as a basis for sanctioning Respondent.

-42-

was none. Indeed, as stated above, Respondent's income did not begin to be available to meet such past and future obligations. Hence, Respondent's income cannot be used as a basis for a finding based on the record that he has the "ability to pay"such amounts and thus Respondent did "willfully refuse" to pay a child support obligation as required by Rule 4-8.4(h).[47]

In sum, the Support Contempt Order is facially deficient of both the requisite findings of fact that (i) Respondent had had at all material times the ability to pay the support of $4,000/month and (ii) that he had the ability to pay both the ordered arrearage of $100,000 and the monthly support figure of $4,000 going forward.

## B.    THE NOVEMBER 22, 2002 CONTEMPT ORDER WAS NOT BASED UPON RECORD EVIDENCE

Last, Judge Lando entered on November 22, 2002, the Commitment Order which first concludes by incorporating "those previous factual and legal findings" that Respondent "has wilfully refused to pay any child support . . .".

Then, Judge Lando continues that Respondent has "substantial personal assets,

---

[47]    Alternatively, such a factual finding could be premised upon assets owned by Respondent. Here again, no such finding of assets presently held by Respondent that could be used to pay the past and future support obligations is recited in the order: indeed, the only findings in this regard show a consistent negative net worth of Respondent throughout this matter's long history. Accordingly, Judge Lando must be questioned upon what factual basis she relied upon to determine that Respondent had assets from which he could pay the $100,000 in child support.

-43-

jointly held with his present wife, which are easily liquidated into cash . . . these include sterling silver and art, which could have been sold and have not been. The Court notes that Mr. Sibley has retained private counsel, ordered and paid for court reporters and transcripts, transportation and other litigation costs, including litigation that has been termed frivolous in Federal Court."[48] Plainly, such a conclusion has no basis in the record.

As such, Respondent did <u>not</u> "wilfully refuse to pay child support" in violation of Rule 4-8.4(h).

## IV.    SUBSTANTIVE DUE PROCESS ERRORS – RULE 4-3.1

As for Count II, Complainant claims that as a result of the opinion in *Sibley v. Sibley,* 885 So.2d 980 (Fla. 3rd DCA 2004)( a copy of which is attached to the Complaint) serves as a basis for alleging a violation of Rules 4-3.1 which states "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is **not frivolous**, which includes a good faith argument for an extension, modification, or reversal of existing law."

### A.    RESPONDENT FILED <u>NO</u> FRIVOLOUS MATTERS

---

[48]    This last assertion of "frivolousness" is so patently false as to raise the question of whether indeed Respondent received anything like due process from the courts of this state.

-44-

What is barred is the bringing of a proceeding which is "frivolous". Noteworthy, the Comments to Rule 4-3.1 state in part: "The action is frivolous, however, if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification, or reversal of existing law."

Here, a review of the decision in *Sibley v. Sibley,* 885 So.2d 980 reveals that the word "frivolous" is **never** employed by the court as it relates to Respondent. Indeed, the court on four occasions uses the word "frivolous" in four cited cases to describe the sort of pleading that warrant sanctions. Hence, the failure of the Third District Court of Appeal to describe – as honestly the court could not – Respondent's pleadings as "frivolous", precludes a finding that Respondent violated Rules 4-3.1.

The sum total of facts recited by Judges Cope, Gersten and Green in *Sibley v. Sibley,* 885 So.2d 980 to justify the sanction imposed upon Respondent was grounded in three areas.

First, an un-cited, undated, out of context quote attributed to Respondent in a letter to his former wife.[49]

---

[49]    Besides the lack of notice of utilization of such quote as discussed *infra*, the *ad hominem* attempt by the panel to impute an improper motive to Respondent is irrelevant to considerations here. Regardless of the subjective intent of a litigant in pursuing litigation, it can only be the objective consideration of the frivolousness of the pleadings that must be utilized to determine whether sanctions should be imposed. To hold otherwise opens the door for a court to subjectively impute to a litigant *mala*

Second, after listing Respondent's twenty-five matters filed in this Court, the panel simply concludes – without citation to any of the decisions in those matters – that "the former husband's subsequent pro se proceedings in this court have been found to have no merit. As is shown by this appeal, the former husband has repeatedly tried to re-litigate matters decided in earlier proceedings, without any legitimate basis to do so."[50]

The basis for the denial in every single instance in the Third District was upon a decision on the merits and <u>not</u> a dismissal for lack of jurisdiction or for frivolous filings. Perforce, a review of those twenty-five matters reveals that in all but three of them, the decision of the panels were *per curiam* without written opinion. Hence for this panel to speculate upon the "merits" of those appeals is an *ex post facto* exercise

_____

*fides* and, notwithstanding objectively non-frivolous pleadings, make the determination that such intent justifies barring the courthouse door to a litigant.

