**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 07-046 (JR)** |
| | : | |
| **v.** | : | |
| | : | |
| **DEBORAH JEANE PALFREY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE**
**IMPEACHMENT EVIDENCE PURSUANT TO FED. R. EVID. 609(b)**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully gives notice, pursuant to Fed. R. Evid. 609(b), of its intent to use a conviction more than 10 years old.  This rule allows use of such evidence, following notice, where "the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances, substantially outweighs its prejudicial effect."

## A.  Factual Summary

1.  In June of 2004, the United States Postal Inspection Service ("USPIS") and the Internal Revenue Service Criminal Investigation Division ("IRS - CID") began a joint investigation into Pamela Martin and Associates.  The defendant owned and operated Pamela Martin and Associates.

2.  On March 1, 2007, a federal grand jury in the District of Columbia returned an indictment against the defendant, charging her with numerous federal violations including RICO, interstate transportation in aid of racketeering, and conspiracy to commit money laundering, along with related forfeiture allegations.  These charges relate, as the Court is aware, to defendant's alleged operation of an interstate prostitution business, Pamela Martin and

Associates, the proceeds of which were sent to defendant through the U.S. mail, from 1993 until approximately August of 2006.

3.  Defendant has a prior felony conviction from June 25, 1992, in the Superior Court of California, County of San Diego, Case Number CR 120385, for pandering.  She received a sentence of eighteen months in prison.

## B.  Discussion

Fed. R. Evid. 609(a) provides, in relevant part, that:

 (a) General rule. – For the purpose of attacking the character for truthfulness of a witness, (1) evidence that a witness . . . has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by . . . imprisonment in excess of one year under the law under which the witness was convicted[.]

Fed. R. Evid. 609(b) provides that:

  (b) Time limit.  Evidence of a conviction under this rule is not admissible if a period of more that ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweigh its prejudicial effect.  However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

In this matter, defendant's prior conviction is more than 10 years old.  Its probative value, however, supported by specific facts and circumstances, substantially outweigh any prejudicial effect of this fifteen-year-old felony conviction.  First, "Rule of Evidence governing admission of prior convictions does not preclude admission of convictions older than ten years, but merely restricts their admissibility; such evidence is admissible if its probative value, supported  by facts and circumstances, substantially outweighs its prejudicial effect."  United

States v. Brown, 956 F.2d 782 (8th Cir. 1992).  In Brown, the court admitted an 18 year-old conviction for burglary.  The Court of Appeals affirmed finding that when the jury is presented with two opposing versions, credibility is "necessarily a critical factor in the jury's choice."  Id at 787. Thus, where the credibility of a witness is crucial to the jury's determination of guilt or innocence, courts have allowed use of convictions much older than 10 years.  United States v. Spero, 625 F.2d 779 (8th Cir. 1980) (22 year-old grand theft conviction in trial allowed in conspiracy to possess unregistered destructive device); United States v. Thomas, 914 F.2d 139 (5th Cir. 1990) (16 year-old conviction for possession with intent to distribute heroin in felon-in-possession trial); United States v. Murray, 751 F.2d 1528 (9th Cir. 1985), cert. denied sub nom. Moore v. United States, 474 U.S. 979 (1985) (17 year-old conviction for receiving stolen property in prosecution for conspiracy to conceal assets in bankruptcy); United States v. Kemper, 503 F.2d 327, 330 (6th Cir. 1974), cert. denied, 419 U.S. 1124 (1975) (court found admissible defendant's prior 30 year-old conviction of transporting a woman in interstate commerce for purposes of prostitution; case, however, decided before enactment of ten-year limit of 609(b)).  See also United States v. Lipscombe, 702 F.2d 1049, 1062 (D.C. Cir. 1983) ("Congress believed that all felonies have some probative value on the issue of credibility").

In this case, defendant has publicly admitted most of what the government has alleged. That is, she ran an escort service in the Washington, D.C., area for thirteen years the proceeds of which were sent by U.S. Mail in the form of money orders to her in California.  Her version, however, is that she was running a legal sexual fantasy business.  The government has alleged that she was knowingly running an illegal prostitution business.  As stated in Brown, when the

jury is presented with two opposing versions, "credibility is necessarily a critical factor in the jury's choice."  956 F.2d at 787.

Second, prior convictions "involving lack of veracity bear greatly on the credibility of a witness."  United States v. Cathey, 591 F.2d 268, 276 (5th Cir. 1979) (crime involving dishonesty more likely to overcome Rule 609(b) presumption).  At the time of defendant's sentencing on her felony pandering conviction, defendant submitted a sentencing memorandum in which she told the court that "[she] will not re-enter the escort service business[.]"  Sentencing Memorandum, filed June 25, 1992, at 29, ¶ 10 (copy attached).  Despite this promise, shortly after defendant was released from her sentence in 1993 she began committing the similar criminal offense in this case, as outlined in the indictment, involving operating another escort service business.  Moreover, her prior conviction is relevant to her veracity as a witness.  See Brown v. United States, 518 A.2d 446, 447 (D.C. 1986) ("[w]e see no rational basis to hold that these enumerated criminal offense do involve 'dishonesty or false statements' within the meaning of § 14-305 and that solicitation of prostitution does not.  Thus, we hold that . . . soliciting for prostitution is an impeachable conviction with the meaning of § 14-305. . . . offenses such as false report to the police and soliciting prostitution which manifestly involve dishonesty or false statements."); Jenkins v. United States, 260 A.2d 677, 678 (D.C. 1970) (defendant's prior conviction for attempted procuring was relevant to issue of defendant's veracity as witness and not unduly prejudicial).  Having committed the criminal offense shortly after her release from prison for a similar offense, defendant should not be allowed to hide from the jury that relevant factor in judging her credibility – that is, her prior felony pandering conviction.

Of course, to significantly lessen the prejudicial effect of admission of evidence of defendant's prior criminal record, the jury will be instructed as to the limited use to which it can put evidence of a prior conviction.  Accordingly, this Court should allow the use of the defendant's prior felony pandering conviction for purposes of impeachment.

