UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                PLAINTIFF,

vs.

DEBORAH JEANE PALFREY,

                DEFENDANT.

_____/

CRIMINAL CASE NUMBER: 07-046-JR

**DEFENDANT'S OPPOSITION TO
GOVERNMENT'S OMNIBUS MOTION TO
QUASH SUBPOENAS AND
MOTION FOR RECONSIDERATION**

Defendant Deborah Jeane Palfrey, by and through her undersigned counsel, opposes the
Government's Omnibus Motion to Quash Subpoenas Issued Pursuant to Defendant's *Ex Parte*
Application and Motion for Reconsideration of the Court's November 13, 2007, Memorandum
Opinion Granting In Part the Application and states:

## I.  BACKGROUND

On October 28, 2007, pursuant to the Due Process Clause of the Fifth Amendment, the
Compulsory Process Clause of the Sixth Amendment, and Federal Rules of Criminal Procedure Rule
17, Defendant filed her "*Ex Parte* Application for Issuance of Subpoenas and Payment of Costs and
Fees." ("*Ex Parte* Application").

That *Ex Parte* Application sought issuance and service of *ex-parte*, pre-trial subpoenas *duces
tecum* returnable to Defendant's counsel's law office from seven categories of individuals or entities:

(i) Verizon and Cellular Telephone Companies[1], (ii) Metro-D.C. Vice Squads[2], (iii) Federal

---

[1]      AT&T Mobility, Sprint Nextel, T-Mobile USA, Verizon Wireless and Alltel.

[2]      1. Metropolitan Police Department of the District of Columbia, 2. Maryland State
Police, 3. Anne Arundel County Police Department,  4.Anne Arundel County Sheriff's Office,
5.Baltimore County Police Department,  6. Baltimore County Sheriff's Office, 7. Howard County

Agencies[3], (iv) ABC News and Larry Flynt Productions, Inc., (v) H&R Block, (vi) Messrs. Tobias, Vitter, and Ullman and (vii) the Internal Revenue Service (for copies of Defendant's tax records and Form 1099s issued to each of the escorts of the service).

Importantly, for each category, Defendant proffered evidence sufficient to meet the requirement that such subpoenas be relevant, admissible, and specific as required by *United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006)(adopting the standard set out by *United States v. Nixon*, 418 U.S. 683, 700 (1974)).

Concurrently, Defendant moved pursuant to LCrR 49.1(h) for an order sealing her *Ex Parte* Application from the government and public view and for grounds in support thereof stated:

> To disclose to the government or the public Defendant's request for *Ex Parte* Application for Issuance of Subpoenas and Payment of Costs and Fees would disclose Defendant's trial strategy to her detriment and violate Rule 17(b). In so much as this Court has recognized the inappropriateness of allowing the Defendant to "preview the government's theories or evidence", [D.E. #89, p. 35], the same respect should be accorded to the Defendant's theories or evidence.

On November 13, 2007, Judge Kessler – who had lived with this case since its inception –

---

Police Department, 8. Howard County Sheriff's Department,  9. Montgomery County Police Department, 10. Prince George's County Police Department, 12. Prince George's County Sheriff's Department, 13. Baltimore Police Department,  14. Arlington County Police Department, 15. Arlington County Sheriff's Office,  16. Fairfax County Police Department, 17. Fairfax County Sheriff's Office,  18. Prince George County Sheriff's Office, and 19. Alexandria City Police Department.

[3]        1. Federal Bureau of Investigation,  2. Department of State - Diplomatic Security Service, 3. Internal Revenue Service Criminal Investigations Division, 4. United States Postal Inspection Service, 5. Office of the Director of National Intelligence, 6. Central Intelligence Agency, 7. Defense Intelligence Agency, 8. National Security Agency, 9. United States Department of State - Bureau of Intelligence and Research.

granted both motions.

On November 20, 2007, the National Security Agency was served by the U.S. Marshal's Service with one of the subpoena *duces tecum* issued by Judge Kessler.[4]    Curiously, eight (8) days later on November 28, 2007, this matter was transferred from Judge Kessler to Judge Robinson by Judge Huvelle in her capacity as Chair of the Calendar Committee.[5]  A copy of that transfer order is attached.

Pursuant to Rule 17(a), Defendant's counsel had issued in blank trial subpoenas by the Clerk for the first of the two trial dates set by Judge Kessler – February 19, 2008.  On November 29, 2007, Defendant properly served the Records Custodian of the White House with a trial subpoena *duces tecum* for a variety of documents relevant to Defendant's defense of political and selective prosecution.

---

[4]    Subsequently, according to the U.S. Marshal's Service, thirty-nine (39) subpoenas were served.  Apparently continuing a pattern of believing they are beyond the reach of the law, both the Central Intelligence Agency and the Defense Intelligence Agency refused to accept service of the subpoenas by the U.S. Marshal's Service.

