# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 07-046 (JR)** |
| | : | |
| **v.** | : | |
| | : | |
| **DEBORAH JEANE PALFREY,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S REPLY TO DEFENDANT'S NOTICE REGARDING THE STATUS OF DISCLOSURE OF JENCKS, BRADY, AND GIGLIO MATERIAL AND OPPOSITION TO DEFENDANT'S MOTION TO STRIKE EXPERT TESTIMONY (DKT. NO. 278)

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this reply to defendant's notice regarding the status of disclosure of Jencks, Brady, and Giglio material[1] and opposition to defendant's motion to strike. As discussed below, defendant's motion to strike a proposed expert witness' testimony is without merit and should be denied.

## A. Background

In June of 2004, the United States Postal Inspection Service and the Internal Revenue Service Criminal Investigation Division began a joint investigation into Pamela Martin and Associates. The defendant owned and operated Pamela Martin and Associates.

On March 1, 2007, a federal grand jury in the District of Columbia returned an indictment against defendant charging her with numerous federal violations, including RICO, interstate transportation in aid of racketeering, and conspiracy to commit money laundering, along with related forfeiture allegations. These charges relate, as the Court is aware, to defendant's alleged operation

---

[1] On March 24, 2008, the defendant filed a motion for production of all outstanding Jencks, Brady, and Giglio materials. Dkt. No. 283. On March 26, 2008, the government responded to that motion, and in its response addressed defendant's claims regarding the status of disclosure of Jencks, Brady, and Giglio material. Dkt. No. 286.

of an interstate prostitution business, Pamela Martin and Associates, the proceeds of which were sent to defendant through the U.S. mail.

## B.  Discussion

**1.    Sufficient expert notice was provided in a timely fashion.**

In her motion, the defendant argues that the government has failed to provide sufficient discovery pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), regarding the anticipated testimony of Los Angeles Police Detective Keith Haight.  Specifically, the defendant argues that the government "has yet to provide a written summary detailing specifically what Detective Haight would offer an opinion about, what that opinion would be, and the bases for his opinion."  Dkt. No. 278 at 6-7.  Because the government provided adequate notice and an adequate summary of the anticipated expert testimony in this case, the defendant's motion lacks merit.  Accordingly, the defendant's motion should be denied.

Trial in this matter is set for April 7, 2008.  In a May 24, 2007 letter, the government advised the defense that "[t]he government may call an expert witness at trial to testify about prostitution and the business of escort services."  On March 2, 2008, the government provided notice to the defense identifying this expert as Detective Haight.  This notice advised the defense that Detective Haight has testified as an expert on escort services/outcall prostitution rings approximately 20 times in state court, and that Detective Haight has testified as an expert in federal court on the subject of street-level prostitution.  The notice stated that Detective Haight would testify as to how escort services and out-call prostitution rings are run, including the tactics and language used by individuals involved in the business to hide its true nature.  The notice also included Detective Haight's two page *curriculum vitae*, which outlines Detective Haight's thirty-four year career in law enforcement, education, training (including courses taught on prostitution- related investigations),

2

and awards he has received for his work in prostitution enforcement. By letter dated March 5, 2008, the defendant asserted that the government's notice did not comply with Federal Rule of Criminal Procedure 16(a)(1)(G), and requested a list of cases in which Detective Haight has testified as an expert, as well as information about the nature of Detective Haight's testimony in those cases. On March 12, 2008, the government responded by letter, citing two published California cases which reference Detective Haight's expert testimony,[2] and advising the defense that the government would, upon receipt, provide a declaration prepared by Detective Haight. On March 18, 2008, defendant filed the instant motion to strike.

On March 19, 2008, the government provided the defense with a declaration completed by Detective Haight.[3] This declaration provides in great detail Detective Haight's qualifications and the bases for his opinions. Specifically, the declaration notes that Detective Haight has been actively involved in over 2000 prostitution-related investigations, was the lead detective in approximately 500 prostitution-related investigations, has interviewed over 1000 prostitutes, has interviewed or taken statements from approximately 50 "madams," has been qualified as an expert in state court approximately 50 times on the subjects of prostitution, pimping, and pandering, and has been qualified as an expert in federal court three times on street prostitution.

