# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 07-046 (JR)** |
| | : | |
| **v.** | : | |
| | : | |
| **DEBORAH JEANE PALFREY,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
## FOR A JUDGMENT OF ACQUITTAL (DKT. NO. 303)

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's motion for a judgment of acquittal and her accompanying memorandum in support. Dkt. No. 303.[1] Defendant moves this Court to overturn the jury's verdict. But, her motion is without merit and should be denied. As will be discussed below, the Court must deny a motion for judgment of acquittal when, considering the evidence in the light most favorable to the Government, the evidence "is sufficient to permit a rational trier of fact to find all the essential elements of the crime beyond a reasonable doubt." United States v. Kayode, 254 F.3d 204, 212 (D.C. Cir.2001). The evidence in this case was clearly sufficient to support the verdict of the jury.[2]

### A.  Factual Background

On March 1, 2007, a federal grand jury in the District of Columbia returned an indictment

---

[1] On April 14, 2008, at the close of the government's evidence, the Court noted defendant's oral motion for judgment of acquittal. Defense counsel stated he might file something to clarify his arguments, for which the Court granted him permission

[2] On Wednesday evening of this week, April 23, 2008, at 8:32 p.m., defendant filed a Renewed Motion for Judgment of Acquittal, or, in the Alternative, for a New Trial. Dkt. No. 309. This opposition will address a number of issues raised in that subsequent defense filing and, to the extent issues are raised beyond those contained in defendant's first written motion for judgment of acquittal, new arguments will be addressed in a subsequent pleading to be filed by the government.

against defendant charging her with numerous federal violations, including RICO, interstate transportation in aid of racketeering, and conspiracy to commit money laundering, along with related forfeiture allegations. These charges relate to defendant's alleged operation of an interstate prostitution business, Pamela Martin and Associates ("PM&A), the proceeds of which were sent to defendant through the U.S. Mail.

On April 7, 2008, trial in this matter began. Prior to the case being submitted to the jury, Count Three and Racketeering Acts 2, 5, 12, and 14 of Count One were dismissed. The remaining Counts and Acts, that is, Counts One, Two, Four and Five, were sent to the jury for its consideration on April 14, 2008. On April 15, 2008, the jury returned guilty verdicts on all these counts.

On the day before the verdict, defendant filed the present motion for judgment of acquittal. The government hereby responds to that motion.

### B. Discussion

#### 1. Legal Standard

The standard for this motion is well summarized in United States v. Morrow, Crim. Action No. 04-355, 2005 WL 1389256, at *3-*4 (D.D.C. 2005), as follows:

> Rule 29(a) of the Federal Rules of Criminal Procedure provides: "After the government closes its evidence or after the close of all evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Court must deny a motion for judgment of acquittal when, considering the evidence in the light most favorable to the Government, the evidence "is sufficient to permit a rational trier of fact to find all the essential elements of the crime beyond a reasonable doubt." United States v. Kayode, 254 F.3d 204, 212 (D.C. Cir.2001); see also Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979). "In ruling on a motion for a judgment of acquittal, 'the trial court must view the evidence in the light most favorable to the Government giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." United States v. Treadwell, 760 F.2d 327, 333 (D.C. Cir.1985)

(quoting United States v. Davis, 562 F.2d 681, 683 (D.C. Cir.1977)); United States v. Sutton, 801 F.2d 1346, 1358 (D.C. Cir.1986). This stringent standard contemplates that the ultimate decision of guilt or innocence should be left to the jury, and that it is the province of the jury to credit certain testimony and reject other testimony. United States v. Davis, 763 F. Supp. 645, 648 (D.D.C.1991) ("Sentencing courts should therefore b[e] wary of rejecting a jury's assessment of witness credibility."). "When a reasonable mind might fairly have a reasonable doubt of guilt or might fairly have none, the decision is for the jury to make." United States v. Herron, 567 F.2d 510, 514 (D.C. Cir.1977) (citation omitted); see also United States v. Bethea, 442 F.2d 790, 792 (D.C. Cir.1971).

However, "where the evidence viewed in the light most favorable to the prosecution is such that 'a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime,' a motion for judgment of acquittal must be granted." United States v. Foster, 783 F.2d 1087, 1088 (D.C. Cir.1986) (quoting Bethea, 442 F.2d at 792) (emphasis in original). "[T]he trial judge should not allow the case to go to the jury if the evidence is such as to permit the jury to merely conjecture or to speculate as to defendant's guilt." Bethea, 442 F.2d at 792; see also United States v. Staten, 581 F.2d 878, 882 (D.C. Cir.1978) (the judge must not let the jury "act on what would necessarily be only surmise and conjecture, without evidence"). In its review of the record, the court is not to "indulge in fanciful speculation or bizarre reconstruction of the evidence" and – while viewing the evidence in the light most favorable to the Government – should "accord the [G]overnment the benefit of only 'legitimate inferences.'" United States v. Recognition Equip., Inc., 725 F. Supp. 587, 588 (D.D.C.1989) (quoting United States v. Singleton, 702 F.2d 1159, 1163 (D.C. Cir.1983)). "[I]n order to find a legitimate and nonspeculative inference of guilt the [G]overnment must articulate a rational basis in the evidence upon which that inference can arise." Id.