[50]   Additionally, Judges Cope, Gersten and Green <u>failed</u> to note that in <u>not</u> one of the twenty-five appeals were sanctions imposed upon Respondent by the various panels under Rules of Florida Appellate Procedure, Rule 9.410 which authorizes the court to "impose sanctions for any violation of these rules, or for the filing of any proceeding, motion, brief, or other paper that is frivolous or in bad faith." *Ipso facto*, none of the twenty-five appellate matters of Respondent were "frivolous or in bad faith". If the judges of this court had any reason to make such a finding in any of Respondent's twenty-five matters, they most certainly would have. This, they never did.

-46-

undertaken towards a conclusion where no conclusion can be made.[51]

As to the second statement – "As is shown by this appeal, the former husband has repeatedly tried to re-litigate matters decided in earlier proceedings, without any legitimate basis to do so" – the panel's conclusory statement is simply wrong.[52]

Finally, the twelve actions in federal court cited by the panel were of no moment in Judges Cope, Gersten and Green's determination of the sanction imposed by them.

In two of them Respondent made significant federal law.[53] Moreover, such

---

[51]   Indeed, as one court has noted, "In rendering the decree for the plaintiff, the chancellor stated that he relied on the *per curiam* decision of *Hoffman v. Drennen*, Fla.1956, 88 So.2d 624. This was a decision without opinion affirming a decree. We are of the view that **such a decision does not establish any point of law; and there is no presumption that the affirmance was on the merits.**" *Schooley v. Judd,* 149 So.2d 587, 590 (Fla.App. 2 Dist. 1963)(Emphasis added).

[52]   In fact, in the panel's decision of November 3, 2004, there is only <u>one</u> reference to an attempt by Respondent to "re-litigate matters decided in earlier proceedings"– the March 4, 2003, order of the circuit court – calling into question this panel's reckless use of the plural "matters" when accuracy demands that the singular "matter" be utilized

[53]   In *Sibley v. Schwartz*, Case No.: 01-3746-Civ-King, *affirmed*, No. 01-16571 (11th Cir. 2001), contrary to Judge King's holding that Defendant Judge Lando enjoyed absolute judicial immunity, the Eleventh Circuit held for the first time in this circuit that "[a]lthough absolute judicial immunity shields state court judges from suits seeking damages for acts taken in their judicial capacity, 'judicial immunity is not a bar to prospective injunctive relief' in 42 U.S.C. § 1983 suits against judicial officers acting in their judicial capacity. *Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984)."

-47-

federal litigation can <u>not</u> serve as the basis for sanctions in Florida State court. Do

so hold would impinge on Respondent's right to access federal courts recognized in

*Donovan v. City of Dallas*, 377 U.S. 408, 413 (1964).[54]   As such, Judges Cope,

Gersten and Green's conclusion that "The former husband has served as an unending

source of vexatious and meritless litigation" is <u>without</u> basis in fact. As such, Judges

Cope, Gersten and Green plainly (i) misstated the facts and (ii) found Respondent's

appeal "meritless"[55] in cases in which they did not sit or of which they had no

---

Additionally, in *Sibley v. Lando*, Case No.: 03-21885-Civ-Huck, *rev.* No. 03-14910 (11th Cir. 2004), the 11th Circuit, **reversed** the dismissal of the lawsuit Respondent brought against Judge Lando for her unlawful imprisonment of him and reinstated the matter holding "For the foregoing reasons we find that the district court (1) erred when it applied the *Rooker-Feldman* doctrine as a jurisdictional bar to Sibley's claims; (2) abused its discretion when it abstained from hearing Sibley's claims under the *Younger* doctrine."

[54]    "Petitioners being properly in the federal court had a right granted by Congress to have the court decide the issues they resented, and to appeal to the Court of Appeals from the District Court's dismissal. They have been punished both for prosecuting their federal-court case and for appealing it. They dismissed their appeal because of threats to punish them more if they did not do so. The legal effect of such a coerced dismissal on their appeal is not now before us, but the propriety of a state court's punishment of a federal-court litigant for pursuing his right to federal-court remedies is. **That right was granted by Congress and cannot be taken away by the State. The Texas courts were without power to take away this federal right by contempt proceedings or otherwise**." (Emphasis added).