## C.  Conclusion

The government hereby submits this notice of its intent to introduce evidence of defendant's prior conviction for purposes of impeachment of her if she testifies at trial.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
DC Bar No. 498610

_/ s / Daniel P. Butler/Catherine K. Connelly_
Daniel P. Butler
DC  Bar No. 417178
Catherine K. Connelly
Mass.  Bar No. 649430
Assistant United States Attorneys
555 4th Street, NW
(202) 353-9431, 616-3384
Washington, D.C.  20530
Daniel.Butler@usdoj.gov
Catherine.Connelly2@usdoj.gov

#-102

1  FRANCIS J. BARDSLEY
   Public Defender
2  County of San Diego
   SUSAN P. CLEMENS
3  Deputy Public Defender
   233 "A" Street, Suite 800
4  San Diego, California 92101
   Telephone: (619) 338-4675
5
   Attorneys for Defendant
6  DEBORAH J. PALFREY

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9             IN AND FOR THE COUNTY OF SAN DIEGO

10

11  THE PEOPLE OF THE STATE OF      )   CASE NO. CR 120385
    CALIFORNIA,                     )
12                                  )
                         Plaintiff, )   SENTENCING MEMORANDUM
13                                  )
    v.                              )
14                                  )
    DEBORAH J. PALFREY,             )
15                                  )   DATE:  JUNE 25, 1992
                         Defendant. )   TIME:  1.45
16  _____)   DEPT:  S-7

17       I, DEBORAH J. PALFREY, prepared this sentencing proposal for

18  the court's consideration.  This proposal is attached and will be

19  in addition to any statement or motion of mitigation prepared by my

20  Attorney, SUSAN P. CLEMENS.

21                          INTRODUCTION

22       I, DEBORAH J. PALFREY, am appearing before the court for

23  sentencing, on 1 Count of Attempted Felony Pimping.

24       I have used the Discovery in this case, as well as unofficial

25  papers and letters to aid in preparation.  No persons were

26  interviewed for this memorandum, as it is virtually impossible to

27  conduct such research from a jail cell.  However, I have used my

28  memory to recollect events to the best of my ability.

F I L E D
Kenneth E. Martone
Clerk of the Superior Ct
JUN 25 1992
By :M. COLAHAN, Deputy

1    I respectfully request that I be granted probation on the
2    terms and conditions the Court deems prudent. The only condition
3    I ask the Court to exclude is mandatory registration as a sex
4    offender.

5    Additionally, it should be noted that the term(s), employer
6    and employee, are used loosely throughout; legal and accounting
7    interpretations should not be utilized.

8                                  **OFFENSE**

9    I admit I knowingly understood that Ms. Liann Rivera would on
10   occasion commit acts of prostitution with various client referrals
11   I, as the owner/manager of "escort service" gave to her. Knowing
12   this, I was clearly wrong to do so. As I explained to the officer
13   who arrested me, I never had any direct knowledge of such activity.
14   Ms. Rivera, like all other employees of the business, were
15   independent agents, who contracted with my company for client
16   referrals. They were free agents capable of doing as they chose.
17   However, common sense would dictate human nature to be a
18   controlling factor, at times, in such situations.

19                               **PRIOR RECORD**

20   I have absolutely no prior criminal history or record,
21   whatsoever; having lived my entire lifetime free of drug/alcohol
22   and/or criminal involvement. I am a "tea tottler" who has never
23   considered the possibility of drugs/intoxicants, as a part of my
24   lifestyle. I, by no means think of myself a prude or a judgmental
25   person, but I have simply never comprehended the sense in such
26   things. I do not gamble, as well. Additionally, I am not an
27   excessive individual, but I believe, a rather balanced one. There
28   is no history of violence or weapons use in my life.

                                        2

<u>DEFENDANT HISTORY</u>

I am 36 years of age. I was born on March 18, 1956, in
Washington County (North Charleroi) Pennsylvania, to Frank and
Blanche E. Johnson Palfrey. I am the older of 2 daughters, my
sister, Roberta Lynn (Bobbie), is 3 years younger. When asked to
describe myself, I have always preferred the seemingly out-of-date
term...honorable. I do not lie to, nor do I (to use jailhouse
slang) "scam" those individuals in my association. If I say
something, it's to be believed. I am a trustworthy and
conscientious woman, who considers living by the Golden Rule, to be
the 1 true law we must all abide. Past times and hobbies in my
life, usually revolved around the home. I love to cook and enjoy
decorating and occasional entertaining. At times, I find myself
simply enjoying the quasi-art form of "piddling around the house."
I am a "cat person," who also enjoys good books and movies, on a
regular basis. I find life to be filled with endless and wonderful
possibilities, too many for 1 person to experience in a singular
lifetime. I am very spiritual in nature.

<u>FAMILY HISTORY</u>

From age 2 thru age 10, my family and I lived in Orlando,
Florida, long before Orlando became what it is today. We lived in
East Orange County, less than a 30 minute drive to Cape Canaveral.
Consequently (to way poetic), I grew up in the sunshine in the days
of Shepard and Glenn and Mercury and Gemini. I was a very happy
child, who experienced a normal and absolutely wonderful childhood.
I have often thought that this time was the happiest of my life.

////

////

3

1 | In late '65, my parents relocated back to Pennsylvania (Pittsburgh
2 | area), where they have since resided and where I completed my basic
3 | education.    In 1974, I returned to Orlando to commence my
4 | adulthood.

5 | My father, Frank Palfrey, age 60, has worked for Fox Grocery
6 | Company, Belle Vernon, Pennsylvania, for the past 27 years. He is
7 | soon to retire. My father can be described as an all-around good
8 | guy (and has been many times.) He adores me, despite the fact I
9 | have often played Gloria to his Archie. My father has had to
10 | endure tremendous personal hardship and loss, since last October.
11 | His mother died unexpectedly on December 21, despite her advanced
12 | age of 83.   He almost lost my mother as well, due to the
13 | development of a life threatening aneurism, in March.    This
14 | resulted directly from the stress my mother experienced over my
15 | incarceration. My father (and mother) just can't comprehend how my
16 | offense could be viewed so harshly. I think they interpret such a
17 | law much akin to how I erroneously did, i.e., for the purpose of
18 | deterring    individuals    (mostly    men)    from    introducing    young
19 | (especially) runaway, juvenile girls and boys into the despair and
20 | hopelessness of street prostitution and drugs. Surprisingly, when
21 | I told my parent's about the type of business I was engaged in last
22 | August, this was their (for me, rather unexpected) response and not
23 | (the somewhat anticipated and judgmental) "but how could you
24 | involve yourself in such a thing?"   I suppose the older one
25 | becomes, the more one realizes what really great people parents
26 | are. My mother, Blanche, 60, a homemaker who is constantly doing
27 | for others, has had alot of difficulty understanding the motive(s)
28 | of the D.A. Mr. William Collins, in the instant concern.    His

4

1 | statement to the <u>Reader</u> at the time of my FTA last summer,
2 | particularly perplexes and upsets her. Mr. Collins stated how much
3 | "fun" it would be to prosecute me once I was picked up.  My
4 | mother's agony here has caused her to almost die because she cannot
5 | bear the thought of me existing as I am.  As she has said many
6 | times, since reading this remark..."Toying with ourlives is not
7 | fun." My parents have severely admonished me many times for my
8 | wrong and have all but threatened (although it's definitely
9 | implied) to disown me if "this sort of thing ever happens again."
10 | They, as well as I, could not bear a repeat performance.
11 | Therefore, there is no intent on my part to re-enter the escort
12 | business and chance such an occurrence.  My parents have stood
13 | solidly behind me throughout this ordeal.  Consequently, this is
14 | the least I owe to them.