[5]    This transfer was apparently made without any granted authority found in the Local Rules which require: (i) random assignment of cases (LCvR 40.3(a)), (ii) that all proceedings in a case after its assignment shall be conducted by the judge to whom the case is assigned ( (LCvR 40.3(f)) and (iii) limits the Calendar Committee to determine and indicate by order the frequency with which each judge's name shall appear in each designated deck to effectuate an even distribution of cases among the active judges. (LCrR 57.10(a)(1)).

Notably here, after inquiry by Defendant's counsel and two journalists, the Clerk was unable to produce any documentation related to the transfer of this Case other than the order of November 28, 2007, thereby ruling out: (i) a LCrR 57.13(a) "Transfers by Consent" or (ii) a LCrR 57.13(c) transfer pursuant to LCrR 45.1 considerations – either of which should have produced memorandum documenting the basis for the transfer to avoid – if only for the sake of appearances – the *vitiation* of the random assignment system. *Accord*: *Cruz v. Abbate*, 812 F.2d 571, 574 (9th Cir. 1987)(While parties do not have a due process right to the random assignment of cases, a judge may not assign a case in order to affect its outcome.)

On December 13, 2007, two (2) days before the return date on the subpoenas, the government filed its "Omnibus Motion to Quash Subpoenas Issued Pursuant to Defendant's *Ex Parte* Application and Motion for Reconsideration of the Court's November 13, 2007, Memorandum Opinion Granting In Part the Application" ("Omnibus Motion").

In the Omnibus Motion, the government requests that this Court:

> (i)    reconsider Judge Kessler's order granting Defendant's *Ex Parte* Application;
>
> (ii)    quash the Judge Kessler-issued subpoenas to the IRS - CID and USPIS as an "abuse of the Court's legal process" by Judge Kessler;
>
> (iii)    quash the remaining federal agencies, local law enforcement agencies, and the three individuals' subpoenas as "unreasonable, unduly burdensome and oppressive"; and
>
> (iv)    quash the trial subpoena served upon the White House as it seeks information that is neither relevant nor admissible and provides for an inappropriate return date.

For the reasons stated *infra*, each of these requests must be <u>denied</u> and Defendant accorded her Sixth Amendment right "to have compulsory process for obtaining witnesses in [her] favor".

## II.    JUDGE KESSLER'S ORDERS SHOULD NOT BE DISTURBED

" Under the doctrine of the law of the case, courts generally will not revisit issues that have already been adjudicated." *U.S. v. Perry*, 111 F.3d 963 (D.C. Cir. 1997).

Here, Judge Kessler has already adjudicated Defendant's "*Ex Parte* Application for Issuance of Subpoenas" after due consideration of the reasons advance by Defendant in support of that *Ex Parte* Application. Moreover, this adjudication was done by Judge Kessler who enjoyed a broad understanding of the various issues in this matter, its extensive history and the resident equities as

a result. Plainly put, Judge Kessler's enjoyed a perspective this Court cannot quickly match absent a full understanding of the two hundred plus (200+) pleadings and the four related civil matters.

Thus, the government's assertion that Defendant has not produce a "scintilla of evidence"[6] was made <u>without</u> knowledge of exactly what Defendant <u>did</u> proffer to Judge Kessler as Defendant's application was made *ex parte* as expressly permitted by Rule 17.

Accordingly, it would be *unseemly* for this Court – particularly given the curious timing and lack of documentation for the reassignment of this matter – to re-visit Judge Kessler's determination as to the sufficiency of Defendant's "*Ex Parte* Application for Issuance of Subpoenas" as the government specifically requests.

## III.    DEFENDANT'S *EX PARTE* REQUEST WAS APPROPRIATE

Regrettably assuming that this Court would engage in second-guessing Judge Kessler – thereby raising an "appearance of bias"[7] if the Court over-ruled Judge Kessler's orders – Defendant is forced to address the government's arguments.

First, the law of *ex parte*, pre-trial subpoena *duces tecum* is <u>*not*</u> as settled as the government argues. Some courts have extended the express authority in Rule 17(b) to permit the *ex parte* issuance of trial subpoenas *duces tecum* under Rule 17(c). See: *United States v. Hang*, 75 F.3d 1275, 1282 (8th Cir. 1996)("Consequently, we conclude that an indigent defendant may, pursuant to Rule

---

[6]    "To date, defendant has provided not a scintilla of evidence to support a good faith belief that the NSA is in possession of any material that is relevant and admissible under the Rule 17(c) standards. Given the broad description of materials sought by defendant, this appears to be merely a fishing expedition"

[7]    *Peters v. Kiff*, 407 U.S. 493, 502 (1972)("Moreover, even if there is no showing of actual bias in the tribunal, this Court has held that due process is denied by circumstances that create the likelihood or the appearance of bias").