---

[2]  The government's March 12, 2008 letter cited People v. Brandon, 145 Cal. App. 4th 1002, 52 Cal Rptr. 3d 427, 439 (2006), remanded for other reasons, 169 P.3d 96 (2007), in which the court found "Detective Haight had extensive training and experience as a vice officer. He had worked in that capacity since 1988. Detective Haight had spoken to thousands of prostitutes and hundreds of pimps. He was familiar with . . . escort services . . . ." The March 12, 2008 letter also cited People v. Gibson, 90 Cal. App. 4th 371, 379, 382, 108 Cal. Rptr. 809 (2001), in which Detective Haight "testified that manuscripts were consistent with a pimping and pandering operation" and defendant "was acting as a madam."

[3]  A copy of Detective Haight's declaration was provided to the Court at the March 19, 2008 status hearing, and is attached hereto as Exhibit A.

Under Federal Rule of Criminal Procedure 16(a)(1)(G), the government must, "[a]t the defendant's request, . . . give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . .  The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G).  The purpose of this rule is "'to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'"  United States v. Wells, 211 F.3d 988, 996 (6th Cir. 2000) (quoting Fed. R. Crim. P. 16 Advisory Committee's Notes to 1993 Amendment).

Here, consistent with Rule 16(a)(1)(G), the government has provided the defendant with an adequate written summary that describes the expert opinion, "the bases and reasons for those opinions, and the witnesses' qualifications."  Moreover the area of expertise for which the government intends to call its expert witness does not involve new or novel theories.  As such, any defense need to challenge the reliability of the specific expert testimony can be satisfied when the parties conduct *voir dire* of the proposed expert prior to the admission of any expert opinions.

Rule 16 does not contain any explicit timing requirements, and indeed, defendant's motion provides no caselaw or statute to support her claim that the government's disclosure was untimely. In fact, the caselaw on this issue establishes just the opposite.  See United States v. Pirro, 76 F. Supp. 2d 478, 488 (S.D.N.Y. 1999) (ordering expert witness disclosure fifteen days before trial); United States v. Petty, 175 F.3d 1017 (4th Cir. 1999) (unpublished) (finding notice was adequate and not prejudicial where expert notice was given five days prior to testimony).  In the instant case, the defendant has been on notice for over ten months that the government was considering calling an

4

expert witness, and the witness was identified over one month prior to trial. Certainly the defense has had ample time to prepare its cross-examination of Detective Haight, particularly given that Detective Haight's testimony does not involve complicated scientific or financial information.

**2.    Expert testimony is necessary in this case.**

Although the defendant's motion did not oppose the expert testimony based on the subject matter of the government's proposed expert, the Court indicated at a status hearing on March 19, 2008, that it required additional information justifying the need for expert testimony. In response, the government offers the following.

"[C]ourts focus on the Federal Rules of Evidence and the purpose for which the evidence is offered: whether it is designed improperly to illuminate the defendant's character or propensity to engage in criminal activity, *or whether instead it seeks to aid the jury in understanding a pattern of behavior beyond its ken*." United States v. Long, 328 F.3d 655, 666 (D.C. Cir. 2003) (emphasis added) (citations omitted). "Thus, experts may testify regarding the modus operandi of a certain category of criminals where those criminals' behavior is not ordinarily familiar to the average layperson, as in the case of the modus operandi of persons involved in illegal drug trafficking or prostitution." Id.; see also United States v. Anderson, 851 F.2d 384, 393 (D.C. Cir. 1988), cert. denied 488 U.S. 1012 (1989) (holding that testimony of government's expert witness on modus operandi of pimps and nature of relationship between pimps and prostitutes was relevant and not unfairly prejudicial). See generally United States v. Boney, 977 F.2d 624, 628 (D.C. Cir.1992) ("The operations of narcotics dealers repeatedly have been found to be a suitable topic for expert testimony because they are not within the common knowledge of the average juror."). Just as the average person does not generally have knowledge as to the modus operandi of drug dealers, the average person does not have any knowledge as to the inner workings of prostitution rings. As the

court noted in <u>United States v. Taylor</u>, "[b]y and large, the relationship between prostitutes and pimps is not the subject of common knowledge." 239 F.3d 994, 998 (9th Cir. 2001).  The same can be said of the relationship between prostitutes and madams, the female equivalent of a high-end pimp.