The evidence in question "need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." United States v. Maxwell, 920 F.2d 1028, 1035 (D.C. Cir.1990) (quoting United States v. Harrell, 737 F.2d 971, 979 (11th Cir.1984), cert. denied, 470 U.S. 1027, 105 S. Ct. 1392, 84 L .Ed.2d 781 (1985)). Moreover, "[t]here is no requirement of any direct evidence against the defendant; the evidence may be entirely circumstantial." United States v. Poston, 902 F.2d 90, 94 n.4 (D.C. Cir.1990) (citing United States v. Stone, 748 F.2d 361, 362 (6th Cir.1984); United States v. Simmons, 663 F.2d 107, 108 (D.C. Cir.1979)). "No distinction is made between direct and circumstantial evidence in evaluating the sufficiency of evidence supporting a guilty verdict," Maxwell, 920 F.2d at 1035, "since it is 'the traditional province of the jury to assess the significance of circumstantial evidence, and to determine whether it eliminates all reasonable doubt.'" Treadwell, 760 F.2d at 333 (quoting United States v. Staten, 581 F.2d 878, 883 (D.C. Cir.1978)). "Similarly, the government, when using

circumstantial evidence, need not negate all possible inferences of innocence that may flow therefrom." Id. (citation omitted). As such, "[i]t is only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the judge may properly take the case from the jury." Davis, 562 F.2d at 683 (citations omitted); see also United States v. Durant, 648 F.2d 747, 750 (D.C. Cir.1981) (same). "If the evidence is such that a reasonable man may have reasonable doubt as to the defendant's guilt, the case should go to the jury." Bethea, 442 F.2d at 792.

See also United States v. Cook, 526 F. Supp. 2d 10, 18 (D.D.C. 2007); United States v. Johnson, Crim. Action No. 03-488, 2007 WL 666566, at *2 (D.D.C. 2007). Plainly, here, the evidence of defendant's guilt is more than adequate.

In her accompanying memorandum in support of her motion, defendant makes three arguments. These will be addressed below in the order in which they are raised by defendant.[3]

**2.    Defendant Acted with Intent to Promote, Manage, Establish, Carry on, or to Facilitate the Promotion, Management, Establishment, or Carrying on of Unlawful Activity**

Defendant's first argument is that the government failed to prove that she acted with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of unlawful activity. Def.'s Mem. at 2. Because such an intent is an element of a Travel Act violation, and because the Travel Act is charged or incorporated in all four counts of conviction, defendant maintains that the proof as to all four counts is insufficient. Id. at 2-3.

But, in her memorandum defendant merely restates the unsuccessful arguments that her counsel made to the jury. The direct and circumstantial evidence, which defendant does not address,

---

[3] The government obtained transcripts for the witnesses that appeared at trial on April 8-10, 2008. The page number in the transcripts are sequential, starting on April 8, 2008, and continuing through April 10, 2008. The transcript citations in this opposition will be to "Tr." and the respective page number. The references to clients and escorts in this pleading who testified at trial will simply reference initials for their first and last names.

4

refutes defendant's argument that she did not intend to promote and to facilitate promotion of prostitution activity when she directed the scheduling of appointments. Using screeners or testers, defendant ensured that the women she employed would prove the full service her repeat-customers demanded for the fees that she knew were considerable higher than the fees "social-only" escort services could command.[4]  Women who did not agree to provide sex to customers in return for money did not remain her employees. Evidence established that the women defendant employed were counseled by defendant about the "protection" they were required to purchase, themselves, before appointments, and further counseled about techniques they might employ to avoid detection by law enforcement during appointments. Evidence also established that defendant's employees were directed, by defendant, to call "Julia" after each appointment to announce that they had finished with one paying customer and were available to handle another "event."

Defendant contends that, in that escort services are not illegal *per se*, her intention to promote PM&A was not akin to her promoting an unlawful activity. Def.'s Mem. at 2. What may be true of some escort services, however, is not the relevant issue. The evidence in this case showed that the primary purpose of PM&A was prostitution,[5] that the escorts whom defendant employed engaged

---

[4]  See, e.g., Ex. NEW-00055 (defendant's newsletter, copies of which she sent to the escorts, May 22, 1994 – "SOCIAL ESCORTS . . . are booked out at approximately $40-50 an hour, usually for functions, banquets, parties and so forth. Conversely, adult service or fantasy escorts command a substantially [sic] greater fee, usually $200 an hour; this, of course, because of the risky and sexual nature of these appointments. . . . . Obviously, the more liberal the booking or act, the more $ one makes. Therefore, if (any)one thinks that fantasy prices can ever be charged for *purely social services* (as a new hire recently believed . . . all the writer can say, is that the person(s) is a *damned fool!* This past weekend (Memorial weekend), this new escort (no longer amongst us) thought she could go 'there', collect the $200 and 'just talk' . . . *her mere presence being justification enough for the big bucks!!!* WRONG!!!")  (emphasis in original).

[5]  See, e.g., Tr. at 5 (escort SK – PM&A "was an escort business, a prostitution service" involving "sex for money").

in sex when that is what the client wanted,[6] which was most of the times, and that defendant

promoted both PM&A and as the underlying prostitution activity, both in her conversations with

escorts and "testers," and through her efforts in managing PM&A.