[55]    Last, the idea of "mertilessness" as a basis for sanction is both novel and absurd. In in *BE&K Construction Co. v. National Labor Relations Bd.* 536 U.S. 516, 532 (2002), the Court addressed the concept of "merit" stating: "Nor does the text of the First Amendment speak in terms of successful petitioning—it speaks simply of "the right of the people . . . to petition the Government for a redress of grievances."

knowledge.

Plainly, there is no factual basis to sanction Respondent for his legal actions cited by the Florida Third District Court of Appeal.

## V.    CONCLUSION

Delightful as it presumably would be for the Justices of this Court to rid themselves and the State of Florida of Respondent, this Court is simply not authorized to do so in this matter. The mis-handling below by the Florida Bar and Referees, coupled with this Court's failure to intervene though repeatedly requested by Respondent to do so, has resulted in a disciplinary proceeding so divorced from fundamental concepts of due process and the right to confront one's accusers as to prohibit the Justices of this Court from signing any order approving the proceedings below without the Justices of this Court abandoning their oaths of office.

---

Second, even unsuccessful but reasonably based suits advance some First Amendment interests. Like successful suits, unsuccessful suits allow the "'public airing of disputed facts,' . . ., and raise matters of public concern. They also promote the evolution of the law by supporting the development of legal theories that may not gain acceptance the first time around. Moreover, the ability to lawfully prosecute even unsuccessful suits adds legitimacy to the court system as a designated alternative to force. . . .Finally, while baseless suits can be seen as analogous to false statements, that analogy does not directly extend to suits that are unsuccessful but reasonably based. For even if a suit could be seen as a kind of provable statement, the fact that it loses does not mean it is false. At most it means the plaintiff did not meet its burden of proving its truth. That does not mean the defendant has proved—or could prove—the contrary."

-49-

Moreover, even if the procedural flaws could be ignored, the merits of the two counts of the Complaint against Respondent fail under real analysis to stand.  First, Respondent never wilully failed to pay child support as he was unable to do so. Instead, a polluted proceeding was recognized as such by the Third District Court of Appeal which then – to acheive it immunized malicious ends – created an entirely new theory of "ability to pay" by pulling out of thin air the idea that Respondent's Father could be made to pay Respondent's child support obligations.

Second, Respondent's repeated petitioning never crossed the line into frivolousness and as such this Court cannot – without trespassing upon the First Amendment – silence one of the few attorneys in this state who will take on and challenge a judiciary which has permitted the travesty which is the Florida Family Court system to continue its primary profit making purpose in this state as it carelessly destroys families in its wake.

WHEREFORE, rather than being condemned, Respondent should be lauded for his diligent and faithful adherence to the ideal of a lawyer who refuses to allow injustice to cross his path unchallenged.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. Mail this September 8, 2007, upon:

Barnaby L. Min
The Florida Bar
444 Brickell Avenue, Suite M100
Miami, Florida 33131

Kenneth L. Marvin
Director of Lawyer Regulation
The Florida Bar
651 East Jefferson Street
Tallahassee, Florida 32399-2300

Brian D. Burgoon
Designated Reviewer
999 Peachtree Street Northeast
Suite 2300
Atlanta, GA 30309

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this motion complies with the font requirements of Florida Rules of Appellate Procedure, Rule 9.210(a)(2).

**MONTGOMERY BLAIR SIBLEY**
Respondent
50 West Montgomery Avenue
Suite B-4
Rockville, Maryland 20850
Voice/Fax: (202) 478-0371


By:_____
    Montgomery Blair Sibley
    Fla. Bar No.: 725730

-51-

## APPENDIX

A copy of those submissions by Respondent's Ex-Wife's counsel are attached as Exhibit "A" to the Appendix

A copy of the letter from Joanne E. Sargent which demonstrates the hostility and bias of the Third District Court of Appeals in support of that request is attached as Exhibit "B" to the Appendix

A copy of the  March 8, 2007, letter from Barnaby Min is attached as Exhibit "C" to the Appendix

A copy of the March 19, 2007,, letter from Barnaby Min is attached as Exhibit "D" to the Appendix. (Note that the date on the cover letter is wrong).

A copy of that "Notice Setting Final Hearing" is attached to the Appendix as Exhibit "E" to the Appendix.

A copy of that April 10, 2007, letter is attached as Exhibit "F" to the Appendix

A copy of that motion is attached as Exhibit "G" to the Appendix.

A copy of that order is attached as Exhibit "H" to the Appendix.