15 | **MARITAL**

16 |     I am single with no children nor dependents.  I consider
17 | marriage to be a major responsibility in one's life.  A
18 | responsibility which should not be entered into casually. I do not
19 | believe in multiple marriages.  Thus, I sincerely hope 1 day when
20 | I have married, that my marriage will be a rich and (hopefully)
21 | always growing and life-long commitment.

22 | **EDUCATION**

23 |     I graduated from high school in 1974.  In 1979, I received a
24 | B.A. degree from Rollins College, Winter Park, Florida.  I tried my
25 | hand at first year law school (Western State University, San Diego)
26 | during the Fall of '87/Spring '88.  Doing something I rarely do in
27 | life, i.e. quit, I decided to fold my hand, so to speak, after my
28 | 2nd semester.  This, only after fully comprehending the tremendous

1  amount of time, money and effort I would need to expend, to
2  effectively accomplish such a goal.  In lieu of law school, I
3  enrolled in the Paralegal Program at the University of San Diego
4  (1988) and successfully completed the 9 month curriculum.
5  Additionally, I believe life to be a continuing informal education
6  of sorts.  As my very sage 88 year old (retired school teacher)
7  grandmother once told me, "All college (and maybe even formal
8  education as well) really does for the person is to teach them how
9  to learn..."  Once the mind has been opened, education really
10 begins.  Therefore, it would be fair to say that my education is
11 unfinished and continues as an on-going concern.

12                          **EMPLOYMENT**

13     Upon my release from custody, I wish to develop a brokerage
14 firm, which will broker authentic American Western and Indian art
15 to the United Kingdom.  Conversely, I hope to import into the U.S.
16 British art items which will be of interest to the American market.
17 Last summer, I spent sometime in England and Wales getting a "feel"
18 for my concept.  I have ascertained as a result, that it is
19 definitely a workable one.  Unfortunately, due to my incarceration
20 since such time, I have been unable to continue my research.
21 However, I do not foresee a or any problem, which would ultimately
22 prohibit my idea from being realized.  I anticipate actual
23 operation within the first 6-12 months.  Gross revenue in the 6
24 figure range within 2 years.  I have an excellent eye for quality
25 and an ability to make things happen.  I can only conclude with
26 some time, hard work and a little luck, I will be able to
27 successfully implement and profit from this venture.
28 ////

                                    6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEDICAL HISTORY

I have enjoyed good health throughout my lifetime.  Other than childhood diseases and problems (tonsils, wisdom teeth), I cannot recall being Ill.  I, of course, experience the occasional cold and headache, but nothing else.  I attribute my good health all these years to proper diet, exercise and a positive mental attitude.  Lack of drugs/chemicals, alcohol, and tobacco in my life, only contribute here.

## FINANCIAL

Prior to my failure to appear in August and subsequent detention in October of last year, I had a lifelong history of superb, if not sterling credit.  I had been a homeowner since the age of 21, who never experienced late payments and/or credit problems of any type.  Now, after almost 9 months in custody, I can honestly state, I do not know where I stand financially, except to say that my debts (approx. $20,000) far exceed my assets ($0) at this time.  More than likely, I will be filing for bankruptcy upon my release.  I truly do not have a grasp on my present financial status, as it is absolutely impossible to monitor and manage such a thing from a jail cell (or in my case jail cells, having been moved from 1 facility to another, during my confinement).  I am simply going to have to ascertain the damage once I am released and make the best and most intelligent decision(s) at the time.  My parents however, have offered to lend me the necessary funds to re-establish my life.

////
////
////

7

## OVERVIEW AND INCEPTION OF BUSINESS;

## INCOME AND REVENUE

I started "escort service" as an alternative to working for the agencies already in operation in the greater San Diego area. I was appalled and disgusted at their professional decorum and complete lack of regard and respect for those persons in their employ.   Seedy, lazy and incompetent are some of the kinder adjectives, which could be attributed to describe the way in which these businesses operated.  Most were drug affiliated.  All were indifferent to the welfare of the women.  Early in 1990, I decided to branch out, so to speak, from my solo stance and begin working with one or two, (maybe three at the most) other women who were in the similar positions to mine.   It became readily apparent a balanced reciprocity between these women and myself was not going to manifest.  They quickly became dependent upon my business acumen and organization and my original concept of simultaneous referrals amongst us became a failed attempt, on my part.  I pride myself on being a perfectionist in everything I try and do in life and this was certainly so of my efforts here.  At the time of my arrest on December 28, 1990, I had finally gotten the business up and running after several dips and lulls over the previous months.  The final quarter of 1990 placed our gross earnings in the 100K a year category.  Ironically, for all my hard work and of course, for all the repercussions I have suffered these past 18 months, as a direct result of my arrest and prosecution, my venture into escort mgmt. has been a terrible failure, financially.  What started as a minor expansion of my little one-person enterprise, turned into a small

////

1   business, employing approximately 12 or so individuals at the time

2   the Vice Department terminated our phone lines, January 4, 1991.

3   Greed was never a motivating factor for putting this business

4   together from the onset, now almost 2 1/2 years ago. Instead, it

5   was a combination of 2 factors:

6   Again...1)  I desired to work within the business minus any

7   association with the various disreputable escort services situated

8   within the city and county at the time, and

9   2)  I found myself getting caught up in a situation

10  whereby I was no longer working by and for myself, nor was I

11  working with a few select associates, but instead was operating a

12  full blown escort service, overtime.

13  It has often been commented upon by others that I must surely

14  have been bringing in the "big bucks" by doing what I was doing.

15  "Doing" was defined and perceived by these individuals as nothing.

16  Besides being mildly amused and somewhat annoyed that my 12 hour

17  days, 6-7 days a week were tantamount to nothing in their minds, my

18  response has always been the same to this thinking.  It would have

19  been so much easier had I simply stayed with my 1-woman operation

20  than to have wandered into the management aspect of the industry.

21  Moretarily, at the time of my arrest, I was no better off that if

22  I had stayed where I was.  However, I will say this in all

23  fairness, there is no doubt the income potential was excellent had

24  I not been derailed as I was.  This, especially in light of my

25  perfectionistic approach to business.  Nonetheless, I did not make

26  a fortune running the service.  In fact, I lost everything I made

27  and then some because of my present predicament.