17(c), make an *ex parte* request to the district court for issuance of a subpoena *duces tecum*. See 2 Wright, *supra,* § 272 (2d ed. 1982 & Supp.1995) ("A district court seems clearly right in construing Rule 17(b) as applying to a subpoena duces tecum as well as to a subpoena to testify."). This result, which is supported by principles of fundamental fairness and equality, is consistent with the objectives of the 1966 amendments to Rule 17."); *United States v. Jenkins*, 895 F.Supp. 1389, 1395-97 (D. Hawaii 1995) (finding that *ex parte* procedure applies to indigents' applications for subpoenas duces tecum).

The compelling logic of these holdings is best stated in *United States v. Florack*, 838 F.Supp. 77, 79 (W.D.N.Y.1993):

> The word "also" suggests that the subpoena described above, that is in Rule 17(a) and Rule 17(b), in addition to requiring the person to attend, may also require that person to produce books, records, and documents. Therefore, Rule 17(c) should be interpreted in accordance with the provisions of Rule 17(a) and (b).... It is, o[f] course, true that Rule 17(c) does not specifically discuss a process for obtaining [document] subpoenas by an *ex parte* application. It is also true, however, that the section does not describe any process for obtaining the subpoena. Nothing in Rule 17(c) suggests that the initial application should be any different from the application for a subpoena which does not happen to require that the subpoenaed witness produce documents.

Moreover, there is <u>no</u> question that exculpatory evidence in the possession of third parties is subject to a subpoena *duces tecum. See e.g. United States v. Cuthbertson*, 651 F2d 189, 195 (3rd Cir.), *cert denied*, 454 US 1056 (1981). "A subpoena duces tecum is the vehicle for securing production of documents and things at a specified time and place either before or after the time of trial." *United States v. Beckford*, 964 F.Supp 1010, 1017 (E.D. Va. 1997). Documents may be produced at court proceedings other than trials. 2 Wright, *Federal Practice and Procedure: Criminal*

2d § 271 at 134 ("[Rule 17] is not limited to subpoena for the trial. A subpoena may be issued for a preliminary examination, a grand jury investigation, a deposition, for determination of an issue of fact raised by a pretrial motion, or for post-trial motions.").

Second, what could be more disingenuous than the government arguing that "most significant, however, is that to allow pretrial inspection of documents on an *ex parte* basis would be completely inconsistent with the Rule's provision for simultaneous inspection by the opposing party." Does Defendant enjoy the right to inspect the government's documents obtained by its *ex parte* grand jury subpoenas? Obviously not. "Although the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded . . . it does speak to the balance of forces between the accused and his accuser." *Wardius v. Oregon*, 412 U.S. 470, 474 (1973). Here, those balancing of forces speaks directly to the need for the Defendant to have access to information that the government does <u>not</u> have. Indeed, for over forty years indigent defendants have <u>not</u> had to disclose defense strategy in order to subpoena witnesses and documents:

> Prior to the 1966 amendment to Rule 17(b), for an indigent defendant to secure at government expense the issuance of a subpoena the defendant was required to make a motion supported by an affidavit, stating; the name and address of the witness, the testimony expected to be elicited from the witness, and the materiality of the witness' testimony. This procedure was not conducted ex parte, and consequently, while the government and wealthy defendants were able to have subpoenas issued in blank, indigent defendants were required to disclose their defense theory to the government. Recognizing that requiring an indigent defendant to disclose his defense strategy to his government adversary may be constitutionally objectionable, Rule 17(b) was amended in 1966. "That amendment removed the constitutionally objectionable procedure from the provisions of Rule 17(b) ... and substituted the constitutionally unobjectionable procedure of permitting such disclosure to be made to the court ex parte. Thus, since 1966 indigent defendants, in requesting the issuance of a subpoena and the payment of witness

7

> expenses, need reveal their defense theory only to an impartial court
> **and not to their government adversary**.

*United States v. Gaddis,* 891 F.3d 152, 154 (7 Cir. 1989).

Practically speaking, this case will turn on the testimony of witnesses whom the Defendant can <u>only</u> identify through documentary discovery and the proof resident in this documents.   The government has already obtained statements under the duress of the threat of criminal prosecution from a number of witnesses and coerced such testimony from others only under a grant of immunity. Moreover, Judge Kessler has already recognized the inappropriateness of allowing the Defendant to "preview the government's theories or evidence", [D.E. #89, p. 35].

Yet now, the government argues its should have the right to "preview the [Defendant]'s theories or evidence".  Plainly, this tilts the already grossly uneven field of play in federal criminal law to the point of absurdity.  Moreover, to reveal the documents Defendant obtains through the subpoenas *duces tecum* would upset the mandatory balance between state and individual. Constitutional law manifests a vital legal tradition of ensuring a level playing field between the government and defendant in a criminal case. The Supreme Court long ago recognized that impartiality in criminal cases requires that "[b]etween [the accused] and the state the scales are to be evenly held." *Hayes v. Missouri*, 120 U.S. 68, 70 (1887). Such a policy dates back to the Bill of Rights, which was "designed to level the playing field between the defendant and the state," Susan Bandes, *Empathy, Narrative, and Victim Impact Statements*, 63 U. Chi. L.Rev. 361, 402 (1996).