Federal Rule of Evidence 702 provides that an expert can be qualified "by knowledge, skill, experience, training, or education."  Police officers have frequently been permitted to provide expert testimony into areas of crime that would not be known to a lay jury.  Indeed, "[i]n cases involving specialized areas of criminal law, such as illegal drugs, gangs, arson prosecutions, money laundering, organized crime and forgery, law enforcement officers are often qualified as experts based solely on their general experience."  <u>United States v. Jasin</u>, 292 F. Supp. 2d 670, 687 (E.D. Pa. 2003).  <u>See</u> <u>United States v. Hankey</u>, 203 F.3d 1160, 1168 (9th Cir. 2000) (permitting law enforcement witness to provide expert testimony regarding gangs); <u>United States v. Marler</u>, 614 F.2d 47, 49 (5th Cir. 1980) (permitting law enforcement witness to provide expert testimony regarding arson); <u>United States v. Majors</u>, 196 F.3d 1206 (11th Cir. 1999) (permitting law enforcement witness to provide expert testimony regarding money laundering); <u>United States v. Locasio</u>, 6 F.3d 924, 937 (2d Cir. 1993) (permitting law enforcement witness to provide expert testimony regarding organized crime); <u>United States v. Chappell</u>, 6 F.3d 1095, 1100 (5th Cir. 1993) (permitting law enforcement witness to provide expert testimony regarding forgery).  <u>See also</u> <u>United States v. Evans</u>, 272 F.3d 1069, 1094 (8th Cir. 2001) (finding no abuse where officer testified about the operation of prostitution rings based on his education, training, and experience).

Relevant evidence is that which tends to make any material fact more or less probable.  Fed. R. Evid. 401.  A key issue in this case is whether or not the defendant knew her employees were engaging in prostitution.  Detective Haight's testimony will assist the trier of fact in, *inter alia*,

determining this issue.[4]   Detective Haight will testify to the various methods employed by prostitution rings in their attempts to operate under the guise of legitimate escort services, particularly by using post office boxes, requiring the escorts to sign employee "contracts," claiming employees were independent contractors, and sending new employees to known associates or clients.  See Declaration of Keith Haight, Section A¶1; §C ¶¶2-3.  The defendant employed each of these tactics while operating Pamela Martin and Associates.

At a minimum, the government requests the Court take this issue under advisement to see how the evidence develops.  When the Court has a better understanding of the evidence, the decision regarding the need for this expert testimony will be more clearly defined and developed.

---

[4]  The defendant herself recently made public statements regarding the manner in which her business was operated, as compared to how other prostitution rings have been run.  The defendant has further asserted that such comparisons will "considerably" assist her defense that she was purportedly unaware that her own business was a prostitution ring.  See, e.g. Eve Conant, Spitzer in Mind, the D.C. Madam Makes Her Case, Newsweek, March 15, 2008. ("Even if the Emperor's Club rates were inflated New York area prices, Palfrey says, her business 'wasn't even in the prostitution price range.  This whole scandal helps my case considerably.'") (attached hereto as Exhibit B).  Expert testimony from Detective Haight regarding, among other things, the broad spectrum of prices charged by prostitution rings, and specifically by escort services, will certainly assist the jury in resolving this key trial issue.