Defendant also contends that no witness ever testified that defendant explicitly directed them

to engage in illegal sexual conduct. Def.'s Mem. at 2. To the contrary, witnesses testified that

defendant actually had some conversations that were explicit with escorts and clients.[7]  Where

---

[6]  See, e.g., Tr. at 17, 20, 43, 44 (escort SK had 80 appointments in which she had sex for money in 79); at 56 (escort DR had over 100 appointments, 90% of the time she engaged in sex with the client); at 94-95, 106, 107 (client CS had approximately 50 appointments for which he had sex on all but five occasions; on all calls to defendant, he had an expectation of sex; kept using PM&A because "on most of the occasions there were – sexual activity did occur"); at 157, 159-60, 179 (client PH had approximately more than 100 appointments; he only did not have sex on two occasions. For one of these, the prospective escort couldn't go through with the sex act and PH told defendant, who responded "Okay, fine." If PH did not have sex, he did not have to pay.); at 210 (escort TH had intercourse with every client in her approximate 20 appointments while working for PM&A); at 242-44 (escort RR had more than 100 appointments, during which she had intercourse or oral sex on all occasions except one or two times); at 286 (escort CW had sex with a client "because I knew I was being paid for a certain service"); at 301, 306 (escort KS had intercourse and/or oral sex on 80% of appointments during the 15-20 appointments while she worked for PM&A; appointments she did not have sex were ones in which she did not feel comfortable or there were hygiene issues, at which time she would just leave); at 343-44, 345, 347 (escort DB said it was client's decision whether to have sex at appointment; "I was there to make the client happy"; after appointment, defendant usually asked DB if client was happy); at 386 (escort AK had sex approximately 98% of the time on the approximate 50 appointments she had while working for PM&A); at 400 (client DL had about 100 appointments and had sex except when he did not find the woman attractive); at 425 (escort CM worked for PM&A for 2-3 months, had intercourse or oral sex with clients in 90-95% of the appointments; exceptions were either physical reason, such as a medical issue, on the man's side or the man did not want to have sex); at 472-73 (escort AH had about 40 appointments while employed with PM&A and had intercourse or oral sex at every one); and at 495, 503 (escort RD had sex most of the time at appointments for the approximate 6-7 months she worked for PM&A; when she did not have sex, that was the man's decision).

[7]  See, e.g., Tr. at 117, 147-48 (escort AD told defendant a client was mentally slow; defendant, who was angry about something, said "[i]f I could come over there and do these appointments and f**k these people, I would do it myself, but I'm in California"); at 245-46 (escort RR told defendant client threw her out because she took a shower during the time they were engaging in sex and the client took offense at that; defendant said if he continued to act like that she

6

defendant did not directly express her intention to provide her clients with "full service," she did so

implicitly through her conversations with the escorts and clients as well as the mechanism by which

she initiated their employment during the test interview.[8]  Defendant made the nature of the business

would not schedule appointments with him); at 385, 394 (defendant told escort AK to do what the client wanted, after appointment defendant asked AK how it went, AK told defendant it went well and that she gave him oral sex, defendant then asked AK if she was ready for her next appointment).

[8] See, e.g., Tr. at 17, 43, 44 (escort SK – "Julia told me that the [initial] appointment [during which she engaged in intercourse] was something that she had to see if I was going to fit into this business, if I understood what was expected of me"; based on the test appointment, "[m]y understanding was, I wasn't going to be hired unless I was having sex with these men"; "we know why we're there"); at 100, 103-04, 106 (defendant asked client CS to interview new escorts; the majority of these interviews involved sex; he saw about 12 new women and reported back to defendant if the potential new escort was "satisfactory"); at 165, 186 (defendant called client PH, who acted as a tester of prospective escorts, after the initial interview to ask how the woman did. Defendant asked questions like "was she enthusiastic, was she passionate, or was she a dead fish"); at 202-03 (escort TH had intercourse at test interview and was then hired by defendant); at 236-37 (at test interview, client asked escort RR for oral sex almost immediately upon her arrival at his hotel and RR complied; defendant told RR she would not be paid for this appointment and she was not paid; RR then hired by defendant); at 298-99, 314 (escort KS had intercourse with client at test interview because that "was what I was there to do"; KS had conversation with defendant that night thereafter in which defendant let KS know things went well and to call defendant to let her know what days she was available for appointments; didn't talk explicitly about what did on appointments because "I guess if you don't talk about it, you didn't do it"); at 319 (escort MJ had intercourse with client at test interview, after which she had a conversation with defendant and then started working for PM&A); at 342 (client at test interview, while undressing potential escort DB, told her "[t]his is what is expected of Julia's girls"; client wanted DB to perform oral sex, but she refused because he had genital warts); at 359-60  (defendant told DB to use client PH for test interviews when DB was running PM&A; understood PM&A to be full service, that is, escorts would have sex with clients); at 419-20 (defendant told potential escort CM that she would not be paid for test interview because that was defendant's "screening mechanism" and "that if all went well then she would put me into the schedule"; at the test interview she had intercourse with the client; in subsequent call with defendant, defendant indicated she received positive feedback and hired CM); at 466, 469-70 (defendant told then-potential escort AH that business was not just having dinner with men, that she would meet with one of defendant's regular clients and that "it would be a baptism by fire, an appointment basically without pay"); at 490 (defendant asked then-potential escort RD regarding meeting with clients "[y]ou know you're not going there just to chat, Right? Yes or no is fine."; RD responded yes); at 491 (defendant told RD initial meeting with a client would be a test run, that she needed to be more aggressive, defendant went to the appointment and engaged in intercourse with the client); and Ex. NEW-173 (9/11/94 – "Due to the geographic distance between the interviewer