28  ////

1   **ANALYSIS**

2       In retrospect, I feel a true sense of sadness and loss for how

3   things ended.   I cannot reiterate enough, that even though the

4   monetary aspect was promising, her it never was a or the motivating

5   factor for creating and operating "escort service."   "Escort

6   service" was something which I made happen, but let happen.   When

7   it did happen though, I made certain the women who worked for and

8   with me, were treated with the utmost respect as employees and more

9   importantly for me - as women.   Many people depended upon me and I

10  have often felt pangs of guilt for letting them down.   This, I

11  truly regret.   Once more, no financial gain occurred as a result

12  here.

13                  **GENERAL OPERATING PROCEDURE**

14          **DEFENDANT'S ASSOCIATION WITH MS. LIANN RIVERA**

15      Liann Rivera contacted me (like most even other perspective

16  employees) by telephone, inquiring about possible employment as an

17  escort.   The women who called usually found our number in either

18  the yellow pages or the <u>Oceanside Blade Citizen</u> (I routinely ran a

19  help-wanted ad 2-3 times a week.)   If I was not working as the on-

20  duty dispatcher/manager when a call of this type came in, then the

21  message was taken and later passed onto me.   The interview process,

22  which commenced at this point, was the same with each and every

23  woman and this most certainly included Ms. Rivera.   As I recall,

24  Rivera contacted me during the fall of 1990 seeking employment as

25  an escort.   I spoke with her initially by phone and made the usual

26  and standard inquiries of her.   <u>Some of the questions posed during</u>

27  <u>this first phase of the hiring process were</u>:

28  ////

                                10

1.   Can you tell me a little about yourself, i.e. your
     physical description...height, weight, hair/eye color,
     age, general look and so on.

2.   Do you have reliable transportation?

3.   Do you go to school or work another job?

4.   What is your educational background?  Do you enjoy
     reading?  If so, what type of subject material?

5.   What hour would you be available to work?

6.   Do you live with someone (relative, friend, roommate) who
     would have a difficult time adjusting to the irregular
     hours of an escort or to the job itself?

7.   Do you have any experience as an escort?  If so, who have
     you worked for and when?

8.   Do you have any hobbies?  If so, what are they?

9.   Do you have any drug involvement at present or any
     alcohol related problems?

From this list Rivera gave the normal responses to questions
1,2,5,8, and 9.  Regarding questions 3 and 4, she told me she
wanted to work as an escort because she needed the money a job of
this type could pay her in order that she could attend U C Santa
Barbara the following year.  With respect to #7, she claimed to
have no experience in this line of work, but felt it was something
she could do.  To #6, she stated she was moving into an apartment
that very weekend with her sister and her sister was aware of her
intentions here.

Based upon these answers I agreed to meet with her at the
Del Mar McDonalds.  The first face to face interview with a
perspective employee was usually conducted within 1-2 days.

11

1  Thereafter, depending on each parties schedule and was done so for
2  a variety of reasons.  I was always amazed at the superlative
3  descriptions (physical) which were given to me over the phone and
4  what in reality showed up at these meetings.  I was very interested
5  in how a woman groomed and presented herself visually.  I was also
6  interested in how she came across i.e., manners, sophistication,
7  composure, common sense and so on.  With the gals who lived way up
8  in North County (Oceanside, Vista), as Ms. Rivera did, I usually
9  arranged to meet them halfway in Del Mar/Solana Beach area.  As I
10 remember, Rivera was approximately 30 minutes late for our
11 appointment.  In actuality though, she was on time, but did not see
12 me waiting for her on the patio.  After the initial confusion was
13 cleared up and apologies made, we began to talk.  she was a pretty
14 girl who appeared to be shy and a little nervous, but nonetheless
15 determined to obtain the position.  We talked for awhile along the
16 same line was did on the phone.  After I was convinced she was
17 acceptable, I told Liann I would be interested in hiring her,
18 without the necessity of a make-over interview.  We then began to
19 discuss the specifics of the position.  At this juncture, I would
20 express to the girls what was expected of her as a new hire of the
21 service and answer any questions she had.  The points and
22 expectations discussed at this time were approximately as follows:
23      1.  I was a stickler for proper physical appearance and
24 grooming.  I placed great significance on this aspect of the job
25 and made certain the escort always left the interview with a
26 guideline on this subject (copy attached in this section).
27 ////
28 ////

12

1    2.   We talked again about the importance of reliable

2    transportation and scheduling (the girls made their own schedules

3    and were permitted to work (be on-call) as often or as little as

4    they wished.  Each escort called in her individual schedule on

5    Sunday, for the next 7 day period.  The girls were always allowed

6    to take off without notice in times of sickness or emergency.  With

7    notice, 24 hours was required.  Otherwise the schedule remained in

8    tact for the week.

9    3.   School and 2nd jobs/careers were always encouraged (the

10    lax scheduling [supra] was designed in part for this very purpose).

11    I always attempted to allay any fear or concern the escort had in

12    this area, from the onset.

13    4.   I explained to Rivera, that many of our clients were

14    extremely well-educated and sophisticated persons, who expected to

15    be introduced to "like" individuals.  Education, be it formal or

16    informal, was requisite.  It was required of them, as a result, to

17    be well-versed in current events and well-read, generally.  Of

18    course, the entire staff combined could not match the level of

19    accomplishment and/or sophistication of some of the clientele.

20    However, we sincerely tired as much as was realistically possible

21    here.

22    5.   I vehemently opposed the use of drugs and abusive alcohol

23    use, on or off the job.  I made it more than clear to a new

24    employee I had no room in neither my personal nor professional like

25    for those persons involved with intoxicants.  I made it know I

26    wanted sharp, together people around me.  While on an appointment,

27    the escort was absolutely forbidden from even carrying through with

28    it, if drugs were present.  With drugs, I truly practiced zero

13

1   tolerance and would not necessitate to terminate someone if they

2   disobeyed my orders here. Regarding alcohol, she, the escort, was

3   allowed to socially drink at the various functions she attend, but

4   was strictly cautioned about possible DUI repercussions.

5       6.   Basic procedure was covered at this meeting as well.

6          a.   The escort was required to check-in by phone at the

7              beginning of her shift (checking out was optional).

8          b.   When she had a referral, it was expected of her to

9              call   the   client   and   make   all   necessary

10             arrangements, i.e. meeting, time, place, required

11             dress, directions, etc.