Finally, even if the government's arguments that Rule 17 does not contemplate the *ex parte*, pre-trial subpoenas *duces tecum* that Judge Kessler has authorized, a higher, and controlling, authority does.  Importantly, Defendant sought those subpoenas not only under Rule17, but also the

Fifth and Sixth Amendment to the Constitution. It is axiomatic that any conflict between Rule 17 and Defendant's Constitutional rights must be resolved against Rule 17.

Even though the Sixth Amendment speaks only of the right to compel the production of witnesses, rather than documents, it has been long and repeatedly held that "this constitutional mandate extends to documentary as well as oral evidence." *United States v. Schneiderman*, 106 F.Supp. 731, 735 (S.D.Cal.1952), *aff'd sub nom.*, *Yates v. United States*, 225 F.2d 146 (9th Cir. 1955). *See also, Myers v. Frye*, 401 F.2d 18, 21 (7th Cir. 1968); *United States v. Burr*, 25 Fed.Cas. p. 187 (No. 14,694) (CCD Va.1807).   Hence, Defendant's has two rights: (i) to execute her trial strategy without advance notice to the government and (ii) compel production of documents for her defense. To adopt the government position of forcing Defendant to reveal the documents obtained *ex parte* would obliterate those rights.

Simply stated, the government cannot have its cake and eat it too without doing violence to Fifth and Sixth Amendment guarantees.

## III.    THE IRS - CID AND USPIS SUBPOENAS WERE <u>NOT</u> AN "ABUSE OF THE COURT'S LEGAL PROCESS"

The government argues in relation to the IRS-CID and USPIS subpoenas that such subpoenas violate the "the Jencks Act and *Roviaro v. United States*, 353 U.S. 53, 62 (1957)".[8]   This characterization seeks to mis-state the scope of the subpoenas to find law favorable to the government to premise its objects to the subpoenas.

What Judge Kessler authorized in the subpoenas was as follows: "Defendant is entitled to

---

[8]    The government's ancillary argument – the October 18, 2007, order of Judge Kessler prohibits these subpoenas – is simply inane as Judge Kessler knew perfectly well what she was doing when she issued the November 13, 2007, order authorizing the subject subpoenas. Accordingly, the government's Rule 16 estoppel argument must fail.

records relating to the investigation of Jeane Palfrey and Pamela Martin & Associates that are in the custody of the [IRS-CID and USPIS]."  (November 13, 2007, Order, p. 8).  This determination was made after Judge Kessler had the benefit of Defendant's *ex parte* "highly specific showing" of the relevancy, admissibility, and specificity.

Hence, the subpoenas of the IRS-CID and USPIS were properly issued and should not be quashed by this Court.

## IV.   THE OTHER AUTHORIZED SUBPOENAS WERE <u>NOT</u> "UNREASONABLE, UNDULY BURDENSOME AND OPPRESSIVE"

As to the other subpoenas, the government argues that : "the defendant has improperly used a Rule 17 subpoena as a discovery device. Further, the defendant has not complied with the fundamental requirements of Rule 17 because she has failed to make any showing of relevancy and materiality."

What the government continues to ignore is that Defendant <u>has</u> made that showing, albeit *ex parte*, but that Judge Kessler determined that the government was <u>not</u> to be privy to that showing as it would unfairly reveal Defendant's tactics, witnesses and defense theories.  Hence, that argument is moot.

Of course, what the government <u>fails</u> to do in its Omnibus Motion is discharge <u>its</u> burden to convince the Court that the subpoenas are in fact "unreasonable, unduly burdensome and oppressive".  Indeed, the government proffers <u>no</u> evidence as to the actual burden complying with the subpoena will cause.  The "burden of proving that a subpoena is oppressive is on the party moving to quash." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C.Cir.1984). Whether a burdensome subpoena is reasonable "must be determined according to the facts of the

10

case," such as the party's need for the documents and the nature and importance of the litigation." *Id*. at 407. *Compare*: *Linder v. Department of Defense*, 133 F.3d 17, 24 (D.C. Cir. 1998) ("The FBI submitted an affidavit estimating that the additional search would require up to 2142 person-hours.)

Moreover, while the government attempts to raise the "law enforcement privilege" as a bar to compliance with the subpoenas, the Omnibus Motion is *incompetent* for failing to make the slightest factual showing of how responding to the subpoenas would implicate the privilege. While the government's citation to *In re Sealed Case*, 856 F.2d 268, 272 (D.C. Cir. 1988) is accurate on the law, it <u>fails</u> the evidentiary burden that case imposed on the government.