**C. Conclusion**

For the foregoing reasons, the United States respectfully requests that the Court deny defendant's motion to strike.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
DC Bar No. 498610

/ s / *Daniel P. Butler/Catherine K. Connelly*
Daniel P. Butler
DC  Bar No. 417178
Catherine K. Connelly
Mass.  Bar No. 649430
Assistant United States Attorneys
555 4th Street, NW
(202) 353-9431, 616-3384
Washington, D.C.  20530
Daniel.Butler@usdoj.gov
Catherine.Connelly2@usdoj.gov

# Exhibit A

## DECLARATION OF DETECTIVE KEITH R. HAIGHT

I, KEITH R. HAIGHT, declare as follows:

1.      I am a 34-year veteran with the Los Angeles Police Department ("LAPD").

2.      I have been a Detective with the LAPD for 25 years.

3.      Prior to being a Detective, I was employed as a Police Officer with the LAPD for 9 years.

4.      I have been a Police Officer with the LAPD, North Hollywood Vice Division for approximately 2 years.

5.      My duties and responsibilities as a Detective include investigating all types of general crimes, including prostitution related offenses.

6.      During the course of my career, I have been involved in approximately 2000 prostitution related investigations.  Approximately 200 of these investigations involved minor prostitutes, meaning persons under the age of 18.

7.      I have been involved in all phases of investigating prostitution related offenses including numerous undercover operations, surveillance of pimps, madams and prostitutes, investigating in-call and out-call prostitution and escort services.  I have written and caused the execution of search warrants related to prostitution offenses.  I have acted as the lead Detective in approximately 500 prostitution related investigations.  I have been involved in approximately 200 successful prosecutions of pimps and madams.

8.      During the course of these investigations, I have interviewed approximately 250 minor prostitute victims.

9.      During the course of these investigations, I have interviewed approximately 1, 000 adult

1

prostitutes.

10.    During the course of these investigations, I have interviewed or taken voluntary statements from approximately 40 pimps, and 50 madams.

11.    During the course of these investigations, I have interviewed or taken voluntary statements from approximately 500 "customers" or individuals that have purchased the services of a prostitute.

12.    I have been investigating prostitution related offenses for approximately 22 years.

13.    Based on the information I have gathered from these interviews, as well as other information I have gathered during the 22 years I have been investigating these offenses, I have learned the following specifics regarding prostitution including, but not limited to:

A.    <u>The complex and voluminous terminology of pimps, madams and prostitutes use in connection with in-call, out-call escort prostitution to explain, among other things, information regarding how the business of street prostitution is conducted. Based on my training and experience, and despite common misperceptions among average citizens, I have learned the following about street prostitution:</u>

· While pimps and madams are ultimately in control of the in-call, out-call escort prostitution business, they are rarely found at these location where the prostitutes work for long periods of time, for fear of being arrested. This also includes the phone spot (answering service) or money drop (P.O. box) where the business is also conducted.

· A pimp or madam who operate an escort service take a split of the monies obtained by the prostitute. This is known as the service fee. The normal split in Los Angeles is 60/40, where the prostitute gets 60% and the service gets 40%. The services that are of an ethnic nature (i.e. Russian, Korean, Chinese, etc.) the split tends to be 50/50. Some of these business that involve human trafficking the split is 30/70. And some services that are operated by street pimps, the

2

prostitute turns all of her money over to the pimp.

· I have investigated five gay escort services where men are sent to men, and these are
operated very similar to heterosexual escort services.

B.    The terms generally used in operating an escort service are as follows:

· **Agency,** an organization or individual that manages many prostitutes.  An agency
handles all calls, bookings, and advertising.  The agency takes a % of each fee for each session.

· **All Inclusive,** straight Sex and Oral Sex.

· **Attempts,** Trying to reach orgasm. e.g. She allowed multiple attempts: means she
allows more than one orgasm per session if the client is able and interested.

· **Bare Back,** sexual intercourse without the use of a condom.

· **BBW,** Big Beautiful Woman, euphemism for overweight

· **CBJ,** Covered Blow Job, oral sex with a condom

· **Cover,** a condom.

· **Cowgirl,** intercourse with the girl is on top.

· **Date,** can be used to describe the act of prostitution or the client.  When a prostitute is
with a client, she is said to be "with a date", "on a date", or "turning a date."