clear by, among other things, her discussion with the escorts about sexually transmitted diseases (STD);[9] defendants discussion with escorts and clients about the use of condoms or "protection";[10] defendant's discussions with the escorts about working through their menstrual periods;[11] defendant's referring to PM&A as a "full service" agency to escorts and clients, which they

---

and the applicants these days, Julia is relying heavily upon the opinion(s) of several, different *'old clients'* . . . . She also reads very well *'between the lines'* when clients comment upon the girls.") (italics in original).

[9] See, e.g., Tr. at 26 (escort SK – talked with defendant about an STD SK believed she obtained from a PM&A client); at 116-17 (escort AD told defendant that a client obviously had an STD, that she would not have sex with him, and that she did not want to see him again. Defendant responded "okay" and said the client just returned from Brazil. AD was not paid for the appointment); and at 342-43 (following test interview, then-potential escort DB told defendant client had genital warts; defendant told DB that "[w]e don't discuss things like that over the phone because we never know who is listening").

[10] See, e.g., Tr. at 26-27, 45 (escort SK); at 58-59 (escort DR complained to defendant about a client who didn't want to use a condom during sex, to which defendant responded "[w]e don't say that word on the phone. We call them 'Cs.'"; defendant told DR "protection" was left to the discretion of the escort); at 118 (defendant told escort AD to "use protection"); at 163-64 (in conversations between defendant and client PH, on a recurring basis the word "protection" was used); at 240 (defendant told escort RR she had to bring condoms to the appointment); at 328 (defendant told escort MJ that it was her responsibility and expense to provide her own "protection," which MJ interpreted to mean condoms); at 438 (escort CM told defendant that test interview client did not want to use a condom, asked defendant what she should do if a client refused to use a condom; defendant responded "'I'm not going to have that conversation' and steered the conversation in a different direction"); and at 492 (escort RD called defendant and told her client at test interview tried to remove his condom; defendant responded with something like "Don't talk about such things on this line." Defendant then told RD she could start working for defendant).

[11] See, e.g., Tr. at 59 (escort DR – defendant "suggested I put an OB [tampon] in and keep working"); at 118 (escort AD told defendant she didn't want to work when she was having her period; defendant "did not like it"); at 246-47 (escort RR); at 350 (defendant told escort DB that "if the period was light enough, then it would not affect what we needed to do"); at 427-28 (defendant told escort CM, who wasn't going to work because of her menstrual period, "to get one of those little OB tampons and get creative"); and at 496 (escort RD told defendant she could not work because of her menstrual period; defendant then called RD on a different line and told her "[o]kay, you need to just go get an OB tampon and go anyway.").

understood to mean sex was involved;[12] defendant's telling escorts they could leave the appointment when the "event" or "act" was done, rather than wait the full 90 minutes;[13] and defendant's instructions to escorts to check identification of new clients.[14]  Despite defendant's contention, sex was not "purely incidental to her business structure[,]" Def.'s Mem at 3, it was the primary purpose of her business and the reason men calling an escort service would pay approximately $250 for the 90 minutes, or less, to complete "an event" with a woman whom defendant employed.  Furthermore, as some former employees of defendant testified, when they did not have sex, defendant berated them and/or terminated their employment.[15]  Finally, the newsletters defendant wrote and sent to the

---

[12]  See, e.g., Tr. at 47 (escort DR); at 155, 180 (client PH); and at 234 (escort RR).

[13]  See, e.g., Tr. at 125 (after sex with client, escort AD would leave and call defendant; not required to stay full 90 minutes); at 240 (defendant told escort RR "[t]he client is not paying for your time, they're paying for the event."); at 434 (escort CM testified that defendant "was very specific that an appointment covered 90 minutes or, quote, unquote, 'a single act.'"; CM would leave if the sex had concluded and then call defendant); and Ex. NEW-125 (Oct. 30, 1994 – "It needs to be clarified once and for all, *that the client is paying for the 'activity' conducted within the one and one half hour period, not for the 90 minutes itself!!!*) (emphasis in original).

[14]  See, e.g., Tr. at 57 (escort DR); at 240-41 (defendant told escort RR to check identification of new clients to make sure they were not police or investigators); at 311, 314 (defendant told escort KS to check identifications to see if client was law enforcement); at 328-29 (defendant told escort MJ to be careful, and that if a client undressed, he could not be a police officer); at 361 (defendant told escort DB to check client's identification; "police always like to set up stings"); at 428-29 (defendant told escort CM to check client's identifications "to make sure it wasn't a law enforcement officer"); and Ex. NEW-180 ("an escort should ask a client, upon meeting him, if he is either a *sworn* police officer *or* an informant working with a law enforcement agency (he is supposed to tell your if he is)") (emphasis in original).