12          c.   She was then required to relay this information

13             onto   the   on-duty   dispatcher   along   with   her

14             estimated time of arrival and to check-in within 15

15             minutes of that ETA. After her appointment had

16             concluded, she was expected to check out, in

17             addition. A second check-out call was optional by

18             her, once the escort returned safely home. I, and

19             the other dispatchers made it out business to

20             always keep tabs on the girls while on appointments

21             and log their times in and out, accordingly. <u>Their</u>

22             <u>safety and welfare was of paramount importance to</u>

23             <u>us</u>.

24          7.   I was often hesitant to employ those persons who

25             had   worked   for   other   escort   services,   simply

26             because of the shoddy way in which these services

27             conducted   business   generally   and   specifically

28             because of the way they treated the girls. These

1   services rarely had standards and the people who
2   worked for them (often, but not always) reflected
3   this.   I was continually offended, as a woman
4   myself, by the degrading and demeaning manner in
5   which these organizations behaved toward women.   I
6   did not operate the way they did and I most
7   certainly did not debase and use the girls they way
8   they did, either.   Subsequently, I made it known to
9   a new hire that she need not be disturbed by
10  thoughts of being forced to do things she did not
11  wish to do.    Additionally, I always made it
12  understood to anyone in my employ, that in many
13  respects we were in a partnership of sorts.
14  Someone, of course, had to lead, but other than
15  this rudimentary business truth the escort, for all
16  intents and purposes, dictated her own job
17  description.   For example, the escort controlled:
18  a.   (once again) her own schedule/working hours.
19  b.   Where she would or would not travel to, within
20       and outside the County.
21  c.   Whether or not she would accompany clients on
22       out-of-town business/pleasure trips.
23  d.   What type of function(s) she would attend.
24  e.   Who she would see.  The escort absolutely had
25       the undisputed option to cancel an appointment
26       with a client at anytime before or during the
27       appointment.
28  ////

1   And most assuredly so, if 1) drugs were
2   present or 2) if she felt her safety was in
3   jeopardy.

4        f.   Her income and was responsible for her own
5          taxes.  For tax purposes, she was deemed an
6          independent contractor.

7        g.   Her mobility and was encouraged to lease
8          ($10.00 a month) a pager, for this purpose.

9        k.   Her tenure.  She was free to quit at anytime
10         or ask for a leave of absence; all I asked was
11         reasonable notice.

12  I do not remember Liann inquiring with me that afternoon about
13  the subject of sex.  As previously stated, her demeanor was a bit
14  timid, yet cautious as if she did not wish to say or do anything
15  which would hamper her from obtaining the position.  Nonetheless,
16  I always made certain when meeting the women in person, that I
17  substantiated with each and every one of them, whether or not they
18  could handle the subtleties of the job, not if, but when they
19  arose.  This was done especially for those women new to this type
20  of work, such as Rivera.  The specifics; however, were never
21  discussed, simply assumed.  I did not need to raise such a topic,
22  even in the quasi-fashion I did and consequently, place myself in
23  such apparent legal jeopardy, as I so obviously have here.
24  However, I did so for fear some gal(s), somewhere along the way,
25  would falsely believe all bookings involved elegant cocktail
26  parties/reception and tennis luncheon dates, at the country club.
27  I basically felt a sense of responsibility and obligation to those
28  naive interviewees to at least, clue them in on the fact many

16

1  clients expected more than just a dinner companion for the evening.
2  I did not want it on my conscious that I helped to psychologically
3  damage and scar a person.  (It should be noted, the girls were
4  never asked nor required to participate in any sort of sexual
5  activity.  If they chose not to when the situation presented
6  itself, they were never in danger of losing their jobs if they
7  declined a client's amorous advances.)  During my short association
8  with Liann Rivera (2-4 weeks), she did not ever seem to balk at nor
9  did she indicate any misunderstanding that from time to time sexual
10  favors would be asked of her by various clients.  In fact, I got
11  the distinct impression, she understood the unspoken rules of the
12  game quite well.

13      Liann worked for the service for less than a month, after our
14  one and only meeting that day in Del Mar.  Initially, she was
15  enthusiastic and couldn't wait to get started.  I received very
16  favorable reports from the dispatchers and all appeared to be well
17  from what I could tell.  Then one day, she called to say her father
18  had been involved in a serious car accident in Salt Lake City and
19  that she needed to spend time with him.  She thanked me for giving
20  her the opportunity to work and (I believe, to the best of my
21  recollection) said she would try to get back in touch with me in a
22  month.  I expressed sympathy for her situation and wished her well.
23  I told her before she left to please settle her account with me
24  (the client always paid the escort directly.  She, in turn,
25  reimbursed the agency it's one-time referral fee of $75.00 and the
26  dispatcher's $25.00 commission).  She said she would.  She didn't.
27  She owed $100.00 for her last appointment.  (Even if the escort did
28  not send in the agencies portion of the booking, I nonetheless, had

17

1  to pay the dispatcher from my own pocket for her efforts.)  As time

2  went on and I had not received payment from Liann, I sent her a

3  brief note requesting immediate payment (copy attached in this

4  section).  Somewhere during this period (30 days or so) or after

5  the note was posted, I can't quite remember which, either I or

6  someone at the service eventually spoke with Liann.  She claimed to

7  have sent the money order from Salt Lake several weeks prior and

8  couldn't understand what had happened.  The next contact with her

9  was by phone the morning of the 28th of December, 1990;

10 approximately 2 hours before my home was raided and I was

11 subsequently arrested on the underlying charge.  she stated here

12 t.at she desired her job back and that she wanted to clear up the

13 outstanding amount owed.  I said I was glad to have her back on

14 board and would try to catch up with her later in the day.  The

15 next time I heard the name Liann Rivera, was five days later on

16 January 2, 1991 at felony arraignment.  To this day, there has been

17 no contact with her, whatsoever.  I did hear later that she had

18 purposely left agency correspondence within open view, so that her

19 mother would find it and indeed, her mother did.  It is my

20 understanding that the mother then contacted Oceanside Police

21 Department, who in turn referred her to San Diego Police

22 Department.

23                              ANALYSIS

24      Ms. Liann Rivera was treated exactly the same as any other

25 employee of "escort service"...before, during and after her tenure.