Notably, in *In re Sealed Case*, "The Commission further explained that disclosure of the information would jeopardize on-going investigations by prematurely revealing facts and investigatory materials to potential subjects of those investigations. *Id*. at 120. In support of this contention, **the SEC submitted a lengthy declaration detailing the effect disclosure would have on its ongoing Wall Street investigation**. Declaration of John H. Sturc, Associate Director of the SEC Division of Enforcement, August 20, 1987, App. 73, 85-6. In view of appellant's broadly-worded deposition questions, the SEC has asserted the privilege with sufficient specificity and particularity." *Id.*. at 272.

Here, the government has <u>failed</u> to submit such an affidavit detailing why the privilege should be recognized. Moreover, by failing to submit such evidence, the Defendant is precluded from arguing counter-facts to overcome the qualified law enforcement privilege. "The public interest in non-disclosure must be balanced against the need of a particular litigant for access to the privileged information." *Id*. at 272.

Simply stated, the government has failed to meet its burden and it is <u>not</u> this Court's job to

backstop the United States Attorney's office in its prosecution failures.

## V.     THE WHITE HOUSE SUBPOENA WAS PROPER

Defendant recognizes that, if challenged by the recipient of a subpoena, in order to meet her initial burden to sustain the issuance of the trial subpoena *duces tecum*, she must proffered evidence sufficient to meet the requirement that such a subpoena be relevant, admissible, and specific as required by *United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006)(adopting the standard set out by *United States v. Nixon*, 418 U.S. 683, 700 (1974)).   Second, the government's <u>sole</u> objection to the subpoena is that Defendant may not offer such evidence at her trial in her defense.   Notably, the government on behalf of the White House does <u>not</u> raise a single issue as to the subpoena being "unreasonable, unduly burdensome and oppressive", thereby <u>waiving</u> those claims completely.

### A.     THE DEFENDANT HAS MET HER BURDEN

To the end of demonstrating that the White House subpoena was  "relevant, admissible, and specific", Defendant states that she has learned from a reliable, independently credited, confidential source that the highest levels of the White House administration were involved in the decision to pursue a search warrant of Defendant's home in October 2006, a few short weeks before the national elections in November 2006 and subsequently prosecute her.   That source's credibility is confirmed by the fact that his/her sealed testimony was taken by the U.S. Congress committee investigating political prosecutions by the Bush Department of Justice.   In particular, the confidential source had related that there is good reason to believe that were telephone conference calls and emails between Karl Rove and Department of Justice employees including, but not limited to Monica Goodling and Mary Beth Buchanan, relating to the desirability of obtaining the proverbial "black book" of Defendant's escort service before the November 2006 elections.

This assertion is supported by circumstantial evidence of such behavior by the Bush Administration as demonstrated by the chronology of relevant events detailed in the Appendix to this Opposition. That chronology, accompanied by the House Judiciary Subcommittees on Crime, Terrorism and Homeland Security and Commercial and Administrative Law Chairman John Conyers's statement made after the Committee held hearings concerning "Allegations of Selective Prosecution: The Erosion of Public Confidence in Our Federal Justice System" also contained in the Appendix hereto, confirms that the Constitutionally-prohibited politicization of the Department of Justice is <u>now</u> simply beyond dispute.

Thus, if true, and the documentary evidence reportedly residing upon White House email servers and records which are the subject of pending litigation to prevent erasure of those emails and records[9], Defendant would have a valid defense to the prosecution of her. As such, Defendant has discharged her burden to demonstrate that the evidence that she seeks from the White House is "relevant, admissible, and specific".

### B.      THE COURT <u>CANNOT</u> EXCLUDE DEFENDANT'S EVIDENCE OF POLITICAL PROSECUTION FROM THE JURY

Clearly, the Bush Department of Justice is desperate <u>not</u> to allow Defendant to surface the truth of the unprecedented and peculiar prosecution of her – as the only one of eighty-three (83) escort services operating in the Metro-DC area. Notwithstanding the modern case law cited by the government for the assertion that a judge can usurp the jury's province to determine both the law and the facts, the Sixth Amendment holds otherwise. Accordingly, Defendant has the right – and intends upon pain of contempt of court – to raise the defense of political prosecution in her defense.

---

[9]      <u>White House Ordered to Keep E-Mails With Suits Pending Over Missing Messages, Judge Issues Directive on Backup Tapes</u>. Washington Post, November 13, 2007; Page A04.

While Defendant will more fully detail her objection to the government's attempt to deny to Defendant the right to gather and present evidence of her political prosecution in her Opposition to the government's motion in Limine to that end, certain points are made here also.