· **Deposit,** When a prostitute requires an up-front payment in advance of a session. Deposits are
usually used by providers as a screening tool to hedge against no-shows.

· **DFK,** deep French Kissing, kissing with tongue.

· **Donation,** payment to a prostitute.

· **Escort,** a woman who is paid for her companionship, some type of sex is usually
included.

· **Extra (s)** additional acts or services by a prostitute

· **FBSM,** Full Body Sensual Massage; not usually full service; expect only massage
(usually nude or topless) and handjob, but more services might be available.

3

· **Full Service or FS**, Sexual Intercourse.

· **GFE**, Girlfriend experience

· **Get comfortable**, Get naked. For security reasons, a prostitute may ask a client to "get comfortable" or "make yourself comfortable" before a session.

· **Greek**, anal sex.

· **Half n Half**, combination of oral sex and straight sexual intercourse. Half-n-half massage, customer gives and receives

· **Hand Job / HJ**, (Hand Release) Stimulation of the penis using hand and fingers, Masturbation, J.O, Jack Off, etc. 2. Undependable customer.

· **Head**, Oral sex.

· **Hobbyist**, a man who patronizes in-call/out-call prostitutes.

· **In-call**, when the customer goes to the prostitute.

· **John**, client of prostitution

· **Madam**, proprietress of an agency. Female Pimp.

· **Mish**, missionary position, Man on top during intercourse.

· **Out-call**, the prostitute goes to the customers location.

· **PSE**, Porn Star Experience

· **Session**, paid time spent with a escort.

· **TER, The Erotic Review**, a prostitute rating service that allows customers (hobbyists) of escort services and internet prostitution purveyors to compare notes on services provided by prostitutes (providers). (Others exist throughout the country)

· **Tip**, additional payment for prostitution.

· **Trick**, customer for an act of prostitution. John, Date. The act of prostitution. Turning a trick, tricking, etc.

4

· These and a multitude of other minor terms can be found on www.urbandictionary.com

C.    The dynamics that often exist between the pimp, madam and prostitutes who work in in-
call and out-call escort services and the various methods they use to recruit women and
girls into prostitution.

· Pimps and madams operating escort services tend to resort to emotional manipulation
and "sweet talk," or promises of wealth and receiving preferential calls and clients or "johns."
To fines for being late, or inappropriate attire or lingerie. Rarely do they use force, and other
degradation rituals, to maintain control over their prostitutes and to ensure that these prostitutes
continue working for them. Some will provide narcotics as a source of control.

· In many cases the pimp or madam will refer to the prostitute as an independent
contractor, and have them sign a disclaimer that no unlawful acts will transpire while working for
the service. The employee then finds out that if sex is not provided during the "date", they will
no longer receive calls from the service.

· Frequently, pimps and madams that operate escort services will send a new employee to
a friend or confidant to check out the new escort. To make sure that the customer is being taken
care of and that the escort is providing sex, and not charging excessive rates for these services.
Also, that the escorts are not giving out their own cell phone number too the clients to
circumvent the service. Return customers are a necessity for an escort service.

· Pimps and madams who operate escort services have the prostitutes who work for them
recruit others to work for the service. Many time offering additional money to those who bring
in new hires.

14.    During my tenure as a Detective, I have taught numerous courses on prostitution related
offenses. Since 1989, I have taught at the LAPD Police Academy, Vice School on how to

5

successfully investigate prostitution related offenses. This training included a discussion of prostitution and pimping and pandering investigations, human trafficking and undercover operations.

15.    Since 2000, I have taught courses on prostitution related offenses to the Law Enforcement Intelligence Unit and the Western States Vice Investigators Association. This training generally includes a discussion of the topics listed above.

16.    I have also provided in-service training to the support staff at Children of the Night; a non-profit organization based in Los Angeles, California, committed to assisting child prostitutes reconstruct their lives by providing living arrangements, education, and a support system of other prostitute victims. This training included a discussion of how to successfully interview victims of child prostitution and an explanation to the staff and victims on what to expect if they are asked to testify in court.