[15]  See Tr. at 189, 194-96 (escort FM, whom defendant recruited to an alleged "social network," complained to defendant that a client asked her about oral sex and she was not paid as a result of leaving after that comment; defendant was upset with FM, told FM the clients hated her, said she did not want to see FM again, called FM a nitwit and terminated her employment); at 381, 383-85 (defendant called escort AK, was furious with her after appointments in which she did not have sex, told her clients unhappy with her, told AK to do what the man asked her to do, next appointment she did, client asked for oral sex, AK complied pursuant to defendant's prior

escorts, as well as documents found in her house in California at the time of the search, made clear

the illegal nature of the business.  In those documents, defendant discussed, among other things,

potential police investigations and how to avoid them.[16]  Other comments by defendant also made

clear that defendant intended and understood that she was providing sex to men for the greater fees,

and repeat business, that providing sex brought to PM&A.[17]

 The above-described evidence clearly showed defendant's knowledge of unlawful activity

and her intent to promote, manage, establish, carry on, or facilitate the promotion, management,

_____

instructions).

 [16]  See, e.g., Tr. at 21-22 (escort SK – newsletters "outlined some of the hints for not getting busted"); at 428-29 (escort CM – defendant sent out newsletters to "explain her ideas about how to screen for law enforcement officers"); Ex. NEW-97 (Jan. - March 2000 – "police" among "the things being looked for at this stage of the employment process by management"; "This initial call acts to eliminate these and many more unwanted potential nightmares from the onset"); Ex. NEW-114 (Dec. 1996 – "No legal unpleasantries occurred during the course of the entire year . . . .  Again, the only jurisdiction, which Mgt. firmly believes gives a *'flying fig'* in this regard, is the charming city of Alexandria, VA.  Needless to say, we continue not to service this area..") (italics in original); Ex. NEW-121 (April-June 1995 – "One never quite knows where evil, i.e. the vice squad, is lurking in this business.  . . . .  Don't go down without a fight."); Ex. NEW-140 (May 15, 1994 – "Those bad boys are at it again. . . .  Vice/Narcotics, City of Alexandria, Badge . . . was/is running a *sting operation,* his annual spring clean-up, out of the Oakwood Apartments") (italics in original); Ex. SWD-157, -158, and -159 (all referencing undercover sting operations in Alexandria, Virginia); and Ex. SWD-148 (second page) (referencing escort who was caught up in Baltimore, Maryland sting).

 [17]  See, e.g., Tr. at 69-70 (escort DR – defendant told her security deposit was for legal fees if she was arrested); at 354 (defendant told escort DB to always "be cautious on the phone because you never know who's listening"); at 355 (defendant told DB to move out of the area when she ran PM&A so she could not be extradited back to the area for prosecution); at 377 (escort AK asked defendant if PM&A was a sex job; defendant asked AK if she was working with the police.  When AK said she was not, defendant told her to always ask the client that question first); at 389-90 (when AK wanted to quit thereafter, defendant threatened to expose the fact that AK worked for an escort service); at 471 (defendant told escort AH that she would not be paid for the first appointment as "proof that I wasn't law enforcement or a reporter or trying to rip her off"); and Ex. NEW-167 ("The extra $10 will be utilized on a variety of fronts, legally, including legal representation for anyone in need of such assistance").

establishment, or carrying on, of the unlawful activity.  This is especially so under the standard

applicable to this type of motion, as is discussed above.

      **3.**      **The Evidence is Sufficient for Racketeering Act Three of the RICO Count**

Defendant contends that racketeering act three should be stricken from Count One, the RICO

count, of the indictment because of limited contact with the District of Columbia.[18] Def.'s Mem. at

3-4.  Defendant's argument fails, as is discussed below, both because there is sufficient connection

to the District of Columbia and because of how RICO venue operates.

The relevant portion of the indictment charges that defendant, aided and abetted by Individual

#3 (escort SK), in the District of Columbia and elsewhere, did use the mail and a facility in interstate

commerce from the District of Columbia to the State of California.  Dkt. No. 2 at 6.  SK, who lived

in Virginia, Tr. at 4, 21, testified at trial that she called a telephone number with a 202 area code, that

is, the area code for the District of Columbia.  Tr. at 11, 31-32.  Moreover, as the Court heard at trial,

the local numbers were remote call-forwarded to defendant's phone in California.[19]  Throughout the

operation of the enterprise, defendant herself was using three local numbers, including the 202 area

code number, for her business that were remote call forwarded to her phone numbers in California,

so she was using an interstate facility with escort SK and other escorts throughout the time period

---

[18]  In the first full paragraph on page 4 of defendant's memorandum in support, she makes the argument that "[a]s no reasonable juror could find guilt beyond a reasonable doubt for acts two, three, five, twelve and fourteen of Count One of the Indictment, the Court should strike those acts." Dkt. No. 303.  Racketeering Act 3 is discussed herein.  As to acts 2, 5, 12, and 14, those were removed from the jury's consideration when the case was submitted to it.  It is the government's understanding that these racketeering act have already been stricken.  If that understanding is incorrect, the government moves to dismiss them.