26 Her treatment was one of professional respect and consideration

27 throughout.  She was a free-agent, who was permitted to dictate

28 when she would work, where she would go, and who she would see,

1  during the scope of her employment.  <u>She was never asked, induced,</u>
2  <u>nor forced to do anything she did not want to do</u>.  When she decided
3  to terminate her position, she was allowed to leave freely.  It
4  should be noted that it was Rivers who initiated the association
5  between herself and "escort service" and not the other way around.
6  Additionally, Rivera had total and complete free will/control over
7  her situation, at all times.
8      Therefore, the Defendant respectfully asks the court to
9  consider these factors at sentencing, in favor of probation.
10  * See this section for examples of weekly employee newsletters.
11              <u>DEFENDANT'S ACCEPTANCE</u>
12              <u>OF RESPONSIBILITY</u>
13      <u>I accept full and complete responsibility for my criminal act</u>
14  <u>i the instant concern.  My acceptance is singular and is shared</u>
15  <u>with no one.  I should all culpability</u>.  Even though I can say I
16  never had actual direct knowledge of prostitution and prostitution
17  related activity involving Ms. Rivera and a particular client(s),
18  I can say however, that <u>I assumed such activity occurred</u>.
19  According to Ms. Rivera's own testimony at the preliminary hearing,
20  criminal acts of this kind happened infrequently.  Nonetheless,
21  <u>assuming as I did, a certain amount of responsibility subsequently</u>
22  <u>was tacitly placed on me to police and eliminate</u> (to the best of my
23  ability) <u>this activity</u>.  Be it frequent or infrequent.  I should
24  not have looked the other way as I did.  Consequently, had I only
25  been more adamant here, I would not have lost everything in my
26  life, as I have.  My family, as well, would have been spared the
27  tremendous grief and suffering they have been forced to endure.
28  Additionally, those other individuals in my employ would not have

1 | been placed in like positions to mine; i.e., immediate loss of
2 | employment/income, police questioning, embarrassment and so I truly
2 | regret my inaction and ask the court for it's forgiveness.

4 | **INTRODUCTION - DEFENDANT'S LETTER TO THE COURT**

5 | **AUGUST 30, 1991; DATE JURY TRIAL WAS TO BEGIN**

6 | The following s an accurately duplicated copy of the letter
7 | read into the court record on 8-30-91. The only alteration being
8 | that certain points and passages have been high-lighted. This has
9 | been incorporated here for easier reading.

10 | **UPDATE - DEFENDANT'S LETTER TO THE COURT**

11 | **AUGUST 30, 1991; DATE JURY TRIAL WAS TO BEGIN**

12 | <u>The statement was read into the court record on August 30,</u>
13 | <u>1991</u>. Subsequently, a no-bail felony bench warrant was issued. In
14 | order to clarify matters, it should be <u>understood by the reader,</u>
15 | <u>that several factors were in operation at the time which are either</u>
16 | <u>implied or not stated at all</u>.

17 | <u>My fear of Detective Sergeant Harvey Kitchell, was real and</u>
18 | <u>continues to this day</u>. It has been primarily <u>based upon</u>
19 | <u>information obtained</u> (to use the colloquial) <u>"from the streets."</u>
20 | No investigation, to the best of my knowledge, was ever commenced.
21 | However, as of this writing, I am attempting to file former
22 | grievance with the Internal Affairs Division of the San Diego
23 | Police Department.

24 | <u>The status of my health (both physical and emotional) was</u>
25 | <u>placed in grave jeopardy last summer as a direct consequence of the</u>
26 | <u>criminal charges</u>. Due to a bacterial infection of both corneas, <u>I</u>
27 | <u>was within hours of losing total and complete vision in each eye</u>.
28 | Additionally, <u>I firmly believe I had a nervous breakdown</u> toward the

1  end.. I was incapable of functioning in an orderly and rational

2  manner. My frame of mind was scattered and disoriented. I awoke

3  each morning with no plans nor objective for the day. My vision

4  problem(s) was caused by improper hygiene (re: contact lens)

5  directly resulting from an indifferent attitude toward such detail

6  in my life.

7       My family tried to help, but there was very little they could

8  realistically do for me. They were as perplexed as I, regarding

9  events.  This, especially in view of the fact I had tried to

10  reasonably plea this case from the outset. I did not wish for this

11  to be a long and drawn-out matter. The irony to all this, is that

12  I am currently pleaing to the exact charge (1 count of attempted

13  pimping and pandering) I had proposed to the People in late

14  July/early August of last year.  (It needed to be noted here, all

15  the prosecution's witnesses who were available for testimony last

16  August, (were and) are also available at this time.  The State's

17  ability "to put on 11 P case, does not appear to have been hampered

18  by the time gap.)  It must be explained, as well, prior Defense

19  Counsel behaved indifferently at best, unethically at worst, in the

20  instant concern.  While the Prosecution pushed forward with it's

21  case from inception, my Attorney, Patrick Briggs, considered the

22  matter to be an inconsequential one, capable of being quickly pled.

23  This, despite the prosecution's unwillingness to do so and the

24  unusual circumstances surrounding my case - most notably the

25  $500,000.00 bail amount and the fabricated charge of extortion (a

26  charge, I intend to prove as having been wholly false and thus,

27  clear my name of even the most tacit implication.) Also, despite

28  numerous attempts on my part for Briggs, "to do something"...he

21

1  wouldn't.  Present Defense Counsel, Sue Clemens, can attest to the

2  fact, that the discovery given to her (March '92), was in a Prima

3  Facie state, absent of a or any investigation report and/or

4  evidence of any attempt, whatsoever, to challenge the prosecution

5  case.  Doing absolutely nothing for me, other than waiting to go to

6  trial, I felt I had no choice, but to find alternative counsel to

7  Briggs, last June.  Subsequently, I retained Frank Puglia.  In my

8  opinion, I went from bad to worse, here.  Briggs was lazy and

9  indifferent; however, Puglia was simply incompetent.  Within a very

10 short time, I got the distinct impression, Puglia, just didn't know

11 what to do with a case like mine.  He too, did nothing to advocate

12 my position; i.e., interview witnesses, view/listen to physical

13      e and so on.  In retrospect, had I the hard working

14      ted and competent counsel, such as I presently have in Sue

15 Clemens, I am certain I would not have panicked and subsequently

16 FTA'd as I did.  As I have said many times since last summer (and

17 during that awful period), the thought of going to trial with a

18 prima facie case, absolutely terrified me.

19      Regarding my mental health...my Viet Nam-like flashbacks were

20 professionally confirmed as having been induced by sudden,

21 unexpected trauma.  I haven't had one of these episodes for quite

22 sometime, but I nonetheless continue to experience disturbing

23 nightmares, on a regular basis.  Prior to my legal difficulties, I

24 rarely, if ever, had bad dreams.