As to the government's citations, they are both distinguishable and inapposite. In *United States v. Abboud*, 438 F.3d 554, 579-80 (6th Cir.), this issue was one of waiver, not the validity of a selective prosecution defense, though in non-binding *dicta*, the Court did address that issue. "Here, Defendants did not make a 12(b)(1) motion based on selective prosecution before trial and thus waived the issue. Therefore, the district court did not err in preventing Defendants from presenting evidence of this waived defense at trial." *Id.* at 579. Likewise, in *United States v. Renan*, 103 F.3d 1072,1082 (2nd Cir. 1997), the issue was a claim that the defendant has been called "before the grand jury solely to elicit perjured testimony" as a "perjury trap" by the government. *Id*. at 1082. Here, Defendant has made the Rule 12(b)(1) motion and a "perjury trap" is not at issue.

However directly on point is *United States v. Armstrong*, 517 U.S. 456 (1996) where the Court stated:

> Of course, a prosecutor's discretion is "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979). One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment*, Bolling v. Sharpe*, 347 U.S. 497, 500(1954), is that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler v. Boles*, 368 U.S. 448, 456 (1962). A defendant may demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive" that the system of prosecution amounts to "a practical denial" of equal protection of the law. *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

Clearly, the Sixth Amendment secures: "In all criminal prosecutions, the accused shall enjoy

14

the right to a speedy and public trial, by an impartial jury . . .".  Hence, the phrase "trial by an

impartial jury" had a specific meaning when grafted onto the Constitution.

That meaning was not mis-understood at the time of its writing.  In *Stettinius v. United*

*States*, Federal Case No. 13,387 (C.Ct. D.C. 1839), the Court exhaustively considered the question

of whether the Jury decided questions of law such as political prosecution.  In concluding that the

Jury, and *not* the Judge was the ultimate arbiter of both the facts and the law, the Court noted:

- "The objection to the judge's giving any instruction to the jury as to the law seems to be founded upon the idea that the jurors are the sole judges of the law, and are under no obligation to respect the decisions of the judge upon the questions of law arising in a criminal cause."

- "In the trial of the impeachment of Judge Chase, Mr. Randolph, one of the managers of the prosecution, in speaking of this right of juries to decide the law, calls it "their undeniable right of deciding upon the law as well as the fact necessarily involved in a general verdict."

- "The court generally hear the counsel at large on the law; and they are permitted to address the jury on the law and the fact; after which the counsel for the state concludes. The court then states the evidence to the jury, and their opinion of the law, ***but leaves the decision of both law and fact to the jury***."

- "In Croswell's Case, 3 Johns. Cas. 346, the counsel for the defendant admitted it "to be the duty of the court to direct the jury as to the law; and it is advisable for the jury, in most cases, to receive the law from the court, and in all cases they ought to pay respectful attention to the opinion of the court; but it is also their duty to exercise their judgments upon the law as well as the fact; and if they have a clear conviction that the law is different from what it is stated to be by the court, the jury are bound, in such cases, by the superior obligations of conscience, to follow their own convictions."

- "And in the opinion which the court had prepared in the Case of John Fries [Case No. 5,126], they said: "It is the duty of the court, in all criminal cases, to state to the jury their opinion of the law

15

arising on the facts; but the jury are to decide in this, and in all criminal cases, both the law and the facts, on their consideration of the whole case."

● "But, in practice, it is allowed in the courts of England, and of some of these states; and it is upon this ground, namely, that as the jury may find a conclusive general verdict in favor of the defendant, upon the general issue, which involves both law and fact, they have a right to hear from the defendant, or his counsel, the defendant's construction of the law, and his reasons for such construction."

Thus, notwithstanding the recent usurpation of the courts to take away from the jury their "right" to determine both facts and law, the Sixth Amendment drafters fully understood that the phrase "trial by an impartial jury" included a jury determining both the law and the facts.

In addition, almost from the beginning of the jury in England, juries have been engaged in "nullification" where the jury exercises its discretion "in favor of a defendant whom the jury nonetheless believes to have committed the act with which he is charged." Thomas Andrew Green, Verdict According to Conscience: Perspective on the English Criminal Trial Jury, 1200-1800 (1985) at pp 200-264. "Jury nullification occurs when guilt is established but the jury decides to acquit on its own sense of fairness, propriety, prejudice, or any other sentiment or concern," Randall Kennedy, *Race, Crime and the Law*, 1997.

In summary, jury nullification refers to a rendering of a not guilty verdict by a trail jury, effectively disagreeing with the instructions given by the judge concerning what the law is, or whether such law is applicable to the case, taking into account all of the evidence presented. It is for this reason that Thomas Jefferson in a letter to Tomas Paine in 1789, stated, "I consider the trial by jury as the only anchor yet imagined by man by which a government can be held to the principles of its constitution."

16

The first landmark decisions since the adoption of the U.S. Constitution which confirmed the right of the defense in a criminal case to not have the bench make a decision on motions until all legal arguments had been made by both sides before the jury, was in this Circuit in *United States v. Fenwick*, 25 F. Cas. 1062; 4 Cranch C.C. 675 (1836); and, 22 F. Cas. 1322; 5 Cranch C.C. 573 (1839)("In criminal cases, the jury has a right to give a general verdict, and, in doing so, must, of necessity, decide upon the law as well as upon the facts of the case.")