17.    I have testified in both federal and state court approximately 100 times in cases involving prostitution related offenses.

18.    I have been qualified as an expert in state court approximately 50 times on the issues of prostitution and "pimping" and "pandering." I have been qualified as an expert 3 times in federal court as an expert on the same topics.

19.    I have not discussed the facts, or any of the specifics of the instant investigation, with the Government.

20.    The information I have outlined in this declaration is based on my personal training and experience and is not based on any case information provided to me by the Government or any other individual.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

_____

Detective Keith R. Haight

3/18/2008

Date

7

# Exhibit B

Case 1:07-cr-00046-JR   Document 287-3   Filed 03/26/2008

# Newsweek

# Spitzer in Mind, the D.C. Madam Makes Her Case

**Eve Conant**
NEWSWEEK
Updated: 11:40 AM ET Mar 15, 2008

If there's one woman who might take some small comfort in the Eliot Spitzer sex scandal, it's Deborah Jeane Palfrey, a.k.a. the "D.C. Madam." Her trial on federal charges of prostitution-related racketeering and money laundering is set to begin in April. Palfrey's "Pamela Martin & Associates" escort service boasted some 10,000 clients, including powerful D.C. figures. Sen. David Vitter, a family-values Republican from Louisiana, admitted he was on Palfrey's customer list and apologized. Deputy Secretary of State Randall Tobias, an anti-prostitution crusader, resigned last year after admitting he was also a Palfrey client. He insisted that he received only massages, not sex.

All along, Palfrey has claimed she was running a perfectly legal "adult fantasy" service that stopped short of sex; the Feds say it was an old-fashioned call-girl ring. If she's found guilty, she could face 55 years in prison. But now, she hopes, Spitzer's fall may give her claims an unexpected credibility boost. Part of Palfrey's defense has been that call girls charge much more than no-sex escorts. Exhibit A: Spitzer, who allegedly paid $4,300 for a session with "Kristen," the Emperor's Club prostitute who met him at Washington's Mayflower Hotel. "We charged between $200 and $300," Palfrey tells NEWSWEEK. Even if the Emperor's Club rates were inflated New York area prices, Palfrey says, her business "wasn't even in the prostitution price range. This whole scandal helps my case considerably."

She can hope so, anyway. Prosecutors are trying to make their case on a provision called the Travel Act, which prohibits use of the mail and interstate travel to promote gambling, unlawful distribution of narcotics and prostitution. Like Kristen, who went by Amtrak from New York to Washington to meet Spitzer, Palfrey's D.C.-area employees allegedly crossed state lines to see clients in the District, Virginia and Maryland. Since Palfrey was based in California, prosecutors say, every phone call and payment from clients violated the law.

Meanwhile, Palfrey is already at work on, of course, a memoir. In the 100 pages she's written so far (and which she shared with NEWSWEEK), she portrays herself as a helpless victim of hypocritical "federales," "Bible thumpers" and heartless prosecutors out to conduct a "witch burning." She writes of growing up in a Pennsylvania steel town and dreaming of a better life. "Had I not left ... my life could have existed of stamping price stickers on cans of green beans at the local A&P supermarket." After failing to find "Mr. Right" or a solid career, she went to San Diego, where she was sentenced to 18 months in prison for running a prostitution ring. On her release, she moved north to Vallejo, Calif., and in 1993 opened her "little cottage industry," Pamela Martin & Associates. For 13 years, she ran her "snooze fest" of an escort service from a desk next to her washer and dryer, daily from 2 to 9, "except for holidays and snow days."

In Palfrey's telling, she was a model citizen. "I paid my taxes on time every April 15th," she writes, and says she filed tax forms for her employees with the IRS. "Empowerment was the goal," writes Palfrey. She says many of the 143 escorts who worked for her throughout the years were college graduates, and some held doctorate degrees. She urged them to save and invest. When the Feds came calling in 2006, she realized that "the government in the course of a 24 or so hour period could wipe out my entire life's work and savings. And I had to take it." The former governor of New York couldn't have put it better himself.