[19]  Tr. at 355 (escort DB testified how the phone system worked while she ran PM&A in 2002); and at 548 (Inspector Couvillon testified how local calls were remote call-forwarded to defendant's phone lines in California).

set forth in racketeering act 3.[20]  All of this involves use of an interstate facility through the District

of Columbia to California supporting racketeering act 3.

But, more importantly, whether SK's racketeering act occurred in the District of Columbia

is irrelevant.  The RICO statute does not contain a specific provision governing venue in criminal

cases; instead, venue for RICO prosecutions is governed by 18 U.S.C. 3237(a).  Section 3237(a)

permits prosecutions of a continuing offense "in any district in which such offense was begun,

continued or completed."  See, e.g., United States v. Persico, 621 F. Supp. 842, 857-58 (S.D.N.Y.

1985); United States v. Castellano, 610 F. Supp. 1359, 1388 (S.D.N.Y. 1985) (venue proper in any

district where offense was begun, continued or completed, even thought virtually every racketeering

act occurred in another district).  Because the initial call to defendant through the 202 area code

number is how SK began her employment with PM&A, during which employment she had sex for

money with approximately 79 of 80 clients, Tr. at 20, it is sufficient use of the interstate facility.

Moreover, SK used an interstate facility, the telephone, to make these appointments and to tell

defendant when the appointment was completed and to see if there was another appointment for her

that night.  Tr. at 18, 43.  These appointments occurred in Maryland, Virginia and the District of

Columbia.  Tr. at 18.  Taking this evidence in the light most favorable to the government, a rational

trier of fact clearly could find that some of these interstate calls were made, especially the initial one

with defendant and the ones following the subsequent appointments in the District of Columbia,

---

[20]  The three numbers were for area codes 202, 301 and 410.  See Tr. at 521-23 (Agent Burrus
identified (202) 737-4300, (301) 231-5800 and (410) 244-1818).  Defendant did not have a local
number in the area code where escort SK lived, that is, northern Virginia, area code 703.  SK
testified she learned about PM&A from the City Paper or the Yellow Pages.  At about the time SK
began working for PM&A, that is, August of 2000, the Yellow Pages for the District of Columbia
only listed the number for the 202 area code, that is, (202) 737-4200, and no other numbers.  See
Def.'s Ex. 9, last page (Yellow Pages, May 1999 - April 2000).

from or through the District of Columbia to California. See Pepe v. United States, 747 F.2d 632, 661 n. 44 (11th Cir. 1984) ("[f]or purposes of the Travel Act, venue lies in any district in which the travel occurred, including the district in which it originated").

But, even if none of SK's unlawful activities had touched on D.C., racketeering act 3 of Count One of the indictment charges activity "in the District of Columbia and elsewhere[.]" Dkt. No. 2 at 5. Venue for a RICO offense lies in any district in which the RICO enterprise conducted business and the RICO charge may include racketeering acts that occurred in districts other the district of venue. See, e.g., United States v. Pepe, 747 F.2d 632, 660 n.44 (11th Cir. 1984); United States v. Persico, 621 F. Supp. at 858. Although the money orders SK sent to defendant in California were sent from Virginia, Tr. at 21, 23, defendant was clearly on notice that some of the actions supporting this racketeering act occurred in the District of Columbia and elsewhere and venue is not at issue.

Furthermore, even assuming solely for the sake of argument that the mailings were the only use of an interstate facility for this racketeering act, those would be sufficient for proof of this act because those mailings supported the Travel Act violation alleged in the act. See, e.g., United States v. Russo, 796 F.2d 1443, 1457 (11th Cir. 1986). In Russo, a defendant alleged a variance in the proof in a drug case of a RICO predicate act charging a violation of the Travel Act, that is, "[h]e contend[ed] that the evidence only showed that he transported marijuana from Chicago to Georgia, rather than from Chicago to Tampa and from Chicago to Pittsburgh as alleged in the indictment." Id. The court found that "[w]e view this as a failure of proof rather than a variance. The government did not prove a different incident from the one that it alleged, but rather it failed to prove all that it alleged." Id. It further held that "[t]he government need not prove every fact charged in the

13

indictment as long as it proves enough of the facts charged therein to satisfy the elements of the crime. . . .  Proof of transportation of marijuana from Chicago to Georgia was more than sufficient to satisfy the elements of 18 U.S.C. § 1952 and constitute a predicate act under 18 U.S.C. §§ 1961(1)(B)."  Id. (internal quotation marks and citations omitted).  Similarly, the mailings in this case from Virginia to California were sufficient to satisfy the "travel" requirement for the Travel Act violation that is charged in racketeering act 3.

Accordingly, for all these reasons, defendant's motion to strike racketeering act 3 of Count One is without merit and should be denied.

### 4.    The Evidence is Sufficient for Count Five of the Indictment

Defendant contends that Count Five of the Indictment should be struck because, she asserts, the government has not adequately shown that she (1) conspired with others to violate 18 U.S.C. § 1956, or (2) conducted a financial transaction with the intent to promote unlawful activity separate from the Travel Act violation.  Def.s Mem. at 4-7.  Defendant's arguments here also fail, both factually and under applicable money laundering principles.