25 ////

26 ////

27 ////

28 ////

**FAILURE TO APPEAR**

**SUBSEQUENT EVENTS TO DATE**

1
2
3      .I was taken into custody on October 14, 1991, at the Raymond
4  Port of Entry Montana. This within 6 weeks of my failure to appear
5  in San Diego, on August 30, I was immediately deposited into the
6  local jail (Plentywood, Montana) to await extradition. Within 4
7  days, on 10-18, a federal grand jury indicted me on 2 felony
8  counts, 1.) Failure to report & 2) Making a false statement. These
9  charges resulted from an error I had made on a custom's declaration
10  form, when detained at the border. I was transported three weeks
11  later, via a 2 day stay on a filthy Souix Indian Reservation, to
12  Billings for arraignment. Three months later on January 27th, I
13  stood trial and was exonerated on count 1. The jury hung on count
14  2), 9-3 in favor of acquittal. However, this charge was
15  immediately dismissed the following day. I was then returned to
16  Plentywood to await extradition, once more. Subsequently, a
17  Montana State District Court Judge ordered San Diego to retrieve me
18  within a 7 day period or else the State of Montana would release
19  me. San Diego Marshal came for me on the 6th day, 23rd hour. At
20  this point, I was transferred to the jail in Williston, North
21  Dakota, where I spent the night. The following morning I was flown
22  from Williston to San Diego (via Billings and Salt Lake City)
23  groomed something akin to a homeless person. Later that day I was
24  booked into Las Colinas Women's Detention Facility where, I have
25  since been housed.
26  ////
27  ////
28  ////

23

1    Initially w/o counsel, my parents intervened on my behalf, in
2    the federal matter. A custom's official (arresting agency) told my
3    parents, he had been in constant contact with the detective in
4    charge, in San Diego and I quote stated, "That when (they customs)
5    were done w/me, (they) were going to let San Diego come & finish me
6    off." My parents, each 60 years of age & in poor health couldn't
7    comprehend the treatment they were shown by this official, in this
8    latest hellish chapter. As a direct result of the stress suffered,
9    my mother developed an aneurism, the size of a baseball, in her
10   stomach area.  The physician in charge said, she was "A walking
11   time bomb" & w/o emergency surgery, her prognosis was terminal. At
12   first, my parents faced what was happening to me (or, so it
13   appeared) in a composed & together fashion, but later as time went
14   on, they fell apart. My mother later told me, that my father often
15   sat in his chair in the living room, staring blankly into space &
16   was caught by a fellow employee crying in the rest room at work,
17   over events.  Conversely, I initially threw the towel in, so to
18   speak, & gave up all hope. I wouldn't eat for the 1st two weeks in
19   custody & seriously considered suicide (by starvation), as a viable
20   option.  The events of the previous 10 months had taken their toll
21   & I truly felt I just couldn't take anymore. Yet, for some unknown
22   and unexplainable reason, a reason I cannot verbally express,
23   something inside of me stopped this from happening, despite the
24   fact I was mentally & emotionally spent.  Consequently to date, I
25   have purposely put myself on a "Human Cruise Control of Sorts" -
26   not permitting feeling of any kind.  This, I have discovered is the
27   only way I can make it day to day.  Upon my return to San Diego,
28   not trusting (liking) defense attorneys, I briefly made the effort

1   to represent myself.  During this time, Wm. Collins & I (at my
2   request), had a chambers conference, w/Judge Link, in late
3   February.  Judge Link attempted to conciliate a compromise, between
4   the 2 parties.   Additionally, both my mother & father wrote
5   separate letters, to Mr. Collins, pleading for the same, but to no
6   avail.   The prosecution refused any attempt at conciliation,
7   stating its best offer remained at...plea to 1 count of felony
8   pimping, mid-term lid.  I refused.  I then permitted Judge Link to
9   appoint Sue Clemens, as defense counsel.

10      I cannot tell in words how much I wanted & truly tried to
11  resolve my legal responsibilities, here in San Diego, but
12  fairly...allowing the punishment to fit the crime.  Nonetheless,
13  for whatever reason, this one or the reasons discussed in the
14  previous sections, the fact remained I chose not to appear for
15  trial, last August 30.  Subsequently causing inconvenience for
16  many, I'm sure.  However, it should be noted in all fairness, that
17  was the 1st court appearance I failed to attend.  In the matter,
18  having always commuted from the Bay Area, each & every time before.

19                              **ANALYSIS**

20      In my (and others) opinion, my federal problems in Montana,
21  resulted directly from my local problems here in San Diego.  I was
22  made to appear by the San Diego authorities as a major felon "on
23  the run".  Subsequently, I feel this was the trigger for the
24  federal charges (in combination w/the fact I had w/me, last October
25  14, the proceeds from the sale of my home.)  After all, I was told
26  shortly after arraignment that if I would forfeit the money to the
27  government they, the government, would in turn let me go, i.e.,
28  plea to a lesser offense, no prison time, etc.  My parents & I were

1  stupefied at this pejorative twist to events.  As a result, each of
2  us, in our own individual ways, did not cope well, either
3  physically nor emotionally.  However, all 3 of us continue to this
4  day to try & resolve this matter & win for me, my freedom.  The FTA
5  was a foolish & wrong act predicated upon desperation.  It
6  accomplished nothing, but to make matters even worse than they
7  already were.

8       Attached (defendant's letter to the court, August 30, 1991,
9  te, jury trial was to begin.)  Find a copy of my handwriting,
10 from August of 91.  This sample comes from the (enclosed) letter to
11 the court, dated 8-30-91.  Compare this example to my present
12 penmanship, exhibited throughout this memorandum.  The sample from
13 last year is sloppy & loose, when likened to the present 1.
14 Penmanship is often considered an indicator of an individual's
15 personality & emotional make-up.  If this is accepted as valid, I
16 offer this writing sample, in support of my fragile mind set, at
17 the time.

18                    ELIMINATION OF CONDITION
19                 TO REGISTER AS SEX OFFENDER
20       At sentencing, the court is to consider whether or not to
21 impose upon the defendant, the condition that she be required to
22 report to her agency of residence & register as a sex offender,
23 upon release, from custody.  I implore the court not to make said
24 registration as a sex offender a condition, of either probation or
25 parole, in the instant concern.  I will be starting a new life, all
26 intents and purposes, in the San Francisco Bay Area once I have
27 been granted my freedom.  From my present vantage point, I
28 realistically believe I could reside in the vicinity, for the

1 | remainder of my life. In addition, I wish to base & operate my art
2 | brokerage company, from the area. Not only would registration of
3 | this type be the ultimate in humiliation for me but it could &
4 | would gravely jeopardize all which I am about to undertake, as
5 | well, if this fact became known in the professional & social
6 | circles I will be traveling in. My life, as I knew it before my
7 | arrest & prosecution, no longer exists. Consequently, I will, for
8 | the most part be starting all over again. This feat alone will be
9 | difficult enough to accomplish, w/o the added burden/ complication
10 | of being a registered sex offender in the community I will be
11 | living & working in. After all, people will hear the term "sex
12 | offender & conclude the worst, i.e. that I am a child molester.
13 | Therefore, I respectfully request the court to take these factors
14 | into consideration, at sentencing & deny the people's request,
15 | registration as a sex offender be made a condition of probation or
16 | parole. Please, do not impede my ability to start anew.