Later the Fourth Circuit in *U.S. v. Moylan*, 417 F 2d 1002, 1006 (1969) affirmed the right of jury nullification, stated:

> We recognize, as appellants urge, the undisputed power of the jury to acquit, even if its verdict is contrary to the law as given by the judge, and contrary to the evidence. This is a power that must exist as long as we adhere to the general verdict in criminal cases, for the courts cannot search the minds of the jurors to find the basis upon which they judge. If the jury feels that the law under which the defendant is accused, is unjust, or that exigent circumstances justified the actions of the accused, or for any reason which appeals to their logic or passion, the jury has the power to acquit, and the courts must abide by that decision.

In *United States v. Dougherty*, 473 F.2d 1113 (D.C. Cir. 1972), the court issued a ruling similar to *Moylan* that affirmed the *de facto* power of a jury to nullify the law, stating: "The existence of an unreviewable and unreversible power in the jury, to acquit in disregard of the instructions on the law given by the trial judge, has for many years co-existed with legal practice and precedent upholding instructions to the jury that they are required to follow the instructions of the court on all matters of law. . . .The jury knows well enough that its prerogative is not limited to the choices articulated in the formal instructions of the court . . .The totality of input generally convey adequately enough the idea of prerogative, of freedom in an occasional case to depart from what the judge says."

17

*Id*. at 1132-1135.  Furthermore, then-chief judge David L. Bazelon argued that the jury should be instructed about their power to render the verdict according to their conscience if the law was unjust. He wrote that refusal to allow the jury to be instructed constitutes a "deliberate lack of candor".  *Id*. at 1132.

The question then is given that the jury has the power to nullify, should they not be given information of government's prosecutorial misconduct, and be told of the juries power?

In Clay S. Conrar's 1998 book, *Jury Nullification: The Evolution of a Doctrine*, he defines jury nullification a the way that jurors in a criminal trials have the right to refuse to convict if they believe that a conviction would be unjust in some way.

The instant action is a case where the Defendant must be permitted to present evidence of political prosecution to the jury and the  jury advised by the Court of its power if not duty to nullify, not only because there an abuse of a bad law, but to a valid claim of selective and/or political prosecution.  See David C. Brody, Sparf and Dougherty Revisited: *Why the Court Should Instruct the Jury of its Nullification Right*, 33 Am. Crim.L.Rev. 89 (1995).

Hence, as indubitably a politically-motivated prosecution violates equal protection of the law guarantees, Defendant has the right to (i) compel evidence to prove this defense and (ii) argue to the Jury this law in her defense.

To hold otherwise would be to reduce the Jury to a mere fact finder which was never the contemplation of the framers of the Sixth Amendment.

### C.    THE GOVERNMENT'S POSITION AFFORDS DEFENDANT A RIGHT WITHOUT A REMEDY

To credit the government's position, Defendant has the right to be free of politically-

motivated prosecution, but has no right to obtain evidence to demonstrate of such politically-motivated prosecution. Even if the Court alone was allowed the sole ability to judge both the facts and the law merits of such a factually intensive question, depriving the Defendant the means – through subpoenas – to obtain that evidence affords to Defendant a right <u>without</u> a remedy to secure that right.

As such, Defendant's subpoena of the White House must be permitted to stand if only to allow access to information to present this Court that her prosecution is politically-motivated and thus prohibited by the Constitution.

## V.    CONCLUSION

For the reasons aforesaid, the Omnibus Motion must be denied, a new date for the subpoenas returns set and the government ordered forthwith to respond.

### CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served pursuant to CM/ECF upon Daniel Pearce Butler, Catherine K. Connelly and William Rakestraw Cowden, Assistant United States Attorneys, Criminal Division, 555 4th St., N.W., Room 4818, Washington, D.C. 20530 this December 28, 2007.

> **MONTGOMERY BLAIR SIBLEY**
> Counsel for Defendant
> 1629 K Street, Suite 300
> Washington, D.C. 20006
> 202-508-3699
> 202-478-0371 Fax
>
> By:  /s/ Montgomery Blair Sibley
>         Montgomery Blair Sibley
>         D.C. Bar #464488