### a.    There is sufficient evidence of a conspiracy to violate 18 U.S.C. § 1956

Defendant contends, without citing any case authority or factual support, that, although the government may have proven a conspiracy to violate the Travel Act, it did not prove a money laundering conspiracy.  Def.'s Mem. at 4-5.  She bases her argument on her contention that she "did not participate in the transfer of the proceeds of unlawful activity from Washington, D.C., to California[.]"  Id. at 5.

To the contrary, all of the female escorts involved in prostitution testified that defendant directed them to take the cash they received from their appointments, most of which involved

prostitution activity, and convert it into money orders to send to defendant in California.[21]  In other words, during the duration of the enterprise, defendant made each employee agree to accept cash, agree to convert part of the cash proceeds into money orders, and agree to mail money orders to the owner/operator's P.O. Box.  This was the mechanism by which defendant would collect her "share" for the services she was providing to her employees – including her agreement to operate the phones, schedule appointments, and advertise the company, PM&A.  Defendant crafted the money laundering agreement and maintained it, unchanged, for the duration of her business.

Defendant also suggests that, agreement aside, she cannot be convicted of participating in a money laundering conspiracy because she stayed in California and thereby, she maintains, did not actually participate in the transfer of proceeds.  But, defendant directed that acts be done, and these actions were done so that defendant could promote, manage, establish, and carry, and facilitate the promotion, management, establishment, and carrying on of the activity that violated the Travel Act.  In other words, even if it were necessary to prove that defendant engaged in an overt act as part of her money laundering conspiracy – Section 1956(h) has no such requirement, see footnote 23, infra – defendant's presence at the Post Office was not necessary for her to be found guilty of "conducting" the financial transactions.  See, e.g., United States v. Prince, 214 F.3d 740, 748 (6th Cir. 2000) (defendant conducts transaction when he directs third party to withdraw cash from a bank, or to send him a check); United States v. Sneed, 63 F.3d 381, 389 (5th Cir. 1995), cert. denied, 516 U.S. 1048 (1996) (defendant conducted transaction where he asked associate to open a bank account and

---

[21]  See, e.g., Tr. at 20-21 (SK); at 53 (DR); at 114 (AD); at 205-06 (TH); at 238 (RR); at 286-87 (CW); at 302 (KS); at 322 (MJ); at 348-39 (DB); at 386-87 (AK); at 421, 423 (CM – defendant told CM to keep money order under $750 or $800 "to avoid any kind of red flags"); at 473-74 (AH); and at 497-98 (RD).

associate deposited checks from victims and wired proceeds to defendant's personal account). Moreover, once defendant received the money orders in California, she engaged in additional activities that confirmed her role in promoting and managing the unlawful activity with her ill-gotten gains – she paid the ongoing operating expenses with the proceeds she received. Accordingly, there is sufficient evidence that defendant participated in a money laundering conspiracy.

> **b.    There is sufficient evidence that defendant conducted financial transactions with the intent to promote, manage, establish, and carry on, and facilitate the promotion, management, establishment, and carrying on, of unlawful activity after the Travel Act violations**

Defendant also claims that the financial transactions were part of the Travel Act violations, and not separate offenses that would support a money laundering offense. Def.'s Mem. at 5-7. She primarily cites a Fourth Circuit case for her "merger" proposition. Id. at 5. As shown below, however, the payments prostitutes received were proceeds of a specified unlawful activity before they were used in unlawful financial transactions. There is no merger here.

In this case, Travel Act violations were set in motion through each initial interstate telephone call defendant made to her employees to set up their appointments (use of interstate facility, intending to promote, manage, etc.). During those appointments, employees were paid for sex, that is, prostitution that was illegal under state or District of Columbia laws. Thereafter, each employee used a telephone to call back to defendant to report on her status, that is, that she had completed one appointment with a client and was available for another.[22]  In each such case, the follow-up calls

---

[22]  See, e.g., Tr. at 356 (escort DB, who ran PM&A for some time in 2002, testified that "[t]he girls always checked in at the beginning of their shift, and checked out at the end of their shift. They were required to call as soon as they arrived in the person's hotel room or in their home . . . . And then, when they were done, or at the end of 90 minutes, they would leave and then call me as soon as they had left the appointment."); at 43 (escort SK testified that normally "I called to let her know the appointment was completed, and if there was another call waiting").

constituted a subsequent act to promote the unlawful prostitution activity – meaning that each time the escort drove away from her prostitution appointment with payment in hand, that payment, typically cash, constituted proceeds of a completed "specified unlawful activity." Thereafter, each time the escorts used the cash they accumulated to purchase money orders that they sent by Express Mail, per defendant's instructions, those purchases and mailings constituted separate money laundering transactions. In a recent Fourth Circuit opinion, Unites States v. Singh, 518 F.3d 236, 247 (4th Cir. 2008), the Court found that prostitutes' receipt of payment from customers completed prostitution transaction that formed basis for Mann Act prosecution, such that prostitutes' payment of motel room charge to the defendant motel operators after receiving payment from their first customer of day could serve as criminally derived proceeds of already completed offense, a required element for promotion of money laundering conviction. The Court found no merger problem even though, unlike here, the specified unlawful activity was not completed before the prohibited financial transaction occurred. The Court in Singh decided that "the key inquiry in not whether the specified unlawful activity was completed prior to the alleged money laundering transaction, but whether the specified unlawful activity generated proceeds prior to the money laundering, and whether the money laundering actually involved those criminally derived proceeds." Id. at n.16 (citation and internal quotation marks omitted). Clearly under that analysis, the cash proceeds that were converted into money orders by the escorts at the direction of defendant could support the money laundering charge, as separate from the Travel Act violations even had the money laundering transactions occurred before completion of the Trave Act violations.[23] Moreover, the financial transactions were done to