17 |     * Additionally, I would like to court to be aware of the false
18 | statements the prosecuting attorney, Mr. Wm. Collins, has peppered
19 | throughout these legal proceedings, from inception to the present.
20 | Collins regularly lies about and assumes certain facts regarding me
21 | & then openly states these falsehood as trump, in court. For
22 | example, at a motions hearing in April, Collins, groping for some
23 | derogatory remark to make about me (I can think of no other
24 | rational explanation) blatantly declared that I had been "running
25 | loose around the county for the previous 7 months. I sat in court
26 | that morning incredulous! Collins has been made aware of my
27 | detention since I was taken into custody, last October & has known
28 | of my whereabouts, all along. In another example, Collins stated

27

1    the only reason I terminated, both Patrick Briggs & Frank Puglia,
2    as defense counsel was because each told me I was going to prison.
3    Not only is this absolutely untrue (see pages 43 & 44) but Wm.
4    Collins, was not, nor is he at present privy to such privileged
5    information between either opposing counsel & me.   Therefore, I
6    hope when the court, entertains arguments from the prosecution at
7    sentencing, Mr. Collins ability to fabricate false date in the
8    instant concern, is taken into account.

9                            **FACTORS ARGUING IN**

10                           **FAVOR OF PROBATION**

11   1).  I voluntarily admit wrongdoing, in the instant case.  I should
12   not have looked away as I did, knowing that criminal prostitution
       was occurring.

14   2).  I tried from the outset, at the time of my arrest to accept
15   responsibility for my offense, but within reason.  Conversely, the
16   prosecutor, Mr. Wm. Collins, chose to strictly pursue the matter,
17   publicly stating the "fun" he would have prosecuting me.

18   3).  I have no prior criminal history nor record, whatsoever.

19   4).  I have no history of drug, chemical and/or alcohol use/abuse,
20   whatsoever.

21   5).  There is no history of violence and/or weapons violation, in
22   my life.

23   6).  I have managed to live my life absent criminal activity, for
24   36 years not, and will continue doing so upon release, this w/o the
25   necessity for further punishment.

26   7).  I am not a criminal.  I do not think like a criminal, nor do
27   I have the mind set of one.

28   ////

                                    28

8). I am not prison material. I do not "fit in" & am considered an anomaly, by fellow inmates even in jail.

9). I am willing to abide by & satisfy all conditions of probation, imposed by the court.

10). I will not re-enter the escort service business, instead...

11). I anxiously wish to begin work, within the art industry, w/o additional delay.

12.) My parents have suffered tremendously as a direct consequence of my confinement, the past 9 months. The stress induced, caused my mother to almost die, from a life-threatening aneurism, in March. My release from custody, would go a long way to speed her recovery.

13). For me, the stress has caused a breakdown, thoughts of suicide & Viet Nam -like flashbacks.

14). There was no financial gain from my association w/ "escort service". Any monies earned were lost to fees/expenses, for my legal defender.

15.) Greed was never a factor in establishing "Escort Service". The motivation was a drug-free, professional environment, from which to work.

16.) The women in my employ were free agents, who always had the ability to do as they wished. They were treated w/respect & consideration, at all times.

17.) The business was sophisticated only in the sense that whatever I encounter, I lend (or so I would like to think) a certain amount of sophistication to, i.e., this was not a criminally sophisticated operation orchestrated by a criminal mind.

////

29

1  18.) My failure to appear in August, was not an act of
2  irresponsibility, but one of fear & confusion & poor defense
3  counsel.
4  19.) I am not a danger to society.
5  20.) Keeping me in custody for any additional period of time,
6  serves no further purpose other than continued punishment.
7  21.) I have suffered enough.

8                              CONCLUSION

9        For the past 18 months, there has been a continued &
10 relentless prosecution & punishment of me, in the instant concern,
11 from the outlandish $500,000 bail to the present attempt to
12 imprison me.    For what reason(s), I do not understand &
13 consequently, to this day I remain perplexed, despite a willingness
14 to accept responsibility for my actions, from the outset of my
15 arrest-forward.    I have never (until now) been afforded the
16 reasonable "break" nor "chance" most others seem to be given (in my
17 category or otherwise) for a first time offense.  Instead, I have
18 been treated w/rigid harshness by the prosecution, to the
19 bewilderment & confusion, of many. As a direct result, my family
20 & I have suffered enormously.
21      No one in my life would say what I did was right.  It was
22 wrong.  It was against the law.  I should never have operated
23 "Escort Service" knowing that some of the proceeds were derived
24 from illegal sexual activity w/o having done something to
25 police/eliminate such conduct from occurring.  Therefore, I do not
26 argue that arrest & punishment were wrong.    However, the
27 "relativeness" of the concept, punishment is where the prosecuting
28 attorney, Mr. Wm. Collins & I differ.  To date, I believe I have

1  been more than sufficiently punished.  To list my suffering as
2  cathartic an exercise as this might be, would be far too lengthy &
3  involved a process, for both the writer & the reader.  Ergo, I will
4  not.  Nonetheless, I will state this.  I cannot believe justice
5  would permit continued custody & subsequent denial of liberty, in
6  the present case.  The imbalance of the offense whether 1 wishes to
7  consider the FTA or not) to the punishment already experienced, is
8  a greatly lopsided one as it stands, for further confinement to be
9  decreed.  A lack of willingness on my part, to police prostitution
10 activity amongst sophisticated adult women & sophisticated adult
11 men (something I quite honestly never could have controlled, had I
12 tried) within my business, absolutely pales when compared to the
13 near death of my mother truly the worst & most salient punishment
14 I have been forced to endure, thus far.  Additionally, I cannot
15 believe the court wishes the continued destruction & deterioration
16 of my family & myself, by implementation of state prison.
17 (Something, I can assure the court will happen if such is ordered.)
18 I sincerely pray instead that the court understands how rueful, I
19 am for my criminal act & desire never to do the same again, if only
20 given the opportunity.  No further punishment is necessary.  The
21 lesson has been learned,
22     In conclusion, I therefore, respectfully request the court to
23 seriously consider the content contained within this memorandum, in
24 favor of a grant of probation.
25
26
27
28