**APPENDIX**

**CASE CHRONOLOGY**

| | |
|---|---|
| June 2004 | Joint Investigation by US Postal Inspection Service and IRS Criminal Investigation Division commences of Defendant. (Couvillion Affidavit, ¶12). |
| Early 2005 | Thomas M. DiBiagio forced out as U.S. Attorney for Maryland because of political pressure stemming from his public corruption investigations involving associates of the state's governor, a Republican.  (N.Y. Times, March 5, 2007) |
| January 2006 | Brandi Britton, a former escort with Defendant's service, arrested in Maryland for running an escort service from her home.  (Baltimore Sun, January 30, 2007, attached hereto). |
| August 2006 | Defendant closes Escort Service. (Amended Civil Forfeiture Complaint, ¶9). |
| September 10, 2006 | Jeffrey Taylor appointed U.S. Attorney for the District of Columbia.  Prior to the appointment, Mr. Taylor Serve as senior advisor to Attorneys General John D. Ashcroft and Alberto R Gonzales on national security, terrorism, criminal law, and death penalty matters. Oversee Department law enforcement operations conducted by U.S. Attorneys, the Criminal Division, the Office of Intelligence Policy and Review, the Federal Bureau of Investigation, and the Drug Enforcement Administration, Represent the Attorney General in interagency deliberations led by the National Security and Homeland Security Councils.  Additionally, advised Chairman Orrin G. Hatch and Republican majority on criminal law, terrorism, and national security issues. Drafted provisions of the "Civil Asset Forfeiture Reform Act" and the "USA PATRIOT Act." (Resume of Jeffrey Taylor, attached hereto). |
| September 29, 2006 | Jeffrey Taylor sworn-in as U.S. Attorney for the District of Columbia. Seizure Warrant for Defendant's Bank Accounts issued by D.C. District Court. |
| October 4, 2006 | Search Warrant Executed on Defendant's home. |
| January 29, 2007 | Brandi Britton found dead, an apparent suicide one week before her trial is to commence.  (Baltimore Sun, January 30, 2007). |

**POLITICAL PROSECUTION BACKGROUND**

On October 22, 2007, the House Judiciary Subcommittees on Crime, Terrorism and

Homeland Security and Commercial and Administrative Law held hearings concerning "Allegations of Selective Prosecution: The Erosion of Public Confidence in Our Federal Justice System."

At the hearing, former Attorney General Dick Thornburgh testified that he believes the Department of Justice sought to prosecute a Pennsylvania Democrat for political reasons.

Upon the conclusion of Mr. Thornburgh's testimony and after receiving other evidence, the Judiciary Committee Chairman John Conyers made the following statement:

> Today we heard compelling testimony from a Republican former Attorney General of the United States **describing his deep concern that the Department of Justice has misused its prosecutorial power for political reasons**. We also heard a former U.S. attorney recount disturbing facts suggesting that **DoJ officials may have overridden the judgments of local career prosecutors for political reasons**. Witnesses described investigators who seem to have targeted individuals to find crimes, rather than investigating the crimes initially. **And we heard mention of numerous cases from Wisconsin to Mississippi and elsewhere, where individuals have stepped forward to present facts giving rise to fears that justice itself has been compromised - for political reasons**. Behind it all, we heard **data from a Ph.D. professor showing a massive disparity in investigations and prosecutions of Democrats over Republicans during the Bush Administration** . . . We have learned that U.S. Attorneys were ranked by high level Department of Justice officials on their political loyalty. We have learned that White House officials, including Karl Rove and even the President himself, passed criticisms of U.S. Attorneys to the Department, including criticisms from local political operatives. And we know that **the Administration changed longstanding policies so that hundreds of White House officials were free to speak about criminal cases to dozens of Department managers**. With those facts on the table, the Committee finds itself compelled to take a serious look at the serious charges of selective and **politically-based prosecution that have been made, not just in the cases we will hear about today, but in numerous cases across the country** . . . All people in this country must be able to trust that criminal prosecutions are based on an unbiased prosecutor's estimation of the strength of the evidence and the application of the law, and not on someone's political portfolio. (Emphasis added).

Additionally, among the other evidence presented at the hearing was a statistic analysis prepared by Donald Shields and John Cragan, two professors of communication studying the prosecution patterns of this administration. Shields and Cagan compiled a database of investigations and/or indictments of candidates and elected officials by U.S. attorneys since the Bush administration came to power. Their study entitled *The Political Profiling of Elected Democratic Officials: When Rhetorical Vision Participation Runs Amok* examined 375 cases and found that 10 involved independents, 67 involved Republicans, and 298 involved Democrats. The authors opine that the main source of this partisan tilt was the huge disparity in investigations of local politicians, in which *Democrats were seven times as likely as Republicans to face Justice Department scrutiny*.

Defendant's escort service – which serviced the powerful of Washington's elite for over thirteen (13) years – presented a double edge sword to the Bush Department of Justice. To pursue her meant potentially embarrassing a large stable of Republican who had been clients. To allow her to close her business  was a risk the Bush Department of Justice simply couldn't afford. Moreover, the temptation to seize the "black book" and then have embarrassing details of Democrats which could prove useful to an increasingly desperate Republican party immediately before fateful elections was a temptation the Bush Department of Justice simply could not resist.

This matter which could have been prosecuted in June 2004 but wasn't until October 2006, finds its genesis <u>not</u> in legitimate prosecutorial restrain, but in a Department of Justice which has been perverted to (i) persecution of political enemies and (ii) protection of friends of the Bush Administration.

22