---

[23] The conspiracy charge under 18 U.S.C. § 1956(h), consistent with the Court instructions to the jury at trial, does not require proof of an overt act. Whittfield v. United States, 543 U.S. 209, 211 (2005); United States v. Huber, 404 F.3d 1047, 1056 (8th Cir. 2005). As the jury instruction told

promote, manage, carry on., etc., the Travel Act violations.  United States v. Alerre, 430 F.3d 681, 695 (4th Cir. 2005), cert. denied, 547 U.S. 1113 (2006) (distributing fraud proceeds to co-defendants and other employees as compensation for their participation in a health care fraud scheme promotes the scheme); United States v. Rivera, 295 F.3d 461, 468 (5th Cir. 2002) (giving confederate his 50 percent share of fraud proceeds promotes the offense); United States v. Coscarelli, 105 F.3d 984, 990 (5th Cir. 1997), aff'd en banc, 149 F.3d 342 (5th Cir. 1998) (using proceeds of telemarketing fraud to pay coconspirators and overhead expenses promotes the scheme); United States v. Wilson, 249 F.3d 366, 378-79 (5th Cir. 2001) (payments compensating coconspirator so he would continue to assist in carrying out scheme promotes the scheme; following Coscarelli); United States v. Baez, 87 F.3d 805, 810-11 (6th Cir. 1996) (sending a third party from New Jersey to Ohio to pick up drug proceeds and deliver them to another state); In re Restraint of Bowman Gaskins Financial Group Accounts, 345 F. Supp.2d 613, 624 (E.D. Va. 2004) (using fraud proceeds to pay confederates for their role in the scheme)  Furthermore, the defendant's subsequent financial transactions in which she plowed funds from those sent to her by the escorts back into the operation of PM&A,[24] also financial transactions related to promotion and management of the unlawful activity, prove the

---

the jury, it only requires an agreement to violate the money laundering statute, which agreement defendant knowingly joined.  Nevertheless, there was extensive proof that escorts who had engage in prostitution, with defendant's knowledge and agreement, conducted numerous financial transactions, converting cash from specified unlawful activity, the Travel Act violations, to money orders and sending those through the U.S. mail to pay defendant for her several roles in continuing to operate the business, scheduling appointments, keeping the phones operational, and advertising the business.

[24] See, e.g., Tr. at 353 (when escort DB ran PM&A, she would send a portion of the money sent in by the escorts to defendant to pay the bills for PM&A); at 520-29 (Agent Burrus testified as to and identified exhibits showing the funds defendants used from the proceeds sent to her to promote, manage, and carry on further operations of PM&A).

requisite intent.  They were not merely to maintain defendant's lifestyle, as suggested by defendant, see Def.'s Mem. at 6, but with the intent to maintain the operation of the RICO enterprise, PM&A, from which the illegal funds were generated.[25]  See, e.g., United States v. Grasso, 381 F.3d 160, 168-69 (3d Cir. 2004) (reinvesting proceeds of fraudulent scheme to cover advertising, printing, and mailing expenses was promotion money laundering), cert. granted and judgment vacated 544 U.S. 945 (2005) (remanded for consideration in light of Booker decision); United States v. Parker, 364 F.3d 934, 949 (8th Cir. 2004) (paying expenses of a business that are intimately connected with fraud scheme); United States v. Evans, 272 F.3d 1069, 1092 (8th Cir. 2001) (using prostitution proceeds to buy cars for use in escort service promoted scheme); United States v. Johnson, 297 F.3d 845, 868-69 (9th Cir. 2002) (using proceeds of telemarketing fraud to keep lights on and phones working promotes scheme).

Defendant's request to dismiss the money laundering conspiracy charge lacks legal support and is refuted by the evidence.  Her request should be denied.

---

[25] Even defendant admits that she used funds from her accounts to pay the business expenses of PM&A, including Yellow Page advertising and telephone bills.  Def.'s Mem. at 6.

## C.  **CONCLUSION**

For the foregoing reasons, the government respectfully submits that defendant's motion for

a judgment of acquittal is without merit and should be denied.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
DC Bar No. 498610

/ s /    *Daniel P. Butler/Catherine K. Connelly*
_____
Daniel P. Butler
DC  Bar No. 417178
Catherine K. Connelly
Mass.  Bar No. 649430
Assistant United States Attorneys
555 4th Street, N.W.
(202) 353-9431, 616-3384
Washington, D.C.  20530
Daniel.Butler@usdoj.gov
Catherine.Connelly2@usdoj.gov